| | |
|---|---|
| DISTRICT COURT, FREMONT COUNTY, COLORADO<br>136 Justice Center Rd<br>Canon City, CO 81212<br>(719) 269-0100 | DATE FILED: April 8, 2022 12:29 PM<br>CASE NUMBER: 2022CR47 |
| **Plaintiff**: The People of the State of Colorado,<br><br>v.<br><br>**Defendant**: Barry Lee Morphew. | ▲ **COURT USE ONLY** ▲<br><br>**Case No.**: 2022CR47<br><br>**Div.**: 1 |
| **ORDER RE: [D-17] DEFENDANT'S RENEWED MOTION FOR DISCOVERY AND CONTEMPT SANCTIONS AND FORTHWITH HEARING; [D-17A] SUPPLEMENT; [D-17B] SUPPLEMENT; [D-17C] SUPPLEMENT; AND [D-17D] SUPPLEMENT.** ||

**THIS MATTER** comes before the Court on Defendant's [D-17] Renewed Motion for Discovery and Contempt Sanctions and Forthwith Hearing ("[D-17]") filed on August 2, 2021 along with Exhibits 1-7. The People filed its Response to [D-17] on August 3, 2021 and a supplemental response on November 5, 2021 ("Responses") together with Exhibits 1-4.

Defendant filed five supplements to [D-17].[1] Defendant's [D-17a] Supplement was filed on August 3, 2021 accompanied by Exhibits A-C and the People filed its Response to [D-17a] on November 6, 2021. Defendant's [D-17b] Supplement was filed on August 4, 2021 along with Exhibit A and the People filed its Response to [D-17b] on November 6, 2021. Defendant filed his [D-17c] Supplement on February 9, 2022 together with Exhibits A-C; the People filed its Response to [D-17c] on February 23, 2022; and Defendant filed his Reply in Support of [D-17c] on February 24, 2022 accompanied by Exhibit 1. On March 2, 2022, Defendant filed his [D-17d] Supplement. The People filed its Response to [D-17d] on March 10, 2022. Defendant filed his Reply in Support of [D-17d] on March 13, 2022 along with an Affidavit. Additionally, the People filed a Notice of Citation to Cases concerning Discovery Violations ("Notice") on February 2, 2022 and Defendant filed his Response to the Notice on February 9, 2022.

The Court heard testimony and argument from the parties over multiple days of hearings. Chief Judge Murphy heard testimony and argument on [D-17] on August 6, 2021 and November 9, 2021 and continued the remainder of the Hearing to December 14, 2021. On December 14, 2021, Judge Murphy was presented with a motion to disqualify himself. Accordingly, the discovery motion was not heard. Thereafter, the Chief Justice assigned the case to the undersigned judicial officer. The undersigned presided over additional hearings on [D-17] and its supplements on January 24-25, 2022, February 1, 2022, February 10, 2022, February 24, 2022, and March 4, 2022.

---

[1] However, the Court noted on March 30, 2022 on the record, that it would only consider [D-17] through [D-17d] in this Order as the arguments in those motions are fully briefed at this time.

The Court has reviewed all of the briefing, testimony, exhibits, the case file, and the pertinent law. Being fully advised, the Court finds, concludes, and orders as follows:

## I. BACKGROUND

Suzanne Morphew of Maysville, Colorado went missing on or about May 9-10, 2020. Initially, a neighbor raised concerns when he was unable to locate her. The neighbor contacted her husband, Barry Morphew, as well as the authorities. Mr. Morphew owns a landscaping business and was in the Denver area working on a project when he received the phone call.

Shortly after the call to law enforcement, police found Mrs. Morphew's bike off a dirt road, down a ravine, near her home. The bike appeared to have crashed or been strategically placed in that location. Apart from her bike, there was no sign of Mrs. Morphew. More search and rescue personnel were brought in to assist that evening, but she was never found. A massive search, involving numerous law enforcement entities and volunteer community members from nearby Salida ensued. An individual did find Mrs. Morphew's bike helmet west of her bike off of Highway 50, however, Mrs. Morphew was never located. To date, she has never been found.

After failing to find Mrs. Morphew, law enforcement suspected foul play. In addition to continuing their search for Mrs. Morphew, police were actively investigating her disappearance as a potential crime. The Morphew residence, including vehicles, were searched and numerous items of evidentiary value were collected. The police, among other efforts, obtained DNA samples from the scene including from the bike, bike helmet, and Mrs. Morphew's vehicle.

Mr. Morphew soon became the focal point of law enforcement's investigation. Police searched the contents of his phone, including location data. Data on Mr. Morphew's phone indicated that around the time she went missing, he turned left on Highway 50, west, passing the location of where Mrs. Morphew's bike helmet was found on the side of the road before ultimately turning around to head to Denver for work. Mr. Morphew said he was following an elk and turned around near Garfield, a small community about 3-4 miles west of where Mrs. Morphew's bike was found. That and other location data on his phone raised suspicion among investigators. Mr. Morphew also spoke with police on numerous occasions. While he never admitted to any wrongdoing, police had come to suspect his involvement in his wife's disappearance.

In the summer of 2020, CBI forensic analysis determined foreign unknown male DNA was found on various items of the crime scene: the interior cushion of the bike helmet, Mrs. Morphew's bike, the glovebox and back seat of Mrs. Morphew's Range Rover. Mr. Morphew, along with other investigative personnel working the scene, were excluded as the source of the sample.

CBI Agent Joseph Cahill was the lead investigator assigned to assist local authorities (Chaffee County Sheriff's Office) in the investigation of Mrs. Morphew's disappearance. Communication logs with the Forensic Laboratory division of CBI indicated that Agent Cahill had come to believe the DNA sample found in Mrs. Morphew's car belonged to suspects who may have perpetrated the crime. In turn, CBI analysts determined the partial genetic profile combined with the investigation warranted uploading the sample into CODIS, a nationwide DNA database. CODIS is the acronym for the Combined DNA Index System and is the generic term used to describe the FBI's program of support for criminal justice DNA databases as well as the software used to run these databases.[2] CODIS contains DNA samples of convicted offenders nationwide,

---

[2] *See CODIS AND NDIS Fact Sheet*, Federal Bureau of Investigations (accessed Apr. 6, 2022), https://www.fbi.gov/services/laboratory/biometric-analysis/codis/codis-and-ndis-fact-sheet.

along with unknown samples from unsolved crimes and active investigations. On May 19, 2021, Agent Cahill, among other law enforcement personnel, received a CODIS match letter indicating the unknown male DNA partially matched DNA found in three out-of-state unsolved sexual assault investigations: Tempe, Phoenix, and Chicago. The letter further indicated that due to the limited genetic profile, this was only a lead and further investigation was necessary.

Sometime in late April of 2021, CBI detectives working on the case became aware that the Chaffee County Sherriff's Office was going to arrest Barry Morphew charging him with murder. Agents Cahill and Graham strongly opposed the arrest of Barry Morphew citing the need for more forensic testing and evidence collection in general. They both believed the arrest was premature and raised their concerns with Kirby Lewis, head of the Major Crimes Division of CBI who, in turn, brought those concerns to Deputy Director Chris Schaeffer. Mr. Schaeffer called the Chaffee County Sheriff, John Spezze, and advised against arresting Mr. Morphew at that time. He expressed the concerns of Agents Cahill and Graham. It was the first time in the Deputy Director's career that he ever called a sheriff about holding off on the decision to arrest an individual. Shortly, thereafter, CBI Director John Camper, called the Sheriff and reiterated the Bureau's concerns with arresting Barry Morphew.

On May 4, 2021, Alex Walker authored a 129 page affidavit in support of the arrest of Barry Morphew on suspicion of homicide along with other charges. The affidavit states numerous agents from CBI reviewed and edited the affidavit, but failed to state that the Bureau did not support the arrest of Mr. Morphew. Notably, as of May 4, 2021, law enforcement had still not determined the source of the unknown male DNA found throughout the crime scene. The Affidavit failed to inform the judge of said DNA and that Barry Morphew was excluded as the source. Ultimately, Chief Judge Murphy found probable case and set a no bond hold as requested by the affiant. Chaffee County Sheriff's Office arrested Mr. Morphew on May 5, 2021.

