# EXHIBIT 1

Tr. of Proceedings, *People v. Morphew*, No. 2021 CR 78 (Chaffee Cnty. District Court Sept. 17, 2021)

DISTRICT COURT, COUNTY OF CHAFFEE, STATE OF COLORADO

CASE NO. 2021 CR 000078, DIV. 2

---

TRANSCRIPT OF PROCEEDINGS (Ruling)

---

IN THE MATTER OF

THE PEOPLE OF THE STATE OF COLORADO,

    Plaintiff,

v.

BARRY LEE MORPHEW,

    Defendant.

---

    The above-entitled matter came on for hearing on Friday, September 17, 2021 at 1:51 p.m. before the HONORABLE PATRICK W. MURPHY, District Judge.

APPEARANCES:

FOR THE PLAINTIFF:           JEFF LINDSEY
                                   LINDA STANLEY
                                   MARK HURLBERT
                                   AARON PEMBLETON
                                   DAN EDWARDS

FOR THE DEFENDANT:         IRIS EYTAN
                                   DRU NIELSEN
                                   SEAN CONNELLY

ALSO PRESENT:              BARRY LEE MORPHEW

1          THE COURT:  Thank you all, please be seated.

2    Apologize for the delay.  We had to do some -- a little

3    extra security screening and that caused us to get a bit

4    behind schedule.

5          Before I call the case I'll remind everybody

6    that's in the courtroom, same rules apply that applied for

7    the preliminary hearing.

8          Please no recording, either video or audio, of the

9    proceedings.

10          You are certainly allowed to report or text on

11    what's happening in here but just no recording.

12          The case in front of the Court is 21CR78, People

13    v. Barry Morphew.

14          Mr. Morphew appears in custody with his attorneys,

15    Ms. Eytan, Ms. Nielsen, and are you Mr. Connelly?

16          MR. CONNELLY:  I am, Your Honor.  Good morning.

17    Pleasure to be here.

18          THE COURT:  It's Sean Connelly?

19          MR. CONNELLY:  Sean Connelly.

20          THE COURT:  And registration number, sir?

21          MR. CONNELLY:  33600.

22          THE COURT:  Thank you.  Present for the People,

23    Mr. Lindsey, Mr. Hurlbert, District Attorney Stanley,

24    Mr. Pembleton.

25          And who is to your left, Mr. Lindsey?

3

1         MR. LINDSEY:  So this is Dan Edwards, Judge.

2         THE COURT:  Mr. Edwards, you're an attorney?

3         MR. EDWARDS:  Yes Your Honor.  Attorney

4    registration 7938.

5         THE COURT:  Thank you.  We have Mr. Edwards

6    appearing for the Prosecution.

7         So we did a four day preliminary hearing last

8    month.  I reserved ruling on both the probable cause finding

9    and the proof evident presumption great finding.

10        In the interim, both parties have filed briefs

11   with regard to the law that's applicable to these hearings,

12   most specifically the proof evident hearing.  I've read all

13   the briefs, so I think we're ready to go.

14        I did indicate that I would allow some argument

15   with regard to the two decisions that I have to make today.

16   I want to have this hearing concluded by 5:00 and we'll have

17   other things to discuss including release of the arrest

18   warrant affidavit, so I'm going to limit the arguments.  I

19   don't want them to go on too long because I want to make

20   sure we get all of the things that we need to do today done.

21        So I would like to -- and I'm going to -- limit

22   the arguments with regard to either probable cause or proof

23   evident to 20 minutes per side.

24        I'll make my decision and then we'll discuss the

25   other issues that we have to discuss.  And then we will need

4

1      to determine what's next for this case.  I know there's a

2      couple of motions that are outstanding, including one that

3      was just filed yesterday by the defense.

4              As we learned last month, it also takes quite

5      a bit of time to coordinate schedules with this many

6      attorneys, so I have to put aside some time to get that

7      done as well.

8              So anything we need to address with you,

9      Mr. Lindsey, before we start the hearing?

10             MR. LINDSEY:  Your Honor, we would ask to divide

11     between law and facts our arguments.  Mr. Edwards would

12     handle the law and I would handle the facts.  I understand

13     the 20 minutes is 20 minutes but we're going to ask to

14     divide that 20 minutes.

15             THE COURT:  Fine with me.  Ms. Eytan?

16     Ms. Nielsen?

17             MS. EYTAN:  We're ready, Your Honor.

18             THE COURT:  It's the People's burden on each

19     issue so the People get to go first.

20             MR. EDWARDS:  Your Honor, just really quickly on

21     the law, the probable cause standard --

22             THE COURT:  Mr. Edwards, could I have you at that

23     podium just to make sure that we're getting a good record.

24             MR. EDWARDS:  Concerning probable cause, the

25     People v. (inaudible) case is most important and I'm sure

5

```
 1    the Court is familiar with.  It's preliminary hearing is

 2    whether there's probable cause with the evidence in the

 3    light most favorable to the Prosecution.

 4              It's the People's position that the standard for

 5    proof evident presumption great is contained in People in

 6    re: Losasso, that the evidence is clear and strong leading

 7    to well guarded and dispassionate judgement to the Court

 8    conclusion that the offense has been committed, that the

 9    accused is the guilty agent, and that he would probably be

10    punished capitally if the law is administered.

11              More recently than the Losasso case -- actually an

12    1890 case, Your Honor, but that's where the rule was

13    actually stated.

14              It was stated -- or paraphrased at least -- in

15    Gladney v. District Court, 1975.  "Bail should be denied

16    when the circumstance disclosed indicates a fair likelihood

17    the defendant is in danger of a jury verdict of first degree

18    murder."

19              I believe the Court needs to be careful concerning

20    the cited cases where they're cited either by the defense or

21    the Prosecution of cases from other jurisdictions.  The

22    reason the Court has to be careful is one, because the cases

23    cited are sufficiency of the evidence cases and they're not

24    proof evident presumption great cases.  Those are different

25    standards.
```

1          The second is that if the Court is not informed of

2     what the particular standard of proof is in that particular

3     jurisdiction then those sufficiency of evidence cases are

4     even less persuasive.

5          So for example, a Rhode Island case held that the

6     evidence has to be viewed in the light most favorable to the

7     Prosecution, which is obviously not the law in Colorado.

8          There was one case out of Florida where the

9     Florida Court of Appeals held that in order to deny bond it

10    has to be proven beyond a reasonable doubt, so more than

11    beyond a reasonable doubt before you could deny bond.

12          So if you're looking at a Florida case and you

13    look at the facts in the Florida case and it's argued those

14    were similar or dissimilar to this case it really is not

15    helpful unless the Court really understands what the

16    standard of proof in that case is as well.

17          I would refer the Court to the Losasso case and to

18    the Gladney case for the appropriate standard here.

19          Another issue I think is very important for the

20    Court is the issue of inference upon inference.  I would

21    refer the Court to the Donald case as cited by the defense.

22    It's cited at page four of the defense brief.  They say that

23    that case stands for the fact that you can't stack inference

24    upon inference.

25          Well the holding in that case actually was you

1    could stack inference upon inference.  The Court said in

2    paragraph 27, "The inference upon inference prohibition was

3    premised on now outdated law requiring the Prosecution to

4    exclude every reasonable hypothesis other than guilt."

5        So not only did it reject the inference upon

6    inference as not applying anymore after the Donald case,

7    which was decided in 2020 by the Colorado Supreme Court, but

8    it also rejected the every reasonable hypothesis other than

9    guilt when looking at proof presumption.

10        Also in the Donald case the Court said in

11    paragraph 30, "The law is pertinent to the analysis of

12    sufficiency of the evidence," because that case really dealt

13    with sufficiency of the evidence.

14        "Because of chain of inferences can become so

15    attenuated that reliance on it to sustain a conviction would

16    be unreasonable and would amount to speculation."  So

17    whether or not it's inference upon inference can be

18    considered but it's got to be -- in order to reject it

19    entirely it has to be so unreasonable that it would amount

20    to speculation.

21        Finally paragraph 32, the Court said, "Following a

22    inference stack and would absolutely prohibit it from the

23    exercise of logic which frequently employs inference derived

24    inferences would not be allowed to the jury.  We perceive no

25    basis for unnecessarily restricting the jury's ability to

1    assess the evidence before it in this way."

2          Mr. Lindsey will argue why the facts in this case

3    has satisfied those standards.

4          MR. LINDSEY:   Good afternoon, Your Honor.

5          THE COURT:  Good afternoon, Mr. Lindsey.

6          MR. LINDSEY:  Suzanne started her path towards

7    being murdered on May 6th.  It was a long, drawn out path

8    but on May 6th her text, "I'm done.  I could care less what

9    you've been up to and have been for years.  We just need to

10   figure this out civilly," is a noteworthy text.  It's a

11   chilling text especially when you think about the

12   defendant's response to that.

13         The defendant's response to agents when they talk

14   about her being able to divorce him was, "It's not going to

15   happen."  He tells them later, "I'm a godly man and you

16   better make sure you want me because it's for life."  When

17   he arrived on scene and the first thing he says is it's a

18   mountain lion -- the very first thing -- he then says, "We

19   love each other to death."  Those are chilling statements

20   given the context of what we have here.  Chilling

21   statements.

22         This is very important to understand that Suzanne

23   has finally taken the leap.  She's finally made the

24   decision.  The Court can look at the texts from Sheila

25   Oliver and Suzanne Morphew and see this metamorphosis of her

9

 1    trying and thinking and doing what she can.  And Macy

 2    suggesting that she get a divorce, a protection order, that

 3    she just leave.

 4            And it was Macy who texted her boyfriend on May

 5    10th, 3:00 in the afternoon and says, "I'm just sad.  Mal

 6    and I texted mom for Mother's day and she hasn't answered

 7    and I'm scared her and dad probably got into a big fight."

 8    That was a fight Suzanne Morphew could not win.

 9            The other important part of this May 6th pivotal

10    text is Barry's response, and the lack of response from

11    Suzanne Morphew.  Barry's response was that afternoon, "I'm

12    sorry things went the way they did."

13            It's important to note, Your Honor, that

14    Mr. Morphew deleted all these texts.  The FBI had to recover

15    them.  So this is Mr. Morphew hiding evidence of problems,

16    of marital strife.  After all, his idea of May 9th was it

17    was a perfect night.

18            "I'm sorry things went the way they did.  You

19    think I'm a terrible person to hide our accounts.  When I'm

20    dead, which won't be long, you guys will be taken care of."

21    Sounds like a gaslight to me.  "If I can control my hurt

22    heart I can overcome your distant, unlovingness towards me.

23    Going to see my Savior.  This life on earth is a mere grain

24    of sand compared to eternity."  Typical response according

25    to what Ms. Morphew tells Sheila Oliver is that he's always

1    going to be looked on as the victim.  He always wants to,

2    according to Ms. Morphew, look good.  And he wants Suzanne

3    Morphew to be the bad guy.  That's what Sheila and Suzanne

4    text each other back and forth.

5            Doesn't that just encapsulate this entire case?

6    Hasn't Suzanne Morphew been on trail this entire case?  All

7    of the things that she has done?  Well you know what?  This

8    is not about Suzanne Morphew and whether she had an affair

9    or whether anything inappropriate happened.  This is plain

10   and simple a domestic violence homicide.  That's what this

11   case is.  Domestic violence homicide.  Intimate partner

12   homicide.

13           When the Court looks at the definition -- it's

14   charged as a domestic violence -- the Court looks at the

15   definition and punishment, control, coercion, revenge.

16   That's what happened.  It happened because Barry Morphew

17   says marriage is for life.

18           Significantly too those responses that Mr. Morphew

19   sends the afternoon of May 6th, Suzanne does not respond,

20   and in the past she had.  In the past it was a method of him

21   coercing and controlling her to say I'm going to kill

22   myself, I'm going to harm myself.  She would say please

23   don't, please don't.  Let's bring this back.  She didn't.

24   She stood her ground.

25           When the Court looks at May 7th, the next day, the

1    Court didn't hear any sort of indication of the parties

2    going their separate ways, that there's fighting going on.

3    So Suzanne Morphew's day of reckoning is May 8, 2020.

4         May 8, 2020, Your Honor, there's evidence that she

5    uploaded a list of grievances, notes for leaving, notes for

6    ending the marriage.  She goes through 50 separate reasons

7    why the marriage is going to end.  We know it's updated

8    because as of May 6th, the date of this text, there's a note

9    in there, "Accused me of BF and hydro, May 6th".

10         So May 8th she types this in and she saves it to

11    her Apple account, and she puts forward the list of reasons

12    why she needs a divorce, why she needs to move on, why she,

13    in her health, is concerned over her cancer diagnosis and

14    how unhealthy the relationship with Mr. Morphew is.

15         What happens next on May 8th of 2020, she steels

16    herself and she sends a text to her sister, Melinda Moorman,

17    and she says, "It's hard dealing with the harsh abrasiveness

18    and having to show respect.  He's also been abusive

19    emotionally and physically.  There's so much.  I went

20    through a period of acceptance and I feel more angry now.

21    Anger at what I've allowed."

22         Chilling prediction of what eventually happens to

23    her on May 9th.  On May 8th she's steeling herself, she's

24    pouring her thoughts to her sister and her sister, according

25    to the investigators, wasn't sure how to respond.  This is

1    not typical Suzanne Morphew.

2           What happens next, 9:30, that's a text that she

3    sends to her sister May 8, 2020.  There's phone calls back

4    and forth.  The evidence is that Suzanne called Barry at

5    10:00 in the morning.  10:05, 10:08, there's Barry back to

6    Suzanne.  Then culminating in a call that lasted 26 minutes

7    and 40 seconds, 10:09 a.m.

8           What happens during that call?  Suzanne goes over

9    the list of grievances.  These are the reasons why we can

10   not be married.  The 50 reasons that she had uploaded.  This

11   is her day of reckoning.  This is the day that she says it's

12   over, we're done.

13          26 minutes and 40 seconds phone call.  There's no

14   other phone calls, there's no other communication that long.

15   Mr. Morphew's response, "I love you, Suzanne."  He seems to

16   accept the list of grievances.  He seems to give in to the

17   fact that she's moving on and he's accepting it.  At least

18   that's his portrayal.  His portrayal is okay.

19          And how do we know that?  Because May 8th and May

20   9th is a day of civility.  That's what Suzanne asked for.

