## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01108-DDD-SKC

BARRY MORPHEW,

*Plaintiff*,

V.

CHAFFEE COUNTY, et al.

*Defendants*.

_____

## RESPONSE TO MOTION TO DISMISS FILED BY DEFENDANTS CHAFFEE COUNTY, BOARD OF COUNTY COMMISSIONERS OF CHAFFEE COUNTY, CHAFFEE COUNTY SHERIFF'S DEPARTMENT, SHERIFF JOHN SPEZZE, AND UNDERSHERIFF ANDREW ROHRICH ("CHAFFEE COUNTY DEFENDANTS") [Dkt. 104]

_____

Barry Morphew, through counsel, responds to the motion to dismiss filed by the above-captioned Defendants, who will be identified as either "the County", see Dkt. 104, ftn. 1, or as "Defendant Officers" (John Spezze, Andrew Rohrich). Dkt. 1, ¶19.

### STANDARDS

"There is a strong presumption against dismissal for failure to state a claim." *Shell v. Am. Fam. Rights Ass'n,* 899 F.Supp.2d 1035, 1055 (D. Colo. 2012). "Fed.R.Civ.P. 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." See also *Khalik v. United Air Lines,* 671 F.3d 1188, 1191 (10th Cir. 2012). The Complaint need only

1

provide fair notice of the claims. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "Facial plausibility" is the benchmark, and reasonable inferences suffice at this early stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). There need not be every detail, but "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the claims]." *Twombly,* at 556.

Morphew's allegations raise his right to relief "above the speculative level," thus satisfying the threshold pleading standard. *Twombly,* at 555. Viewing the Complaint "as a whole," *Zokari v. Gates*, 561 F.3d 1076, 1085 (10th Cir. 2009), this Court must accept as true all the factual allegations and draw all reasonable inferences in the light most favorable to Morphew. *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

Plaintiff does *not* bring general claims that "encompass a wide swath of conduct, much of it innocent." *Khalik,* at 1191. The Complaint identifies dozens of specific acts committed by *specific* defendants. Plaintiff appropriately narrowed the list of defendants, formed small, effective subgroupings, and clearly identified which defendants were in which subgroup. [Dkt., 1, ¶¶19, 140].

## PERSONAL PARTICIPATION

A complaint may refer to defendants collectively if there is no confusion. *Bledsoe v. Board of County Commissioners of the County of Jefferson, Kansas*, 501 F. Supp. 3d 1059, 1080 (D.Colo. Nov. 18, 2020). Use of defined subgroupings of defendants is allowed. *Id.,* at 1078; *Dawson v. Bd. of Cnty. Commissioners of Jefferson Cnty., Colorado*, No. 16-CV-01281-MEH, 2017 WL 5188341, at *11 (D.Colo. 1/3/2017), *aff'd*, 732 F. App'x 624 (10th Cir. 2018). The Complaint identifies dozens of highly specific acts committed by *specific* defendants. Plaintiff appropriately narrowed the list of defendants, formed small, effective subgroupings, and clearly identified which defendants were in which subgroup. [Dkt., 1, ¶¶19, 140].

2

There is no ambiguity: Spezze and Rohrich were early, active, and continuous participants in the investigative team, they are alleged to have read the key documents and participated in the drafting of the Affidavit, and caused the constitutional violations.[1] Read "in tandem with [Morphew's] factual allegations elsewhere in the complaint," *Bledsoe*, 53 F.4*th* at 608, there is ample notice of what Stanley did.[2] This is not "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. at 678.

The fact that Spezze and Rohrich are identified in two sub-groupings ("Defendant CCSD Officers" and "Defendants authoring the Affidavit") gives more, not less notice. The Defendant Officers do not explain why this exceptionally-detailed Complaint does not give notice. Given the context and substantial detail throughout the Complaint, there are no reasons to dismiss any claims against these Defendants for lack of notice.

Officer Defendants ignore all of the claims that are alleged against the small subgroupings of defendants who authored the Arrest Affidavit.