On May 19, 2021, the People disclosed a CODIS match letter to the defense indicating the unknown source of DNA may be linked to other unsolved out-of-state sexual assaults in Tempe, Phoenix, and Chicago. Meanwhile, Mr. Morphew remained in custody unable to post bond pending his preliminary hearing and his hearing to determine whether the proof was evident and presumption great (*i.e.*, a bond hearing reserved for those accused of first degree murder).

In the months leading up to and during the Preliminary Hearing, the prosecution had three meetings with law enforcement and CBI analysts to discuss the meaning of the CODIS match, its significance, and follow up investigation to rule out potential sources of the DNA. Information tending to negate the guilt of accused was discussed, but nothing was reduced to writing and disclosed to the defense in any of the three meetings. The Preliminary Hearing commenced on August 9, 2021 and lasted four days. The People called the following witnesses: Alex Walker, Kenneth Harris, Jonathan Grusing, Derek Graham, Andy Rohrich, and Kevin Koback. The People did not elicit any testimony concerning the foreign male DNA from any of these witnesses. The defense ultimately called Agent Cahill of CBI to present the information to the Court. The Court reserved ruling.

On September 17, 2021, the Court issued its ruling finding that proof was not evident and the presumption not great. The Court specifically found that the unknown male DNA profile was "particularly significant because while it doesn't prove a stranger abduction theory, it does at least support it"). *See Tr.,* at 65:25-66:13 (Sept. 17, 2021). Accordingly, bond was set, which the

defendant posted. In all, the defendant remained in custody unable to post bond for a little over five months.

Defendant is charged with First Degree Murder, along with other counts, for the alleged murder of his wife, Suzanne Morphew, on or about May 9-10, 2020. Defendant has pled not guilty. A jury trial is scheduled to commence on April 28, 2022.

## II.     APPLICABLE LAW

The purpose of C.R.Crim.P. 16 ("Rule 16"), which sets forth pretrial disclosure obligations of the prosecution and the defendant, "is intended to ensure a fair trial by permitting both sides to obtain relevant information before trial, thus reducing the risk of trial by ambush." *People v. Armijo*, 179 P.3d 134, 136 (Colo. App. 2007).

Rule 16(I)(a)(2) requires the prosecuting attorney to disclose to the defense "any material or information within his or her possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce the punishment therefor." *See Brady v. Maryland*, 373 U.S. 83, 88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, the prosecution must disclose exculpatory evidence to the defense, meaning evidence that is material. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *People v. Lowe*, 2020 COA 116, ¶ 10, 486 P.3d 397, 402, *cert. denied,* (Colo. May 10, 2021). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *People v. White*, 64 P.3d 864, 874 (Colo. App. 2002)(quoting *People v. Wilson*, 841 P.2d 337, 339 (Colo. App. 1992)). Exculpatory evidence includes evidence which bears on the credibility of a witness the prosecution intends to call at trial. *People v. Dist. Ct. of Colorado's Seventeenth Jud. Dist.*, 793 P.2d 163, 166 (Colo. 1990)(citing *Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972)).

The prosecuting attorney's obligation under section (a) extend to material and information "in the possession or control of members of his or her staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report, or with reference to the particular case have reported, to his or her office." Rule 16(I)(a)(3). *People v. Grant*, 2021 COA 53, ¶ 31, 492 P.3d 345, 350-51. The prosecuting attorney shall perform its obligations as soon as practicable but not later than 35 days before trial. Rule 16(I)(b)(3). It is the prosecuting attorney's duty to "ensure that a flow of information is maintained between the various investigative personnel and his or her office sufficient to place within his or her possession or control all material and information relevant to the accused and the offense charged." Rule 16(I)(b)(4).

When it is brought to the attention of the court that a party has failed to comply with Rule 16 or with an order issued pursuant to Rule 16, the court may: (1) order such party to permit the discovery or inspection of the materials not previously disclosed; (2) grant a continuance; (3) prohibit the party from introducing in evidence the material not disclosed; or (4) enter such order as it deems just under the circumstances. Rule 16(III)(g). Discovery sanctions serve the dual purpose of protecting the integrity of the truth-finding process and deterring prosecutorial misconduct. *People v. Zadra*, 2013 COA 140, ¶ 15, 396 P.3d 34, 41, *aff'd,* 2017 CO 18, ¶ 15, 389 P.3d 885. A district court should account for these purposes by imposing the least severe sanction that will ensure full compliance with the court's discovery orders and protect the defendant's right to due process. *Id.* at 41-42. Dismissal is a drastic sanction and must be reserved for situations where no other sanction will "restore as nearly as possible the level playing field that existed before

the discovery violation." *People v. Dist. Ct., City & Cty. of Denver*, 808 P.2d 831, 837 (Colo. 1991). In the absence of willful misconduct, dismissal as a sanction for a discovery violation is usually beyond the discretion of the trial court. *People v. Daley*, 97 P.3d 295, 298 (Colo. App. 2004). In the absence of willful misconduct or a pattern of neglect demonstrating a need for modification of a party's discovery practices, the rationale for a deterrent sanction loses much of its force. *People v. Lee*, 18 P.3d 192, 196 (Colo. 2001). Particularly in the criminal justice context, "the need to find the truth is the paramount interest at stake." *Lee*, 18 P.3d at 196-97 (internal citations omitted).

The regulation of discovery matters lies within the sound discretion of the trial court. *People v. White*, 64 P.3d 864, 874 (Colo. App. 2002). Because of the "multiplicity of considerations involved and the uniqueness of each case, great deference is owed to trial courts in this regard", and therefore an order imposing a discovery sanction will not be disturbed on appeal unless it is manifestly arbitrary, unreasonable, or unfair. *Lee*, 18 P.3d at 196.

### III.   APPLICABLE TIMELINE

On May 27, 2021, Mr. Morphew appeared on the filing of charges. *Tr.*, 3:5-8 (May 27, 2021). The Court also addressed several motions filed by the defense related to discovery (*i.e.*, [D-6] and [D-13]). In court, then lead District Attorney Jeff Lindsay, objected to [D-13], paragraph 2 (emails and text messages), as it was "overly burdensome to the Prosecution." *Tr.,* at 4:22-23. Mr. Lindsey stated that he would confess a motion that mimics Rule 16 requirements or any relevant statutory authority. *Id*. at 15:4-6.  The Court ordered the People to produce all mandated and other discovery by June 2, 2021.[3] *Id.*, at 30:18-19.

The Proof Evident Presumption Great and Preliminary Hearing was set for August 9, 2021. *[D-17]*, at ¶¶ 1-2. *See Tr.*, at 33:24-25. On June 3, 2021, Chief Judge Murphy entered further orders related to [D-6] and [D-13] consistent with his previous rulings on the record on May 27, 2021. *Order*, 1 (June 3, 2021). [D-6] was granted in whole. *Order*, at ¶ 3. As it related to [D-13] and the Defendant's request for all "emails and text messages between law enforcement officers and all individuals (including prosecutors) contacted and pertaining to this case," the Court found the request was "too broad and [was] not required by case law or statute." *Id*. at ¶ 3. However, the Court ordered that any electronic communications created or received by law enforcement officers related to this case must be disclosed to the defense "if they are material to the prosecution of the case or if they contain any evidence that would be in any way favorable to the defense." *Id*.

On June 24, 2021, Defendant filed [D-16]. *[D-17]*, at ¶ 4. On July 6, 2021, Defendant filed a Motion for Contempt Citation. *[D-17]*, at ¶ 4. On July 22, 2021, the Court and parties held a discovery sanction hearing. *[D-17]*, at ¶¶ 4-5. *See Tr.,* 3:14-6:10 (July 22, 2021). The Court, on the record, made the follow findings related to discovery materials:

- Mirror copies of the iPhones: "So while that [mirror image of the iPhones delivery to Defendant] was past the deadline set by the Court and therefore a violation of Rule 16 I [the Court] can't find that that was willful misconduct on the part of the District Attorney's office" *Tr.*, at 52:16-19;
- Spy Pen Recordings: Court finds "a discovery violation there," and ordered the remedy of requiring the People to "provide that recording, the enhanced version, within seven days of today's date" *id*. at 52:24-53:7;

---

[3] On June 2, 2021, the People produced a hard drive. *[D-17]*, at ¶ 3.