21   Let's be civil.  May 8th and May 9th is a day of civility.

22   That's when there's communication between Suzanne and Barry

23   after this phone call where Barry asks Suzanne to come by

24   the property off of County Road 105.  Says, "Stop by if you

25   can."  Suzanne tells Barry, "I'm studying."  Later in that

1    afternoon at 3:05 Barry says, "Can you bring us a drink and
2    check it out?" They're being civil. They're being sort of
3    the way normal marriage people are. He's tricking her into
4    believing this is what's going to happen.
5         They talk about going on a hike. They talk about
6    a trip to Moonlight Pizza. There's evidence the Court saw,
7    a screen shot of Barry Morphew at Moonlight Pizza. Suzanne
8    is taking a photograph of him and sending it to her
9    daughter, Mallory. It's a civil situation as of the evening
10   of May 8, 2020.
11        Further into the evening of May 8, 2020 Suzanne
12   begins to embrace a new life without Barry Morphew. The
13   evidence is that Suzanne was not allowed to have friends on
14   Facebook that were male. What does she do at 8:00? 8:50?
15   9:00? She starts then making friend requests on Facebook.
16   Mostly male people, 23 separate friend requests. She wasn't
17   allowed to do this. Mr. Morphew would not let her have male
18   friends, but yet all of a sudden on May 8th things are civil
19   and she feels comfortable doing this. She's letting her
20   guard down.
21        May 9th there's testimony there was 59
22   communications between Jeff Liebler and Suzanne Morphew. A
23   lot more than normal. There's also communication between
24   Suzanne and Jeff Liebler -- there's a discussion about Barry
25   Morphew moving to Arizona.

1           What else are the communications?  The

2     communications appear to indicate they are wanting -- or at

3     least appearing to want to sell their house.  Suzanne asked

4     Barry Morphew, "Do you have sandpaper to sand the door?",

5     8:50 a.m. on May 9th.

6           Later at 9:33 a.m. Suzanne sends a photo to Barry

7     Morphew of a property, 5621 King Gulch Trail.  She tells

8     Barry on the text, "It's been on the market for three days.

9     It has a walk out basement.  Up the road from Spartan West

10    Trails."  There's an air of civility to these conversations

11    and these communications that didn't exist the entire week

12    of May 6th.

13          Even into May 9th, the morning hours, 9:50

14    Mr. Morphew messaged Suzanne, "Do you want to hike?"  Suzanne

15    says, "Where?"  Suzanne then asks, "Do we have my old summer

16    tires for the Rover?"  What does that tell you?  That tells

17    you that she is planning a life separate and apart from

18    Mr. Morphew, completely separate.

19          10:36 Suzanne messaged Barry, "Do you want to meet

20    for hike?"  10:48 he messaged back and says, "No, I'll come

21    home."  That's when she texted Barry and says, "Get hot tub

22    stuff."

23          We then have Barry Morphew coming home about

24    11:30, goes down, around the north side of the property

25    towards the east, and then approaches back.  What do we know

1    Mr. Morphew does?  What do we know he has?  What do we know

2    he likes to do?  He likes to hunt and he likes to observe

3    animals.  He has game cameras.  He's removing those game

4    cameras at 11:27 into 1:00, 1:30.

5         1:42 p.m. Suzanne messaged Jeff Liebler and said,

6    "Guess who is alone again?"  Mr. Morphew left.  2:03 p.m.

7    Suzanne sent her last proof of life -- her last photograph

8    -- not to Barry Morphew but to Jeff Liebler.  She then

9    messaged Mr. Liebler at 2:11 p.m., "I'm on WA"  That was

10   her last communication with anybody -- with anyone.

11        When you think about this case, Your Honor, you

12   think about sort of who could have done this.  Well there's

13   only one person.  There's only one person that has a motive.

14   Mr. Morphew is not going to let Suzanne Morphew divorce him.

15   It's not going to happen.

16        And he tells law enforcement that.  He tells them

17   that three separate times, "We love each other to death."

18   It's not going to happen.  "A divorce is not going to

19   happen.  You better love me now because it's for life."

20   Those are predictions.  In a normal marriage when you think

21   about those things you think about those vows -- those

22   sacred vows -- those aren't vows to Mr. Morphew, those are

23   promises.

24        We know Mr. Morphew is an accomplished hunter.

25   We know he's used to laying in wait, not disclosing his

16

1    presence, and eventually moving in for the kill.  Especially

2    in the sense that the animal -- in this case Ms. Morphew --

3    has let her guard down.

4           We know Mr. Morphew gets back around 2:43 or 2:44.

5    He goes in the garage, loads up the syringe, takes the cap

6    off, puts it in his pocket, puts his phone in airplane mode,

7    and then it's on.  That is Mr. Morphew's day of reckoning.

8    That is the day that domestic violence homicide happens.

9           Mr. Morphew says as agents confront him, hey your

10   phone looks like it's moving all over the house.  Whether

11   or not the physics of that exists or not Mr. Morphew

12   acknowledges that and says yeah, I shoot chipmunks.

13   He says I'm bouncing around because I shoot chipmunks.

14   And he admitted to shooting a chipmunk that day.  Admitted.

15   Mr. Morphew was preventing Suzanne Morphew from getting to

16   a phone or getting to a safe -- safely away from him.

17          And the evidence is clear that he has defensive

18   wounds on his arm that were inflicted by Suzanne Morphew and

19   photographed three days after this incident.

20          The motive, the opportunity.  The opportunity is

21   him getting her to believe this is going to happen.  He's

22   got the means.  The only thing that's not thrown away that

23   should have been thrown away is that needle sheath that's

24   found in the dryer.

25          That should have been in one of the five trash

1    runs.  Mr. Morphew says, "I didn't think about that," when

2    he talks to agents.  That's one of those items at RTD, or

3    Holiday Inn Express, or McDonald's, or Men's Wearhouse, or

4    back to Holiday Inn Express, when agents talked to him what

5    are you throwing away, what are you putting in the trash

6    five separate times, "I don't recall."

7         In fact, 98 times he tells Agent Grusing when they

8    finally start pressing him on this, start saying here's the

9    evidence, your story doesn't make sense, what does he go to?

10   I don't recall.  The Court remembers what he calls that I

11   don't recall.  It's somebody that doesn't want to tell the

12   truth.  According to Mr. Morphew, that's his words.

13        The tranquilizer needle cap in the dryer, Judge,

14   is a pivotal piece of evidence.  There is no single pivotal

15   piece of evidence, and there is no body.  We admit that.

16   That's the way it is.  But it seems like that's something

17   that Barry Morphew accomplished rather than law enforcement

18   not finding it.

19        He does admit finally that that tranquilizer

20   medication was on his work bench and was possibly something

21   that he threw away.  Possibly.  That's the only thing he

22   ever admits to throwing away.  Too bad that needle sheath

23   wasn't part of that trash.

24        Judge, when you look at the crime scene it is

25   clear it has been staged.  In fact, the first officer on

1    scene remarked that the bicycle looked like it had been

2    staged.  The evidence supports that.  The evidence is that

3    that bicycle was ghost ridden off the side of the hill and

4    the handlebars had twisted around and caused that brake to

5    lock.

6          There's no evidence of damage, there's no evidence

7    of wreck, there's no evidence of vegetation other than that

8    bike going down.  There's no evidence of blood or any sort

9    of damage.  And if a person were to go over the top of those

10   handlebars there is going to be significant damage to the

11   person and the bike.

12         The helmet, also staged.  Also staged 1.7 miles

13   further west, conveniently enough where Mr. Morphew admitted

14   late in the investigation turning left on Highway 50 instead

15   of turning right.  He has no business turning left when he's

16   leaving the house at 4:30 or 5:00 in the morning.

17         But what's most important about this bicycle

18   helmet and this bicycle scene, every time Suzanne Morphew

19   would go bicycle riding she would put on her Camelback and

20   her sunglasses.  Those were found in her vehicle.

21         We then look to the fireplace with the lacquered

22   wood, the metal file folders, the book binding.  Mr. Morphew

23   is asked about those and says we had burned stuff that week.

24   Isn't that convenient?

25         Five separate trash runs.  Five separate dumps.

1    The inference is -- and people get that inference -- that

2    he's destroying evidence.  He's getting rid of evidence that

3    supports he killed Suzanne Morphew.

4            When you really think about it, Judge, you really

5    get to the actual essence of this case he tells them perfect

6    night.  We had a steak.  We had sex.  But yet when he leaves

7    early morning on Mother's Day when Suzanne is going to be

8    completely by herself he doesn't kiss her -- according to

9    him -- he doesn't say goodbye.  And he can't because she's

10   not there.

11           What's really important and really significant on

12   this case is this tranquilizer.  And I'm almost done, Judge.

13           THE COURT:  Okay.

14           MR. LINDSEY:  The tranquilizer evidence is

15   significant in the sense that Johnny Grusing spoke to the

16   biology person and the biology person says she's going to be

17   on her feet two to five minutes.  She's going to go down and

18   then she's going to have hypoxia and she's going to be

19   lightly snoring.  The defendant, when asked what was the

20   last thing you saw, what was the last thing going on with

21   Ms. Morphew, she was asleep, she was lightly snoring.

22           I'm done.  Prophetic words by Ms. Morphew, and she

23   is.  Judge, we'd ask the Court to bind over probable cause

24   and we'd ask the Court to find proof evident presumption

25   great and hold the defendant without bond.

1          THE COURT:  Thank you, Mr. Lindsey.

2          MR. LINDSEY:  Thank you.

3          THE COURT:  Mr. Connelly?

4          MR. CONNELLY:  Thank you, Your Honor.  Sean

5   Connelly on behalf of Barry Morphew.  It's a privilege to

6   represent Mr. Morphew in this beautiful part of our state

7   which I've never before been to.

8          This prosecution fails as a matter of law.  It

9   fails not because there's no dead body but because it's

10  based on supposition and conjecture.  No reported case

11  anywhere in the country involving no dead body has relied on

12  such supposition and conjecture to find sufficiency at any

13  stage of the case.

14         It's remarkable what you just heard this

15  afternoon.  It just proves the supposition.  Let me give one

16  example.  Suzanne's Facebook friending.  I read the

17  affidavit written by the D.A. investigator, supposedly

18  reviewed by the D.A. that just made that presentation,

19  supposedly reviewed by the D.A. of the District.

20  The theory of that case was that Suzanne wouldn't have

21  Facebook friended people.  It was strange, it was odd, it

22  must have been hacked.  That's the theory that they

23  presented this court to show probable cause to convict -- or

24  to charge this man with murder.

25         180 degree change I think for the first time ten

1    minutes ago.  The theory now is Suzanne is the one Facebook

2    friending because she's declared her independence.  May 6th

3    is a pivotal night and now she's a new person.  Empowered.

4    Declaring independence.  And she is texting and Facebooking

5    many men.

6            As opposed to the theory of the case -- I think

7    it's page 39, I could be wrong, of the probable cause

8    affidavit -- is that it must have been hacked.  He must have

9    controlled her like he controlled every other part of her

10   life.  He must have been the hacker and sent out these odd

11   requests that the recipients found odd and strange.

12           No, they have a new theory.  At 2:10, at the time

13   we're arguing the probable cause hearing, a brand new

14   theory.  If I'm wrong they can correct me but I'm not wrong.

15   The theory of the case was that this was a hacked Facebook

16   page, and now it is Suzanne's doing it because she's

17   declared her independence.

18           I'm going to talk about corpus delicti case law.

19   We've cited two critical cases.  They're the Fisher case of

20   the Michigan Court of Appeals, 1992.  The (inaudible) case

21   in 2010.  They say no case has allowed a murder prosecution

22   with no dead body to go forward, even to get to a jury, if

23   there's no physical evidence, no confession, no eyewitness

24   testimony of either the death or the disposal of a body.

25   That's our case.

1    I won't dwell on that other than they respond with

2    a litany of cases that -- and the original D.A. argument

3    today said cases from out of state are not that relevant,

4    but they cite dozens.

5    I read them all, including on page 3 of their

6    submission they cite the case of People v. Manon, California

7    Appellate Court 1977.  You know it's actually not People v.

8    Manon, this allegedly similar case.  It's People v. Manson,

9    as in People v. Charles Manson.  That's the case they rely

10   on.  It's not People v. Manon.

11   People v. Manson, the California Court of Appeals

12   upheld a no dead body conviction of Charles Manson that was

13   not based on conjecture and supposition.  It was based on

14   what the Court said was ear witness testimony.  Charles

15   Manson had told a confederate that he was going to torture

16   the victim and cut his body into nine pieces.  He said he

17   was going to do it that night in a designated room.  That

18   night an ear witness, who testified at the trial, said I

19   heard the victim screaming bloody murder.

20   I can go through all their cases, but that People

21   v. Manon aka Charles Manson case exemplifies the reach that

22   they are making here.

23   Let me talk quickly about the standards, because I

24   don't think we're that far apart.  The Court has to make two

25   determinations for two separate issues in this combined

1  hearing.  Probable cause in the preliminary hearing context

2  to bind him over to stand trial, and then proof evident

3  presumption great to continue a denial of bond that is his

4  Constitutional right absent such proof.

5       Let me just briefly touch on those two standards

6  and then I'd like to talk about applying those standards to

7  the facts of this case.  I'll try to stay within 20 minutes.

8  I think they ran a little over but I'll try to keep within

9  the 20 minutes.

10      In terms of standards probable cause -- the Court

11 is well familiar with that.  It's in main the same two words

12 that the Court relies on in issuing a warrant, but I suggest

13 it's a slightly different -- very different context.

14      In this case, unlike a warrant, this is an

15 adversarial proceeding.  Their proof has to meet the

16 scrutiny of an adversarial testing.  Obviously as the Court

17 knows having issued many warrants in this case and many

18 others, they are ex parte proceedings.  The target does not

19 get to come in and say hey, you've omitted this fact or you

20 misled this fact.  It's an ex parte proceeding where the

21 Court has to rely on the good faith of the investigator.

22      Different case here, and that's why we have

23 adversarial testing.  So for probable cause it has to pass

24 scrutiny of an adversarial scrutiny.  They're correct in one

25 respect, credibility is not an issue at the PH/PC stage.

1    But plausibility is, and we cite the Hunter case, and the

2    Hunter case says the Court can reject evidence, not because

3    it doesn't find it credible, but because it's implausible.

4    Much of their evidence is implausible, much of it is

5    supposition, much is conjecture.  It doesn't meet probable

6    cause after adversarial testing.

7            Let me talk about proof evident presumption great.

8    That's a standard that actually originates in Colorado's

9    Constitution at its inception.  Goes back even to pre-

10   Colonial days I think in some of the colonies.

11           Proof evident, what's the dictionary definition?

12   Clear.  Clear proof.  Presumption great, a great presumption

13   based on clear proof that a jury is going to convict this

14   individual.  Clear proof, presumption great.

15           We're not that far off.  They cite the Losasso

16   case from 1890 that hasn't stood the test of time in many

17   respects, including the burden of proof, but they say it

18   should be clear and strong.  Fair enough.  Clear and strong.

19   It has to be clear evidence and raise a strong presumption.

20   I think a more accurate way is to say clear and convincing

21   but I'm not going to quibble over words with them.

22           Question then is:  Is this evidence clear and

23   strong for that context or is it even plausible for probable

24   cause context?

25           Let me talk about their evidence.  They have

1    argued today motive and opportunity.  Even if we grant them

2    that, even if we say yeah, they've proven motive, they've

3    proven opportunity, that's not enough.