Morphew claims the Officer Defendants knew the following facts, knew that they had not been disclosed and knew that false, misleading statements were being inserted into the Affidavit and exculpatory material was being left out. Instead of intervening and refusing to conspire to continue the underlying constitutional violations, the Officer Defendants chose to violate Morphew's constitutional rights, on these subjects:

(1) exculpatory DNA evidence, including CODIS matches and unknown male DNA, and false, misleading statements about DNA [¶¶158-165, 179-191, 209].

---

[1] The question is not whether Rohrich/Spezze authored every sentence of the Affidavit or whether they attested to it. It is whether they participated in *causing* the constitutional violation(s). 42 U.S.C. §1983. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)."

[2] Specific details about which defendant wrote, edited, authorized each sentence or what exactly each defendant knew are evidentiary matters Plaintiff can learn only through questioning each defendant in discovery.

(2) the fabricated pushpin map [¶¶217, 218, 242-245, 291, 294, 296, 298, 299, 315].

(3) Suzanne was alive and on her computer past the times they asserted she was deceased and highly exculpatory evidence about Suzanne's social media accounts [¶¶325-329, 330-352].

(4) Morphew's movements and false information about whether his phone was in "airplane mode." [¶¶253-275].

(5) the content of Morphew's law enforcement interviews and exculpatory facts like Morphew's remarks were taken out of context and made in response to lies the officers told him [¶¶239-240, 731-738].[3]

(6) false and reckless statements about alleged internet searches and the fact there had not been a reasonable forensic investigation. [¶¶ 276-280].

(7) there was not a "second device" [¶¶281-285].

(8) Morphew's truck activity [¶¶357-363].

(9) the activity on Suzanne's phone. [¶¶290-300, 357-373], and the false timeline [¶¶434-436].

(10) "missing" miles on Mr. Morphew's truck and related eyewitness accounts of his whereabouts at the relevant times. [¶¶512-521].

(11) the "tranquilizer dart evidence." ¶¶186-197, 374, 381-386, 387, 393-94, 399-400, 402-404, 409-413, 417-428].

---

[3] False representations about Morphew's police interviews included: Morphew "blamed" a mountain lion [¶¶719-721, 723-726, 730]; Morphew "blamed" a .22 caliber firearm "to describe his violence towards Suzanne that afternoon…," [¶¶741-746]; Morphew said Suzanne was experiencing "labored breathing" [¶¶752-757]; Morphew "cannot provide a last sighting" [¶¶748-751]; Morphew said he had taken Suzanne's phone away from her to control her [¶¶760-761]; Morphew said he did not have lunch with Suzanne on May 9, 2020 because of a turkey [ ¶¶731-738]. Hurlbert learned these were all false and misleading.

(12) Morphew's stay at the Broomfield hotel.  [¶¶441-446, 455, 478, 526-536].

(13) Morphew's attempts to reach Suzanne on May 10, 2020. [¶¶457-58, 461-62, 466-70, 479-484, 490-492].

(14) Suzanne told her daughters and "numerous" friends she wanted out of the marriage; [¶¶543, 546].

(15) Suzanne's spy pen was purchased for "safety" reasons [¶¶556-558].

(16) Jeff Libler said he avoided Colorado because of Mr. Morphew's surveillance cameras [*Id*., ¶¶570-574].

(17) There was "suspected blood" on the garage apron; [¶¶584-587]

(18) Law enforcement was sure Suzanne had not used a credit card; [¶¶591-92]

(19) Morphew questioned Suzanne about her plans to take a trip with Libler and that he knew about their affair, [¶¶619-623]

(20) Mr. Morphew grabbed Suzanne's phone once when she was surreptitiously speaking with Libler; [¶¶624-628, 629-639]

(21) Morphew had a female friend, and their relationship dated back to July 2020; [¶¶648-654]

(22) the skid steer, [¶¶659-668, 673-705, 702-704]

(23) a K-9 alert on the skid steer [¶¶673-705]

(24) See also previous footnote

(25) "negative" K-9 search results and the irrelevant, false, misleading one; [¶¶673-705],

(26) the package of steaks in the freezer [ ¶¶709-715].

(27) recent mountain lion presence in the area (showing his questions were reasonable)[¶¶723-726, 730].

(28) a K-9 alert to Suzanne's scent at and near her bike (showing Morphew did not place or stage the bike)[ ¶¶497-511].