- Copy of Suzanne Morphew's iCloud account: "provided to the defense July 12th, so there was a violation of the Court's order by about five weeks", however, the issue was remedied since it has "been provided, provided late, but provided" *id*. at 53:8-12;
- Two laptops and a Kindle: Court found it "hard…to determine whether there's been a violation because there's such a discrepancy in what the attorneys are telling" the Court. *Id*. at 53:13-24; and
- Court findings and conclusions:
  - "[A]t this time I can't really find that it's a pattern. I'm hoping that this is just the result of the enormous amount of information that had to be disclosed within those few weeks, and **not a situation where as new evidence is being generated, new reports being generated, that there's a delay in providing those to the defense."** *Id*. at 56:3-12.
  - The Court also finds "there are violations here." *Id*. at 56:13.
  - The Court also notes: "I'm glad that these discovery issues have been brought to my attention because if this does appear to be a pattern my response might be different going forward." *Id*. at 56:3-6. **"If this becomes a pattern my response as far as sanctions might be different. I say that all in the context of Mr. Morphew being held without bond, which raises the stakes significantly in my opinion."** *Id*. at 58:1-6.

Thereafter, the People disclosed additional discovery between July 22 and 29, 2021 and again on July 31 through August 2, 2021. *[D-17]*, at ¶¶ 6-7. The Peopled disclosed the "CODIS DNA Casework Match" letters between July 22 and August 2, 2021, including: (1) a Tempe CODIS Match letter dated 10/22/20, (2) a Phoenix CODIS Match letter dated 11/19/20, and (3) an Illinois CODIS Match letter dated 4/28/21. *[D-17]*, at ¶ 18. Between August 2 and 3, 2021, the prosecution disclosed 16 additional discovery productions. *[D-17a]*, at 1. Specifically, on August 2, 2021, Defendant was to receive another discovery production via FedEx (not received at time of filing [D-17a] supplement). *[D-17a]*, at 2. On August 3, 2021, the defense was notified it would receive another hard drive via FedEx *[D-17a]*, at 2. Since filing [D-17] on August 2, 2021 and [D-17a] on August 3, 2021, the prosecution made four additional discovery productions comprised of 173 files. *[D-17b]*, at 1. On August 4, 2021, the prosecution disclosed a hard drive via FedEx *[D-17b]*, at 1-2.

On December 13, 2021, the defense conferred with the People regarding discovery issues including the Range Rover data. *[D-17d]*, at 2. On January 26, 2022, the People disclosed a July 16, 2021 email related to "very relevant" and "very helpful" information regarding the Range Rover. It should be noted, however, that it is unclear what the author of the e-mail was referring to or whether, if at all, the information was in fact relevant or helpful. *[D-17d]*, at 2. Nonetheless, on February 10, 2022, the Court ordered disclosure of the Range Rover data by February 24, 2022 on the record. *[D-17d]*, at 3. *See Tr.*, 12:23-13:2 (Feb. 10, 2022)(court orders disclosure not later than 14 days from the today's date). On February 24, 2022, the defense made another request for the Range Rover data. The People provided a flash drive that same afternoon. *[D-17d]*, at 3. *See Tr.*, 148:8-17 (Feb. 24, 2022)(court orders disclosure). On March 1, 2022, the defense contacted an FBI Agent regarding the Range Rover data. The FBI Agent indicated he sent the initial data to the case agent on July 23, 2021. *[D-17d]*, at 3-4.

On February 3, 2022, the Court issued an Order related to the discovery of Agent Joseph Cahill's Internal Affairs ("IA") file. *Order*, 1 (Feb. 3, 2022). On February 7, 2022, the defense

received the IA file after the Court issued its Order. *[D-17c]*, at ¶ 2. On February 8, 2022, the defense opened the IA file flash drive. *Id.*, at ¶ 2. On March 4, 2022, the Court and parties conducted a hearing related to the contents of Mr. Cahill's IA file. *See Tr.,* (Mar. 4, 2022) *generally*.

On March 10, 2022, while the Court was considering the instant discovery litigation, the court was confronted with more motions alleging discovery violations: [D-62b] and [D-62c]. Both motions alleged the People failed to make their expert disclosures to the Defense pursuant to Rule 16 and this Court's Case Management Order (CMO) dated October 29, 2021. *See Tr.* (Mar. 10, 2022) *generally*. The Court agreed and found the People were in violation of both Rule 16 and the Court's CMO. The Court further found the violations amounted to a "pattern" and saw fit to impose a sanction to deter future discovery violations and encourage compliance with this Court's orders. In all, the Court **excluded 14 of the People's 16** endorsed experts witnesses.[4]

On March 30, 2022, the case came before the Court for a *Shreck/Brooks* hearing related to numerous expert witnesses. During the hearing, the People informed the Court and the defense that they just learned of a report authored by Doug Spence, the dog handler and expert witness. The People conceded that the report should have been disclosed and stipulated to not calling him as a witness. Accordingly, the Court again found a Rule 16 expert disclosure violation as it related to Mr. Doug Spence and excluded him from testifying at trial in the prosecution's case in chief. *See Tr.* (Mar. 30, 2022) *generally*.

## IV.     RELEVANT WITNESS TESTIMONY

### January 24-25 and February 1, 2022 Hearings

#### Commander Alex Walker

On January 24, 2022, the Court heard testimony from Commander Alex Walker. *See Tr.*, 85:11-12 (Jan. 24, 2022). A meeting was convened on September 2, 2021 with CBI analyst Caitlin Rogers. *Tr.*, at 110:4-9, 17-19. Defense learned of the meeting because Ms. Rogers kept a communications log and she provided it to the defense. *Id.* at 103:10-16. The People never disclosed the meeting to the defense or what was discussed. *Id.* at 112:12-15. In attendance was Sheriff Spezze, Detective Burgess, Jeff Lindsey, Mark Hurlbert, Aaron Pembleton, Jonathan Grusing, Ken Harris, Derek Graham, and many other investigative personnel. *Id.* at 110:12-16. In the meeting, the group of individuals discussed among other things: who to test next, who to swab, and where the investigation was heading. *Id.* at 111:1-17. The individuals were still actively trying to determine who the unknown foreign male DNA belonged to at the time. Commander Walker did not take any notes and did not generate a report. *Id.* at 111:18-24. Neither did any other law enforcement personnel, including the district attorneys. *Id.* at 112:4-8. Exhibit 10, entered into evidence, was an e-mail setting up the meeting and produced by Caitlin Rogers. *Id.* at 102:14-19.

Alex Walker did not think he needed to turn over the email because it was just "logistical" in nature (*i.e.*, contained scheduling information only). Walker agreed with the defense that the meeting discussed exculpatory information, but no one took notes or generated a report. *Id.* at

---

[4] The Court notes as it relates to the exclusion of Sheri Vanino and Blake McConnell, those experts were excluded due to previous Court orders on February 10 and 24, 2022 related to Defendant's [D-38], [D-38a], [D-39], and [D-40] and People's [P-33], [P-34], and [P-34a]. *See Tr.* (Feb. 10, 2022) *generally*; *Tr.*, 7:19-8:9 (Feb. 24, 2022)(Court outlining motions to be heard). Also, as to Lisa Wolfe, the Court excluded her on different grounds on March 30, 2022.

177:4-9. On August 2, 2021, Alex Walker had a meeting with Detective Cahill to discuss the DNA CODIS match. *Id*. at 117:1-7. No notes were taken, yet Alex Walker conceded the topic of discussion was exculpatory. There were three meetings regarding the unknown male DNA and CODIS match, however, no notes were taken in any of the three, nor were any reports issued. *Id*. at 119:7-19. Alex Walker believed he saw the Tempe/Phoenix CODIS match information (attached to Mr. Cahill's report) in August 2021, but the report and attachments were not disclosed to the defense until September 27, 2021. *Id*. at 139:13-25.[5] The initial CODIS match letter regarding the three "CODIS hits" from Megan Duge was received by law enforcement on May 19, 2021 and turned over to the defense. *Id*. at 166:17-24. Alex Walker testified, however, that he did not know about the CODIS match letter when he drafted the Probable Cause Affidavit. *Id*. at 93:8-11. *See Aff*., 126 (May 5, 2021)(signed by Alex Walker on May 4, 2021).