4         Let me tell why they haven't even proven either

5    one of those.  Motive, heard a lot today about May 6th.  A

6    chilling day.  A chilling day.  Suzanne sent a text sitting

7    -- I think the evidence shows -- in her neighbor's kitchen

8    at the time, said I'm done.  Let's do it civilly.  May 6th.

9         Barry's response was not chilling.  He didn't say,

10   "I'm going to kill you."  He didn't threaten her with any

11   harm.  There's no domestic violence.  This is not a domestic

12   violence case.  There's no evidence of domestic violence.

13   He didn't respond violently to her with any threats on May

14   6th.  So even on May 6th it doesn't hold weight.

15        But this alleged murder didn't happen on May 6th.

16   It happened on May 9th, and many events happened in the

17   meantime.  I'd like to talk about facts not supposition in

18   terms of every day after that was Suzanne declaring her

19   independence and becoming an emancipated wife.  There's no

20   evidence of that.

21        The facts I'd like to focus on are let's look at

22   May 8th.  May 8th by all accounts, no dispute, including her

23   May 9th text to her secret paramour, Jeff Liebler, said it

24   was a fine night.  May 8th was a fine night.  We went to

25   town, looked at real estate, had Moonlight Pizza.  Her

1   words, it was fine.

2           She's not hiding anything from her lover.  That's

3   the same day she's telling the lover that we should be

4   husband and wife.  This is not victim blaming.  This is just

5   talking about facts in terms of we have to look at what are

6   all the facts.  Nobody here on the defense side has blamed

7   Ms. Morphew.

8           Barry Morphew hasn't blamed her himself, and he'd

9   have reason, having found out months later about an affair

10  -- and no one admits he knew about an affair at the time.

11  He doesn't blame her.  And nobody on the defense side is

12  blaming her.  Just talking facts and not supposition, and

13  not trying to put a spin on what happened, just saying what

14  happened.

15          What happened, by all accounts, no dispute,

16  May 8th, pleasant, fine evening.  Not satisfactory to

17  Ms. Morphew, she said -- with somebody she was communicating

18  in secret said I still want to be your wife, but from her

19  accounts to that paramour a fine night.

20          Let's talk about Saturday, May 9th, the alleged

21  date of the murder.  Average day in the life of Barry

22  Morphew.  He goes and finishes a job in Salida.  Routine

23  job, does it well.  Comes home about 11:30 after a day on

24  the job.  He's a seven day a week worker.  The testimony is

25  undisputed.

1       Comes home at 11:30, they meet, no evidence of

2   anything untoward going on there.  Then he leaves and we

3   know that from Suzanne texting Jeff Liebler saying, "Guess

4   who's alone again."  That starts more secret conversation.

5   Again, nothing there about I'm scared for my life.  He's

6   threatening me.  Or I've declared my independence.  There's

7   no evidence of that.  That's conjecture and that's not

8   admissible either at PH or at proof evident.

9       But a routine day.  Then he goes more routine in

10  the afternoon.  He's gone by everyone's admission for a

11  couple of hours or more, until 2:44.

12      2:44 he comes back and -- from getting a back hoe

13  part and then getting a new skid steer blade.  No evidence

14  that has anything to do -- in fact it's conceded that has

15  nothing to do with the murder, what he's doing on the skid

16  steer and the Bobcat.  Nothing to do with the murder.

17      Comes back from a routine event and then,

18  according to them in three minutes -- three minutes, because

19  that's their theory based on more supposition about cell

20  phone coverage that their own case agent, Mr. Walker, said

21  what's the deal with the cell service there, he said, "It's

22  a mystery."  His words, not mine.  It's a mystery.

23      But based on that they say that we know that from

24  2:44 to 2:47 all hell has broken loose.  This mundane day

25  for Barry Morphew and Suzanne Morphew has become a day of

1    bloody murder.  In three minutes.  So that's motive.

2    There's no proof of motive that at 2:44 that day he was

3    motivated to kill his wife.  No evidence of motive.  It's

4    all speculation.

5         We can talk about opportunity.  Opportunity, two

6    respects.  Number one, opportunity to kill her then

7    opportunity to dispose of the body.  Both are elements of

8    proof, they have to prove that.  That's not even enough,

9    they haven't proven opportunity.

10        Opportunity to kill her, their theory, three

11   minutes.  He comes home, becomes so enraged at something, we

12   don't know what -- maybe her declaration of independence

13   from three days earlier -- and becomes so enraged that he's

14   driven to murder this wife that all his professions had been

15   of love for her, but he's driven to murder her.

16        How?  Well, we don't really know.  We think know,

17   because I think I heard today the word hunted, hunted her

18   down like an animal.  More rhetoric.  Offensive rhetoric.

19   And what's that based on?  And how did he hunt her down?

20   Well, they'd say with a 22.  Well, it's not a 22 shotgun.

21   It's not a bullet.  I think their argument is it's a 22 dart

22   gun, I guess.  But the evidence is undisputed.  The animal

23   control guy, Rohrich, I think was a former animal control

24   guy, said you can't use a 22 to shoot a dart.

25        So it has to be that the -- the theory has to be

1    it was shot by a dart gun.  What's the evidence of that dart

2    gun?  The only evidence before the Court is it doesn't work.

3    That again is what Rohrich said.  And they say he's not

4    really a firearms expert.  They didn't put on any evidence

5    that it worked.  The only evidence before the Court is this

6    dart gun is not functional.

7         I think I heard then at day four of the hearing --

8    I didn't hear it today because I still don't know what their

9    theory is about how the murder happened -- I think the

10   theory now might be that he shot her with a syringe.  Chased

11   her around the house, not carrying a gun but carrying a

12   syringe.  And Ms. Nielsen I think in her cross examination

13   -- I think it was Agent Grusing, I could be wrong -- showed

14   the many steps that you had to do to do that.

15        It's not something you do in three minutes.  Get

16   enraged, take steps, fill a syringe, and then chase your

17   wife around somehow in the house and then shoot her and

18   knock her out.  It's not plausible.  They've offered no

19   plausible theory and the theories keep shifting how he

20   killed her.

21        How did he dispose of the body?  We know that

22   there's no evidence of any car or any motorized vehicle

23   being used to -- her body ever being there.  No decomposed

24   body or any parts of a body or any DNA of her in his truck

25   or any other motor vehicle that could have been used to move

1    it.

2            So somehow in this airplane off mode time

3    supposedly, which we know -- we don't know what it means --

4    at some point he has the means and ability to dispose of the

5    body such that it can't be found by I would say the largest

6    search team in this part of the country. One of the

7    largest, I would imagine, anywhere in the country, on a

8    frozen ground. May 10th, all the evidence is the ground was

9    frozen. And he somehow disposed of the body such that

10   nobody after thousands of hours of searching could find it.

11           Let me -- so it's not -- they haven't proven

12   either one of those.

13           Let me close, if I could -- and I have another ten

14   minutes or so -- with indications about how this

15   investigation didn't meet the standards we expect of Chaffee

16   County authorities, or the CBI, or the FBI, fell short in

17   many ways. Primarily because it was result focused. It

18   wasn't let's try to figure out what happened here.

19           Barry Morphew, by the way, cooperated in every way

20   he possibly could, 30 hours or more, interview him any time

21   you want. Nobody challenges his cooperation. In a way that

22   no lawyer would advise, by the way. Certainly at the point

23   when -- he didn't know. He still thinks I'm going to try to

24   help find my missing wife -- clearly early on, and certainly

25   by the end when Agent Grusing, a supposed advocate, is

1    having hour after hour of interview, it's meant to trap him.

2    It's really meant to convict him, not to find out what

3    happened, but to try to trick him into admission.

4           Let me talk about ten reasons -- the top ten

5    reasons, I could go on longer but I'll keep it at ten --

6    that we know this investigation was result oriented, result

7    driven and disregarded any facts contrary to our theory --

8    our theory being the Prosecution and D.A. and investigative

9    theory.

10          One, DNA.  No dispute that DNA -- not Barry

11   Morphew's because no dispute, it's not Barry's DNA -- DNA is

12   identified in Suzanne Morphew's car that matches -- that's

13   the word by their scientist -- Kaitlyn Rogers I think is her

14   name -- their scientist says it matches DNA in three

15   unsolved sex assault cases in Tempe, Arizona, Phoenix,

16   Arizona, and Chicago.

17          What does Agent Cahill do?  First of all, he tried

18   to say well, it's not really a match.  I know she used that

19   word.  It's not a match, it's really just a lead.  Let me

20   say he's not the scientist.  I'd trust the -- you know,

21   these days and times I think we want to trust scientists.  I

22   trust the scientist over Agent Cahill.

23          But give him the benefit -- it's just an

24   investigative lead.  What does he do with that lead?  He

25   goes and calls the Tempe people and says hey, we've got

1    this.  Does your unknown sex assailant match the description

2    of Barry Morphew?  That's chilling.  Talk about chilling.

3    The idea is not that I'm trying to solve who may have

4    contributed DNA -- which we know is not Barry Morphew's --

5    geez, maybe I can solve an Arizona case and say that Barry

6    Morphew is a serial rapist.  That's chilling.  That's

7    chilling, the presumption of innocence, and to good law

8    enforcement.  That chills me.

9         Number two, Salida Spa.  They can not account for

10   18 miles that's not picked up on Telematics.  The testimony

11   is Telematics is imperfect, doesn't capture everything.  18

12   miles they can't account for.  Well, we can.  And their

13   evidence did.  We didn't do it, their evidence did.

14        Their evidence showed that on Saturday in the

15   afternoon -- sometime after this chilling murder happened,

16   4:30 or 5:00 or 5:30 -- Barry Morphew came into Salida Spa

17   asking whether Colton was going to be able to come over and

18   look at his spa and look at their hot tub.  And that's

19   corroborated by a message that he left for Colton.  And his

20   mom said no doubt it was Barry Morphew.  Agent Cahill went

21   back and tried to say are you sure about that and she said

22   100 percent.

23        Agent Grusing and the D.A. now says it didn't

24   happen.  Why didn't it happen?  Not because these witnesses

25   are not credible.  Not because they have a motive to lie.

1    Not because it's not corroborated.  It didn't happen because

2    it doesn't fit our narrative.

3            Example three, Jeff Liebler.  It's not blaming

4    Jeff -- well actually it is.  I'm not blaming Suzanne

5    Morphew but let me blame Jeff Liebler and hold him to the

6    same standard that they are holding Barry Morphew to.  They

7    -- it takes them a couple of months to learn who this Jeff

8    is that's having an intimate relationship with Suzanne

9    Morphew.

10            The FBI agent, our highest and best law

11    enforcement agency in this country, goes and interviews Jeff

12    Liebler.  And they say to him hey, we learned you were

13    having an affair.  You didn't come forward.  He goes yeah, I

14    didn't come forward because I was embarrassed.

15            What else happened?  Well, I deleted my secret

16    LinkedIn account.  Deleted it.  That doesn't sound good but

17    no crime, the FBI just rolls with it.  What about the phone?

18    You're the last proof of life witness we have.  What

19    happened to your phone?  My phone?  I dropped my phone.  It

20    shattered in June and I replaced it.  I sent it to the

21    company and I got a new phone.  The FBI goes well, that

22    sounds good to me.

23            180 search warrants -- I think that's the number,

24    I could be wrong -- they don't bother issuing a warrant to

25    do any more.  Proof of life.  And he can't remember.  When's

1    the last time you communicated?  Was there anything after

2    that LinkedIn post, and I don't know, there might have been.

3    I can't remember.  Can't recall.

4         Barry Morphew did a lot less than that in terms of

5    a private message deleted that he was messaging his wife --

6    that's obstruction of justice.  This is obstruction.  They

7    don't follow up, they don't ask.

8         Number four, the Facebook.  They originally --

9    this Court issued a probable cause warrant based on the

10   theory that Suzanne wouldn't have done this.  Barry Morphew

11   must have hacked her phone.  Today, different story.  These

12   shifting stories, that's not probable cause.  That's not

13   proof evident.  That's a Prosecution that's just looking to

14   make a case that they have no evidence to support.

15        Number five, Mallory's sheets and this needle cap.

16   This is devastating stuff.  Why would Suzanne be washing

17   Mallory's sheets?

18        Well first of all you might ask why does Mallory's

19   bedroom have anything to do with this crime that happened in

20   three minutes?  There's no evidence it did.  There's no

21   evidence of blood or anything recovered anywhere in the

22   house.  That bedroom, anywhere in the house, anywhere in the

23   car.  No physical evidence.  But this is suspicious.

24        Why is the bed sheet being washed?  Well I don't

25   know.  Look at the post note that Suzanne wrote to herself

1    in the kitchen.  It said Mal's sheets.  In terms of

2    inference it sounds like she washed those sheets and not

3    that Barry somehow washed sheets to cover up something that

4    happened in the bedroom and there's no other evidence that

5    it ever happened.

6            Then this cap.  Whose DNA is on that?  Suzanne's.

7    There's no evidence tying that cap to Barry Morphew, much

8    less -- in that position in the washer -- much less tying it

9    to a murder.

10           Six, chlorine.  This evidence -- supposed evidence

11   -- that one witness said when I checked in to the room that

12   Barry stayed in it smelled like chlorine.  Well not

13   surprising, it's above a pool.  Every investigator, did you

14   know it's above the pool?  Not really, I didn't really know

15   that.  Did you ever investigate?

16           This is us having to prove a negative.  We don't

17   have a burden of proof here.  The only evidence before this

18   Court -- and they say it smells -- the strong smell of

19   chlorine in the room.  Evidence, it's right above a pool.

20           I think one of the D.A.s said well, it's time of

21   COVID, maybe the pool was closed.  There's no evidence of

22   that.  That's kind of like just throw something out.  We

23   have no evidence but it's supposition.  No evidence of that.

24           Seven, coffee.  This murder allegedly happened at

25   2:44.  Suzanne had finished her morning routine, all the

1   evidence will be.  And her morning routine, undisputed, her

2   morning routine -- not Barry.  Barry's not a coffee drinker.

3   She drinks her coffee in the morning.

4        Well, at the crime scene that afternoon on May

5   10th when she's allegedly been dead since May 9th there's a

6   half drunk cup of coffee.  Clearly the evidence supports

7   that's Suzanne's coffee, and it would be odd that somebody

8   was so clean -- all the evidence she's very clean -- to

9   leave that half drunk cup of coffee out at 2:44.  No

10  evidence that ever happened.

11       So the emphasis there -- and again, it was pulling

12  teeth.  Did you see the coffee cup?  I don't remember.  But

13  the evidence came out that there was a half drunk cup of

14  coffee.

15       Eight.  I guess Undersheriff Rohrich -- it's kind

16  of damned if you do, damned if you don't for Barry Morphew.