Morphew alleges all of the above subjects were false, misleading, and/or were exculpatory. The Officer Defendants (including Rohrich, and Spezze) are alleged to have personally falsified material for the investigation and affidavit and omitted exculpatory information. This means they are personally responsible for causing the constitutional violations against them. Because Sheriff Spezze is a final policymaker for the County, it means municipal liability attaches to his violation of Morphew's constitutional rights.

## A.  MALICIOUS PROSECUTION (SPEZZE AND ROHRICH)

Neither Defendant challenges that malicious prosecution is a clearly-established constitutional violation nor challenges the absence of probable cause. [Dkt. 104, p. 4, n. 3]. Each only challenges their personal participation in the constitutional violations.

However, both Spezze and Rohrich ignore the constitutional right to be free from a continuing malicious prosecution after probable cause has dissipated. *Carbajal v. Lucio, supra*; *Montoya v. Vigil, supra.*  Plaintiff sufficiently alleges that any probable cause dissipated when exculpatory DNA information continued to be developed [¶¶851-853, 858]; when they discovered the firearm they believed to be the murder weapon was inoperable (and could not shoot tranquilizer darts)[¶¶887]; when their forensic computer investigation showed it was Suzanne, not Morphew, who changed passwords on her social media [¶¶330-350]; when they learned a K-9 alert to Suzanne's scent did not lead from the bike to the Morphew home (showing

6

Morphew did not place or stage the bike)[¶¶505-509];  when they learned their speculative theories about vehicles, phones, and computers were not true; [*E.g.*, ¶¶276-279, 324-329] and when they continued to learn about the plethora of facts alleged in the Complaint, and yet maliciously continued the prosecution.  See *Pierce*, 359 F.3d at 1281–82, 1284, 1296.

Probable cause does not exist when a "minimal further investigation" would have exonerated the suspect. *Kuehl v. Burtis,* 173 F.3d 646, 650 (8th Cir. 1999); *Baptise v. J.C. Penney, Co., Inc.*, 147 F.3d 1252, 1259 (10th Cir. 1998).  Morphew sufficiently alleges Defendant Officers did not have probable cause for the *continued* prosecution.  *Kimball v. Fox, supra,* at *5.  Because Plaintiff's allegations, taken as true, show that probable cause was lacking when Plaintiff was charged *and throughout the rest of his prosecution.*  Plaintiff has met his Rule 8 burden to move forward.

A.     *Spezze*

Spezze alleges there are only four "non-conclusory" allegations and those do not demonstrate that Spezze's actions caused Morphew's arrest:

(1)     The fact that the term "limited genetic profile" was meaningless alleges Spezze's involvement in the malicious prosecution because this was the term used by law enforcement to discount the exculpatory DNA evidence described in the Complaint and to justify continued prosecution of Morphew.

(2)     The reluctance to arrest Morphew was not related to a lack of probable cause - this factual question must await factual development. At the pre-discovery stage, a plaintiff would not be expected to know all of the behind-the-scenes discussions "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the

claims]." *Twombly,* at 556.  In evidentiary hearings in the state court proceeding, the CBI

defendants, Spezze, and Stanley gave wildly divergent testimony on this point.

(3)  using incomplete or "inchoate" data to interrogate a suspect is not unconstitutional,

(4)  Mr. Morphew could have remained silent. Mr. Morphew agrees he did not remain

silent. As the Affidavit explains, he met with the investigators dozens of times and

answered all their questions.

(5)  The affidavit mentions a mountain lion multiple times – The fact that the words

"mountain lion" appear in the Affidavit does not address the allegations in the Complaint

that Defendant Officers were aware of exculpatory corroboration for the questions Barry

was asking about whether a mountain lion could be responsible; the Affidavit does not

contain the corroborating evidence set forth in the Complaint. [¶¶719-730].

Spezze argues that  there are insufficient allegations that he was involved in writing the

arrest affidavit.  That is incorrect.  Spezze is identified as one of the authors of the Affidavit.

[¶140].  More detail is not required as that is a very specific allegation.  If what Spezze means is

that Morphew should already know, pre-discovery, which author wrote, edited, authorized each

sentence or exactly what each defendant knew and told the other authors, that is not required.