### Former District Attorney Jeff Lindsey

On January 24, 2022, the Court heard testimony from Jeff Lindsey. *Id*. at 178:9-10. Mr. Lindsey conceded that he had meetings where he and law enforcement discussed testing other people for DNA samples, including neighbors or law enforcement who may have been on scene. *Id*. at 188:1-189:25. Defendant's Exhibit 14, admitted as an exhibit, was generated approximately seven months before authoring the probable cause affidavit. *Id.* at 191:15-192:25. Exhibit 14 was a request drafted by CBI Agent Cahill to laboratory services of CBI requesting the forensic analysis of numerous items. *Id*. It further stated that "this unknown male profile was submitted to CBI lab as a result of the fact that there was a submission because additional information to suspect the 2015 Range Rover was used in commission of a criminal offense." *Id*. at 191:4-10. Agents involved in the case received a DNA report on August 22, 2021, however, said report was not mentioned at the Proof Evident Presumption Great and Preliminary Hearing or provided to the defense until September 7, 2021. *Id*. at 229:16-230:4.

### Detective Robin Burgess

On January 25, 2021, the Court heard testimony from Detective Burgess. *Tr.*, 8:15-16 (Jan. 25, 2021). Detective Burgess received the May 19, 2021 CODIS letter from Megan Duge. *Tr.*, at 23:1-14. He followed up with an Illinois detective identified in the letter. *Id*. at 24:10-12. He was under the impression that the Phoenix and Tempe matches had been followed up on already or were otherwise being handled. *Id*. at 24:13-25:5. This Letter came only fourteen days after the arrest of Mr. Morphew. *Id*. at 26:6-13. Detective Burgess also was under the same impression of Alex Walker that Detective Cahill "followed up on" it. *Id*. at 39:15-18. Agent Cahill told Detective Burgess "it was taken care of." *Id*. at 40:5-8.

### Agent Joseph Cahill

The Court heard testimony from Agent Cahill on February 1, 2022. *Tr.*, 13:16-17 (Feb. 1, 2022). During Mr. Cahill's testimony, Exhibit 23 was admitted. *Tr.*, at 24:3-5. The email discussed the arrest warrant in the case. *Id*. at 22:19-20. The email specifically critiqued the draft arrest warrant of Barry Morphew noting that it is missing details, lacks specificity, certain forensic investigation information was missing, and work done to rule out other suspects is missing. *Id*. at 22:25-23:20. In Exhibit 23, Mr. Cahill writes that he reviewed the arrest warrant in its entirety, however, at the Proof Evident Presumption Great and Preliminary Hearing, Mr. Cahill told Chief

---

[5] The DNA match in Tempe was linked to a Phoenix case, therefore, the two are "correlated" and discussed in conjunction throughout testimony and pleadings. *Tr.*, at 138:8-23.

Judge Murphy that he only reviewed the first nineteen pages. Mr. Cahill, as part of the ongoing investigation, reviewed reports related to DNA. *Id*. at 29:17-23. Mr. Cahill learned Mr. Morphew's DNA was excluded from various items, including portions of the bike and bike helmet; and agreed that those items and DNA results would have been discussed with the investigative team because these are "two critical" pieces of evidence. *Id*. at 33:1-34:12. However, at the Proof Evident Presumption Great and Preliminary Hearing, Mr. Cahill testified that he was unaware whether Mr. Morphew's DNA was excluded. *Id*. at 34:18-35:1. Mr. Cahill was further confronted with exhibits demonstrating that he likely knew that information at the time including Exhibit 24. *Id*. at 33:2-4.

In a communications log (admitted as Exhibit 1, page 29059), Caitlin Rogers memorialized a conversation with Mr. Cahill. *Id*. at 37:15-21. The communications log specifically states that Mr. Cahill thinks the partial match relates to suspects who perpetrated the crime. *Id*. at 38:2-22. Mr. Cahill did not "remember [his] conversation with [Ms. Rogers] so [he] would defer to her comm[unications] log." *Id*. 38:21-22. As a result of the conversation with Caitlin Rogers, Mr. Cahill submitted a forensic analysis request for both 24.1 (DNA found on the rear passenger seat) and 27.1 (DNA found on the glove box) as demonstrated in Exhibit 14 and 25. *Id*. at 39:2-40:8, 41:17-22. Both 24.1 and 27.1 were submitted into the CODIS system as shown in Exhibit 26. *Id*. at 42:8-24.

During the course of Mr. Cahill's investigation into the potential matches to the unknown male DNA, Detective Bermudez from Tempe, Arizona sent Detective Burgess (forwarded to Mr. Cahill) information with more specifics about the Arizona unsolved sexual assault case. *Id*. at 47:19-49:25. It contained information about the alleged victim in that case and modus operandi of the suspect. *Id*. That report (written on February 2) was never uploaded to Smart Force by Mr. Cahill. *Id*. at 51:20-23.

Mr. Cahill discussed an August 3, 2021 email (Exhibit 29) attached to the 595 Report regarding Mr. Cahill's investigation into the CODIS matches. *Id*. at 69:17-24. On August 16, 2021, Mr. Cahill emailed the report to Detective Burgess. *Id*. at 71:2-11. The Court found numerous instances where the defense impeached Mr. Cahill with prior inconsistent statements. Although Mr. Cahill was aware of the DNA linked to two other cases, he did not discuss it at the Proof Evident Presumption Great and Preliminary Hearing and the People did not elicit questions related to Report 595. *Id*. at 154:9-20. Report 599 (Exhibit 35) referenced additional Tempe reports and related attachments and was eventually forwarded to Detective Burgess between August 16-23, 2021. *Id*. at 154:24-156:18.

### March 4, 2022 Hearing RE: Joseph Cahill's I.A. File

#### Commander Alex Walker

On March 4, 2022, the Court heard additional testimony from Mr. Walker. *Tr.*, 5:22-23 (Mar. 4, 2022). Mr. Walker denied knowing Mr. Cahill or CBI's position on deficiencies in the arrest warrant: he did not learn about these claims until after submission of the probable cause affidavit. *Id*. at 12:15-13:17.

#### Agent Joseph Cahill

On March 4, 2022, the Court heard additional testimony from Mr. Cahill. *Tr.*, at 31:14-15. Mr. Cahill explained he thought the case was nowhere near ready for court and that the arrest was premature. Mr. Cahill, Mr. Kirby, and Mr. Derek Graham all shared the same belief. *Id*. at 69:4-23. Mr. Cahill was aware that Mr. Schaeffer talked to Sheriff Spezze regarding their concerns. *Id*.

at 69:24-70:3. Both Mr. Camper and Mr. Schaeffer expressed concerns to Sheriff Spezze that CBI wanted to wait on the arrest. *Id.* at 75:12-14. Mr. Cahill did not believe his concerns about the timing of the arrest were shared with the defense. *Id.* at 78:12-80:23. As to Mr. Cahill's testimony at the PEPG and Preliminary Hearing, Mr. Cahill was told that District Attorney Linda Stanley wanted him off the case, but he was not given any further specifics other than his general conduct. *Id.* at 83:20-84:11.

During cross examination, Mr. Cahill noted he did not share his concerns with Commander Walker, the arrest warrant affiant, regarding the arrest being "the worst decision you could make right now." *Id.* at 101:9-25. Mr. Cahill conceded his concerns were more procedural in nature and not about probable cause to arrest Mr. Morphew. *Id.* at 99:3-11. Further, Mr. Cahill did not even express his concerns about the timing of the arrest to Commander Walker even though he knew Commander Walker was working on the probable cause affidavit and shared some notes and comments about the draft affidavit. *Id.* at 94:8-95:4. During redirect examination, however, Mr. Cahill noted he expressed to Commander Walker that the draft affidavit "lacks detail and specificity in multiple areas." *Id.* at 110:1-12.