17  He cooperated.  Everybody agrees.  Cooperated hours and

18  hours, way beyond -- by the way evidence came in searched

19  independently with a colleague of his -- searched hundreds

20  of hours on his own for the body.  In terms of can't do

21  anything right, everything gets thrown against you.

22       Sheriff Rohrich says yeah, he went in there and

23  after we asked him to go in the house -- after we sealed the

24  house off and said go in there -- with very specific

25  instructions.  Go in there and do nothing but retrieve an

1    item of her clothing.  He did as he was asked, loyal

2    soldier.  Went right in there and did what he was asked.

3            What does Rohrich say?  He says it was odd.  He

4    didn't look around.  He didn't look at the bed.  I guess an

5    armchair psychologist who faults somebody for doing exactly

6    what he was told to do.

7            Point nine -- and I guess it's back to the dart

8    gun.  Again, it's the shifting burden.  This is the alleged

9    murder weapon and the only evidence is it doesn't work.

10   Again, it was pulling teeth to get that admission out of

11   there and the Court I think heard the video of the agent

12   that said it didn't work and then the agent admitted yeah,

13   it didn't seem like it worked.  Their cross as well, you're

14   not really an expert in firearms.

15           They had the burden.  You would think if they

16   wanted to see if it worked or not they'd say let's get it

17   tested.  Just their own firearms person tried to fire and it

18   didn't appear to work, didn't appear to be shot.  They say

19   yeah, we don't know that.

20           I guess the final point I'd like the Court to look

21   at -- because I don't want to quote it because it's under

22   seal, it's the arrest warrant.  It's the arrest warrant,

23   page 126, the last page of the warrant, the last two lines

24   of the first full paragraph.  The warrant, by the way, that

25   was signed by an agent -- or Investigator Walker, reviewed

1    by D.A. Stanley, reviewed by the D.A. that just made the

2    argument today supposedly.  On that same page it said they

3    reviewed it.

4            It had a metaphor, and it's not unlike the

5    metaphor that I just heard the Prosecutor use a few minutes

6    ago, and it's an ugly metaphor.  It's a metaphor that has no

7    basis in the fact and I'd like the Court to look at that

8    because it's offensive.  It just shows the suppositions that

9    are in there.

10           Final thing to just say in closing, so those are

11   the points I'd ask the Court to consider.  I know the

12   Court's paid careful attention.  I've not -- I was not here

13   but I've read the four days very carefully.

14           There's one point we agree in the affidavit on,

15   oddly.  One point -- and this affidavit is so misleading, so

16   many omissions, so much hyperbole and overstatement of

17   suppositions, but we agree on one point.  Page two it says

18   this affidavit is based on supposition.  It's their word.  I

19   didn't make that up.

20           What's the definition of supposition?  Supposition

21   is an assumption without proof of evidence.  That's their

22   word.  On that one point we agree.  We agree this case --

23   and what I just heard 20 minutes ago -- is all conjecture.

24   All supposition.

25           And we also agree that the standard is probable

1    cause has to be a plausible case to lead the Court to

2    conclude after adversarial testing that a crime has been

3    committed.

4            Proof evidence presumption great, clear and

5    strong.  The proof has to be clear and strong.  This was

6    anything but.  This proof was not clear and strong.  It was

7    muddy and weak and we'd ask the Court to end this case now

8    or in the alternative to let this man have his

9    Constitutional right to bail.  Thank you.

10           THE COURT:  Okay, thank you very much Mr. Connelly.

11           Well I'll discuss probable cause first.  I'll

12   first discuss the law and then the various pieces of

13   evidence that I've relied on to make my decision.

14           I feel like before I talk about probable cause I

15   do need to at least address this issue of corpus delicti.

16   Because this case has drawn a lot of public interest I'm

17   probably going to spend more time explaining legal theories

18   than I normally would.

19           In this case the defense has argued that the case

20   can not be bound over for trial because Suzanne Morphew's

21   body has not been found.  They cite a legal theory that a

22   crime can not be proven without the "body of the crime" or

23   the corpus delicti being established.  In a homicide case

24   corpus delicti means one, the death of the victim, and two,

25   the criminal agency of another as the cause.

1          The defense argument in a nutshell is that if a

2    body is not recovered a murder can not be proven and

3    therefore probable cause can not be established.  I did find

4    it interesting and somewhat surprising that there seems to

5    be no direct Colorado case law on this issue as it relates

6    to a no body homicide.

7          There are three things that mitigate against the

8    defense's position.  First, we have to remember what this

9    part of the hearing is.  It is a probable cause hearing.  As

10   I'll speak about in a moment, I have to resolve all

11   inferences in favor of the People when making a probable

12   cause determination.  Based upon her disappearance one

13   inference that can be made -- and is being made by the

14   Prosecution -- is that Suzanne Morphew has been murdered by

15   her husband, Barry.  This is the inference put forward by

16   the Prosecution and unless it is entirely unsupported at

17   this hearing I must give deference to that inference.

18         Second, the vast majority of states that have

19   considered this issue have decided the opposite, that a

20   recovered body is not required to be convicted of murder,

21   let alone a finding of probable cause.

22         Third, Colorado courts have rejected the corpus

23   delicti requirement for prosecution in favor of what they

24   call a trustworthiness standard.  In People v. Larossa,

25   which is a Colorado Supreme Court case from 2013, there is

1    confession to a crime.  In that case it was a sexual assault

2    on a child.  There were multiple confessions by the

3    defendant, but there was no other evidence that the crime

4    had been committed other than the words of the defendant.

5    In other words, there was no corpus delicti.  The defendant

6    went to trial, he was convicted, his conviction was

7    appealed.

8            In that case the Colorado Supreme Court held that

9    the corpus delicti requirement should be replaced by a

10   requirement that the confession itself be reliable and

11   trustworthy, even if there's no other evidence of the crime

12   occurring.  In other words the body of the crime need not be

13   shown as long as there is other reliable and trustworthy

14   evidence to support the proposition that the crime has

15   occurred.

16           I believe I can find probable cause in a homicide

17   case even in a situation like here where the victim's body

18   has not been recovered as long as there is reliable and

19   trustworthy evidence to support that conclusion.

20           With regard to preliminary hearings and probable

21   cause determinations we need to first understand that this

22   is not a trial.  The purpose of the preliminary hearing is

23   not to serve as a mini trial but solely to determine one,

24   whether there is probable cause to believe that an offense

25   has been committed, and two, whether there is probable cause

1    to believe that the defendant is the person who committed

2    that offense.

3           Probable cause is established when the evidence is

4    sufficient to induce a person of ordinary prudence and

5    caution to entertain a reasonable belief that the defendant

6    may have committed the crimes charged.  A reasonable belief

7    that the defendant may have committed the crimes charged.

8    This is the lowest standard of proof that we have in the

9    criminal justice system.

10          As I just mentioned the Court has to view the

11   evidence presented in the light most favorable to the

12   Prosecution at this stage, and I must draw all reasonable

13   inferences in favor of the Prosecution in determining

14   probable cause.  If testimony at a preliminary hearing

15   merely conflicts a question of fact exists for a

16   determination by a jury and the Court must draw the

17   inference favorable to the Prosecution.  Evidence to support

18   conviction of the crime is not necessary at this stage of

19   the proceedings.

20          Finally, the rules of evidence are relaxed at a

21   preliminary hearing and evidence such as hearsay statements

22   -- which we heard a lot of at the preliminary hearing --

23   that would not normally be allowed to be introduced at the

24   trial may be introduced at a preliminary hearing.

25          Understanding the relatively low standard of

1    proof, the presumptions in favor of the Prosecution, and the

2    requirement that I resolve all reasonable inferences in

3    favor of the People, I do find probable cause.  In other

4    words there's a reasonable belief that Mr. Morphew may have

5    committed the offenses.  I find probable cause for Counts 1,

6    first degree murder, and 2, tampering with a deceased body.

7    Counts 3, 4, and 5, because of their level of the offense,

8    are not eligible for preliminary hearing.

9         I make that finding based upon the following

10   recitation of facts and evidence established at the

11   preliminary hearing.  At the preliminary hearing it was

12   established that Suzanne Morphew was in a long and serious

13   affair with a person named Jeff Liebler.  The affair began

14   in 2008 with Suzanne Morphew messaging Mr. Liebler, "Howdy

15   stranger."  The affair progressed from there.

16        In 2019 the two met up in New Orleans and the

17   affair became physical.  They ended up meeting six times

18   throughout the country.  The last of those was in February

19   2020 in Florida.

20        Suzanne Morphew and Jeff Liebler communicated

21   frequently, if not daily.  Suzanne Morphew revealed to

22   Mr. Liebler that she was unhappy in her marriage, that she

23   wanted a divorce, and that she wanted to marry Mr. Liebler.

24        Motive is not an element for any of the crimes

25   charged, but that does not make it irrelevant.  Instead

1    motive evidence can be exceptionally important evidence as

2    it gives context of weight to other evidence in the case.

3    Here the Court can infer that Mr. Morphew's awareness of the

4    affair would give him the motive to harm his wife.

5              This was a marriage of over 30 years, the Morphews

6    were high school sweethearts.  Revelation of the affair and

7    the serious nature of the affair -- it was both physical and

8    emotional -- would understandably lead to feelings of hurt,

9    anger, jealousy, and desperation, all of which could lead a

10   person to do things that they would normally not do, like

11   harm the person who has harmed them.

12             In a similar vein the evidence established Suzanne

13   Morphew's desire to be divorced.  This evidence was also

14   evidence of motive on the part of Mr. Morphew and could help

15   put other evidence and his actions in context.

16             Several things happened on May 6th that clearly

17   indicated that Ms. Morphew wanted a divorce and that she

18   clearly communicated that to Mr. Morphew and that

19   Mr. Morphew reacted in an emotionally charged manner.

20             First Suzanne Morphew sent Mr. Morphew a text that

21   read, "I'm done.  I could care less.  We just need to figure

22   this out civilly."  In the context of her discussions with

23   her friend, Sheila Oliver, she's clearly referring to the

24   marriage when she says I'm done.  The last portion of the

25   text also supports this interpretation.  A rational

45

1  inference is that let's figure this out civilly means let's

2  try to get to the dissolution of the marriage with as little

3  fighting as possible.

4      Second, on May 6th Ms. Morphew also sent a message

5  to Mr. Liebler saying, "These next few days will be rough."

6  Considering the text that she had sent to Mr. Morphew on the

7  same day it is a reasonable inference that she is telling

8  Mr. Liebler that her next few days will be rough because she

9  just told Mr. Morphew that she wanted a divorce.

10     Then finally we have the text from Mr. Morphew to

11 Ms. Morphew in response to her text.  That text read -- I'm

12 paraphrasing -- I'm sorry.  When I'm dead, which won't be

13 long, you will be taken care of.  I am going to meet my

14 Savior.  So we know that three days before she disappeared

15 Ms. Morphew told Mr. Morphew, with no equivocation, that she

16 wanted a divorce.  We know that Mr. Morphew reacted to that

17 statement with emotion and desperation.

18     It is human nature and the Court can infer that

19 emotional and desperate people do not always act rationally

20 and can do things that not only hurt themselves but that can

21 also hurt other people, especially those people that have

22 caused them the pain that they are reacting to.

23     Thus the Court can infer that Mr. Morphew had two

24 motivations to kill his wife.  The fact that she was having

25 an affair and the fact that she wanted a divorce.

1          The next portion deals with what we were talking

2    about earlier in the arguments made by the two attorneys

3    about the fact that we do not have a body.  The Court can

4    infer that the following facts support the proposition that

5    Ms. Morphew is deceased, not missing or purposely hiding.

6          First, no one has heard or seen Ms. Morphew since

7    May 9th of 2020.  This case has garnered enormous media

8    attention locally, state wide, and at the national level.

9    Her photo has appeared in numerous news stories throughout

10   Colorado, the country, and even internationally, and yet she

11   has not been sighted or found.

12         Ms. Morphew's Camelback and her glasses were found

13   in her car.  Photos of Ms. Morphew when riding her bike and

14   testimony by those who knew her riding habits show that she

15   would not ride with either her Camelback or her glasses.

16   Anyone who rides in the mountains and hills around Chaffee

17   County knows that these two items are critical for mountain

18   biking in our sunny and arid climate.  This makes it

19   unlikely that Ms. Morphew went for a mountain bike ride this

20   morning -- that morning and then disappeared.

21         Ms. Morphew was a stay at home mother.  She had

22   not worked in many years so she could care for and raise her

23   children.  She did not have an outside source of income from

24   which she could hide money and then use that money to

25   disappear.  She did have some money from an inheritance but

1  that money, as we know from Sheila Oliver and the spy pen,

2  was apparently spent by Mr. Morphew to help purchase the

3  home and to purchase silver.

4      Along these same lines, Mr. Morphew stated to law

5  enforcement on May 21st of 2020 that he was Suzanne

6  Morphew's ATM, indicating that he was in charge of

7  controlling and dispensing their money.

8      Testimony to law enforcement was that Ms. Morphew

9  always had three items with her, her Bible, her journal, and

10 her book entitled Courage to Change.  Law enforcement found

11 the Bible and the book at the Puma Path home.  Her journal

12 was missing but in the fireplace they noted the charred

13 remains of several odd non-firewood items including what

14 looked to be the binding of a book or journal.  If

15 Ms. Morphew were purposely hiding it's likely she would

16 have taken those items with her.

17     Similarly, in her purse was found her driver's

18 license, credit cards, and cash.  It would be hard to

19 function in today's society without those items.

20     Finally, and probably most importantly,

21 Ms. Morphew was a dedicated and caring mother.  This is not

22 in dispute.  To demonstrate, in one of the texts to Sheila

23 Oliver Ms. Morphew states, "Once Macy is gone I won't be

24 able to do it."  In that context Ms. Morphew is clearly

25 stating that she will hold out in an unhappy marriage until

48

1   her youngest child is out of the house, presumably after

2   high school.

3           She was a mother that was able to put her

4   children's best interest ahead of her own, so it would make

5   little sense that she would purposely absent herself from

6   her children's lives and cause them such obvious and deep

7   pain.

8           Similarly, she was close to her brother, her

9   sister, her father, and had several very close friends.

10  She does not seem, from what I understand, to be a person

11  who would purposely cause pain to these people.

12          I'd like to talk about Ms. Morphew's phone.

13  Ms. Morphew used her phone quite a bit, as we all do.  It's

14  how she communicated, interacted with the world.  Therefore

15  her use and then her non-use of the phone is a good barometer

16  of when she might have died.  The last verified activity on

17  her phone was a series of messages between Ms. Morphew and

18  Jeff Liebler the afternoon of May 9, 2020.

19          At 2:04 Mr. Liebler asked her, "How did you get

20  alone?"  She answered, "He's always gone somewhere.  It

21  never stops."  Ms. Morphew then stated, "I'm just in love

22  with you."  Mr. Liebler asked, "Do you want to get stripped

23  down and naked?"  Suzanne Morphew replied, "Oh man, can you

24  talk or video?  I can load WA", which we all are assuming is

25  Whats App.

49

1          At 2:11 her last message was, "I'm on Whats App".

2    This is her last message despite the fact that Mr. Liebler

3    continues to message her without a response.  We know that

4    the last ping that registered her phone was from the Poncha

5    Springs cell tower at 4:23 in the morning on May 10th.  Her

6    phone has had no registered activity since and has not been

7    found.