These are evidentiary matters Plaintiff can only learn through discovery.  The point is that the

Defendants authoring the Arrest Warrant are alleged to have conspired together with the common

objective of omitting exculpatory information and including false, misleading information.

In a single sentence, Spezze says that there was no clearly established law that his

involvement would have been unconstitutional.  That is incorrect.  A constitutional violation can

occur when one officer conveys false or misleading information to another officer who then

drafts the affidavit.  *Cf. Montoya v. City & Cnty. of Denver*, 2022 WL 1837828, at *5 (*Franks*

claim) "*Franks* itself recognized 'police could not insulate one officer's deliberate misstatement

merely by relaying it through an officer-affiant personally ignorant of its falsity.'"  *Montoya*, at

*5, quoting *Franks*, 438 U.S. at 163 n.6.

> ### B.    *Rohrich*

Morphew makes specific, non-conclusory claims against Rohrich:

(1)    Rohrich does not deny that Morphew makes a specific allegation about what

exculpatory DNA information Rohrich learned and when he learned it.  Morphew alleges

Rohrich and the other defendants who authored the Affidavit purposely omitted this information

from the Complaint and instead intentionally inserted false, incomplete, and misleading

information.  It is one of the most significant facts in this case that Rohrich and the other authors

knew about the CODIS hits in 2020 but omitted them from the Affidavit.  Rohrich's only

response is that, six months later, days after Morphew had already been arrested, CBI released its

CODIS match letter.

(2)    "Limited genetic profile" - This term was critical to the continued prosecution

over the summer and into the fall of 2020, when Rohrich and the other conspirators attempted to

suppress as much information as possible about the CODIS hits and delay disclosure in an effort

to continue to maliciously prosecute Morphew at the preliminary hearing.

(3)    Rohrich admits he knew that the GPS data was of limited value – in fact, the

Complaint alleges it was false and misleading. Rohrich is correct that "squeezing" an adult

suspect with false information has not yet been declared unconstitutional.

(4)    "Airplane Mode" - Rohrich admits he knew the "airplane mode" data was

incorrect and that Morphew's phone was *not* frequently placed on "airplane mode" during

critical times on May 9-10, 2020.  Rohrich does not deny this false and misleading information

was inserted into the Affidavit by those (including himself) who authored the Affidavit. It is irrelevant for purposes of this motion to dismiss, that Rohrich put Morphew's denial on this subject in the Affidavit.  Without the exculpatory information Rohrich possessed that the phone was not in "airplane mode," the Affidavit was misleading on subjects likely to influence a finding of probable cause.

(5)    CAST Report and activity on Ms. Morphew's phone at times that law enforcement theorized she was deceased - Rohrich again admits the information was false, but asserts the Complaint is not sufficiently specific about which Author of the Affidavit actually wrote down the information that appears there. As noted above, this does not matter.

### C.    Conspiracy

Rohrich and Spezze argue that because Morphew "has not pled that either official was involved in the decision-making process of what to include or omit from the affidavit," he fails to show they conspired.  To that Mr. Morphew would add that he does not know if there was a "decision-making process" or what that was.

This Court must reject Defendants' arguments for the same reasons that such arguments were unavailing in *Montoya*, *supra*, 2022 WL 1837828, at *8.  Morphew alleges Rohrich, Spezze, and the other Defendants (particularly those authoring the arrest affidavit) "falsified an affidavit in support of the warrant for his arrest" and "ignored [or intended] the obvious falsity of [the statements in the Affidavit] and that each advanced the clear common goal." *Ibid*.  Such allegations are sufficient to "nudge" Mr. Morphew's conspiracy claim "across the line from conceivable to plausible." *Id., quoting Twombly*, at 570.

The allegation that the defendants conspired is thoroughly supported with detailed factual allegations that Rohrich, Spezze, and the others "act[ed] in concert" and that there was "a

meeting of the minds, an agreement among the defendants, or a general conspiratorial objective [to fabricate evidence, lie in an Arrest Affidavit, and maliciously prosecute Mr. Morphew].'" *Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021)(internal citation omitted). It is certainly "plausible" Morphew will be able to prove his claims following discovery.