Mr. Cahill further explained that he did not support the arrest of Barry Morphew "based on the state of which that [he] felt things were at that time." *Id.* at 112:17-25. *See also id.* at 113:10-114:19(discussing his position that the case, at the time, was not in a position to be filed, and ultimately, to receive a conviction).

### Agent Derek Graham

The Court heard testimony from Agent Derek Graham on March 4, 2022. *Id.* at 118:20-21. Mr. Graham also thought the arrest was "premature" in nature because he believed more evidence testing needed to be done including but not limited to the unknown male DNA. *Id.* at 127:8-25. Mr. Graham expressed that he was "concerned about the timing." *Id.* at 127:14-15. Mr. Graham discussed the unknown male DNA that needed additional testing. *Id.* at 145:9-146:19. While Mr. Cahill expressed concerns to Mr. Graham, he never used the language that was contained in the IA file (i.e., "worst decision ever"). *Id.* at 151:4-12.

### Deputy Director Chris Schaeffer

On March 4, 2022, the Court heard testimony from Deputy Director of Investigations for the Colorado Bureau of Investigations ("CBI"), Chris Schaeffer. *Id.* at 156:18-19. Mr. Shaeffer made a phone call to Sheriff Spezze and told him he "didn't agree with it [the decision to arrest Mr. Morphew] basically, that [he] didn't think that the timing was right." *Id.* at 160:23-161:3, 164:10-12. To the best of Mr. Shaeffer's knowledge, this incident was the first time in his career that he ever called a sheriff about holding off on the decision to arrest an individual. *Id.* at 167:18-23. At one point, Mr. Shaeffer had a conversation with Mr. Hurlbert regarding Mr. Cahill's PEPG and Preliminary Hearing testimony. *Id.* at 172:5-6. He also had a conversation with Mr. Walker about Mr. Cahill's testimony. *Id.* at 171:25-172:3. Mr. Schaeffer ultimately made the decision to have Mr. Cahill removed from the case and transferred to the Marijuana Unit (which was in process prior to the Preliminary Hearing). *Id.* at 172:9-173:10.

### Agent Kirby Lewis

On March 4, 2022, the Court heard testimony from Agent Kirby Lewis (in charge of the Major Crimes Unit at the Denver office of CBI). *Id.* at 187:18-188:14. Agent Cahill, Agent Graham, and Agent Lewis agreed that "probable cause existed but that timing might not be the

best." *Id*. at 193:3-9. Mr. Lewis voiced these concerns to Mr. Schaeffer. *Id*. at 200:6-13. Mr. Lewis never remembered Mr. Cahill using specific language such as "worst decision you can make" or "premature." *Id*. at 204:9-25.

As to Mr. Cahill's testimony at the PEPG and Preliminary Hearing, Mr. Lewis remembered having a conversation with Ms. Stanley after hearing concerns from Mr. Schaeffer. *Id*. at 207:9-20. Ms. Stanley articulated to Mr. Lewis that they no longer wanted Mr. Cahill on the case based primarily on his testimony at the PEPG and Preliminary Hearing related to CODIS. *Id*. at 209:2-19. Ultimately, a decision was made between Ms. Stanley and Mr. Shaeffer to take Mr. Cahill off of the case. *Id*. at 209:14-21. At that time, Mr. Lewis had no knowledge that Mr. Cahill was in the process of being transferred to the Marijuana Unit. *Id*. at 210:13-22.

### Director John Camper

On March 4, 2022, the Court heard testimony from CBI Director John Camper. *Id*. at 220:14-15. Director Camper had a phone call with Sheriff Spezze (after Mr. Schaeffer called Sheriff Spezze first). *Id*. at 235:1-24. Director Camper "recall[ed] a definite feeling that there would be a benefit in waiting" to arrest Mr. Morphew. *Id*. at 235:1-2.

### District Attorney Linda Stanley

On March 4, 2022, the Court heard testimony from District Attorney Linda Stanley. *Id*. at 244:12-13. Ms. Stanley was never aware of CBI's concerns with Mr. Morphew's "premature" arrest. *Id*. at 249:22-250:24. Ms. Stanley also noted she was disappointed in Mr. Cahill's testimony at the PEPG and Preliminary Hearing. *Id*. at 252:10-253:19. Specifically, Mr. Cahill "when he got to the stand he answered them [the questions] differently" than he had been prepped by Mr. Hurlbert. *Id*. at 253:6-13. Ms. Stanley, Mr. Hurlbert, and Mr. Lindsey later expressed these concerns to Mr. Shaeffer and their "disappointment." *Id*. at 254:6-21.

### Sheriff John Spezze

On March 4, 2022, the Court heard testimony from Sheriff John Spezze of Chaffee County. *Id*. at 260:21-22. Mr. Spezze went forward with Mr. Morphew's arrest due to public safety concerns and Mr. Morphew being a flight risk. *Id*. at 261:11-21.

## V. FINDINGS OF FACT AND CONCLUSIONS OF LAW

On May 4, 2021, law enforcement filed a 129 page criminal affidavit seeking the arrest of Barry Morphew on charges including first degree murder. *See Aff.* (May 4, 2021) *generally*. The warrant sought a no bond hold from the judge. *See Warrant*, 1 (May 5, 2021). In all the information included in the 129 page affidavit, the affidavit was devoid of any discussion of the fact that foreign male DNA, not belonging to Mr. Morphew, was found all over the crime scene: on the bike helmet, bike seat, bike breaks, glovebox of her car and rear seat of car. *See Aff. generally*. According to the author of the affidavit, Commander Alex Walker, he did not know about the CODIS match letter when he drafted the Probable Cause Affidavit. *Tr.*, at 93:8-11 (Jan. 24, 2022). Commander Walker was told that "Agent Cahill with 100 percent sincerity told these guys that this is nothing, it's been taken care of." *Id*. at 92:17-20. Additionally, Commander Walker was under the belief that "Agent Cahill put that to rest. It was done." *Id*. at 93:2-4. Alex Walker received the CODIS match letter on May 19, 2021, twelve days after he penned his probable cause affidavit in support of the arrest of Mr. Morphew. *Id*. at 92:21-23.

In the instant case, the Defendant sat in jail for five months on a no bond hold prior to receiving a PEPG and Preliminary Hearing on August 9-10 and 23-24, 2021. The Judge who found probable cause and set a no bond hold was not told that unknown foreign male DNA was found on various items at the crime scene or in the alleged victim's car at the time of signing the warrant for Mr. Morphew's arrest. *See Aff.*, at 44-45 (discussing CBI laboratory results related to DNA analysis of various items). If the Judge had known at the time of reviewing the arrest warrant about foreign unknown male DNA and CODIS matches to out-of-state cases, he may not have required Mr. Morphew to sit in jail for five months pending the PEPG and Preliminary Hearing.

On September 17, 2021, the Court issued its ruling finding probable cause. *Tr.*, 42:25-43:8 (Sept. 17, 2021). The Court, however, did not find the proof evident and presumption great that Mr. Morphew committed first degree murder. *Tr.*, at 66:14-19. The Court specifically found the unknown male DNA profile was "particularly significant because while it doesn't prove a stranger abduction theory, it does at least support it." *Id*. at 65:25-66:13.

It is important to note that Chief Judge Murphy did not learn about the unknown foreign male DNA and CODIS matches in the Arrest Affidavit or through the People's elicited testimony at the PEPG and Preliminary Hearing. Over four days of testimony, the People did not discuss the CODIS matches throughout their case-in-chief. Chief Judge Murphy learned about the evidence because the defense presented it by calling and examining Agent Cahill. Shortly after his testimony, the District Attorney contacted CBI to express their displeasure with Mr. Cahill's testimony at the Preliminary Hearing.