8          This is good evidence for the Prosecution because

9    it is logical to determine -- and the Court can infer --

10   that when her phone went silent -- the phone she used to be

11   in almost constant contact with Mr. Liebler, her kids, her

12   friends, her family -- that when that phone went silent

13   Ms. Morphew also went silent.

14         The phone went silent about 30 minutes before

15   Mr. Morphew arrived home and remained silent during the time

16   that Mr. Morphew says he had dinner and intercourse with

17   Ms. Morphew.  It's also relevant to the Court that her phone

18   had its last interaction with the network shortly before

19   Mr. Morphew left for the Broomfield work site.

20         The Court believes there's significant relevance

21   in Ms. Morphew's state of mind and her fear of Mr. Morphew.

22   She indicated on several occasions that she was fearful of

23   Barry Morphew.  In several texts to Sheila Oliver in

24   September of 2019, about eight months before she

25   disappeared, she stated, "He's not stable."  "He is doing

1   damage both mentally and physically."  "I wouldn't feel safe

2   alone with him."  "He won't take the high road," referring

3   to Ms. Morphew asking him for a divorce.

4          In texts with Ms. Oliver from March of 2020, just

5   weeks before her disappearance, Ms. Morphew indicated that

6   she had talked to her daughter, Macy, about getting a

7   restraining order against her husband, and referred to

8   Mr. Morphew having a Jekyll and Hyde personality.

9          We know that she wrote a list of grievances

10  concerning Barry Morphew and this list was recovered by law

11  enforcement.  One of the grievances included an incident of

12  Mr. Morphew physically chasing her around a resort in a way

13  that troubled her when the two of them were on vacation.

14         We know that the door frame to the master bedroom

15  had been broken out at some point after the Morphew's moved

16  in.  Exhibit 80 is a photo of that door frame, and it looks

17  as if the door had been forced until it broke.

18         Sheila Oliver told law enforcement about an

19  incident in the fall of 2018.  In that incident Mr. Morphew

20  returned early from a trip.  Sheila Oliver was at the Puma

21  Path home with Ms. Morphew.  Ms. Oliver and Ms. Morphew saw

22  lights and the lights turned off short of the house.  Then

23  they saw someone in the woods, apparently looking into the

24  house.  They were concerned enough to call law enforcement

25  but eventually figured out that person was Mr. Morphew.

1    Ms. Oliver believes that Mr. Morphew was spying on

2    Ms. Morphew because he thought she was having an affair.

3          The fact that Ms. Morphew was fearful of

4    Mr. Morphew in the months leading up to her disappearance

5    is relevant evidence for the Prosecution.  That relevance

6    becomes even greater because Ms. Morphew is alleging

7    physical abuse at the hands of Mr. Morphew.  Abuse

8    significant enough that she considered obtaining a

9    protection order against her husband of some 30 years.

10          The logical inference is that if she was that

11   afraid of him, if she felt like he wasn't "stable" and

12   that she "couldn't be alone with him," she had a good

13   reason to feel that way, and that makes it more likely

14   that Mr. Morphew was capable of harming his wife.

15          With regard to the afternoon and evening of

16   May 9th, the Telemetrics from Mr. Morphew's truck show him

17   arriving at the home at about 2:44 in the afternoon.  From

18   2:44 until 2:47 Mr. Morphew's phone moves around the outside

19   of the house to various points.  At 2:47 the phone is put

20   in airplane mode.  Ms. Morphew continues to get messages

21   from Mr. Liebler but does not respond to them.  At 10:17

22   Mr. Morphew's phone goes out of airplane mode and he's at

23   the Puma Path home.

24          We don't know where Mr. Morphew or his phone was

25   between 2:47 in the afternoon and 10:17 at night, a period

52

1   of some seven and a half hours, which would be ample time to

2   dispose of Ms. Morphew's body.

3        Agent Grusing testified that he believes -- or

4   law enforcement believes that Mr. Morphew incapacitated

5   Ms. Morphew with a tranquilizer dart when he came home, and

6   that because it took several minutes for the tranquilizer to

7   take effect Mr. Morphew was likely chasing Ms. Morphew

8   around the property during those three minutes.

9        When confronted with the photo of the home overlaid

10  with the push pin locations of his phone Mr. Morphew said

11  that at that time he was shooting chipmunks with a 22 rifle

12  that he keeps for that purpose.

13       With regard to the morning of May 10th from 3:25

14  in the morning until 3:52 in the morning Mr. Morphew's truck

15  registers a couple dozen actions, including doors opening

16  and closing numerous times.  Between 3:58 and 4:07 the truck

17  might have moved --- although it wasn't clearly established

18  -- towards the County Road 225/Highway 50 intersection where

19  Ms. Morphew's bike was later found.

20       At 4:31 Mr. Morphew's phone is placed in airplane

21  mode.  At 5:37 in the morning his phone is removed from

22  airplane mode and he is in Buena Vista.  Mr. Morphew's

23  statement to law enforcement was that he woke up shortly

24  before 5:00 to go to Broomfield.  He saw Ms. Morphew

25  sleeping and he left shortly thereafter.  He did not say

1    anything about being in his truck at 3:30 in the morning.

2            When he is questioned by law enforcement he says

3    he is often up in the middle of the night to urinate but

4    this would not explain the activity in and around his truck.

5    The fact is that somebody was up and about well before 5:00

6    and they were doing something in and around Mr. Morphew's

7    truck.  The Court can infer that that person was Mr. Morphew.

8    Not only does that make logical sense, only he and

9    Ms. Morphew are at the home, and as he says Ms. Morphew is

10   sleeping.  But we also know that Mr. Morphew is up before

11   5:00 because his phone goes into airplane mode at 4:31.

12           This is relevant evidence for the Prosecution as

13   it indicates Mr. Morphew is doing something early that

14   morning and that he was not truthful about it when

15   questioned by law enforcement.

16           With regard to the helmet, we know Ms. Morphew's

17   helmet was found on the south side of Highway 50 about .84

18   miles west of the home or about a half a mile from the

19   225/Highway 50 intersection.  It was not damaged, it had her

20   identification inside of it.  It looked as if it had been

21   tossed off the highway.  It was not hidden and it was not

22   far down the embankment.

23           In March of 2021 when questioned by law

24   enforcement ten months after her disappearance Mr. Morphew

25   for the first time states that he turned left at the 225/50

1    intersection.  He had never mentioned this before.

2          This is relevant information for the Prosecution

3    as it places him in the area where the helmet was found as

4    he would have passed this area on the way back when driving

5    towards Poncha Springs in the east bound lane and would have

6    had the opportunity to toss the helmet where it was

7    eventually found.  When questioned Mr. Morphew said that he

8    saw a bull elk and wanted to follow the elk as he likes to

9    salvage shed antlers.

10          However this statement is problematic for several

11    reasons.  First, Undersheriff Rohrich testified that number

12    one, elk do not have antlers in May.  Two, when Undersheriff

13    Rohrich went to the same area exactly a year later at the

14    same time it was pitch black and there would be no way to

15    spot an elk.

16          Finally Mr. Morphew said he did not turn around

17    until Garfield, which is some three miles west of the 225/50

18    intersection.  Unless the elk was walking down the highway,

19    which an elk would not do, there would be no reason for him

20    to go that far up the highway before turning around if he

21    was truly following an elk.

22          From this evidence the Court can infer that

23    Mr. Morphew disposed of the helmet as his own statement puts

24    him at the spot that the helmet was found.  Further, the

25    Court notes that he had no legitimate reason to be in this

1    area as he would have turned right to go to Broomfield, not

2    left.  So the evidence is given even more relevance.

3         Mr. Morphew had a history during the investigation

4    of this case of a consistent and troubling pattern of either

5    changing his statements once confronted with evidence by law

6    enforcement, or leaving out information and adding it later.

7    Some are rather major discrepancies, like the one I just

8    mentioned, some are smaller.  The Prosecution has argued,

9    and the Court can infer that changing statements and leaving

10   information out of statements is evidence of untruthfulness

11   on the part of Mr. Morphew.

12        Some examples include on May 28, 2020 he said he'd

13   never used his tranquilizer darts in Colorado.  When

14   confronted with the evidence of their use on March 5, 2021

15   he said that he would use those tranquilizer darts and shoot

16   deer from the breezeway of the home.  When they fell asleep

17   he would saw off their antlers.

18        With regard to the afternoon of May 9th, on May

19   21st of '20 he said we never left after we got home.  Yet on

20   June 3rd of 2020 he said that he and Ms. Morphew had hiked

21   to Fooses Creek that evening.

22        On July 8th of '20 he says that Ms. Morphew never

23   said that she wanted a divorce.  When confronted with the

24   retrieved texts on March 21, 2021 he says well, she never

25   sat down and said that to me.

1          We know that Mr. Morphew told law enforcement on

2     July 8th that when he arrived in Broomfield he only went to

3     the hotel, to the McDonald's, and to the job site, but we

4     know -- as will be discussed in a moment -- that that was

5     not a true statement and he left out a significant stop -- a

6     40 minute stop -- at the Men's Wearhouse.

7          Which leads me to Mr. Morphew's behavior while in

8     Broomfield.  Mr. Morphew made a number of stops while in

9     Broomfield and many of these stops were to throw away known

10    and unknown items.  The first was at a bus stop outside of

11    Broomfield.  The second was on the south side of the hotel

12    where he was going to stay.  The third was at a McDonald's

13    where he was seen on camera depositing items two or three

14    times into a garbage can, including one image showing him

15    pushing items down as far as possible towards the bottom of

16    the garbage can.  The fourth was a 40 minute stop at the

17    Men's Wearhouse parking lot where, while not on video, he

18    stated to law enforcement he was throwing things away.  The

19    fifth was at the hotel.

20         During these stops at the minimum Mr. Morphew

21    threw away a pair of boots and a camouflage jacket.  He also

22    admitted to law enforcement that he might have thrown away

23    the tranquilizer equipment but he wasn't sure.

24         The Prosecution has argued, and the Court can

25    infer, that this rather strange behavior by Mr. Morphew

1    indicates that he was disposing of evidence of a crime.

2            It's also relevant to the Court, and an

3    interesting question, why Mr. Morphew arrived so early in

4    Broomfield.  We know from Morgan Gentile that the work on

5    the wall was to begin Monday, May 11th.  We also know from

6    Ms. Gentile that Mr. Morphew's Bobcat would be needed to

7    conduct the work on the retaining wall, and that they would

8    need landscape bricks and gravel.  Mr. Morphew did not bring

9    the Bobcat to Broomfield, and when Ms. Gentile arrived at

10   the site on May 11th there were no bricks, and no gravel,

11   and the work could not be completed.

12           We also learned at the hearing that Broomfield

13   City Ordinances do not allow work like this to be conducted

14   on Sundays.  The person that hired Mr. Morphew to do the

15   work said that Mr. Morphew would have been aware of this

16   restriction.

17           We also know from hotel surveillance that

18   Mr. Morphew spent nearly five hours -- from 12:42 until

19   5:55 -- in his hotel room.  According to Mr. Morphew he was

20   watching television.

21           Finally, we know from Ms. Gentile that Mr. Morphew

22   was supposed to pick her up in Salida and drive her to the

23   job site on the afternoon of Sunday, May 10th.  Instead he

24   called her at 11:18 in the morning to tell her, without

25   explanation, that he had already arrived in Broomfield.

1      The question then is why would a person who was

2   devoted to his wife, who called her his angel, leave her

3   alone on Mother's Day when he did not have to.  Especially

4   since her children were not there to celebrate Mother's Day

5   with her.  Why get up at the crack of dawn to drive to a job

6   site when you know you are not allowed to work, where you

7   didn't have the proper equipment, and you don't have the

8   proper materials, and then spend five hours sitting in a

9   hotel room.

10      The Prosecution can argue and the Court can infer

11   that Mr. Morphew's plan was to drive down on the afternoon

12   on May 10th with Ms. Gentile but that something happened to

13   alter those plans.  Combined with the trash runs, the Court

14   can further infer that that something was the death of

15   Ms. Morphew which then led to the need for Mr. Morphew to

16   be away from the Puma Path home as soon as possible to

17   establish an alibi and to get away from the house to dispose

18   of evidence.

19      For all of those reasons, and considering the law

20   as I have to apply it, resolving inferences in the favor of

21   the People, looking at the evidence in the light most

22   favorable to the People, and combined with the low level of

23   proof the Court does believe that probable cause has been

24   established for Counts 1 and 2.

25      That gets us to proof evident presumption great.

1    Again, I'll talk about the law a little bit more than I

2    normally would.  In Colorado a defendant has an absolute

3    right to bail before convictions in all cases except --

4    there's one exception.  Prosecution for capital cases in

5    which the proof is evident or the presumption great that the

6    accused committed the offense charged.  That is in our

7    Colorado Constitution.  It's also codified in our statutes.

8          The burden of proof is on the Prosecution to

9    establish that the proof is evident or the presumption

10   great.  Unlike a preliminary hearing there is no presumption

11   in favor of the Prosecution, nor does the Court have to

12   resolve inferences in favor of the Prosecution.

13         Instead the Court is to act as a neutral,

14   objective fact finder and the weight given to certain

15   evidence or the credibility given to certain witnesses is

16   solely at the discretion of the Court.  That's Gladney v.

17   District Court, 535 P.2d 365, a Colorado Supreme Court case

18   from 1975.

19         So what does proof evident or presumption great

20   mean?  This was discussed by both attorneys earlier.  The

21   standard which the Constitution requires before bail may be

22   denied is greater than probable cause -- in other words,

23   greater than what we just talked about at the preliminary

24   hearing -- but less than what is required for a conviction.

25   So more than reasonable belief that the defendant may have

1    committed the crime, and less than proof beyond a reasonable

2    doubt.

3              In their brief the defense has asked the Court to

4    adopt clear and convincing as the appropriate standard of

5    proof.  This standard has been adopted by other states to

6    deny bail.  To give you some idea of how high of a standard

7    that is it's the same standard that courts use in Colorado

8    to terminate the parental rights of a parent in child

9    neglect cases.

10             The Court declines to adopt clear and convincing

11   evidence as the evidentiary standard in this case.  I do so

12   for two reasons.  First, no Colorado appellate court has

13   done so there is no precedent for using this as the

14   standard.  Second, the Court believes that the Colorado

15   Supreme Court has already given enough guidance to trial

16   courts regarding what clear and convincing evidence means.

17             Specifically the Court in the Gladney case cited

18   favorably to a case from the Supreme Court of New Jersey.