"[B]ecause direct evidence of an agreement to join a conspiracy is rare, a defendant's assent can be inferred from acts furthering the conspiracy's purpose." *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022). At this stage, before discovery, Plaintiff's allegations are more than sufficient. *E.g., Montoya, supra; Janny v. Gamez*, 8 F.4th 883, 924 (10th Cir. 2021) quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995).

### D. Withholding of Property

Spezze does not defend his refusal to release Morphew's property even though almost four years have passed since Suzanne's disappearance and two years have passed since the charges were dismissed. To Morphew's knowledge, Spezze is the official who continues to have physical custody of Morphew's property. Morphew's claim against Spezze is not based on mere supervisory liability.

Rohrich is incorrect that Morphew has an adequate state law remedy for the post-seizure retention of his property. On May 6, 2022, four days after the Complaint was filed in this case, Morphew filed a motion for return of property in the Fremont County District Court. Stanley and Hurlbert opposed the motion by written opposition filed on June 17, 2022. Hurlbert appeared and objected to the defense motion at a hearing on October 25, 2022, at which time the district court ruled that, because the property had been seized pursuant to a search warrant, the

district court would not order it to be returned. All of these facts, which occurred after the

Complaint was filed, are known to Spezze and can easily be added to an amended complaint.[4]

Spezze is not shielded by qualified immunity for his retention of property long after the

case has been dismissed. *Coleman v. Turpen,* 697 F.2d 1341, 1346 (10th Cir. 1982). The due

process right to the return of Morphew's property is clearly-established. See *United States v.*

*Rodriguez-Aguirre*, 264 F.3d 1195, 1213 (10th Cir. 2001)("After the criminal proceedings

conclude, however, the government has no right to retain the property, absent the commencement

of forfeiture proceedings, and its continued retention of the property from that point forward

could legitimately be viewed as a deprivation of the defendant's due process rights."); *Hudson v.*

*Palmer*, 468 U.S. 517, 533 (1984)(intentional deprivations of property violate the Due Process

clause if adequate state post-deprivation remedies are not available); *Mathews v. Eldridge,* 424

U.S. 319, 344 (1976). The Due Process Clause of the Fourteenth Amendment forbids state

actors from depriving persons of life, liberty or property without due process of law. U.S. Const.

amend. XIV, § 1. Cf. *Nelson v. Colorado*, 581 U.S. 128, 139 (2017)("Colorado has no interest in

withholding [former defendants'] money to which the State currently has zero claim of right.").

Colorado's purported post-deprivation procedures do not satisfy due process because,

after a trial court lacks subject matter jurisdiction over the criminal case, the court has no

jurisdiction to rule on a motion to return property. *Woo v. El Paso Cnty. Sheriff's Off.*, 2022 CO

56, ¶19, 528 P.3d 899, 905, *cert. denied,* 143 S. Ct. 2475 (2023).

Morphew has more than sufficiently alleged it is plausible that he will be able to prove

that Spezze (and his co-conspirators) have unconstitutionally deprived him of his property by

retaining it for years after the criminal case was dismissed, with no forfeiture proceeding and no

---

[4] See DDD Civ. P.S. III(D)(1)("Rule 12(b) motions are discouraged if the defect is correctable by the
filing of an amended pleading."). *Gee v. Pacheco*, 627 F.3d 1178, 1195 (10th Cir. 2010); *Iqbal,* at 687.
See also Fed.R.Civ.P. 15(a)(2).

adequate post-deprivation remedy. The risk of erroneous deprivation is manifest. *Mathews,*
*supra.*

### D.  MONELL LIABILITY (*Monell v. Department of Social Services*, 436 U.S. 658 (1978))

Defendants argue that Morphew fails to allege a specific County policy, custom, practice,
or training that was constitutionally deficient, much less establish a relationship to his alleged
injuries.