**Pattern of Violations**

It is clear to this Court there is a pattern of discovery violations in this case attributable to the People. Black's Law Dictionary defines "pattern" as a "mode of behavior or series of acts that are recognizably consistent." *Pattern*, Black's Law Dictionary (11th ed. 2019). The People's first discovery and disclosure-related violations occurred on July 22, 2021 while Chief Judge Murphy was still assigned to the case. *See Tr.*, (July 22, 2021) *generally*. These violations continue and are ongoing. As recent as March 30, 2022 (less than one month before trial is set to begin), the Court found another Rule 16 violation related to an expert report of Doug Spence. *See Tr.*, (Mar. 30, 2022) *generally*. Over the last eight months and over multiple days of hearings, the Court has witnessed a pattern of disregard by the People towards its Rule 16 obligations, the Court's Case Management Order, and subsequent Court disclosure-related orders made on the record. This Court has repeatedly noted it does not, in any way, condone the People's behavior. The behavior has, in the Court's eyes, been recognizably consistent. While the Court, for the reasons stated below, does not find this pattern willful based on the record, the Court does find this pattern to be negligent, bordering on, reckless.

**CODIS Matches**

First, the Court will start with the most obvious and egregious violation in the Court's view: the CODIS matches (*i.e.*, unknown foreign male DNA). These type of materials, as noted by Chief Judge Murphy during his ruling on bond in September 2021, lend themselves to an alternate suspect theory of the case. Therefore, the materials clearly fall within the People's Rule 16(I)(a)(2) obligation as "material or information within his or her possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce the punishment therefor." Chief Judge Murphy did not find the proof evident and presumption great in September 2021, based in part, on the DNA evidence and testimony discussed by Mr. Cahill. Yet, we know law

enforcement was well aware of this information for months prior to seeking Mr. Morphew's arrest. The lead detective characterized this evidence as "critical pieces" of information that would have been discussed with the investigative team.  In a communications log (admitted as Exhibit 1, page 29059), Caitlin Rogers memorialized a conversation with Mr. Cahill. *Tr.,* at 37:15-21 (Feb. 1, 2022). The communications log specifically states that Mr. Cahill thinks the partial match relates to suspects who perpetrated the crime. *Id*. at 38:2-22.  Thus, one of the *lead* detectives on the case at the time, believed that the partial match related to *suspects* who may have perpetrated the crime *other than Mr. Morphew*.  It is utterly absurd to this Court that anyone could even fathom arguing that this information does not fall within the mandatory disclosures of Rule 16(I)(a)(2).

The Court finds articulable prejudice suffered by the defense because of the People's failure to disclose some of this material. To illustrate, had the defense had all of the information surrounding the CODIS matches and related investigation, they may have decided to call witnesses or experts to negate any probable cause findings. Also, at the PEPG and Preliminary Hearing, Mr. Cahill, one of the lead detectives on the case, testified that he only reviewed 19 pages of the arrest affidavit, yet subsequent disclosures indicated he had reviewed it in its "entirety" and even offered specific critiques to the affiant. Those untimely disclosures could have been used to impeach his testimony. *See Tr.*, 57:8-11 (Aug. 24, 2021)("I believe it was around 126 [pages] of which I got to page 19"). Some of the reports related to CODIS matches were in the People's constructive possession as early as October 2020, yet not timely turned over. *See Ex. 3 to [D-17]*, 1 (Aug. 2, 2021)(dated October 22, 2020).[6]

The Court finds the People failed to put in place a system to preserve emails as ordered by Judge Murphy on June 3, 2021. Whatever process the People put in place was clearly ineffective as the witnesses attested on January 24-25 and February 1, 2022 that they did not understand the Order. *See e.g. Tr.,* at 97:1-99:25(Commander Alex Walker discussing the fact that he did not understand the Order issued by Chief Judge Murphy). Rule 16(I)(b)(4) requires that "[t]he prosecuting attorney shall ensure that a flow of information is maintained between the various investigative personnel and his or her office sufficient to place within his or her possession or control all material and information relevant to the accused and the offense charged."  The Court finds the People failed to perform their mandatory obligations.

The People argued, at one point, to this Court that the information withheld pertained to an ongoing investigation and it was not discoverable information. The Court wholeheartedly disagrees with this sentiment. Rule 16 is titled "Discovery and Procedure before Trial." This title embraces the sentiment that discovery in a pending case includes ongoing investigations, testing, etc. If the ongoing investigation produces information, reports, etc. that "tends to negate the guilt of the accused," it must be disclosed.

It is even more serious in situations, such as this case, where the Defendant was held on a no bond hold pending the PEPG and Preliminary Hearing. Defendant was held on a no bond hold from May through September 2021.[7] In this case, information from the numerous meetings between law enforcement and the District Attorneys with CBI DNA analysts concerning the CODIS matches should have been reduced to writing and disclosed to the defense. The prosecution cannot circumvent an obligation to disclose exculpatory information by deliberately avoiding

---

[6] Certainly, relevant and exculpatory information was not produced in a timely fashion, however, the People ultimately did disclose it and the defense is now in possession of it prior to trial.

[7] Defendant currently is out on bond and has been now since September 2021.

taking notes or reducing statements to writing. *People v. Anderson*, 837 P.2d 293, 299 (Colo. App. 1992). Even law enforcement witnesses conceded this information may be material or have exculpatory value. *See e.g. Tr.*, at 103:25-105:10(Feb. 24, 2022)(Commander Alex Walker agreeing that an unknown male DNA profile linking to potential leads with unsolved sexual assault cases would be favorable to the defense).

The CODIS matches were discoverable materials. Also, any steps taken to rule out the possible source of the foreign male DNA (*i.e.*, who was swabbed, who has been ruled out as a source) is exculpatory information to the accused in a pending criminal prosecution and, therefore, must be turned over. The Court finds that the meetings regarding DNA discussed exculpatory information and information favorable to the accused during the pendency of a criminal prosecution. Therefore, it was incumbent upon law enforcement to reduce said information to writing and disclose it to the defense. The Court finds that the People's failure to disclose the unknown foreign male DNA and investigative steps being taken in the summer of 2021 prior to, during, and after the PEPG and Preliminary Hearing, constitutes a violation of Rule 16 and the Court's orders.

Lastly, it is unclear to the Court how much information the affiant had when he submitted the probable cause affidavit or whether CBI failed to disclose certain evidence to the affiant who then unwittingly omitted material information. The affidavit states it "was edited and reviewed by SA Kenneth Harris and CBI Agents Joseph Cahill and Derek Graham." *Aff.*, at 2. While Mr. Cahill testified under oath at the preliminary hearing that he had only reviewed 19 pages of the affidavit, at another hearing, he was impeached by the defense with an e-mail he sent to the affiant where he stated he reviewed the affidavit in its "entirety" and noted the affidavit "lacks detail and specificity", in particular, "regarding allegations, suspicions, evidence of other possible involved people, and the investigative steps and results." *See Ex. 23,* 2 (Feb. 8, 2022).

But even so, there is no requirement that an affiant include all information in discovery in support of an arrest warrant, and the defense is not challenging the validity of the warrant itself, *i.e.,* arguing it lacked probable cause. Rather, the defense contends that the foregoing omissions should have been disclosed through the discovery process shortly after Mr. Morphew's arrest, and that the prosecution's failure to do so constitutes a discovery violation. The Court agrees.

**March 10, 2022 Expert Disclosures**

On March 10, 2022, this Court found numerous violations of Rule 16 and its case management orders as it relates to the People's expert disclosures. *See Tr.*, 154:15 (Mar. 10, 2022)(beginning of Court's ruling).[8] The Court specifically found exclusion was appropriate because there was a pattern of discovery violations citing *People v. Lee*, 18 P.3d 192 (Colo. 2001).

The Court, in issuing its oral ruling, noted Judge Murphy's previous Rule 16 findings and violations of his case management orders in July 2021. *Tr.*, at 183:11-17. On February 24, 2022, at a separate hearing, the defense asked the Court to exclude all the People's experts because they missed the expert disclosure deadline of February 14, 2022. *See CMO*, 2 (Oct. 29,

---

[8] The Court notes there is an outstanding motion submitted by the People to "partially reconsider" its March 10, 2022 Order striking Expert Witnesses. *Mot.*, 1 (Apr. 1, 2022). However, as of the date of this Order, the Motion has not been fully briefed by the parties and the Court does not consider these arguments in its discussion of its findings today. On April 5, 2022, Defendant filed his Response to the Motion to Partially Reconsider.