19   The Gladney Court stated, "The Supreme Court of New Jersey

20   in applying a Constitutional provision almost identical to

21   ours stated that bail should be denied when the

22   circumstances disclosed indicate a fair likelihood that the

23   defendant is in danger of a jury verdict of first degree

24   murder."

25             The question then becomes can the Court find that

```
 1   there is a fair likelihood that Mr. Morphew would be

 2   convicted at a trial where the standard of proof would be

 3   the highest that we have in our legal system, proof beyond a

 4   reasonable doubt.

 5            Taking away the presumption in favor of the

 6   People, taking away resolving inferences in favor of the

 7   People, and observing the case as a neutral observer, an

 8   observer who has been in the criminal courts since 1992

 9   analyzing the strength or lack of evidence in all sorts of

10   cases, I find that the answer to that question is no.

11            Is it possible that Mr. Morphew would be

12   convicted?  Yes.  But is it fairly likely that he could be

13   convicted?  I can not make that finding.  Frankly, in my

14   eyes and after a fair assessment of this evidence -- or lack

15   of evidence -- this case could go either way in front of a

16   jury.

17            Here are some of the reasons I make that finding.

18   First, at the proof evident presumption great hearing the

19   Court is legally obligated to consider the defenses and

20   questions raised at the hearing regarding the evidence that

21   the Court just reviewed in finding probable cause.  These

22   include when I spoke about the affair, there's no evidence

23   that Mr. Morphew was aware of the affair until it was

24   revealed to him by law enforcement.  Therefore if he did not

25   know about it it would not have served as a motive.
```

1            With regard to Ms. Morphew's body not being

2    recovered, by inference the defense was making an argument

3    that she could have disappeared herself.  I think that's

4    unlikely, but there is some evidence to support it.  She did

5    have an internet banking account that nobody was aware of

6    called Green Dot.  Mr. Morphew says that $70,000 was missing

7    from the safe in the garage.  Ms. Morphew was researching

8    living in Ecuador.

9            We also know that Ms. Morphew was a very good

10    secret keeper.  Nobody, including her close friends, had any

11    idea that she was having a long term and significant affair

12    with Mr. Liebler.

13            Frankly, the Court sees three possibilities.

14    Ms. Morphew was killed by Mr. Morphew, that she has

15    purposely disappeared, or someone other than Mr. Morphew

16    abducted and presumably killed her.  There is no evidence

17    that specifically rebuts the third option and there is some

18    evidence that supports it.  Most notably the presence of an

19    unknown person's DNA in the glove compartment of her vehicle

20    and the fact that that person has likely committed several

21    unresolved sexual assaults in two states.  I'll talk about

22    this at greater length in a moment.

23            The Prosecution's theory that Mr. Morphew came

24    home, discovered her on the phone with Mr. Liebler, became

25    enraged and then killed her in that three minute period

1    between 2:44 and 2:47, first of all, that is a very tight

2    time frame, as noted by Mr. Connelly.  Second of all, her

3    communication with Mr. Liebler ended -- and all

4    communication ended -- 30 minutes before Mr. Morphew even

5    arrived at the home.  Her last message was at 2:11.  he

6    arrived at 2:47.

7         Ms. Morphew's fear of Mr. Morphew, the counter to

8    that is no one witnessed Mr. Morphew ever being physical

9    with Ns. Morphew.  Neither daughter saw evidence of this

10   abuse.  Miles Harvey said they fight like most married

11   couples but did not -- but said that he had never seen them

12   physical with each other.

13        With regard to the afternoon of May 9th and the

14   statement regarding hunting chipmunks, we know that that

15   statement wasn't made until February 28, 2021.  Like many of

16   Mr. Morphew's statements, the defense would argue that he

17   cooperated with law enforcement, did I believe over 30

18   interviews, and that he could have conflated times and

19   dates.

20        Exhibit H through T, the Cellebrite report, shows

21   with greater clarity where his phone was during that three

22   minute period and it was established at the hearing it would

23   have been physically impossible for him to move as alleged

24   by law enforcement.

25        We know that on that afternoon the neighbors, the

1    Ritters, were home and they did not hear any disturbance or

2    any signs of distress.

3           It's also not clear when Mr. Morphew's phone was

4    placed in airplane mode.  Exhibit FF only shows when

5    airplane mode was turned off and not when it was turned on.

6           Finally, according to the owner of the Salida

7    Stove and Spa, Janelle Nepple, Mr. Morphew was at Salida

8    Stove and Spa between 4:00 and 5:00 on the afternoon of May

9    9th and acted normal.  Although to be fair to the

10   Prosecution, we know from Undersheriff Rohrich's testimony

11   that his car was not seen on the camera at the Shell gas

12   station west of Salida Stove and Spa, and if Mr. Morphew

13   took the normal route to get to Salida Stove and Spa he

14   would have passed in front of that camera at the Shell

15   station.

16          Also there is no direct evidence linking

17   Mr. Morphew to the disappearance of Ms. Morphew.  No one

18   saw him murder her or dispose of her body.  No one heard or

19   witnessed a disturbance on the afternoon of May 9th.  He has

20   not admitted to the crime.

21          The home surveillance system, which might have

22   provided significant direct evidence regarding the crime,

23   was disabled and the DVR was missing.  But it was Suzanne

24   Morphew's DNA on the cables leading to the missing DVR, not

25   Mr. Morphew's.  The DVR has not been found.

1          Despite numerous and thorough searches there is no

2    forensic evidence linking Mr. Morphew to the crime.   No

3    traces of blood or evidence of murder were discovered at the

4    house, in the garage, or on the property.   No traces of

5    blood or evidence of murder was found in his truck, in his

6    Bobcat, or at the hotel in Broomfield.

7          Unknown DNA was found on Ms. Morphew's bike.

8    It did not belong to Mr. Morphew.   Unknown DNA was found in

9    the back seat of Ms. Morphew's car.   It did not belong to

10   Mr. Morphew.

11         As mentioned before there are three possible

12   scenarios.   Mr. Morphew murdered Ms. Morphew and disposed of

13   the body.   Someone unknown took Ms. Morphew and murdered

14   her.   Or three, Ms. Morphew voluntarily and intentionally

15   disappeared.   I've already addressed in finding probable

16   cause why scenario one is possible.   I've also addressed why

17   scenario three seems unlikely.

18         What I have not talked about is scenario two, and

19   there is now evidence that scenario two is at least a

20   possibility.   We know -- what we know is that DNA from an

21   unknown male was found in the glove box of Ms. Morphew's

22   vehicle.   That DNA was swabbed, a profile was developed.

23   That profile did not match Mr. Morphew.   It was entered into

24   the CODIS database.

25         What we also know is that the DNA profile from

1    Ms. Morphew's vehicle matched a partial profile of DNA left

2    at three separate sex assaults, two in Arizona and one in

3    Chicago.  All of these unsolved sex assaults apparently

4    involved a person who had access to the inside of

5    Ms. Morphew's vehicle.  This information was received after

6    the arrest warrant was issued but before the hearing started

7    in early August, and I'm sure it will be further analyzed

8    and investigated.  But for now the evidence I have in front

9    of me is that there is a partial profile of a serial sex

10   offender's DNA in Ms. Morphew's vehicle.

11          The Court finds this particularly significant

12   because while it doesn't prove a stranger abduction theory,

13   it does at least support it.

14          So for those reasons I find that the proof is not

15   evident nor is the presumption great that Mr. Morphew

16   committed first degree murder.  Because I have not found

17   that the Prosecution -- because I have found that the

18   Prosecution has not met their burden the Court is obligated

19   to set bond under the Colorado Constitution.  Which is what

20   we will do next but I could use about a five minute break.

21   Why don't we come back -- maybe about a quarter to, so about

22   a ten minute break.

23          (Pause in proceedings from 3:33 p.m. to 3:45 p.m.)

24          THE COURT:  Back on the record.  The parties and

25   counsel are all present.  Mr. Lindsey?

1          MR. LINDSEY:  Judge, we are asking for a bond of

2     $10 million cash only.  The reason for that is our

3     understanding from all of the investigation, the search

4     warrants, what have you, is Mr. Morphew is probably about $3

5     million liquid at this point in time.  He's also very adept

6     at hiding money and keeping money from other people,

7     especially Suzanne.  We believe ten million cash only will

8     serve the statute 16-4-105 and 16-4-104 appropriately.

9          Judge, it is our position and our opinion

10    Mr. Morphew does not have a residence currently.  He's been

11    in the jail.  He sold the Puma Path residence.  He sold that

12    for the neighborhood of $1.7 million cash, so he has that to

13    use.  He also has several accounts through different areas

14    and different brokerage firms, silver market.  We just do

15    believe there's about $3 million liquid on his person.  So

16    that's a significant concern.

17         We also ask for that amount because we are

18    concerned of his ties to the community.  Right now he

19    doesn't have any.  He lived there at Puma Path, he moved and

20    he lived in a condo in Poncha.  He no longer has that condo

21    as part of his residence.

22         More importantly, Judge, Mr. Morphew has been

23    found, at least by this Court from a probable cause

24    standard, to have committed first degree murder.  That means

25    the Court has made a determination that he acted --

1    obviously understand the probable cause -- deliberately and

2    intentionally and killed his wife.  Several people have

3    expressed concerns to us if he were to get out that their

4    safety would be at risk. I think it's a legitimate concern,

5    Judge.

6              Obviously at the top of the list if Jeff Liebler

7    and his family.  They are concerned for their safety.

8    Sheila Oliver, also very concerned for her safety.  Brad

9    Oswald, very concerned.

10             I'm sorry, I said the wrong name.  The two ladies

11   that were involved, Holly and Sheila, are the two ladies

12   that are involved.  We would ask all of those ladies and

13   their family, Mr. Oswald and his family, Jeff Liebler and

14   his family be put on a protection order prohibiting any

15   contact whatsoever by Mr. Morphew.  We would also extend

16   that to all of the family of Suzanne -- the Moorman family,

17   David, Andrew, her sister as well, no contact.

18             No contact orders really are basically worth the

19   paper that they're printed on if somebody wants to run afoul

20   of that no contact order.  We also have information during

21   the course of several jail calls that there's been a lot of

22   money been moving around between Mr. Morphew and his family.

23             There's also been books delivered to the jail

24   about how to survive in nature and how to eat plants from

25   the land.  Mr. Morphew has been to Mexico, talked about

```
 1    going to Mexico.  He's talked about going to Arizona.  He's
 2    talked about going to Indiana.  So I think it's a legitimate
 3    concern based on Mr. Morphew's own words that he is a
 4    significant danger to flee.
 5           That's my argument about what I believe the bond
 6    should be set at, Judge.  However, on 16-4-105 the Court has
 7    to require any type of bond in a felony case that he execute
 8    a waiver of extradition, he has to acknowledge the
 9    protection order.  18-1-1005, he has to surrender any and
10    all firearms and agree not to purchase any firearms while
11    he's on this bond.
12           One of the other things the Court can do in 16-4-
13    105 and we're requesting is electronic or global positioning
14    monitoring of Mr. Morphew.  That gives the parties and the
15    witnesses to this case some peace of mind as to where
16    Mr. Morphew's whereabouts are.
17           I do believe that there is provisions under 16-4-
18    105 that he also periodically visit a pre-trial services
19    program.  I know the Court in this jurisdiction doesn't have
20    that.  I think one needs to be created for Mr. Morphew.
21    It's a significant enough concern in the People's mind that
22    that needs to happen.  That's all I have.  Thank you, Judge.
23           THE COURT:  Is there any criminal history?
24           MR. LINDSEY:  There was a criminal case I believe
25    in Indiana involving an assault involving another party, but
```

1    not anything other than that, Judge.

2        THE COURT:  The names that you're proposing for

3    the protection order, Jeff Liebler, Sheila Oliver, David,

4    Andrew, and Melinda Moorman?  Did I miss -- you were talking

5    about somebody named Oswald?

6        MR. LINDSEY:  So Jeff Liebler and his family,

7    Sheila Oliver and her family, Brad Oswald and his family,

8    Holly Wilson and her family, Martin and Jean Ritter have

9    asked for no contact orders.

10       THE COURT:  You said Holly Wilson?

11       MR. LINDSEY:  Yes sir.  Martin and Jean Ritter

12   have asked for no contact.  Cassidy Cordova, Morgan Gentile.

13       THE COURT:  Ms. Eytan?

14       MS. EYTAN:  Your Honor, first off the Prosecution

15   knows that the case that they're referring to was a

16   disorderly conduct case in Indiana that was dismissed.  So I

17   just want to make it clear that that's what was produced to

18   us in discovery.  So Mr. Morphew does not have any criminal

19   history.

20       He is 54 years old.  He's a hard working man, and

21   has been married, as the Court knows, for over 30 years.

22   His -- the Court's determination of bond should be guided by

23   16-4-103 to determine the bond type, the conditions and the

24   amount.

25       In looking at the factors in 16-4-103 what appears

1    to be is that the Court is dealing with an individual,

2    Mr. Morphew, whose family supports and loves him very much.

3    There's ten of them here in the courtroom right now.  Many

4    of them have flown from Indiana and have participated by

5    watching -- either listening to the Webex hearings initially

6    but now have come all the way from Indiana to support him.

7    They love him dearly, including his two daughters, which are

8    here and present in the courtroom, and they can't wait to

9    hug their father and have their father be near them.  I want

10   to make sure the Court understands his mother also and his

11   two sisters are here in the courtroom, as well as their

12   husbands.

13         So the fact that Mr. Morphew doesn't have ties in

14   terms of longevity in Salida or in this county or in

15   Colorado, he has significant ties in that his two daughters

16   live here.  That is where he intends to live, near by them.

17   So it's important to know that the people that are the most

18   important to Barry are here.  They love him and they need

19   him, and the best evidence that he will come to court is

20   them.  They're here, and they support him, and they love

21   him.  He will be here in court and he will answer to these

22   charges.

23         The fact that there's a question that he's a

24   danger to the community, I think the Court needs to look at

25   the past -- or actually look at 360 days.  Look at from May

1   5, 2010 to May 10, 2021.  What was Barry doing in terms of

2   trying to harm, threaten, or intimidate anybody that was

3   involved in Suzanne's disappearance?  None.  Nothing.

4        All the Court knows is that Mr. Morphew spent

5   hours and hours and days trying to find his missing wife.

6   He was doing that with friends.  He talked to people,

7   begging them to help him find her.  And in no way -- and all

8   the times even that Sheila Oliver, for example, was an

9   informant for the FBI Mr. Morphew in no way ever disparaged

10  his wife or anybody else for that matter.  Never threatened

11  anybody in any fashion.