**<u>Failure to train/supervise</u>**

A failure to provide proper training may constitute the policy or custom executed by the
municipal entity if that failure reflects "deliberate indifference to the constitutional rights of its
inhabitants." *City of Canton v. Harris*, 489 U.S. 378, 392 (1989).  Such deliberate indifference is
apparent when "in light of the duties assigned to specific officers or employees the need for more
or different training is so obvious, and the inadequacy so likely to result in the violation of
constitutional rights, that the policymakers of the city can reasonably be said to have been
deliberately indifferent to the need."  *Id.* at 390. Put another way, "[t]he deliberate indifference
standard may be satisfied when the municipality ha[d] actual or constructive notice that its action
or failure to act [wa]s substantially certain to result in a constitutional violation, and it
consciously or deliberately choose[] to disregard the risk of harm."  *Barney v. Pulsipher*, 143
F.3d 1299, 1307 (10th Cir. 1998).  Notice is generally established by showing a pattern of
tortious conduct, *id.*, so "proof of a single incident of unconstitutional activity is ordinarily not
sufficient to impose municipal liability."  *Moss,* 559 F.3d at 1169 (*citing Jenkins v. Wood*, 81 F.3d
988, 994 (10th Cir. 1996)).  However, evidence of a single violation, "accompanied by a showing
that a municipality has failed to train its employees to handle recurring situations presenting an

obvious potential for such a violation, is sufficient to trigger municipal liability." *Allen v.
Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997).

Morphew meets this standard. He alleges that the highest levels of the CCSO were
involved in multiple meetings and work sessions on this case for over a year. It is impossible
that the supervisors were not providing training and supervision, in fact, Spezze himself was
showing his subordinates how to fabricate allegations and conceal exculpatory information.

Defendants argue Morphew has not alleged with specificity what aspects of the CCSO
training were deficient. That is because Morphew has been unable to conduct discovery because
of the stay in place. This Court should regard the allegations as sufficient to allow Mr. Morphew
to enter into the discovery process for the Monell claims. Additionally, evidence of a single
violation, "accompanied by a showing that a municipality has failed to train its employees to
handle recurring situations presenting an obvious potential for such a violation, is sufficient to
trigger municipal liability." *Allen Supra.* This case presents a situation where there is an obvious
potential for a violation because of lack of training.

Defendants cite *Estate of Strong v. City of Northglenn*, No. 17-cv-1276-WJM-MEH, 2018
WL 1640251, at *7-8 (D. Colo. Apr. 5, 2018), but that case is distinguishable. There, the plaintiff
filed a lawsuit over a single incident – a SWAT raid. It was not, as here, a course of conduct
spread over a year involving an entire team of supervisors and deputy sheriffs.

At this preliminary stage of the proceedings, Plaintiffs often must rely upon the discovery
process to find the type of specificity that the defendants seek.

**Final Policymaker Liability**

The Supreme Court has carved out multiple, independent pathways for holding
municipalities liable under §1983. Plaintiffs often establish municipal liability by showing that

county employees' unconstitutional conduct was taken in "compliance with a pre-existing policy or longstanding custom" in accordance with *Monell, supra.* But that is not "the only way to demonstrate that an action is properly viewed as the municipality's own." *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007). "While *Monell* found [municipal] liability on the basis of an 'official policy as the moving force of the constitutional violation,'" the Court in *Pembaur* "establish[ed] that actions taken by a municipality's final policymakers *also* represent acts of 'official policy' giving rise to municipal liability." *Id.* (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)) (emphasis added). "Accordingly, a municipality is responsible for both actions taken by subordinate employees in conformance with preexisting official policies or customs and actions taken by final policymakers." *Id.* at 1284.

Under *Pembaur*, "if a county official has been delegated the power to make final policy in an area of the county's business, then the official's acts in that area are the acts of the county." *Starrett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989) (citing *Pembaur*, 475 U.S. at 482-83; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, (1988)). "Whether an official has final policymaking authority in a particular area is a question of state law." *Id.* Importantly, the final policymaker's acts need not amount to formal rules or customs—"municipal liability may be imposed for a single decision . . . tailored to a particular situation and not intended to control decisions in later situations." *Pembaur*, 475 U.S. at 480-481. In fact, municipalities are liable for "actions by final policymakers taken in *defiance* of a policy or custom that they themselves adopted." *Simmons*, 506 F.3d 1281 at 1285 (emphasis added).

Sheriff Spezze had final policymaking authority under state law over criminal investigations in the County. Because actions Spezze took are effectively the actions of the municipality under the final decision maker *Monell* prong, Mr. Morphew adequately sets forth a

15

*Monell* claim. Morphew has adequately alleged Sheriff Spezze's personal participation and his role as the Sheriff makes the County liable.