2021)(specifically Section (III)(1)).[9] The People conceded at the hearing that they missed the February 14, 2022 disclosure deadline, while arguing the Rule 16 deadline of 35 days before trial somehow usurped Chief Judge Murphy's case management authority and rendered the CMO superfluous. *See Order*, 2 (Feb. 25, 2022)("the People conceded that their expert disclosures…did not comply with Rule 16 or the Court's CMO"). On February 24, 2022, notwithstanding the violation, the Court granted the People's request for a short extension of up to and including February 28, 2022, to comply with their expert disclosure obligations. *Order*, at 2. The Court denied the Defense's motions to strike, [D-62] and [D-62a], in the same Order. *Id*. at 2. The Court warned the People, however, of two things: (1) the court "in no way, condones the People's behavior" and (2) it "will not entertain any further extensions to the People's expert disclosure deadlines." *Id*.

Then, on February 28, 2022, the People filed [P-44] People's Superseding Endorsement of Expert Witnesses. Defendant subsequently filed his supplements to his original [D-62] Motion to Strike. *See [D-62b]*, 1 (Mar. 1, 2022); *[D-62c]*, 1 (Mar. 2, 2022); *[D-62d]*, 1 (Mar. 23, 2022); *[D-62e]*, 1 (Mar. 23, 2022). The Defense asked the Court again exclude the People's expert witnesses due to their failure to make expert disclosures by the February 28, 2022 deadline.

On March 10, 2022, the Court addressed Defendant's motions to exclude. After conducting a hearing, the Court found the People missed the extended deadline of February 28, 2022 for numerous expert witnesses.  The Court also found there was a pattern of discovery violations and imposed a sanction to deter future violations: the Court prohibited the People from calling those experts whose reports and opinions were not turned over to the defense by the February 28, 2022 deadline. *See Tr.*, at 160:24-167:22. However, the Court noted some of those witnesses may still be called in a lay capacity. *See Id.* Other experts were permitted to provide expert testimony, but would be restricted to the four corners of their reports or summaries. *Id.*

### March 30, 2022 *Shreck/Brooks* Hearing[10]

At the March 30th Hearing, the Court found another discovery violation as it relates to Doug Spence, the canine handler.  The matter came on for a *Brooks* Hearing concerning the reliability of Rosco (the Dog) and law enforcement's conclusions concerning Rosco alerting or searching for the scent.

The response to [D-67] from the People represented that Rosco never "alerted to" the scent of Mrs. Morphew.  The People opined that because Rosco never picked up the scent, it supported the People's theory that the bike crash was staged, *i.e.*, Mrs. Morphew was never there, rather, another individual placed her bike down the ravine to make it appear like a crash. *See Resp. to [D-67]*, 3 (Mar. 28, 2022). On the day of the motion hearing, however, the People learned this expert had produced a report but it was not turned over. Consistent with their obligations and continuing duty to disclose pursuant to Rule 16, the People acknowledged the undisclosed report, and stated they would not be calling the witness. The Court excluded the witness based on the People's stipulation. This finding, yet again, supports a pattern of discovery violations by the People.

---

[9] The motion to strike experts is numbered defense's [D-62] filed on February 22, 2022 and included subsequent supplemental filings [a] through [e].

[10] As of the date of this Order, the Court does not have access to the entire transcript from the March 30, 2022 Hearing. Therefore, the Court refers to its notes for purposes of its findings herein.

Although Spence would not be called, the Court permitted the defense at the Hearing to call the witness to determine what information he had that had not been disclosed, and notably, whether if at all it was exculpatory.

Contrary to the People's written response asserting that Rosco never picked up the scent of Mrs. Morphew, Doug Spence testified that Rosco did get "on scent" near the south Arkansas River. Rosco pulled him down stream, but lost Mrs. Morphew's scent at a log. The Court admitted body camera evidence corroborating his testimony.[11] Indeed, the defense played body camera footage of other officers describing Rosco picking up a scent, but then losing it. Mr. Spence was shown the video and agreed with the statements made as being consistent with his findings.

Additionally, the People represented in their response that "Rosco kept trying to go in the direction of the Morphew home but could not get there due to a creek." *Resp.*, at 2. This was false based on the testimony and evidence presented at the Hearing. Indeed, Mr. Spence unequivocally testified that had Rosco picked up a scent across the creek or in the creek he would have pulled him right into the creek and even crossed the creek if necessary. According to Doug Spence, his dog did not go into the creek because it did not alert to the scent of Mrs. Morphew in that direction or vicinity: Rosco simply lost the scent.

The defense also showed Mr. Spence Defendant's Exhibit C, the report of Sergeant William Plackner. Sergeant Plackner summarized Mr. Spence's findings in his report. The People also provided the defense a summary of the what they anticipated Mr. Spence would testify to which was consistent with Plackner's report and their representations in response to [D-67]. Mr. Spence, however, stated portions of Sergeant Plackner's report were "false." Specifically, Mr. Spence discussed the portion of Sergeant Plackner's report that states:

> After a short distance his dog was attracted to the water in the area. ln his opinion there was a possible track leading downstream between the South Fork of the Arkansas and County Road 225 before it crosses the first bridge off of Highway 50.

*See Def.'s Ex. C*, at 3(admitted at March 30, 2022 Hearing). Mr. Spence unequivocally denied that his dog was attracted to the water or the direction of the Morphew home.

Based on the testimony, the Court finds Mr. Spence is in possession of information favorable to the accused. It is abundantly clear that the People failed to consult with Mr. Spence, an endorsed expert, prior to making their expert disclosures and even prior to the *Brooks* hearing on March 30, 2022. As illustrated by what transpired on March 30, 2022, this is not best practice. The People's expert disclosures contained inaccurate statements authored by Sergeant Plackner and the district attorney, who in turn, drew additional inferences based upon statements that were never correct in the first place. Mr. Spence's testimony is potentially exculpatory. At a minimum, in does *not* lend support to the People's theory that Mrs. Morphew was never there and that Mr. Morphew staged a crash scene. According to Mr. Spence, Rosco picked up Mrs. Morphew's scent at the scene.

While the court did not find the failure to disclose Spence's report willful, it did characterize the failure to do so as "sloppy" and "reckless." In this instance, it implicated exculpatory information. The Court found and still finds the proper remedy is exclusion of the witness, but this violation bolsters a pattern of discovery violations in this case. It is also strikingly

---

[11] Exhibit B collectively are the clips of the body camera footage.

Page **16** of **20**

similar to the litigation surrounding the motion to sever the possession of a dangerous weapon count.

### Motion to Sever [D-58]

On February 24, 2022, the Court held a hearing on the Defendant's [D-58] Motion to Sever Counts among other motions. District Attorney Dan Edwards stated in his response to [D-58] that "the possession of the short rifle is one method that the Defendant may have used in the murder" and the darts found at the crime scene "can be shot from the dangerous weapon." *Resp. to [D-58]*, 2-3 (Jan. 18, 2022). At the Hearing, District Attorney Weiner handled oral argument and stated that the dangerous weapon at issue could not have been used to fire a tranquilizer as it was incapable of firing such a dart. *Tr.*, 109:5-25 (Feb. 24, 2022). This was news to both the defense and the Court. Understandably surprised, the Court inquired about the representations in the pleading objecting to the motion and advancing a theory that the dangerous weapon could have been used in shooting a tranquilizer dart. *Id*. In response, Mr. Weiner indicated that he learned from law enforcement that the weapon was not capable of firing a dart. *Id*. at 110:6-17. Mr. Weiner ultimately, in part, confessed the motion and the Court severed the illegal possession count. *Id*. at 110:14-111:24. This was the first time the defense became aware that the People no longer sought to introduce evidence that the weapon was capable of firing a dart. Akin to the situation with Mr. Spence discussed above, the People made incriminating inferences based upon assumptions and/or inaccurate information.