12       Now Mr. Morphew is okay with any protection order

13  the Court wants to put on him.  He didn't ever while he's

14  been in jail and he's known who Jeff Liebler is, he's never

15  attempted to try and reach him, talk to him in any way.  The

16  Court hasn't heard him making any statements, even to the

17  FBI when they finally told him about this paramour that

18  Ms. Morphew had, that he had any intentions to try and track

19  Mr. Liebler down.

20       But saying that, Mr. Morphew has no problem with

21  the Court entering any order protecting them from any

22  potential danger that Mr. Morphew might be to them, which we

23  don't believe there's any.

24       As the Court knows Barry talked with law

25  enforcement over 30 times, over hundreds of hours he spoke

73

1    with them.  He invited them to his house.  He had them over

2    for steak.  This is not an individual who I think the Court

3    can see from his track record that he is going to flee and

4    he's not going to appear in court, which is what the Court

5    needs to look at in terms of making a determination of bond.

6          Now the Prosecution is stating without really any

7    evidence that he has $3 million liquid.  Well that's not

8    true.  I'll tell the Court that's not true.  That's false.

9          He has spent an enormous amount of money in order

10   to be able to get to this moment where he's going to be able

11   to bond out and be with his daughters and be with his family

12   and be able to grieve with them, because no one is able to

13   find his wife.

14         This now is a situation where the Court is being

15   asked to set no bond.  A $10 million bond?  That's no bond.

16   The law says that he has a Constitutional right to bond and

17   the Court now has allowed that.  So the Court needs to set a

18   bond that will assure that he comes to court.

19         In looking at the cases across the state where

20   bond has been granted in Class I felony cases, it appears

21   that the bond that is usually set is between $50,000 and

22   $250,000.  We'd ask the Court to set a $50,000 cash bond.

23   Understanding that that's a lot of money for anybody.

24         Mr. Morphew hasn't been able to work in the last

25   four months since he's been incarcerated on the charges

74

1    where the Court says that it can go either way.

2         In a case that can go either way -- and of course

3    the Court probably understands from the defense side that we

4    believe that he will be found innocent at the end of this

5    case.  We believe he is innocent now -- that a man that is a

6    hard working man, hasn't been able to work over the last

7    four months, we believe is unlikely to be convicted, and

8    then to have to post a bond so that he is paralyzed in terms

9    of being able to defend his case and support his two

10   daughters, which he needs to do.  They are not an age where

11   they are able to support themselves.

12        Setting a bond is of no consequence if the Court

13   sets it in an amount that he can't post.  Since he's been

14   incarcerated he's not only suffered the emotional and mental

15   losses of being caged and made a public spectacle all over

16   the world, as the Court knows, and wrongly defamed, but he

17   has sustained such great financial loss that as the Court

18   probably can understand, it's going to be hard for him to be

19   able to make money at this point in time.  Who is going to

20   hire him?

21        We'd ask that the Court take away his passport.

22   He's not going anywhere.  He's not going to Mexico.  Take

23   his passport.  We will surrender that immediately.

24        The Court can -- we're a little question mark

25   about the Ritters.  We'd ask that there be some statement

1    from them that they actually want a protection order.

2    That's confusing a little bit to the defense.  But all the

3    other individuals that were mentioned by the Prosecution,

4    absolutely no problem in adding them to a protection order.

5         But we'd ask that the Court set a reasonable bond

6    that will ensure that he appears, and at the same time is

7    actually a Constitutional bond that Mr. Morphew can make and

8    go home to his daughters.  Thank you.

9         May I approach with the Prosecution on the

10   location where Mr. Morphew intends on living?  If the Court

11   would like that information.

12        THE COURT:  Is it in Chaffee County?

13        MS. EYTAN:  No.  Gunnison.

14        THE COURT:  Part of my order is going to be that

15   he resides in Chaffee County.

16        MS. EYTAN:  Your Honor, I'd like to at least

17   address that.  I appreciate the Court letting me know that.

18   In order for him to be near his daughters, which is

19   imperative for his daughters and for him, he can't live in

20   Chaffee County.

21        Not only is he a public spectacle living here, and

22   he probably will not be able to even -- I don't know -- live

23   a normal life -- which he should be able to.  He's just been

24   charged.

25        He's presumed innocent and we will give the Court

1    the actual -- I don't want it in public record but we will

2    give the Court the address in Gunnison County where he is

3    living with his daughters -- or near one of the daughters.

4    It's close.  It's not far away.

5           He will not leave the State of Colorado.  He will

6    follow all court orders, as he has always followed.  And he

7    has abided by all law enforcement requests.

8           I'd ask that the Court not set that perimeter for

9    -- if the Court wants to arrange for a private pre-trial

10   services individual just for Mr. Morphew Mr. Morphew doesn't

11   have a problem with that.  Mr. Morphew will travel and meet

12   with a pre-trial services person as often as the Court

13   wishes for that to happen.

14          But for him to be constrained to this county it

15   would really -- it would be extremely difficult considering

16   the circumstances, both of the publicity in this case and

17   the fact that his daughters don't live in this county.

18          THE COURT:  Thank you.  Both sides have mentioned

19   16-4-103.  Those are the criteria that the Court has to

20   consider when setting the amount and the type of bond as

21   well as the conditions of release.  They don't all

22   necessarily apply to all cases and they don't all

23   necessarily apply to this case.

24          Those that stick out to me -- the big one is

25   obviously the likely sentence considering the nature of the

1  offense presently charged.  If Mr. Morphew is convicted the

2  sentence is life without parole.

3          But the other factors seem to mitigate in favor of

4  Mr. Morphew.  For instance, prior criminal record, if any.

5  There doesn't appear to be any criminal record.  Mr. Morphew

6  is 54 years old.  Facts indicating possibility of violations

7  of the law if he's released.  Again, no criminal history.

8          Again, the point made by Ms. Eytan that he has

9  been in the community for ten months while the investigation

10  was proceeding.  Did nothing to indicate that he would

11  violate the law, or intimidate, or harass possible

12  witnesses, which is another factor the Court has to

13  consider.

14          I have to consider facts tending to indicate that

15  the person in custody has strong ties to the community and

16  is not likely to flee the jurisdiction.

17          While he might not have strong ties to Chaffee

18  County -- because apparently his daughters no longer live

19  here -- he does still have strong ties to the immediate

20  community.  As we all know, Gunnison County is adjacent to

21  Chaffee County.  We know also that he has friends that have

22  supported him in Chaffee County, and at least until recently

23  he had lived here for several years and owned a home.

24          So I think adding all of those up I think ten

25  million is too high.  It is effectively no bond.  But I

1    think 50,000 cash is too low.  We need to be somewhere in

2    the middle.  Somewhere where if Mr. Morphew decides not to

3    present himself for trial there will be a financial burden

4    to the people who have posted his bond or to himself.

5    Enough so that they would have some motivation to find him,

6    but low enough that he has a realistic chance to post bond.

7    I'm obligated to do that under the Colorado Revised

8    Statutes.

9         So the Court is going to set bond at $500,000.00.

10   The type of bond will be cash only.  There will be specific

11   conditions of bond that I will now read to Mr. Morphew.

12        First of all, you're to have no contact with Jeff

13   Liebler or his family.

14        You are to have no contact with Sheila Oliver and

15   her family.

16        You are to have no contact with David, Andrew, or

17   Melinda Moorman.

18        You are to have no contact with Brad Oswald.

19        You are to have no contact with Holly Wilson.

20        At this point you are to have no contact with

21   Martin and Jean Ritter, Cassidy Cordova, and Morgan Gentile.

22        I'm going to talk about a protection order in a

23   moment.  If the Ritters want to be off that protection order

24   they can petition to the Court and I would remove them.  I'm

25   going to enter a protection order once we get the date of

1    birth, etcetera.  Mr. Lindsey?

2              I will enter a protection order for Sheila Oliver,

3    David, Andrew, and Melinda Moorman, Brad Oswald, Holly

4    Wilson, Martin and Jean Ritter, Cassidy Cordova, and Morgan

5    Gentile.  You are to have no contact with those people.

6              No contact means no -- I need you to be listening

7    to me, Mr. Morphew.  I don't want there to be any confusion

8    about what these bond conditions mean.

9              No contact means no face to face contact with

10   these people, no written contact through a letter, no

11   electric contact through text or IM or email, social media.

12   It also means no third party contact, so you can not ask

13   somebody to get a message to these people.

14             If you were to violate that order I am obligated

15   to tell you -- although it doesn't mean much in this

16   particular case -- you could be charged with a Class I

17   misdemeanor.  I think more importantly is if you violate the

18   protection order it's also a bond condition so I could

19   revoke your bond.

20             Mr. Lindsey, obviously I can't include on a

21   protection order and family because that does not give

22   Mr. Morphew notice as to who those particular persons might

23   be.  So while it is a bond condition it's not a condition

24   of a protection order because I don't have those names.

25             MR. LINDSEY:  Understand, Your Honor.

1          THE COURT:  You can not harass, molest, or

2    intimidate any named witnesses.  The other witnesses that we

3    haven't discussed you can have contact with them but you're

4    not to harass, molest or intimidate them, and you are not to

5    discuss the case, their involvement with the case, or their

6    potential testimony in any manner with them.

7          You are to surrender your passport.  You can not

8    post bond until the Court is in receipt of your passport.

9    We will keep that passport in our safe and it will be

10   returned to you once the case has been resolved.

11         You are not to travel or reside out of Chaffee

12   County.  I make this an order because this is where the case

13   has occurred, and it's this prosecutor's office and this

14   court that has to monitor your compliance with the bond

15   conditions.

16         I understand the point Ms. Eytan is making but the

17   counter point she also made earlier, which was you were in

18   this community for ten months -- well, for 12 months --

19   before the arrest warrant was issued.  During that period of

20   time you would have faced the same scrutiny.

21         I understand your children live in Gunnison, but I

22   want you here in Chaffee County so that I know that you are

23   close by.  You are to appear in person at every court

24   hearing.  You are to wear an ankle monitor to monitor your

25   location.  We don't have big city services with regard to

1    pre-trial services.  The ankle monitor is not GPS.  It will

2    tell me whether Mr. Morphew is residing in Chaffee County

3    though, and it will tell me if he leaves.

4         The monitor will be provided at cost to you

5    through the private probation department here in Salida.

6    Ms. Eytan, Ms. Nielsen, their office is in the basement of

7    this building, however they are not there on Fridays so they

8    are not there today.  So this bond can not be posted until

9    noon on Monday.

10         You are to sign a waiver of extradition, which is

11    automatic.  You are not to possess any firearms or weapons.

12    Anything else with regard to bond, Mr. Lindsey?

13         MR. LINDSEY:  No sir.

14         THE COURT:  Ms. Nielsen?

15         MS. NIELSEN:  After he gets set up and has the

16    ankle monitor would the Court consider allowing him the

17    ability to travel to our office if we give times, dates,

18    because it is going to be important going forward that he be

19    able to come to us.  It's much more cost efficient for him

20    if he can travel to our office.

21         THE COURT:  Yeah, I don't want to get in the

22    middle of Mr. Morphew's work with his attorneys so that

23    would have to be something that would be -- you would have

24    to notify the private probation of the time that he's going

25    to be out of the county and it could not be over night.

```
 1              MS. NIELSEN:  Understood.  Thank you, Your Honor.

 2              THE COURT:  That gets us to the affidavit.

 3              MS. EYTAN:  Your Honor, before we address the

 4    affidavit I've talked to Mr. Lindsey and the People are in

 5    agreement that the Court does need to make a determination

 6    of probable cause as to Counts 3, 4, and 5 because

 7    Mr. Morphew is in custody.

 8              THE COURT:  Oh, you're right.

 9              MS. EYTAN:  I will tell the Court that we don't

10    have any argument about probable cause as to Count 4, the

11    possession of the dangerous weapon.  The People admitted an

12    exhibit measuring the length of the firearm.

13              But we do not understand, and no theory has been

14    articulated at all by the Prosecution with regards to Counts

15    3 and 5.

16              We ask that the Court not find probable cause as

17    no evidence, even in the light most favorable to the

18    Prosecution, was presented during the preliminary hearing.

19              THE COURT:  I appreciate that and I appreciate you

20    bringing that to the Court's attention.  I think like

21    everyone on this case we tend to focus on Count 1, although

22    I am obligated to find probable cause, you're correct, on 3,

23    4, and 5.

24              4 has been stipulated to.  I do find probable

25    cause on 3 and 5.  3 is tampering with physical evidence.
```

83

1    Obviously if Mr. Morphew committed this offense the body has

2    not been found, that would establish tampering with physical

3    evidence.

4            Similarly Count 5, attempt to influence a public

5    servant.  In that case it's essentially alleged that he was

6    deceitful to several investigators in the case.  Again, if

7    he murdered his wife and then hid her body and then lied

8    about it that would constitute influencing a public servant.

9            So let's talk about the affidavit.  The People

10   were neutral originally.  Is that still your position,

11   Mr. Lindsey?

12           MR. LINDSEY:  It is, Judge, although a lot of the

13   information has been disclosed so I'm not sure how

14   beneficial it is to keep it sealed.  Anything that gets

15   released, any minor, we would ask that be scrubbed.

16           THE COURT:  Understood.  Ms. Nielsen?

17           MS. NIELSEN:  Your Honor, we are asking the Court

18   to keep the arrest affidavit sealed.  Mr. Morphew's

19   substantial interests are the same as what was previously

20   articulated in our motion to limit public access and those

21   that the Court identified in its June 4, 2021 ruling.

22           What has changed now -- and I can agree with

23   Mr. Lindsey at some level -- is that the public now has

24   significant information about the case.  More so than what

25   could be released in a redacted arrest warrant affidavit.

84

1   This affidavit, as the Court has noted, is nothing like I've

2   seen in nearly 25 years of criminal defense practice.    It

3   reads and looks like a tabloid.

4       It is obvious from the way that the affidavit is

5   written, replete with content that is irrelevant,

6   speculative, inflammatory, argumentative, and largely

7   inadmissible, that the D.A.'s office did this not with the

8   limited purpose of trying to secure an arrest warrant, but

9   instead I think their target audience is much different.    No

10   disrespect to Your Honor, but it appears based on the way

11   that the affidavit was written that you were not the true

12   target audience.

13       They wrote this affidavit to do exactly what is

14   not permitted, to try this case in the media, to sway the

15   court of public opinion, and to potentially taint a jury

16   pool.    The District Attorney's recent improper participation

17   in press conferences and podcasts further demonstrates their

18   true intention and their true audience.

19       The Court has already made a decision to arrest

20   Mr. Morphew and now, although we respectfully disagree,

21   found probable cause and bound this case over for trial.

22   It's even more imperative that the arrest warrant remain

23   sealed to preserve Mr. Morphew's right to a fair trial.    As

24   the Court has stated in an order, "No right ranks higher

25   than the right of the accused to a fair trial."

1          Release of this particular affidavit will decimate

2     Mr. Morphew's right to a fair trial and his ability to get a

3     fair and impartial jury.  Because of the way that the

4     District Attorney's office chose to style and write this

5     particular affidavit if it is released and disseminated

6     among the masses and commented on it will exponentially

7     increase the risk of a tainted jury pool in Salida and

8     across the State of Colorado.