## ABOLITION OF QUALIFIED IMMUNITY

This Court should reject the doctrine of qualified immunity completely. This Court should completely reject qualified immunity as unjust, unlawful, and contrary to the plain language and intent of §1983.[5]  Qualified immunity undermines §1983's objective to promote and protect civil rights.  Public sentiment is against the application of qualified immunity as is evidenced by the illumination of qualified immunity in numerous states.[6]  It incentivizes prosecutors and law enforcement to brazenly disregard civil rights.[7]

Justice Thomas has repeatedly observed that the Court's qualified immunity jurisprudence "stands on shaky ground." *Hoggard v. Rhodes*, 141 S. Ct. 2421 (2021), citing *Ziglar* v. *Abbasi*, 582 U. S. 160, 156-160 (2017)(opinion of Thomas, concurring in part and concurring in judgment); *Baxter* v. *Bracey*, 140 S.Ct. 1862 (2020)(opinion of Thomas, dissenting from denial of certiorari). This is particularly true regarding the doctrine's abandonment of a subjective intent standard in favor of a one-size-fits-all objective standard. See *Baxter*, at 1863.  "But this [qualified immunity] test cannot be located in § 1983's text and may have little basis in history." *Hoggard,* at 2421 (citing *Baxter*, at 1862-1864 (opinion of Thomas); *Rehberg v. Paulk*, 566 U.S. 356, 366 (2012)(Alito)(*Imbler* went beyond the scope of immunity as of 1871); *Kalina*, at 132, 135 (Scalia, with Thomas, concurring)("There was, of course, no such thing as absolute prosecutorial immunity when § 1983 was enacted. … *Imbler*'s

---

[5] Taylor Kordsiemon, *Challenging the Constitutionality of Qualified Immunity*, Journal of Constitutional Law Vol. 25:3, pg. 576 (May 2023), Whitney K. Lovak, *Policing the Police: Qualified Immunity and Considerations for Congress*, Congressional Research Service, LSB10392 Version 4 (February 21, 2023).
[6] Colorado, Connecticut, New Mexico, and New York City have either ended qualified immunity altogether or limited its application in court cases involving state law claims.
[7] Jay Schwiekert, Qualified Immunity: *A Legal Practical, and Moral Failure,* CATO Institute (September 14, 2020).

principle of absolute prosecutorial immunity ... make[s] faithful adherence to the common law embodied in §1983 very difficult."); *Burns v. Reed*, 500 U.S. 478, 497 (1991)(Scalia, concurring in the judgment in part and dissenting in part)(history suggests that "prosecutorial action would have enjoyed only qualified immunity.").

Because judges should not "substitute [their] own policy preferences for the mandates of Congress"[8] and for the reasons articulated in these opinions and scholarly sources, Plaintiff respectfully requests that this Court decline to apply the doctrines of qualified or prosecutorial immunity.[9]

## CONCLUSION

If this Court finds that any claim is subject to dismissal, this Court should grant leave to amend. *Gee v. Pacheco*, 627 F.3d 1178, 1195 (10th Cir. 2010). *See Iqbal,* at 687. See also Fed.R.Civ.P. 15(a)(2)("[t]he court should freely give leave when justice so requires.").

Respectfully submitted,

s/*Jane Fisher-Byrialsen*
JANE FISHER-BYRIALSEN
IRIS EYTAN
HOLLIS WHITSON

## CERTIFICATION

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1) and this Court's Order of March 26, 2024.

s/*Jane Fisher-Byrialsen*

---

[8] *Hoggard,* at 2422 (quoting *Ziglar,* at 160 (opinion of THOMAS, J.)).
[9] If this Court disagrees with respect to qualified immunity, Mr. Morphew requests that this Court reject the objective standard and, consistent with Justice Thomas's opinions, rule the Defendant must show subjective evidence of good faith.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 29, 2024, I electronically filed the foregoing paper with the

Clerk of Court using the ECF system, which resulted in service on all counsel of record.

s/*Jane Fisher-Byrialsen*
JANE FISHER-BYRIALSEN