### [D-17c] Internal Affairs File

The Court finds, as it relates to the Internal Affairs file (referenced repeatedly in pleadings and testimony as the "IA" file), the People did not have the IA file in its "possession" for purposes of Rule 16(I)(a)(2). A subpoena duces tecum ("SDT") had to be issued for the file and reviewed by the Court in-camera prior to either party receiving the contents of the file. *See Order*, 1 (Feb. 3, 2022). On January 24, 2022, on the record, the Court granted in part and denied in part the People's motion to quash the Defendant's SDT. *Order*, at 1. After the Court's in-camera review, the Court immediately disclosed the file to the parties citing Rule 16, C.R.E. 401, and *Brady v. Maryland*, 373 U.S. 83 (1963). *Id*. at 1. The contents of the IA file concerned events occurring between November and December 2021 (*i.e.*, after the arrest of Mr. Morphew and the PEPG and Preliminary Hearing). While it is clear the file contained the personal opinion of Mr. Cahill indicating he thought the arrest was premature, it was ultimately not Mr. Cahill's decision to make. The defense may, nonetheless, inquire about it during trial. However, this does not amount to a Rule 16 violation. Accordingly, the Court finds the People did not commit a discovery violation pursuant to Rule 16 or the Court's CMO. Therefore, the Court denies any request for sanctions based on the arguments set forth in [D-17c].

### [D-17d] Range Rover Data

The Court finds, as it relates to the Range Rover data, that while the People have been "dilatory" in providing the data to the defense, the Court does not find said material is exculpatory (*i.e.*, *Brady* material) at this juncture. On February 10, 2022, the Court ordered disclosure of the Range Rover data by February 24, 2022 on the record. *[D-17d]*, at 3. *See Tr.*, 12:23-13:2 (Feb. 10, 2022)(court orders disclosure not later than 14 days from the today's date). On February 24, 2022, the defense made another request for the Range Rover data. The People provided the flash drive that same afternoon. *[D-17d]*, at 3. *See Tr.*, 148:8-17 (Feb. 24, 2022)(court orders disclosure). On March 1, 2022, the defense contacted the FBI Agent regarding the Range Rover data. The FBI

agent indicated he sent the initial data to the FBI case agent on July 23, 2021. *[D-17d]*, at 3-4. *See also Aff.*, ¶ 3(d). The People assert the email was sent before the FBI completed the analysis. *Resp.*, at ¶ 6. It is clear it took at least two orders from this judicial officer (one February 10 and another on February 24, 2022) before the People disclosed the Range Rover data.

The underlying issue is a July 16, 2021 email disclosed to the defense on January 26, 2022. The email itself states the evidence includes "very relevant" and "very helpful" information regarding the Range Rover. *[D-17d]*, at 2 (citing Ex. 50). Both parties dispute the meaning of these terms. Defendant asserts the language indicates evidence that is material and/or exculpatory. *Reply*, at ¶ 2. The People, on the other hand, argue this language is not exculpatory or material. *Resp.*, at ¶ 6. While the email stated the information is relevant and helpful that, in and of itself, does not lead to a conclusion that the use of said language means it is also material or exculpatory.

The Court cannot conclude that the email, based on the evidence provided, is in violation of Chief Judge Murphy's Order related to [D-13] issued on June 3, 2021. "Relevant evidence" means evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." C.R.E. 401. An officer simply referring to data as "very relevant" does not make it so, nor is the statement itself relevant under Rule 401. Whether or not the Range Rover data is relevant will depend on what information is contained in said data. The Court does not find the email itself is in violation of Rule 16 or Chief Judge Murphy's June 2021 Order. The actual Range Rover data, on the other hand, does fall under Rule 16 and should have been disclosed.

Indeed, the FBI Agent analyzing the data indicated he sent the initial data to the case agent on July 23, 2021. While this information should have been disclosed in July of 2021, the defense is now in possession of the data (to the best of the Court's knowledge) and is free to consult with an expert to determine what information is contained in the file. The information may very well be "relevant" or "helpful," but that remains to be seen. Accordingly, any prejudice suffered has now been cured. While the Defense argues that it is too late to consult with an expert and extract the data, the Court finds the statement conclusory and additionally notes that the defense is not seeking a continuance to consult with an expert. *See Reply to [D-17d]*, at ¶ 6.

## CONCLUSION

WHEREFORE, for the reasons stated above and in the Court's discretion, the Court concludes as follows:

1. The Court finds a **continuing pattern** by the People of an inability and failure to comply with its Rule 16 obligations as well as the Court's case management orders;

2. The Court finds the People's actions amount to **negligent, and arguably, reckless** disregard for their Rule 16 obligations and duty to abide by court orders;

3. The Court does not find, based upon the record, the People's actions amount to willfulness;

4. Defense requests the following sanctions: dismiss the case; reduce the charges; set a reasonable bond (*i.e.*, reduce the current bond); and reimbursement of attorney fees and costs for time and expense incurred;

5. The Court finds the following as it relates to a request for sanctions:

    a. On March 10, 2022, the Court sanctioned the People for their continued violations related to expert disclosures and excluded numerous experts as a result. The Court excluded the following prosecution experts[12]:

        i. Megan Duge, Andrew McDermott, Kevin Hoyland (excluded the witnesses as expert witnesses);

        ii. James Stevens, Kenneth Hicks, Alex Walker, Andy Rohrich, Jonathan Grusing, Derek Graham, Ken Harris (not permitted to provide expert testimony; free to provide lay opinions); and

        iii. Caitlin Rogers (may provide expert testimony, but restricted to the four corners of her current report);

    b. On March 30, 2022, the Court excluded another proffered expert witness (Mr. Doug Spence) albeit based upon the stipulation of the People;

    c. These sanctions on March 10 and 30, 2022, effectively excluded **11 out of 16** of the People's endorsed expert witnesses.[13] *See [P-44] generally*. Three additional experts were excluded on other grounds.[14] The Court finds the exclusion of these witnesses amounts to a significant sanction, but one that was warranted based upon the record;[15]

    d. Considering the witnesses this Court has already excluded as a sanction for the People's discovery violations, the Court does not find a reduction of the charges to be an appropriate remedy. The Court is also mindful that the defense is now in possession of exculpatory information, which cures much of the prejudice;

    e. Because the Court did not find willfulness on the part of the People, dismissal of the case is beyond this Court's discretion[16];

    f. The Court does not find reducing Mr. Morphew's bond is an appropriate sanction;[17]

    g. [D-17c] regarding the IA file is denied relating to any request for sanctions as the People did not have constructive possession of the file;

    h. [D-17d] regarding the Range Rover data is denied, but the Court does find the People failed, yet again, to comply with the Court's disclosure deadline related to the data;

---

[12] *See Tr.,* 163:8-166:7 (Mar. 10, 2022).

[13] The remaining expert witnesses at this time are Caitlin Rogers (subject to limitations) and Christine Lucero-Foote (subject to a continued *Shreck* hearing set for April 29, 2022 at 9 am).

[14] *See* n.4, *supra*.

[15] The Court only considers those expert witnesses excluded due to the People's discovery violations for purposes of imposing additional sanctions.

[16] *People v. Daley*, 97 P.3d 295, 298 (Colo. App. 2004).

[17] The setting and selection of bond is to "reasonably ensure the appearance of the person as required and to protect the safety of any person or the community, taking into consideration the individual characteristics of each person in custody, including the person's financial condition." C.R.S. § 16-4-103(3)(a). Chief Judge Murphy made findings and considered the criteria outlined in C.R.S. § 16-4-103 and set bond at $500,000 cash only. *Tr.*, 76:18-78:11 (Sept. 17, 2021). The People originally requested bond at $10 million cash only. *Tr.*, at 67:1-68:5. Mr. Morphew requested bond be set at $50,000 cash bond. *Id*. at 73:19-23.

      i. As to the motivation behind removing Agent Cahill from the case, the Court does not find a discovery violation, however, the defense is free to inquire about it at trial before the jury.

6. The Court concludes additional sanctions are not appropriate at this time. However, this Order will serve as the baseline for future orders related to discovery violations. The case is set for trial to begin on April 28, 2022.

**SO ORDERED** this Friday, April 8, 2022.

BY THE COURT:

_____

Ramsey Lama
District Court Judge