9          If this affidavit is released we believe it will

10    be difficult, if not impossible, for jurors to base a

11    decision based only on admissible evidence that they would

12    hear at the trial and not what they have heard in the media

13    based on a release of the information contained in this

14    particular affidavit.

15         Yesterday the Boulder judge who is hearing the

16    King Sooper murder case ruled that a video taken from the

17    King Sooper store wouldn't be played in the preliminary

18    hearing so that the public couldn't hear it.  What the judge

19    ruled in that case is that the defendant's right to a fair

20    trial overrides the public's right to see it.

21         The Court said, "The Court finds that the

22    defendant's right to a fair and impartial jury pool

23    overrides the right of public access to Exhibit 1.  The

24    Court finds making Exhibit 1 accessible risks tainting the

25    jury pool in both Boulder County and the State of Colorado

1    as a whole."

2         In addition to the significant risk of tainting

3    the jury pool, release of this affidavit at this point will

4    severely limit the defense's ability to conduct meaningful

5    interviews without witnesses being tainted and biased by the

6    information in the affidavit.

7         We have spent time thus far trying to review the

8    massive amounts of discovery, prepare for the preliminary

9    hearing and the proof evident presumption great, and we're

10   still very early in the case.  We haven't even gotten to

11   arraignment.  So we still need to investigate.  We still

12   need to talk to witnesses, and if you release this affidavit

13   that's going to severely limit our ability to have potential

14   witnesses speak with us.

15        This affidavit is so chock full of inadmissible,

16   speculative, salacious information that once read or heard

17   by potential -- well intentioned potential -- jurors they

18   will not be able to separate what they read or hear in this

19   affidavit and the admissible evidence at trial.  You can't

20   unring that bell.

21        So for the reasons detailed in defense motion D-7

22   and those identified in your previous order of June 4th, to

23   protect Mr. Morphew's Constitutional rights including his

24   right to a fair trial, his right to a fair and impartial

25   jury, effective assistance of counsel, due process, and

1    fundamental fairness the defense urges the Court to have the

2    affidavit remain sealed.

3          THE COURT:  Thank you.  So release of records like

4    this is governed by Colorado Criminal Procedure 55.1.  A

5    very new rule, just went into effect in May, right around

6    the time this case started.  That rule tells me, first of

7    all, court records in criminal cases are presumed to be

8    accessible to the public.

9          "The Court shall not grant any request to limit

10   public access to a court record or to any part of a court

11   record, or enter an order on its own motion limiting such

12   public access unless it issues a written order in which it

13   one, specifically identifies one or more substantial

14   interests served by making the court record inaccessible to

15   the public, or by allowing only a redacted copy of it to be

16   accessible to the public.

17         Two, finds that no less restrictive means than

18   making the record inaccessible to the public or allowing

19   only a redacted copy of it to be accessible to the public

20   exists to achieve or protect substantial interest

21   identified, and three, concludes that any substantial

22   interest identified overrides the presumptive public access

23   to the court record."

24         In my order from June 4th I limited access to the

25   arrest warrant affidavit for three reasons.  In my opinion

88

1    none of those reasons remain a valid reason to limit public

2    access to the affidavit.  First, I found that the affidavit

3    contained a large amount of information regarding the case.

4    It's a highly detailed description of the investigative

5    efforts of law enforcement.  Some of the information was not

6    relevant for the Court's determination of probable cause,

7    and some of the information would likely not be admissible

8    at trial.

9        The Court was concerned that release of the

10   affidavit at that time could harm Mr. Morphew's right to a

11   fair trial as the allegations in the affidavit would not

12   have been challenged.  As stated I think by Mr. Connelly, we

13   have to remember an affidavit is the Prosecution's version

14   of what happened with no input and no challenge from the

15   defense.

16       Today the public is now aware of most of the

17   information in the affidavit due to the length and detailed

18   hearing that we held in August, as well as the reporting on

19   that hearing.  At that hearing I allowed the defense

20   adequate time to question the Prosecution witnesses, and I

21   allowed cross examination well beyond the scope of direct

22   examination.  I did that so that the Prosecution's evidence

23   could be challenged in a public forum.  Thus the evidence

24   put forward by the Prosecution was fairly challenged by the

25   defense and therefore this is no longer a valid reason for

1    suppressing the affidavit.

2          Second, I suppressed the affidavit because the

3    Court recognized the unusual amount of attention the

4    community has given to this case, and because of that the

5    Court wanted to give the defense time to interview witnesses

6    before those witnesses names were made public.  The defense,

7    in my opinion, has had that opportunity.  They've had the

8    affidavit since the inception of the case four and a half

9    months ago.  This is no longer a valid reason to suppress

10   the affidavit.

11         Third, I wanted to give the Morphew children, who

12   are defined as victims for purposes of the Victims Rights

13   Act, the opportunity to learn or not learn what was in the

14   affidavit and the time to process that information before

15   the information became public.  I hope that the children

16   have had that opportunity, but this is no longer a valid

17   reason for suppressing the affidavit.

18         The Court has redacted certain portions of the

19   affidavit.  Not evidentiary portions.  Those portions that

20   would give identification information, medical information,

21   social media addresses, anything relating to a minor.  Those

22   are the redactions that the Court is going to do.  I'm not

23   going to redact the affidavit further.  The meat of this

24   case has been heard by the public.  The other things that

25   the defense has not argued today but has argued in prior

1    motions, that certain things are inadmissible, they are

2    opinion evidence, that might be true but really the meat of

3    this case has been exposed.  The other things are ancillary

4    to the major facts of the case.

5            The Court is going to -- the affidavit will be

6    posted on the Colorado judicial website, and specifically

7    the page related to the Eleventh Judicial District.  I

8    believe it's under cases of interest.  You can either access

9    it that way, you can ask the Court for a copy but we would

10   have to charge you for it.  As we've established it's a

11   pretty long affidavit.

12           That gets us to whatever we're doing next.  I

13   think that bus is pretty much driven by the defense.

14           MS. EYTAN:  Your Honor, may I -- I would like to

15   submit to the Court for the purposes of the record a

16   proposed redacted version of the affidavit.  I would ask the

17   Court to consider this before releasing the affidavit, to

18   consider the defense proposed redactions.  I don't see the

19   urgency so if the -- I ask the Court to reconsider and to

20   consider the defense proposed redactions.

21           If I may approach --

22           THE COURT:  You can approach, and it will be made

23   a part of the record.

24           MS. EYTAN:  Thank you.

25           THE COURT:  But I'm not going to grant your

1    request.  Again, there's a presumption in favor of revealing

2    the records, and as I mentioned the bones of this case have

3    been exposed and have been challenged by the defense in a

4    public forum.

5              The affidavit will be posted by noon on Monday.

6              What then are we -- what are we doing next,

7    Ms. Eytan?

8              MS. NIELSEN:  Your Honor, we have a motion, D-22,

9    that we filed and we'd like that addressed before we convene

10   today.  Then we'd ask the Court at this time we'd like to

11   set the case for trial.  We understand that the Court

12   calendar is really backed up.  As a result we'd like to find

13   time now to set it -- even if we waive speedy in order to do

14   it -- so that we can mark it on the Court's calendar before

15   we arrive at an arraignment.  We're happy getting arraigned

16   today.

17             THE COURT:  Okay.  Mr. Lindsey, the State's

18   estimate with regard to length of trial?

19             MR. LINDSEY:  Gosh Judge, I'm guessing at least

20   four weeks.

21             THE COURT:  Ms. Eytan?

22             MS. NIELSEN:  We'd agree with four weeks.

23             MS. EYTAN:  Just to throw out there for the Court,

24   Ms. Nielsen and I were looking at May of 2022.

25             THE COURT:  Okay.  If we're looking at May,

92

1    unsurprisingly I don't have anything set except for the

2    first Monday every month is when I do my juvenile dockets

3    and I don't like to move those.  So if we started May 3rd

4    and ended May 31 that's a full four weeks although --

5             MS. NIELSEN:  We can accept that.

6             THE COURT:  -- I must say Memorial Day is the

7    30th.  So May 3 through June 1?

8             MS. NIELSEN:  We can accept that.

9             THE COURT:  Mr. Lindsey?

10            MR. LINDSEY:  I'd rather not but I don't have a

11   good reason.  May is my wife's birthday, Mother's Day, and

12   our anniversary.  I'd rather not spend it with you, I'd

13   rather spend it with her, Judge.  But we can accept that

14   date.

15            THE COURT:  Trial will be set May 3rd through June

16   1.  Mr. Morphew, I'm being told you're entering a not guilty

17   plea today, but you are also not demanding that your trial

18   be held within six months of that not guilty plea.  You have

19   a right to have a speedy trial.  That has been interpreted

20   to mean within six months of your request.  The request is

21   today, but that trial date is outside of the six month

22   period.  Do you consent to that?

23            MR. MORPHEW:  Yes.

24            THE COURT:  Okay.  All right, so we have trial

25   dates set.  You asked me to rule on D-22 that was filed

1    yesterday afternoon at 3:48.  I have -- I know it exists, I

2    haven't read it.

3            MS. NIELSEN: I  can give the Court a little

4    synopsis.

5            THE COURT:  I don't think that's a healthy way to

6    decide a motion and impose contempt sanctions without --

7            MS. NIELSEN:  Well --

8            THE COURT:  -- me even reviewing the motion.

9            MS. NIELSEN:  You know Your Honor, I'd ask that

10   due to the nature of the motion that the Court maybe enter

11   temporary orders pending review and final orders.

12           The question -- the motion that's requested is a

13   gag order.  That the Prosecution has been spending a lot of

14   time with the media in press conferences, on podcasts,

15   commenting in writing to various lay people about the case.

16   And going far outside what we believe are the bounds of the

17   Court's pre-trial publicity orders, and outside the bounds

18   of the rules of professional conduct.

19           We are assuming that there is going to be another

20   press conference as a result of today's ruling.  We are

21   concerned that even additional opinions and facts outside of

22   what has been presented at the preliminary hearing, and more

23   than what the Court ordered, and what the rules of

24   professional conduct states are allowed, which is referring

25   to exact quotes, but not elaborating on anything that

94

1   already is in the public forum.  Which has been occurring by

2   D.A. Linda Stanley and her team.

3         So we are extremely concerned that once we step

4   out of here we're going to enter another swell of analysis

5   and opinions by the D.A.'s office in the very jurisdiction

6   where Mr. Morphew is supposed to be tried.  If the media

7   wants to, and they will continue to report on this case and

8   have multiple podcasts, which they have, they're going to do

9   that.  But the D.A.'s office shouldn't be participating in

10  those and shouldn't be fueling those because it is them that

11  needs to try this case on a man, Barry Morphew, who is

12  presumed innocent.

13        They should not be participating in this media

14  frenzy, and they are, and they're creating it.  So we'd ask

15  that because we believe they have violated the Court order

16  that the Court issue a gag order on the Prosecution until

17  the case and after the case is tried.

18        THE COURT:  Is there a response?  I'm not saying

19  substantively to the motion.  Again, I just received it.  I

20  haven't read it.

21        MR. LINDSEY:  We just received it yesterday as

22  well, Judge.  I haven't had a chance to read it or respond

23  to it.  I'm not sure of the contents of it.

24        THE COURT:  All right.  The Court has already

25  issued an order regarding pre-trial publicity.  The Court

1    issued that order June 3rd.  I would hope all attorneys are

2    aware of their obligations under the Colorado rules of

3    professional conduct.  It's my recollection there are

4    specific rules with regard to prosecutors.

5           I don't know if what is alleged -- first of all, I

6    don't know what's alleged in the motion because I haven't

7    read it.  So I certainly don't know if it's true.  But there

8    seems to be a pretty easy way to avoid any sort of

9    allegations of improper conduct.  While I won't order it, it

10   certainly seems reasonable to limit interaction and

11   interviews with the media regarding a specific case that you

12   are prosecuting.  That is the normal route that I see most

13   prosecutors take.

14          So I'm not ruling on the motion, I'm not issuing

15   an order other than the order I've already issued, but I am

16   saying if there's a violation it's going to be a self-

17   inflicted wound.

18          So by my recollection we've got an outstanding

19   discovery motion and then this motion.

20          MS. NIELSEN:  That's right.

21          THE COURT:  So if we are setting a date to address

22   those two motions -- or should we be setting a date to

23   address those two motions?

24          MS. NIELSEN:  Yes.

25          THE COURT:  I would have time November 9th.

1            MR. LINDSEY:  That's fine by us, Judge.

2            MS. NIELSEN:  We can accept that, Your Honor.

3            THE COURT:  I don't think that would take more

4    than two hours?

5            MS. NIELSEN:  That seems right.

6            THE COURT:  If we do it in the afternoon since you

7    would be coming from Denver, 1:30?

8            MS. NIELSEN:  Thank you.

9            THE COURT:  We'll set a motions hearing with

10   regard to the most recent motion regarding discovery

11   violations.  It was filed I believe shortly before the

12   preliminary hearing started in early August.  Then second

13   the motion for contempt citations for violations of a court

14   order to limit pre-trial publicity.

15           What else do we need to do today?

16           MR. LINDSEY:  I don't have anything from our side,

17   Judge.

18           THE COURT:  Ms. Nielsen?

19           MS. NIELSEN:  Does the Court have a standard trial

20   schedule order in terms of when motions to suppress, when

21   motions need to be filed prior to trial?

22           THE COURT:  It's usually 30 days from trial being

23   set.  But this case is unusual in that we just set the trial

24   eight or nine months out.  So I don't think I need to have

25   that rigid of a schedule.  But I think what I would order is

1    any motions are to be filed by November 9th.  We'll do the

2    hearing on those two motions and then if I have other

3    motions that have come in we will set the date to hear those

4    motions.

5            MS. NIELSEN:  Thank you, Your Honor.

6            THE COURT:  Unless that's it the Court will be in

7    recess.

8            MS. NIELSEN:  Your Honor, for Mr. Morphew to

9    provide the Court the passport, should we provide it to the

10   Clerk of the Court?

11           THE COURT:  Yes.  Mr. Morphew will have to also

12   fill out the firearms affidavit within 48 hours of his

13   release.  Thank you.  Court will be in recess.

14           (Hearing adjourned 4:38 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3                C E R T I F I C A T E
 4
 5        I, Randel Raison, certified electronic
 6   court transcriber, do hereby certify that I typed
 7   the proceeding in the foregoing matter from audio
 8   recording, or the transcript was prepared under my
 9   direction, and that this is as accurate a
10   transcript of what happened at that time and place
11   as best as is possible, due to conditions of
12   recording and/or duplicating.
13
14
15
16
17
18
19
20
21
22
23   Date:  10-12-2021          /s/Randel Raison, CET
24   _____          _____
25
```

AB Litigation Services
303-296-0017