<table>
<tr><td>

SUPREME COURT, STATE OF COLORADO
ORIGINAL PROCEEDING IN DISCIPLINE BEFORE
THE OFFICE OF THE PRESIDING DISCIPLINARY JUDGE
1300 BROADWAY, SUITE 250
DENVER, CO 80203

_____

**Complainant:**
THE PEOPLE OF THE STATE OF COLORADO

**Respondent:**
LINDA STANLEY, #45298

</td><td>

_____

Case Number:

**23PDJ041**

</td></tr>
</table>

**OPINION IMPOSING SANCTIONS UNDER C.R.C.P. 242.31**

Following the highly publicized disappearance of a Chaffee County wife and mother, the newly elected District Attorney of Colorado's 11th Judicial District, Linda Stanley ("Respondent"), brought first-degree murder charges against the woman's husband. During the prosecution, Respondent made three improper extrajudicial statements about the case to the media, which threatened to prejudice the defendant and undermine the public's interest in justice. Those statements contributed in part to a judicial ruling changing venue in the case.

At the same time, Respondent did not adequately supervise the prosecution of the case. She failed to timely direct adequate administrative resources to process discovery, leading to a series of judicially imposed sanctions against the prosecution for discovery violations. She failed to take reasonable measures to establish a leadership structure that ensured accountability within the prosecution team, with the result that important projects in the case fell through the cracks. And she failed to intervene when the prosecution team was given an opportunity to cure its deficient endorsements for expert witnesses, the majority of whom were eventually excluded.

After the presiding judge issued several adverse rulings less than two months before jury selection, Respondent instructed her chief investigator to interview the judge's former spouse to determine whether the judge committed domestic abuse. Even though she had no credible evidence to believe that the judge had ever engaged in such criminal conduct, Respondent ordered the investigation in an effort to uncover information about the judge that would require him to recuse from the case. Shortly after the interview, which revealed that the judge had never abused his former spouse, Respondent dismissed the case without prejudice.

In a bid to rehabilitate her relationship with the media, Respondent later agreed to sit for a videotaped interview with a local reporter. During that interview, which Respondent reasonably should have known was on the record and would be publicly disseminated, she again made improper extrajudicial statements about two defendants criminally charged in the death of a

ten-month-old baby. She effectively pronounced that one of the defendants was guilty, revealed inadmissible details about the defendant's sexually based juvenile offenses, and impugned the motives and character of the defendants. Two judicial officers, ruling independently, concluded that Respondent's extrajudicial statements amounted to outrageous government conduct so severely prejudicing the defendants that the judiciary was required to dismiss each defendant's criminal case.

Taken in totality, a majority of the Hearing Board concludes that these ethical violations warrant Respondent's disbarment.

## I.    PROCEDURAL HISTORY

This matter began as a proceeding under C.R.C.P. 242.22. Later, on October 30, 2023, Erin R. Kristofco and Jonathan P. Blasewitz of the Office of Attorney Regulation Counsel ("the People") filed a complaint with Presiding Disciplinary Judge Bryon M. Large ("the PDJ"), bringing seven claims against Respondent that alleged violations of nine Colorado Rules of Professional Conduct: Colo. RPC 1.3 (Claim I); Colo. RPC 3.6(a) (Claim II); Colo. RPC 3.8(f) (Claim III); Colo. RPC 5.1(a)-(b) (Claim IV); Colo. RPC 8.4(a) and (d) (Claim V); Colo. RPC 3.6(a) (Claim VI); and Colo. RPC 3.8(f) (Claim VII).

Steven L. Jensen entered his appearance as Respondent's counsel on November 13, 2023, and answered the complaint on Respondent's behalf on December 18, 2023. On January 2, 2024, the PDJ held a scheduling conference with counsel, who appeared via Zoom. At that conference, the PDJ set a nine-day disciplinary hearing to take place from June 10-21, 2024.[1]

Respondent moved to disqualify the PDJ on January 16, 2024. The PDJ denied that motion on February 5, 2024.

On February 15, 2024, Respondent moved the PDJ for an order requiring the People to prove their claim as to Colo. RPC 1.3—Claim I—under a heightened standard, arguing that the Colorado Supreme Court's decision in *In re Attorney C.*[2] requires the People to demonstrate a mens rea of intent as to that claim.[3] Twelve days later, Respondent moved to dismiss Claim V (alleging violations of Colo. RPC 8.4(a) and (d)).[4] In that motion, Respondent challenged Claim V on grounds that it fails to state a claim, violates the separation of powers doctrine, and is void for vagueness. Alternatively, she argued, the PDJ ought to require a mens rea of intent as to Claim V

---

[1] Though the PDJ initially scheduled the hearing to begin each day at 9:00 a.m., the parties agreed at the prehearing conference to advance the start time each day to 8:30 a.m.

[2] 47 P.3d 1167 (Colo. 2002).

[3] *See* "Respondent's Motion to Resolve the Legal Issue of the Applicability of the Standards of In the Matter of *Attorney C.* to People's Alleged Violations of Colo. RPC 1.3" (Feb. 15, 2024).

[4] *See* "Respondent's Motion to Dismiss People's Claim V or to Set the Scienter as Intentionally and to Impose No Sanction If a Violation Is Found as a Matter of First Impression" (Feb. 27, 2024).

or to impose no sanction because the claim presents a matter of first impression. The People lodged their opposition to each motion in responses filed, respectively, on February 27, 2024, and March 12, 2024.

The PDJ decided Respondent's two motions in an omnibus order.[5] In that order, the PDJ first determined that the alleged discovery violations at issue in Claim I were not subject to *Attorney C.*'s holding and thus refused to import an intentionality standard into that claim; the PDJ ruled that the People need only prove the elements of Colo. RPC 1.3 to meet their burden on Claim I. The PDJ then denied Respondent's motion to dismiss Claim V on procedural and substantive grounds. The PDJ first found that Respondent's motion to dismiss for failure to state a claim was untimely and that, in any event, Claim V sets forth facts that, if taken as true, provide plausible grounds for relief. The PDJ next determined that Respondent failed to demonstrate that the People's claim V is constitutionally impermissible. Finally, the PDJ concluded that the alternate forms of relief Respondent requested were inconsistent with the rules governing Colorado's lawyer regulation system.

From June 10-21, 2024, a Hearing Board comprising the PDJ, lawyer Sherry A. Caloia, and citizen member Melinda M. Harper held a disciplinary hearing under C.R.C.P. 242.30 in Courtroom 2A of the Lindsey-Flanigan Courthouse at 520 West Colfax Avenue in Denver, Colorado.[6] Kristofco and Blasewitz attended for the People, and Respondent appeared with her counsel, Jensen. The Hearing Board received in-person testimony from Jeffrey Lindsey, Alex Walker, Daniel Edwards, Mark Hurlbert, Robert Weiner, Ramsey Lama,[7] Andrew Corey, Stan Garnett (qualified as an expert in prosecutorial ethics), Grant Grosgebauer, Aaron Ordway, John Suthers (qualified as an expert in prosecutorial ethics), Thom LeDoux, Tilo Voitel (qualified as an expert in forensic video analysis), Crystal Keim, Marijo Souza, Stephanie Courtney, Matthew Durkin, Tom Raynes, Michael R. King, and Respondent. The Hearing Board also watched the videotaped deposition of Sean Rice.[8] The PDJ admitted stipulated exhibits S1-S67,[9] the People's exhibits 2, 3, and 5-7, and Respondent's exhibit D.[10]

---

[5] "Omnibus Order Resolving Questions of Law Under C.R.C.P. 56(h) and Denying Respondent's Motion to Dismiss Claim V" (Apr. 9, 2024).

[6] The hearing was not held on June 19, 2024, which is a state holiday.

[7] For consistency, this opinion refers to Lama, who has retired from the bench, as Judge Lama.

[8] *See* Exs. S65 and S66.

[9] Exhibits S7 and S65 are redacted. During a recess on June 13, 2024, the Hearing Board privately viewed the portion of exhibit S58 at issue in the People's "Unopposed Motion for Protective Order Pursuant to C.R.C.P. 242.41(e)," filed on May 20, 2024, which the PDJ thus **DEEMS MOOT**. In addition, because the PDJ granted "The People's Unopposed Motion to Remove from the Protective Orders Exhibits to be Used at Trial" on May 24, 2024, the PDJ **DEEMS MOOT** nonparty Mark Hurlbert's response thereto, which he filed on June 3, 2024, and **MAKES PUBLIC** stipulated exhibit S15.

[10] The PDJ **STRIKES** the People's "Brief Regarding 'Information Contained in a Public Record' Provision of Colo. RPC 3.6 and Related Legal Issue," submitted on June 21, 2024, as redundant

Respondent was admitted to practice law in Colorado on October 29, 2012, under attorney registration number 45298.[11] She is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in this disciplinary proceeding.[12]

## II.    MORPHEW CASE: FINDINGS OF FACT[13]

*Background*

Respondent grew up in Davenport, Iowa. After receiving an associate's degree in criminal justice, she moved to Colorado in 1989 and worked as a truck driver. In 1993, she obtained a bachelor's degree at Metro State University in criminal justice. Later, she served as a police officer for several years, first in Arvada and then in Blackhawk. Before starting her family, Respondent returned to driving semis, which paid more and which she adjudged was less dangerous. She had two boys, who are now grown. Eventually, she attended the University of Denver master's degree program in public administration with an emphasis in domestic violence prevention, an issue personal to her, having been a victim of domestic violence. In autumn 2006 she enrolled at University of Denver law school in the part-time evening program, with the goal of working as a prosecutor. She graduated from law school in May 2010.

Respondent was admitted to practice law in Colorado in 2012. She has worked as prosecutor for most of her legal career in municipal, county, and district courts. In 2017, she briefly worked in private practice before accepting employment as a hearing officer for the Colorado Department of Revenue. She left that position in January 2020 to campaign for the position of district attorney ("district attorney" or "DA") for the 11th Judicial District, which encompasses Fremont, Chaffee, Park, and Custer Counties. She testified that she ran in part on a platform of prioritizing cold cases. She won the election and was sworn on January 11, 2021.[14] Respondent recounted that on assuming the role of district attorney, she discovered that the office was buried in a backlog of cases, hampered by several prosecutorial vacancies, and cash-strapped, as the county commissioners refused to allocate adequate funds.[15] She also mentioned, however, that her office held a fund balance of $540,000.00, which served as a cushion to balance overspending in the budget and to cover expenses associated with prosecuting particularly large cases.

---

with the parties' arguments on those matters at the disciplinary hearing. The Hearing Board thus does not consider the People's submission in this opinion.

[11] Compl. ¶ 1; Answer ¶ 3.

[12] C.R.C.P. 242.1(a).

[13] Factual findings are drawn from testimony offered at the hearing where not otherwise indicated.

[14] She defeated Thom LeDoux in the primary and Kaitlin Turner in the general election.

[15] Ex. S54, Ex. D.

Since January 2021, Respondent has served as the elected district attorney for the 11th Judicial District.[16] As the elected district attorney, her deputies operate through her authority to prosecute cases in the 11th Judicial District,[17] And her name appears on every filing her deputies submit to courts in the district.[18] She is also responsible for overseeing all administrative aspects of the office, including budgeting, hiring, communicating with county commissioners, and directing allocation of technology and other resources.

Soon after Respondent won the election, she hired lawyer Jeffrey Lindsey to fill the position of Senior Deputy District Attorney.[19] Lindsey was a career prosecutor, having spent more than two decades prosecuting serious crimes, including homicides, in various Colorado jurisdictions. Lindsey initially staffed the Fremont County docket; Respondent reassigned him to the Chaffee County felony docket in spring 2021.[20]

Around the time Respondent won the election, she began corresponding with Mike King, the host of the YouTube channel "Profiling Evil," a publicly viewable show and comment forum. King named his channel "Profiling Evil" to signal that the show's purpose was to expose predatory behaviors and educate people about how predators select victims. King testified that he reached out to Respondent, hailing her election. She responded, thanking him for his support and sharing her vision for the office. Both testified that they built a friendly relationship over text and email, discussing law enforcement topics but also personal matters, like the sorrows of a parent's aging and death. Soon after she took office, she was twice featured on King's show.[21] After Respondent's appearance on King's show on May 3, 2021, King texted Respondent, thanking her for the trust she placed in him.[22]

*Barry Morphew's Investigation and Arrest*

On May 10, 2020, Suzanne Morphew, a citizen of Chaffee County, went missing.[23] For almost a year, several law enforcement agencies investigated Suzanne Morphew's disappearance, including the Chaffee County Sheriff's Office ("the sheriff's office"), the Colorado Bureau of Investigation ("CBI"), and the Federal Bureau of Investigation ("FBI").[24] Her disappearance and the

---

[16] Stip. Facts ¶ 1.
[17] Stip. Facts ¶ 2.
[18] Stip. Facts ¶ 2.
[19] Stip. Facts ¶ 8.
[20] Stip. Facts ¶ 9.
[21] Ex. S8 at 3312.
[22] Ex. S8 at 3315.
[23] Stip. Facts ¶ 3.
[24] Stip. Facts ¶ 4.

resulting investigation garnered significant media attention.[25] Respondent was aware of the investigation into Suzanne Morphew's disappearance before she was elected district attorney.[26]

Respondent testified that within a few weeks of taking office, she discussed the Morphew investigation with John Spezze, the elected sheriff of Chaffee County. She then assigned Lindsey to the Morphew investigation by virtue of his assignment as the felony prosecutor in Chaffee County.[27] According to Respondent, she did not have the requisite experience to try the case herself. Instead, she took on county court docket duties in Fremont County.

In March 2021, Lindsey started talking to Commander Alex Walker, Chief Investigator for the 11th Judicial District Attorney's Office. Lindsey quickly realized the investigation was enormous. According to Respondent, Sheriff Spezze invited her and Lindsey to Salida in spring 2021 for a two-day presentation about the Morphew investigation. She and Lindsey attended and asked questions. Then, around the end of April 2021, Walker sent Lindsey a 129-page arrest affidavit for Barry Morphew, Suzanne Morphew's husband. Respondent testified that she and Lindsey were actively involved in discussions with Walker about the affidavit's iterative drafts.

On May 5, 2021, Walker submitted to 11th Judicial District Chief Judge Patrick Murphy the "Affidavit for Arrest Warrant for Barry Morphew," which sought to arrest Barry Morphew for Suzanne Morphew's murder.[28] A no-bond hold was requested due to the first-degree murder charge.[29] Judge Murphy found probable cause to arrest Barry Morphew, who was arrested on May 5, 2021.[30]

After Barry Morphew's arrest, Respondent attended a press conference alongside Sheriff Spezze in the afternoon of May 5, 2021.[31] Respondent testified that she was exhausted, did not want to be at the press conference, and did not want to answer questions. Sheriff Spezze, however, told her that her presence was required. Respondent recalled being briefed beforehand for two hours by a public relations officer about responding to press questions. At the conference, Sheriff Spezze deflected several questions and directed them to Respondent. According to Respondent, she knew she had to choose her words carefully and to stress that Barry Morphew was presumed innocent. At one point, a journalist asked whether Barry Morphew was cooperating with the investigation and whether he was questioned about the location of his wife's body. When Sheriff Spezze gestured for Respondent to respond, she answered, "[Barry Morphew] was taken into custody and when asked questions he said he wanted a lawyer, and all questioning ended."[32]

---

[25] Stip. Facts ¶ 5.
[26] Stip. Facts ¶ 6.
[27] Stip. Facts ¶ 9.
[28] Stip. Facts ¶ 10; Ex. S1.
[29] Stip. Facts ¶ 10.
[30] Stip. Facts ¶ 11.
[31] Stip. Facts ¶ 12.
[32] Stip. Facts ¶ 15; Ex. S2.

Morphew first appeared in court on May 6, 2021, to hear the charges against him. The arrest warrant remained suppressed following that appearance.

Thereafter, Lindsey took the role of lead counsel for the Morphew case.[33] Respondent assigned Deputy District Attorney Aaron Pembleton to the Morphew case to assist Lindsey.[34] Respondent spoke with Lindsey on a weekly basis about the case's status.[35]

On May 18, 2021, Lindsey filed a complaint and information outlining the charges against Barry Morphew, which included first-degree murder, a class-one felony; tampering with a deceased human body, a class-three felony; tampering with physical evidence, a class-six felony; possession of a dangerous weapon, a class-five felony; and attempting to influence a public servant, also a felony.[36]

*Discovery Difficulties*

During the Morphew investigation, the sheriff's office acted as a central clearinghouse for information collected by all law enforcement agencies. After Barry Morphew's arrest, the sheriff's office dumped a ten-terabyte external hard drive of discovery, including scores of videos and other digital-based discovery, on the district attorney's office. Crystal Keim, an administrative assistant with the 11th Judicial District Attorney's Office, testified that the discovery production—the most massive she had ever seen—was not usefully organized, merely slotted into digital folders labeled according to the agency that generated the material. Keim explained that it was extremely irregular for the sheriff's office to send discovery on an external hard drive. Usually, she said, the sheriff's office organizes discovery, labels it, and uploads it to Action, a proprietary in-house, statewide case management system for Colorado prosecutors. Respondent agreed, calling the production an "anomaly" and faulting the sheriff's office for failing to mention the size of the discovery cache. Had she known, she said, she could have delayed in filing charges or put resources in place beforehand to process the materials.

The prosecution team, including Respondent, was aware that under Crim. P. 16, initial discovery was due within twenty-one days. In addition, Barry Morphew's counsel filed a discovery demand on May 17, 2021.[37] To timely get the material to the defense, Lindsey instructed Keim to copy the information onto an external hard drive, bypassing the usual process of Bates labeling the material before producing it to the defense. Lindsey then directed Aaron Ordway, an investigator for the office, to drive to Denver to hand-deliver the hard drive.

---

[33] Stip. Facts ¶ 13.

[34] Stip. Facts ¶ 17.

[35] Stip. Facts ¶ 14.

[36] Stip. Facts ¶ 16; Ex. S3.

[37] Stip. Facts ¶ 21.

Daily, law enforcement agencies sent new batches of discovery to the sheriff's office, which in turn forwarded the material to the district attorney's office. Keim worked long hours uploading the material to Action so that the district attorney's office could Bates label it. Keim then tried to run the new information through eDiscovery, Colorado prosecutors' electronic discovery portal that integrates with Action and uploads information into a standard format that defense counsel can access. But eDiscovery got "bogged down" due to bandwidth issues, Keim said, which prevented her from efficiently uploading material.

Judge Murphy, who was presiding over the Morphew case, held a hearing to address discovery issues on May 27, 2021; Lindsey and Pembleton attended in person, and Respondent appeared virtually.[38] On June 3, 2021, Judge Murphy issued an order ruling on the defense's request to compel discovery, ordering that "any electronic communications created or received by law enforcement officers related to this case must be disclosed to the defense if they are material to the prosecution of the case or if they contain any evidence that would be in any way favorable to the defense.[39] Also on June 3, 2021, Judge Murphy issued—and Respondent received—an order regarding the defense team's motion to limit pretrial publicity.[40] "Without suggesting that there [were] any violations of general ethical principles," Judge Murphy set forth "guidance in all forms of extrajudicial statements" about the Morphew case by reciting and incorporating as an order Colo. RPC 3.6 and Colo. RPC 3.8, as well as relevant comments.[41]

As the prosecution struggled to effectively manage discovery requirements, the defense filed a motion for discovery sanctions on June 24, 2021; it requested a contempt citation relating to discovery issues on July 6, 2021; and it filed another motion for sanctions on July 8, 2021.[42] On July 22, 2021, Judge Murphy ruled that the prosecution had committed a discovery violation by failing to timely provide cell phone data and other electronic devices to the defense.[43] Judge Murphy did not conclude that the prosecution's failures were willful and declined to enter sanctions.[44]

Respondent was aware of Judge Murphy's ruling.[45] She was also aware that if a court finds a pattern of discovery violations, the presiding judge has wide discretion to impose sanctions, which can involve excluding evidence or witnesses, reducing or dismissing charges, or dismissing a case.[46] At the disciplinary hearing, Lindsey testified that Respondent did not make efforts at that point to rectify the discovery issues her office was facing. But Respondent insisted that part of Judge Murphy's ruling hinged on the prosecution's failure to provide a mirror image of a cell

---

[38] Stip. Facts ¶ 22.
[39] Stip. Facts ¶ 23.
[40] Stip. Facts ¶ 24; Ex. S4.
[41] Stip. Facts ¶ 24; Ex. S4.
[42] Stip. Facts ¶ 25.
[43] Stip. Facts ¶ 27; Ex. S5.
[44] Ex. S5.
[45] Stip. Facts ¶ 27.
[46] Stip. Facts ¶ 28.

phone—which the prosecution had not regularly provided in criminal cases before that point—and a recording pulled from a spy pen that Suzanne Morphew allegedly surreptitiously placed in her home, which the prosecution provided but the defense alleged was inaudible. According to Respondent, these discovery violations occurred only because the prosecution had to go to "the back of the line" in asking CBI technicians to process these defense requests, leading to a lag in production that overstepped the discovery deadline.

During this time, Respondent continued to communicate with King. She testified that their private correspondence was not meant to be published, and King said he honored that understanding and never published their exchanges. On May 15, 2021, King requested information about a short rifle some speculated that Barry Morphew used to murder Suzanne Morphew.[47] Respondent responded to King by text, "Um, I will see what I can do. Only because it's you, Mike."[48] Via text, King also asked Respondent whether Barry Morphew strangled Suzanne Morphew in the hot tub.[49] Respondent replied, "We know it wasn't bloody. The hot tub was drained with 'crust' around the drain areas indicating it has not been used in a long time. But keep on spinning ideas in your brain!"[50] And King messaged about Suzanne Morphew's car keys; Respondent replied, "We think she always left her purse in the car."[51] Later, in mid-June 2021, Respondent texted King, sending him an article titled "News Organizations ask judge to reconsider his decision to seal Barry Morphew arrest affidavit"; King replied that he would "create something tonight and put it out in the morning."[52] King also expressed enthusiasm that Judge Murphy was being challenged and that Respondent was not opposed to publicly releasing the affidavit. Later that summer, King texted, "I have a new video coming on Barry and I laud you. . . . You good?"[53] Respondent replied, "I'm great! Thanks!! We got him. No worries."[54]

*Expanding the Prosecution Team*

According to Lindsey, he felt taxed and overwhelmed by summer 2021. He was handling a full-time felony docket in Chaffee County as well as litigating the Morphew case, one of the biggest, most ungainly cases he had ever prosecuted. He testified that he viewed the resources available to him as "pretty paltry" and frequently asked Respondent for help, including for at least one full-time lawyer on the Morphew case. Respondent was not very responsive to his emails, he recounted, nor was she easy to find in person. He reported that she did not help with discovery or motions, though he expected that as the elected district attorney she would be involved in every aspect of this high-profile case. Respondent disagreed with Lindsey's characterization. She

---

[47] Stip. Facts ¶ 18.
[48] Stip. Facts ¶ 18.
[49] Stip. Facts ¶ 19; Ex. S8 at 3331.
[50] Stip. Facts ¶ 19; Ex. S8 at 3331.
[51] Stip. Facts ¶ 20; Ex. S8 at 3332.
[52] Ex. S8 at 3324-25.
[53] Ex. S8 at 3326.
[54] Ex. S8 at 3326.

described her role as consulting, advising, and staying abreast of developments, and she testified that until late summer 2021, Lindsey never mentioned that he needed additional assistance. Nor did she recall Lindsey requesting a full-time lawyer on the Morphew case.

Nevertheless, beginning in June 2021, Respondent began regularly asking Tom Raynes, executive director of the Colorado District Attorneys' Council ("CDAC"), for support. CDAC, a statewide organization representing all twenty-two Colorado district attorneys' offices, provides prosecution-related services; as part of that mission, Raynes often taps his network in more resource-rich judicial districts for volunteers to assist with cases in rural jurisdictions. Statewide, this was a very challenging period to recruit and retain prosecutors, however, and Raynes was unable to find any elected district attorneys that could spare lawyers for secondment to the 11th Judicial District.

Meanwhile, Lindsey began calling his own contacts, something he said he never before had to do as a line deputy. He reached out to Michael Dougherty, the elected district attorney in the 20th Judicial District, and Daniel Rubinstein, the elected district attorney in the 21st Judicial District. Neither could help. Lindsey also called Mark Hurlbert, former elected district attorney in the 5th Judicial District. Though Hurlbert was living in Summit County, he had been working for the 11th Judicial District since before the Morphew case was filed, handling correctional facility homicide cases on contract. In July 2021, Hurlbert agreed to join the prosecution team as a deputy district attorney.[55] Respondent assigned Hurlbert to the Morphew case.[56]

In August 2021, Lindsey also contacted Daniel Edwards, a former assistant attorney general, deputy district attorney, and public defender, to assist the prosecution in answering and filing motions.[57] Lindsey said he was "desperate" for help and "literally begged [Respondent] to bring [Edwards] on." Edwards, whom witnesses uniformly praised as a giant in the Colorado prosecution community, agreed to join the team[58] on the understanding that he would continue to live and work in the Denver metro area. Edwards was hired as a motions attorney; others on the team were to provide him with the facts of the case, and he would then supply the law and argument in draft motions and responses. Although Respondent provided Edwards with a laptop, intending that he would have access to discovery, Edwards testified that he was not able to log into Action and never had access to the facts of the case.

The combined preliminary hearing/proof evident presumption great ("PH/PEPG") hearing in the Morphew case was held on August 9-10 and August 24-25, 2021.[59] The PH/PEPG hearing was meant to assess whether the prosecution had demonstrated probable cause for the charges against Barry Morphew and whether, for purposes of denying bail, the prosecution had shown

---

[55] Stip. Facts ¶ 26.
[56] Stip. Facts ¶ 51.
[57] Stip. Facts ¶ 29.
[58] Stip. Facts ¶ 29.
[59] Stip. Facts ¶ 31.

that the proof against him was evident and the presumption great. To prepare for the PH/PEPG hearing, Lindsey requested—and Respondent provided—coverage of the Chaffee County felony docket for a full week. In that time, Lindsey organized all of the exhibits and prepared all of the witnesses, many of whom he anticipated would be named as experts. Lindsey's opinion was that the case, which was "all about experts," would rise and fall on expert testimony.

Lindsey handled most of the hearing, but Hurlbert did the direct examination of a few witnesses and Respondent examined two witnesses, including Walker, who had earlier left the DA's office in June 2021 to work for the Chaffee County Sheriff's Office. Lindsey asked both of Respondent's witnesses to write out the questions that Respondent should ask them on direct examination. At the conclusion of the PH/PEPG hearing, Judge Murphy reserved ruling until September 17, 2021.[60]

Mid-morning on August 24, 2021, in the midst of the PH/PEPG hearing, King texted Respondent, "feeling good?" Respondent replied, "Yes. Only because the judge has basically indicated that he's done. That's good for us."[61] That same day, King texted, "Now the noise. I heard [Barry Morphew] tried to stare you down this morning?" Respondent replied, "I stared him down. I have tried to every single day."[62]

*Respondent's Media Appearances*

Respondent and King agreed to do another "Profiling Evil" segment in late August 2021. At the disciplinary hearing, Respondent explained that although she received many media requests from several national outlets, including 20/20 and Dateline, she never agreed to give interviews. She testified she was not "trying to get famous" or "put [her]self out there." She noted, however, that she made an exception to her general media approach for King, and she emphasized that she appeared on his show to educate people about the criminal justice system.

On August 29, 2021, Respondent and King texted, discussing what he should tell his audience about Respondent and the Morphew case.[63] During these communications, King recounted, they agreed to cover topics involving the procedural aspects of criminal cases, including PH/PEPG hearings. Respondent recalled that she and King discussed the parameters of the show extensively, and she warned him that she could answer questions only about information in the Morphew case's public record. Respondent testified that before she recorded the segment with King, she conferred with Lindsey and Hurlbert about her participation.

In advance of the show, King promoted the segment, advertising Respondent's appearance. According to King, some audience members complained about Respondent's return

---

[60] Stip. Facts ¶ 32.
[61] Stip. Facts ¶ 33.
[62] Stip. Facts ¶ 34; Ex. S8 at 3335.
[63] Stip. Facts ¶ 35.

to the show, expressing concern that Respondent might prejudice the Morphew case by speaking publicly about it. When Respondent registered surprise that some of the pre-show comments were "not good," King offered her the option to cancel.[64] Respondent declined, remarking, "I'm not understanding why people are so pissed," and, "I obviously am not going to talk about anything that isn't already public information."[65] She concluded the exchange with "I don't ever back down."[66] At the disciplinary hearing, Respondent expounded: she testified that she did not view King's audience as knowledgeable about her ethical constraints as a prosecutor, and she rejected the notion that the power of her office would confer on her comments an extra measure of credibility in the public's eyes.

On August 30, 2021, Respondent appeared on King's "Profiling Evil" YouTube channel.[67] King said the show garnered about 23,000 views, around 1,000 of which were in Colorado. During the episode, Respondent explained various procedural concepts, including the meaning of direct and circumstantial evidence; the difference between a preliminary hearing and a grand jury proceeding; what occurs during a PH/PEPG hearing; the information she can ethically discuss; and the doctrine of double jeopardy. Respondent also reported that she intended to add to the prosecution team; voiced irritation that citizens would question whether she had probable cause to arrest Barry Morphew; defended her choice of attire during the May 2021 press conference; boasted that she stared down Barry Morphew at the PH/PEPG hearing "every chance [she] got"; and mentioned Barry Morphew's short stature.[68] She concluded the segment by noting that she was a little insulted that people would question whether she should appear on the show and insisted that "[a]nything out in the public is ok to talk about."[69]

After the podcast, Respondent texted King complaining that some "nasty shit" was posted about her in the show's chat forum.[70] As she explained to King, her reputation was "priceless" to her, and she viewed the comments as "borderline defamation."[71]

During or after the "Profiling Evil" podcast, Respondent authored comments using her own name and online avatar to respond to various members of the public who posted on "Profiling Evil's" chat forum.[72] Her comments were extensive. Many demeaned or personally attacked audience members.[73] Sometime between the show's airing on August 30, 2021, and September

---

[64] Ex. S8 at 3342.
[65] Ex. S8 at 3345.
[66] Ex. S8 at 3346.
[67] Stip. Facts ¶ 36.
[68] Ex. 3.
[69] Ex. 3.
[70] Ex. S8 at 3352.
[71] Ex. S8 at 3352-53.
[72] Stip. Facts ¶ 37.
[73] *See, e.g.,* Ex. S6 at 332 ("Sound likes someone needs their blankey . . ."); Ex. S6 at 358 ("I refuse to engage in a battle of wits with an unarmed opponent.").

30, 2021, a YouTube member with the username "Gian-Luc Brasseur" posted a public comment on "Profiling Evil," responding to Respondent's statements about Morphew:

> . . . in a preliminary hearing you are supposed to lay out enough evidence to take the accused to trial. The defense did a great job of debunking a few of the theories. Most reasonable observers of this case aren't even confident that the state laid out enough evidence to take this to a trial. How do you expect them to win a case with 0 DNA and 0 body with a very weak preliminary hearing? If there was some smoking gun they could have provided more info at the preliminary hearing causing the judge to actually send it to trial on day 4. Him needing time is not a sign of a very strong case. He has read the holy [sic] affidavit already so if you think there is something special in there, think again. It's best for the state to let this one go for now. Try the man again if you find better evidence.[74]

Respondent publicly responded to Brasseur's comment, again using her own name:

> . . . the judge explained why he was going to take time with it. He actually should because there was a lot of evidence admitted. I'm curious how long you've been a criminal law attorney since you like to think that you know it. Look this up: Dante Lucas. Convicted in Pueblo, Colorado (right next to my jurisdiction) less than a year ago for First Degree Murder!! Guess what?? No DNA. No Body, No murder weapon, No "smoking gun" as you say. But here's the clincher! He was the last one to see Kelsey alive!! And Barry was the last one to see Suzanne alive (as we stated in the prelim). Those items you listed may be important to you, but not for others (PS Dylan Redwines father was also just recently convicted of first degree murder in the death of his son. Same scenario. Didn't have any of the laundry list of items that you think are required for a conviction. I can come up with plenty more. Just let me know.[75]

At the disciplinary hearing, Respondent justified her posts, drawing an "important distinction" between her public persona—the elected district attorney—and her own private activities as Linda Stanley, who was entitled to defend herself from personal attacks. She reasoned that in her responsive comments, she was acting as a person, not the elected district attorney, as evidenced by her use of her personal picture, as opposed to her professional headshot, and her personal email, rather than her business email. But she also testified that her purpose in responding to Brasseur was to correct the record to show that no-body homicides could be prosecuted successfully, thus lessening the prejudicial effect of Brasseur's comments to her client, the people of the State of Colorado.

On September 14, 2021, soon after her appearance on "Profiling Evil," Respondent exchanged Facebook Messenger messages about the Morphew case with Julez Wolf, creator of

---

[74] Stip. Facts ¶ 38; Ex. S6 at 353.
[75] Stip. Facts ¶ 39; Ex. S6 at 355.

"True Crime with Julez," which is a podcast available through YouTube and other public platforms.[76] According to Respondent, she learned of statements Wolf made suggesting that Respondent had not read Barry Morphew's arrest affidavit. Respondent testified that she believed that statement was "super important to correct": her job as the top prosecutor in the 11th Judicial District was to make decisions about probable cause, so she feared the public's perception of her office would be diminished if people thought she had not been involved. "I did not want incorrect information to be disseminated further," she testified.

Respondent thus reached out to Wolf to note this inaccuracy. She also gave Wolf her contact information so Wolf could ask her questions. Wolf promptly inquired whether Barry Morphew was getting ready to flee, and Respondent wrote, "possibly."[77] Respondent testified that her "possibly" was "straight, neutral, down the line." Wolf made these text messages public, and they remained available for public consumption.[78]

Barry Morphew's defense lawyers moved for sanctions on September 16, 2021, alleging the prosecution had violated Judge Murphy's pretrial publicity order of June 3, 2021.[79] The motion was based in part on Respondent's statements to the media, her written comments to the public on the "Profiling Evil" YouTube channel, and her messages to Wolf.[80]

On September 17, 2021, Judge Murphy heard argument about bond. Lindsey argued the matter, contending that Barry Morphew was a flight risk.[81] The judge found probable cause for the charges against Barry Morphew, but he granted bond, concluding the prosecution had not met its burden regarding the proof evident presumption portion of the hearing.[82] The defense thereafter requested a $50,000.00 bond, while the prosecution requested a $10 million bond.[83] Judge Murphy set bond at $500,000.00, cash only,[84] and he released a redacted arrest affidavit to the public shortly after the hearing.[85]

Also on September 17, 2021, the defense requested that Judge Murphy address its motion for sanctions based on Respondent's extrajudicial statements.[86] Judge Murphy stated he had not reviewed the defense's motion, but he advised Respondent:

---

[76] Stip. Facts ¶ 40.
[77] Stip. Facts ¶ 41; Ex. S7 at 360.
[78] Stip. Facts ¶ 42.
[79] Stip. Facts ¶ 43.
[80] Stip. Facts ¶ 44.
[81] Ex. S9 at 6764.
[82] Stip. Facts ¶ 45.
[83] Stip. Facts ¶ 46.
[84] Stip. Facts ¶ 46; Ex. S9 at 6773.
[85] Ex. S9 at 6784-85.
[86] Stip. Facts ¶ 47.

> While I won't order it, it certainly seems reasonable to limit interaction and
> interviews with the media regarding a specific case that you are prosecuting. That
> is the normal route that I see most Prosecutors take. So I'm not ruling on the
> motion, I'm not issuing an order other than the order I've already issued, but I am
> saying if there's a violation it's going to be a self-inflicted wound.[87]

Lindsey described Judge Murphy's advisement as a "lecture" that dressed down the prosecution.

Even so, when King later texted Respondent questions about the hearing, Respondent responded, "Not surprised on bail. No CH, and our CBI witness, Cahill majorly screwed up on his testimony. He's not on the case anymore."[88]

### Personnel Changes on the Prosecution Team

In early October 2021, Lindsey resigned, giving four weeks' notice.[89] In testimony, Lindsey expressed bitterness that Respondent had not provided the support he expected, and he bemoaned Respondent's lack of involvement in the Morphew case or the district attorney's office, writ large. In his view, nothing happened on the Morphew case unless he made it happen. According to Lindsey, he told Respondent that he could handle either the Morphew case or the Chaffee County felony docket, but not both; Respondent promised to make a call the next day but failed to contact him; and when Respondent did not take prompt action to support him and could not be located, he placed a two-sentence resignation notice on her chair. Lindsey said that Respondent texted him later that night, "If you don't tell me what's wrong, how can I fix it?" But Lindsey had already resolved to move on.

Respondent disagreed with Lindsey's narrative. She said that when Lindsey approached her, she asked him whether he preferred to keep the Morphew case or the Chaffee County felony docket. According to Respondent, Lindsey told her that he did not want to give up either, leaving her stymied, and then he dropped off a resignation letter that contained no explanation. "In retrospect, it sounds like it was money," she opined, noting that during a budget meeting some weeks before, the county commissioners refused to allot funds to increase Lindsey's salary for the amount he requested. On October 29, 2021, Lindsey left the 11th Judicial District Attorney's Office.[90]

Lindsey's departure was "a big blow," Respondent testified, because he was essentially handling the Morphew case and a full felony docket. Further, Lindsey had been on the Morphew case since its inception, so replacing his institutional knowledge would be difficult. Respondent said she worked "tirelessly" to find his successor. Walker testified that in Lindsey's absence he had

---

[87] Stip. Facts ¶ 48; Ex. S9 at 6790.
[88] Stip. Facts ¶ 49; Ex. S8 at 3360.
[89] Stip. Facts ¶ 50.
[90] Stip. Facts ¶ 58.

"great concerns" about the Morphew case's staffing. It was not a good time to lose the case's lead counsel, Walker opined, and Lindsey's departure felt to him like "starting over." Hurlbert, for his part, testified that after Lindsey left, Respondent did not anoint anyone to be lead counsel, although he supposed he assumed that role. Edwards had a similar impression: he was never informed how, if at all, Respondent had decided to staff the case or assign tasks, but he assumed that Hurlbert took over lead counsel duties.[91]

As Lindsey's involvement in the Morphew case drew to a close, other personnel changes were afoot. Raynes and Respondent arranged for a team of experienced investigators and paralegals from the 4th Judicial District Attorney's Office to help organize and label discovery in the Morphew case. Stephanie Courtney, an investigator with the 4th Judicial District Attorney's Office, testified that she and her team began work in October 2021, though she believed that, based on their availability, they could have started the project as early as summer 2021. According to Courtney, she and her team spent two weeks touching every piece of discovery that had already been produced, categorizing that discovery, and indexing it. Along with other employees, she then paginated documents and Bates stamped them using Action. Courtney conceded some discovery was duplicated and produced twice because she did not know the case well enough to spot the duplicates. According to Courtney, her team received new discovery through at least March 2022, and the team continued to work on the Morphew case even after that time.

In addition, Sheriff Spezze managed to procure from the Chaffee County Commissioners $100,000.00 in extra funding for the Morphew case.[92] Those funds went toward hiring Robert Weiner in late October or early November 2021.[93] Respondent recruited Weiner, a former Senior Chief Deputy District Attorney who was working for a private law firm in Denver, after Raynes advised her to seek assistance from prosecution community alumni. Weiner agreed to work on the Morphew case from Denver on a part-time basis. Respondent gave Weiner a computer to log on to Action, but he experienced technical issues when using the system; for most of his tenure on the Morphew case, Weiner testified, he did not have access to a complete set of discovery.

Respondent testified that after Weiner joined the prosecution team, she continued to oversee the Morphew case and received weekly status updates.[94] According to Respondent, there was never any confusion about "whose jobs were whose" or which lawyer was responsible for various aspects of the case. But other testimony shaded the situation somewhat differently. Hurlbert related that when Weiner came on, he inferred that Weiner assumed the role of lead counsel; his own job, he thought, was to handle discovery and review motions. Conversely, Weiner testified that he "absolutely" was not the lead lawyer, as he was working remotely on a part-time basis and was already scheduled to try two other sizeable cases in spring 2022. Weiner said that he was not sure who was making the important decisions in the case, although he discerned that

---

[91] Stip. Facts ¶ 52.
[92] Stip. Facts ¶ 30.
[93] Stip. Facts ¶ 30. Respondent had discussions with Weiner about joining the case before Lindsey resigned. Stip. Facts ¶ 59.
[94] Stip. Facts ¶ 53.

Edwards was doing the bulk of the work and that Hurlbert was running the case on a day-to-day basis. Ultimately, Weiner believed that he was responsible for conducting the trial. From an outside perspective, Walker deemed it a "mystery" as to who took over the role of lead counsel, and he perceived that the prosecution team was confused about spheres of responsibility for various aspects of the case. For all intents and purposes, the prosecution team lacked a clear leader.

Walker recalled that after Lindsey left, he did what he could to get Hurlbert, Weiner, and Edwards up to speed, but his guidance landed on "deaf ears." In Walker's opinion, Hurlbert and Weiner seemed not to digest information about the case or to grasp its details.

*Setting Pretrial Deadlines and Judge Murphy's Recusal*

On October 13, 2021, Judge Murphy held a hearing regarding several matters, including discovery issues and Barry Morphew's bond conditions.[95] Lindsey, Hurlbert, Edwards, and Pembleton appeared on the prosecution's behalf.[96] At the hearing, Judge Murphy explained why the prosecution had to ensure that discovery disclosed to the defense was Bates stamped:

> I think ultimately – I mean you're going to have to provide all discovery and Bates stamped so that – I mean literally so that we are all on the same page. Otherwise, it's just going to be a mess if we get to trial and they've got something that's not numbered and they don't know how to reference it back to you and vice versa. So that obviously needs to happen.[97]

Further, both the prosecution and the defense agreed that the deadline established in Crim. P. 16 for expert disclosures—thirty-five days before trial—did not provide them enough time in the Morphew case to process those endorsements.[98] Instead, the parties consented to set the prosecution's deadline for expert witness disclosures on February 14, 2022.[99] Judge Murphy also orally ordered:

> I think both sides have requested that I order, in the absence of a report prepared by the expert, the underlying data upon which the expert is relying to form their opinion and a written summary of what their opinion will be. I'm allowed to order that under the rule, and I think it makes perfect sense. I would imagine most experts will have filed a report but if not, again I want to reduce the amount of surprise that we encounter at trial.[100]

---

[95] Stip. Facts ¶ 54; *see also* Ex. 6.
[96] Stip. Facts ¶ 54.
[97] Stip. Facts ¶ 55; Ex. 6 at 6818.
[98] Stip. Facts ¶ 56.
[99] Stip. Facts ¶ 56.
[100] Stip. Facts ¶ 57; Ex. 6 at 6838.

On October 29, 2021, Judge Murphy issued a case management order based on the parties' arguments and agreements during the hearing on October 13, 2021.[101] Regarding expert disclosures, the case management order memorialized the parties' agreed deviations from Crim. P. 16:

> Prosecution expert disclosures are due February 14, 2022 and supplement expert disclosures are due March 21, 2022. Defense expert disclosures are due March 7, 2022. These disclosures should include the underlying facts or data supporting the opinion, as well as providing a written summary of the testimony describing the witness' testimony (if no report has been prepared by the expert). Rule 16 I(a)(d)(3). Objections to the admissibility of any expert testimony under C.R.E. 702 (e.g. People v. Shreck, 22 P.3d 68 (Colo. 2001)), or for any other reason, shall be filed by the parties by March 29, 2022.[102]

According to Weiner, the case management order set the trial for earlier than was typical—jury selection was to begin May 3, 2022—which accelerated the timeline and put added burdens on the whole prosecution team. Indeed, because most members of the prosecution team were juggling other work and carrying heavy caseloads, Respondent continued to ask CDAC for supplemental assistance. But, said Weiner, "no one had bodies to lend to the 11th."

Once the case management order issued, the prosecution fell into a regular meeting pattern: Hurlbert, Weiner, and Respondent typically scheduled weekly Wednesday night telephone calls to prepare for trial. Due to the timing, Edwards attended only occasionally.

At the end of 2021, the likely contours of the trial began to emerge through a blistering motions practice. On December 7, 2021, the prosecution filed a motion seeking to admit into evidence prior acts of domestic violence through C.R.E. 404(b).[103] Also on December 7, 2021, the defense filed a motion for a bill of particulars as to Count 3 (alleging tampering with physical evidence) and Count 5 (alleging attempting to influence a public servant).[104] And on December 13, 2021, the defense moved to recuse Judge Murphy.[105] Edwards, who was tasked with drafting and responding to these many motions, circulated a chart in mid-December 2021, listing around two dozen pending drafts. Edwards prefaced the chart, "I am hesitant to file responses without review and comment from the trial attorneys to make sure that I am not saying something contrary to their strategy and/or require additional factual material to write the response. So

---

[101] Stip. Facts ¶ 60; Ex. S11.

[102] Stip. Facts ¶ 60; Ex. S11 at 15051.

[103] Stip. Facts ¶ 61. Edwards urged the prosecution team to secure expert witnesses about domestic violence. *See* Ex. S17.

[104] *See* Ex. S15; *see generally People v. Dist. Court,* 603 P.2d 127, 129 (Colo. 1979) (explaining a bill of particulars requires the prosecution to recite the facts it intends to prove and limits the proof at trial to those areas described so as to enable a defendant to prepare a defense).

[105] Ex. S12.

please review and send a response even it is as simple as "okay" or "reviewed."[106] According to Edwards, Respondent did not respond.

On the defense's motion, on December 30, 2021, Judge Murphy recused himself from the Morphew case, because an associate with the law firm of McDermott, Stuart and Ward entered their appearance on behalf of Shoshona Darke.[107] Judge Murphy was good friends with Sean McDermott, a named partner at the firm, whom Judge Murphy had known for at least forty years.[108] Shoshona Darke was Barry Morphew's new girlfriend and a potential witness at his trial.[109] The then-Chief Justice appointed Judge Ramsey Lama to preside over the Morphew case.

<em>Confusion About the Prosecution's Theory of the Case</em>

On January 11, 2022, the defense filed a motion (labeled D-58) requesting to "sever the trial of Count 4, Possession of a Dangerous Weapon[] from trial of the other counts in the] case."[110]

Edwards emailed Weiner, Hurlbert, and Respondent on the morning of January 17, 2022, writing, "sorry to contact you on a holiday – but I need to get this response filed. D-58 is a motion to sever ct 4 – possession of a dangerous weapon, a short rifle, from the other counts. I am not that familiar with the evidence to know whether the theory is that this short rifle was used to murder the victim."[111] Respondent did not respond, but Weiner replied the same day, including Respondent in the email.[112] Weiner wrote, "Is this gun a .22? If so I think the theory is that this is the gun that he claims he used to shoot chipmunks around the house. I can call [FBI Agent] Ken [Harris]."[113] Edwards replied, "I appreciate it."[114] Not long thereafter, Weiner wrote:

> This is [the] .22 that [Barry Morphew] claims he used to shoot Chipmunks. He talks about it a lot. This gun was hidden consistent with the fact that he was hiding evidence and then he is driving down the road and hands the guns to Jonny and Ken. Very odd. Barry is the one who cuts barrel. I think this evidence is inextricably intertwined. I should note this gun was supposed to be tested for functionality. I am not sure this was completed.[115]

---

[106] Ex. S15.
[107] Ex. S16; *see also* Exs. S12-S14.
[108] Stip. Facts ¶ 69.
[109] Stip. Facts ¶ 69.
[110] Stip. Facts ¶ 62.
[111] Stip. Facts ¶ 63; Ex. S18 at HURLBERT_001121-22.
[112] Stip. Facts ¶ 64; Ex. S18 at HURLBERT_001121.
[113] Stip. Facts ¶ 64; Ex. S18 at HURLBERT_001121.
[114] Stip. Facts ¶ 65; Ex. S18 at HURLBERT_001120.
[115] Stip. Facts ¶ 66; Ex. S18 at HURLBERT_001120.

Respondent did not respond. At the disciplinary hearing, she testified that she did not recall seeing the email.

Based on this information, Edwards filed the prosecution's response to the defense's motion to sever on January 18, 2022, arguing:

> Ultimately, [Barry Morphew] claims that he used the dangerous weapon to shoot chipmunks. [Barry Morphew] makes numerous statements about this. However, the gun was hidden, but ultimately found by law enforcement. [Barry Morphew] had cut down the barrel and that makes it illegal. In addition, found in the search of the property are (1) a plastic hypodermic cover from the dryer; (2) a dart needle from a box in the garage; and (3) a dart body from a box in the garage. Affidavit page 45. These darts can be shot from the dangerous weapon. See Affidavit. It is the [prosecution's] position that one method [Barry Morphew] may have used was the dangerous weapon to shoot the victim with a dart to tranquilizer [sic] her before he murdered her and/or with the dart to murder her. Because the evidence of the dangerous weapon and the other charges are based on two or more acts connected together or that constitute parts of a common scheme or plan the count should not be severed.[116]

But on the morning of a motions hearing just thirty-seven days later, on February 24, 2022, Weiner learned the short rifle was not capable of firing a dart. Weiner was forced to retract the prosecution's written representations about the short rifle in open court:

> Your Honor, I think I can make this pretty short. First of all, I want to correct a factual statement in our response. I believe our response indicates something to the effect of this particular gun could shoot the dart. That's not accurate and I just want to clarify that to the court. . . . This gun does not shoot the darts. It's not the dart gun. We're talking about a separate weapon, okay? I just want to clarify that for your honor.[117]

According to Weiner, he saw a notation to that effect in the file and inquired with Harris, the FBI agent, who confirmed the short rifle was not able to shoot a dart. In accordance with his ethical obligations, Weiner immediately corrected the record.[118]

Weiner testified that the prosecution team's confusion stemmed from Barry Morphew's changing stories, but Weiner also indicated, without elaboration, that Edward's response did not "correlate" with his own email. In contrast, Respondent testified that Weiner's email suggested that he confused the short rifle with another firearm. She insisted that "we absolutely" knew the

---

[116] Stip. Facts ¶ 67; Ex. 5.

[117] Stip. Facts ¶ 81; Ex. S32 at 8036.

[118] The next day, on February 25, 2022, Weiner emailed Hurlbert, asking in part, "where the hell is . . . the testing of that illegal gun?" Ex. S35.

theory of the prosecution, however: that the short rifle was not the gun used to shoot the dart. Later, though, she also stated that the prosecution's theory did not remain the same throughout the case, and she mentioned that the team ultimately concluded "it wasn't a gun at all that shot the dart."

*Hearing on Extrajudicial Statements and a Change of Venue to Fremont County*

On January 24 and 25, 2022, Judge Lama held a hearing on the defense's motion for sanctions based on Respondent's pretrial extrajudicial statements, which highlighted numerous statements Respondent made to the media.[119] These included Respondent's statements at the arrest press conference, Respondent's statements about staring down Barry Morphew in court, and her written comments to the public on the "Profiling Evil" YouTube channel and to Julez Wolf, creator of "True Crime with Julez."[120] At the hearing on January 25, 2022, Judge Lama found that several of Respondent's statements to the press, including her statement after Barry Morphew's arrest, violated Judge Murphy's pretrial publicity order.[121] Judge Lama declined to dismiss the case based on those statements, but he did not decide the sanction at that time.[122]

Though Edwards argued the matter for the prosecution, he was personally "shocked" by the sheer number of Respondent's extrajudicial statements. He was also concerned that many of her statements were ethically violative because they lacked a disclaimer that Barry Morphew was presumed innocent until proven guilty. Edwards was so taken aback by Respondent's statements to the media that he drafted and circulated to the entire 11th Judicial District Attorney's Office a form reciting the language of Colo. RPC 3.6 and Colo. RPC 3.8 as well as both rules' comments. He requested that each member of the office read the form and sign a sheet attesting that the signatory read and understood the rules. He hoped that this measure would guarantee that no further pretrial publicity problems cropped up.

Respondent believed that Judge Lama treated the prosecution unfairly during the January 2022 hearing. Specifically, she took umbrage with one allegation that Judge Lama required Edwards to address without prior notice. At the hearing, the defense observed that journalist Carol McKinley had penned an article stating that Respondent was not concerned about Lindsey's departure because several other prosecutors on the team were "just as determined to put [Barry] Morphew behind bars."[123] Judge Lama expressed particular concern about this statement in McKinley's story.[124] But because Edwards had no opportunity to research the factual predicate, Respondent testified, he could not bring to Judge Lama's attention the quote that Respondent had actually confirmed with McKinley: "We are fine. We have four prosecutors and

---

[119] Stip. Facts ¶ 68.
[120] Stip. Facts ¶ 68; Ex. S20 at 7367-76, 7406.
[121] Ex. S20 at 7393.
[122] Ex. S20 at 7408.
[123] Ex. S20 at 7362.
[124] Ex. S20 at 7397.

we are looking into hiring at least one more who works on the case full-time."[125] Respondent testified that she had "never seen a judge do something like this."

On January 31, 2022, Judge Lama issued an order changing the venue of the Morphew trial from Chaffee County to Fremont County.[126] As one prong of his analysis, Judge Lama focused on the volume and intensity of the case's press coverage. He pointed in particular to Respondent's statements at the press conference immediately following Barry Morphew's arrest as violating Judge Murphy's pretrial publicity order prohibiting extrajudicial statements—notwithstanding that the arrest preceded issuance of the publicity order. Judge Lama also found that Respondent's appearance on Profiling Evil was prejudicial to Barry Morphew's rights, as "[t]he title of the podcast alone is prejudicial."[127]

"I can't even explain what my reaction was [to the order]," Respondent testified at the disciplinary hearing. She acknowledged that even though court orders occasionally contain inaccuracies, lawyers still must respect and comply with those orders. But she found "shocking" that, in her opinion, a whole paragraph in the order was incorrect. She also described Edwards's submission of a motion to correct the facts, but she said Judge Lama refused to reconsider his ruling. This episode, Respondent testified, was the beginning of a trend she resolved to keep an eye on.

Around the same time, Weiner and Hurlbert recommended that Respondent cease to appear in person at hearings before Judge Lama. Hurlbert thought Respondent had become a "lightening rod," provoking the "ire" of Judge Lama and defense counsel when she appeared in court. For that reason, Hurlbert believed that the parties could better focus on the issues if Respondent were not present. Weiner echoed that sentiment. Both lawyers emphasized that their suggestion was not meant to remove Respondent from the case but rather merely to encourage her to be less visible.

*Communication About the Bill of Particulars*

The defense filed a motion for a bill of particulars on December 7, 2021, seeking to require the prosecution team to specifically set forth the facts underlying Count 3 (alleging tampering with physical evidence) and Count 5 (alleging attempting to influence a public servant).[128] Judge Lama granted the motion and issued an order on January 29, 2022, directing the prosecution to file the bill of particulars.[129]

---

[125] Ex. S10.

[126] Ex. S21. The case was recaptioned Fremont County Case 22CR47. Stip. Facts ¶ 70.

[127] Ex. S21 at 02037.

[128] *See* Ex. S15.

[129] *See* Ex. S30.

On February 7, 2022, Edwards sent an email about the bill of particulars to the prosecution team, writing, "I could not find a due date, but it has been ordered in 21CR78. DO YOU REMEMBER? Please let me know."[130] In that same email, Edwards stated that he could not locate the deadline for filing motions in limine, reminded the team that he did not have access to discovery, and volunteered to research and write any necessary motions in limine if other team members supplied the facts.[131]

Edwards testified at the disciplinary hearing that his email was intended, among other things, to alert the prosecution team that the bill of particulars, which was coming due, was a fact-based filing, so he could not draft it without assistance. Hurlbert's interpretation, however, conflicted with Edwards's intended message. Hurlbert testified, "[The bill of particulars] was a motion [Edwards] needed to respond to; he responded to all the other motions." Respondent, on the other hand, testified that she thought Hurlbert or Weiner would take care of the motion and thus did not respond. In the end, no one filed the bill of particulars.

Ten days later, Edwards again emailed the prosecution team, including Respondent, attaching a motion to dismiss Counts 3 and 5, which the defense filed after the prosecution failed to submit a bill of particulars. Edwards wrote, "It was my understanding that [Weiner] and/or [Hurlbert] was going to take care of this issue."[132] Unbeknownst to Edwards, other members of the prosecution team had made a strategic decision to dismiss those counts and thus chose not to answer the bill of particulars. Weiner explained that responding to the bill of particulars required drafting a full-blown narrative and arguments, which Hurlbert and Weiner worried would require them to disclose certain trial tactics. As such, the team—minus Edwards—decided to confess those counts, which would result in their dismissal. Weiner insisted in testimony that the prosecution's failure to respond to Judge Lama's order granting the bill of particulars was not a sign of disrespect, explaining that there were "a lot of moving pieces" at the time and that "sometimes things get missed."

Notwithstanding this failure to respond, Weiner testified, he did not see the prosecution team as disorganized or chaotic. Edwards's testimony suggested otherwise; he expressed frustration with the other prosecutors' failures to communicate and to provide facts when he requested them.

*Expert Witness Endorsements*

Under the case management order, the prosecution's expert witness endorsements were due on February 14, 2022. According to Respondent, the prosecution team was aware of the deadline and collectively made decisions about experts, but she also acknowledged that she had never endorsed expert witnesses in a homicide case, so she had to defer to the prosecution team.

---

[130] Ex. S22.

[131] Ex. S22.

[132] Ex. S30.

At the disciplinary hearing, Respondent insisted that the case "did not depend on experts." Edwards had a diametrically opposite opinion; he thought experts were "important" to a successful prosecution and should have been given more attention by the prosecution team. Hurlbert believed that certain experts would be crucial, including a telematics expert and a computer expert. Weiner, too, recognized the importance of putting on experts to support its case, but he also was mindful that several law enforcement investigators could be considered either lay or expert witnesses.

About a week before the expert endorsement deadline, Edwards realized that no one had taken the lead in drafting the expert witness endorsements. Though he was not initially assigned to helm this project, he volunteered to compile the endorsements with the understanding that Hurlbert and Weiner, who had divided up the experts between them, would provide him with the necessary information.

 On February 9, 2022, Edwards sent the team an email titled "MORPHEW – EXPERT ENDORSEMENT DEADLINE MONDAY, FEBRUARY 14."[133] Hurlbert testified that he did not understand why Edwards sent this email, as he assumed Edwards had access to a spreadsheet with all the requisite information and could ask for more information if he needed it. Respondent said this email did not concern her.

The following day, the prosecution was dealt a significant setback when, during a hearing, Judge Lama excluded evidence of domestic violence under the doctrine of res gestae.[134] Respondent and Weiner both took issue with the ruling. Weiner testified he was confused as to why Judge Lama precluded the domestic violence evidence, a finding that Weiner thought was disjointed from the record. Respondent said there was no way to get around the suppression of the prosecution's domestic violence evidence, which was "huge."

Also on February 10, 2022, Edwards sent another email to Hurlbert and Weiner. At the top of the email, Edwards wrote, "toward bottom there are new dates we need to be aware of," while at the bottom of the email, he typed in all caps: "EXPERT ENDORSEMENTS DUE MONDAY!"[135] Hurlbert said he understood from this email that Edwards was gathering all the necessary information from a spreadsheet. Weiner said he did not understand why Edwards sent this email. Respondent said she did not take any action in response.

On the morning of February 14, 2022—the deadline to file expert witness endorsements— Edwards sent Hurlbert, Weiner, and Respondent an email that stated, "as soon as I get information from you all concerning what witnesses will testify to what subject, I can file the expert notice –

---

[133] Ex. S23.

[134] Ex. S24.

[135] Stip. Facts ¶ 71; Ex. S25.

**WHICH IS DUE TODAY.**"[136] At 7:38 p.m. that evening, Edwards sent another email to Respondent, Weiner, and Hurlbert soliciting information about expert disclosures,[137] asking, "any experts in dv, profiling, dog tracking, mining, cell phone analysis????????"[138] In the same email, Edwards informed the recipients that he had compiled information from emails and web searches but that "we are still missing a lot of crucial information," and noted "we need to get CVs [curricula vitae] and reports from all witnesses – we might have some re CBI DNA. We need to get this filed tonight. I am a little embarrassed by what we might be filing."[139]

Hurlbert and Weiner responded that Edwards was working from an old list, and Hurlbert sent the latest version. At 8:45 p.m., Hurlbert replied to the same email chain, on which Respondent was included, "And [Weiner] was working on a DV expert. The rest should be up to date."[140] At 9:00 p.m. Edwards asked the group, "okay – updated list – still need data. What/who is Nighthawk, cannot find on internet. Address for Lisa Wolf? Address for Verizon? Address for Doug Spence? Info on Robert Johnson? Awaiting info on dv expert."[141] At 9:28 p.m., Hurlbert responded to all recipients:

> Nighthawk is Nighthawk LEOVision and I can't find an address other than Aurora. Lisa Wolfe: When I asked Jonny for an address the email is what he gave me. I can ask further. Verizon: They are in California, I will call tomorrow and get an address from them. Spence: Here is CDOC Headquarters—1250 Academy Park Loop, Colorado Springs, CO 80910. Robert Johnson is Robert D. Johnson CPA, PC and he is at 1980 Dominion Way, #200, Colorado Springs, 80918. DV Expert: Bob is working on this.[142]

Edwards responded to the prosecution team at 9:45 p.m., "I am going to file what we have – if there is additional information or more endorsements I will file a supplement."[143] Hurlbert replied a minute later, "Sounds good."[144] That night, Edwards filed the prosecution's witness list endorsing expert witnesses.[145] The next day, Edwards texted Weiner and Hurlbert, "did we ever come up with domestic violence expert(s)????"[146]

---

[136] Stip. Facts ¶ 72; Ex. S26 (emphasis in original). According to Walker, the prosecution did not contact him to gather information for his expert endorsement until February 14, 2022.
[137] Stip. Facts ¶ 73; Ex. S27 at HURLBERT_001130.
[138] Ex. S27 at HURLBERT_001130.
[139] Stip. Facts ¶ 73; Ex. S27 at HURLBERT_001130.
[140] Stip. Facts ¶ 74; Ex. S27 at HURLBERT_001128.
[141] Stip. Facts ¶ 75; Ex. S27 at HURLBERT_001128.
[142] Stip. Facts ¶ 76; Ex. S27 at HURLBERT_001127.
[143] Stip. Facts ¶ 77; Ex. S27 at HURLBERT_001127.
[144] Stip. Facts ¶ 77; Ex. S27 at HURLBERT_001127.
[145] Stip. Facts ¶ 78; Ex. S28 (designated as P-42).
[146] Ex. S29.

Edwards testified that although he compiled the list as best he could based on the information available to him, he did not believe that the disclosures complied with the case management order. "I was not happy with the expert disclosures that I made," he said, because they did not contain CVs or reference the reports' location by Bates numbers. Edwards explained that he has high standards, and the disclosures did not meet his expectations. Weiner agreed that the disclosures did not comply with the case management order, though he did not view the last-minute rush to compile expert information for endorsements as unusual. Hurlbert, who was not as troubled by the deficiencies, viewed them as de minimus.

On February 22, 2022, Barry Morphew moved to strike the prosecution's experts.[147] The defense argued that the prosecution listed twenty experts but provided only one written summary of the proposed testimony and, of the remaining witnesses, three endorsed experts did not appear in discovery and twelve had no explanation or summary of their expert opinions.[148]

Judge Lama held a hearing two days later, which Hurlbert and Weiner attended.[149] At that hearing, Hurlbert asked for and was given until February 28, 2022, to produce statements for any remaining experts who had not provided reports or statements as well as to provide all expert CVs.[150] Judge Lama issued a written order following his oral rulings at the hearing. He found that the prosecution conceded its expert disclosures did not comply with Crim. P. 16 or the case management order; that excluding the experts' testimony would severely limit the prosecution's case-in-chief; and that prejudice to the defense could be cured by giving the prosecution a short extension of time.[151]

Also on February 24, 2022, Edwards filed a notice withdrawing as a lawyer for the prosecution.[152] Edwards withdrew due to health issues, coupled with frustration at his colleagues' lack of responsiveness. Respondent testified that Edwards told her the case was affecting him physically and mentally but that she never heard him voice frustration about the prosecution team. Weiner testified that he was blindsided by Edwards's departure.

On February 28, 2022, Hurlbert filed a superseding endorsement of expert witnesses.[153] Respondent was aware of this filing.[154] The superseding endorsement listed the prosecution's expert witnesses, notated with statements that the experts would testify to the contents of their reports, which, with a few exceptions, were not included or attached. Lisa Wolfe's statement was disclosed to the defense, though no data was provided to support her statement.[155]

---

[147] Stip. Facts ¶ 78; Ex. S31 (designated as D-62).

[148] Ex. S31 at 2772.

[149] Stip. Facts ¶ 80.

[150] Stip. Facts ¶ 82; Ex. S32 at 8010.

[151] Ex. S34.

[152] Stip. Facts ¶ 79; Ex. S33.

[153] Stip. Facts ¶ 83; Ex. S36 (designated as P-44).

[154] Stip. Facts ¶ 83.

[155] *See* Ex. S37. Hurlbert testified that Wolfe's disclosure was his responsibility.

Doug Spence's statement, too, was disclosed.[156] But of expert witness Blake McConnell, the superseding endorsement stated, "He is currently in the process of preparing a statement. It is anticipated that he will testify consistent with his statement discovered to the defense."[157] And of expert witness Andrew McDermott (from Nighthawk), the superseding endorsement stated, "Mr. McDermott is currently in the process of analyzing data and preparing a report. . . ."[158] Further, some expert CVs were disclosed a day late, on March 1, 2022.[159] Hurlbert testified that the system may have glitched, obstructing the upload initiated on February 28, 2022.[160]

Respondent testified that her contributions to the Morphew case between February 14 and February 28, 2022, consisted of participating in higher level strategy about experts via a few phone calls and emails with Hurlbert and Weiner. She did not see anything "glaringly wrong" with the superseding endorsement, though she conceded that two experts lacked reports and thus were vulnerable to being stricken. Hurlbert testified that the disclosures were "adequate" and contained more information than he normally would provide in a criminal case. Weiner testified that Respondent bore the ultimate responsibility for any deficiencies, because the "buck stops there."

*Expert Witness Exclusions*

In March 2022, the prosecution added a new member to the team.[161] Grant Grosgebauer, a deputy district attorney in the 18th Judicial District, joined the Morphew prosecution after Respondent persuaded John Kellner, the 18th Judicial District Attorney, to deputize Grosgebauer to work on the Morphew case.[162] According to Grosgebauer, Respondent never reached out to him directly or delegated specific duties to anyone on the team. While Grosgebauer did not see the prosecution team as "captainless," he did question who was in charge of setting the overall prosecution theme.

On March 1, 2022, the defense filed a supplemental motion to strike the prosecution's expert witness endorsement.[163] The following day, the defense filed a supplemental motion to strike, arguing that the prosecution's disclosures violated the case management order and that

---

[156] *See* Ex. S38. Hurlbert testified that he, along with Walker, drafted Spence's disclosure after Walker communicated with Spence. Hurlbert testified that to his knowledge, no prosecutors spoke with Spence before Spence was endorsed as an expert witness.

[157] Stip. Facts ¶ 83; Ex. S36. Hurlbert said that Weiner was responsible for handling the McConnell disclosure.

[158] Stip. Facts ¶ 83. Hurlbert said that Weiner was responsible for handling the McDermott disclosure.

[159] Ex. S40 at 8550.

[160] *See also* Ex. S40 at 8550.

[161] Stip. Facts ¶ 84.

[162] Stip. Facts ¶ 84.

[163] Stip. Facts ¶ 85.

the prosecution produced some CVs one day past the deadline of February 28, 2022.[164] The defense supplemented its motion for discovery sanctions on March 8, 2022, based on the prosecution's additional discovery productions of February 28 and March 3, 2022.[165] On March 9, 2022, Hurlbert filed the prosecution's response to the defense's motion to strike proffered expert witnesses.[166]

Judge Lama held a hearing on March 10, 2022, to address the defense's supplemental motion to strike the prosecution's endorsement.[167] Hurlbert and Grosgebauer appeared for the prosecution. At the hearing, the defense argued that with a few exceptions, the prosecution team failed to disclose reports or statements for its endorsed expert witnesses. The defense also contended that the expert CVs and statements disclosed on March 1, 2022, were untimely and thus should be excluded. According to Hurlbert, he argued that the prosecution had already given the defense all of the required reports in discovery, save for the few experts who were still drafting their reports. He also asked Judge Lama to overlook the half-day delay in uploading CVs, which he attributed to a system glitch.

Judge Lama noted that the parties were telling two different stories: the defense said it never received expert reports, whereas the prosecution contended it had disclosed all the reports in discovery.[168] For that reason, Judge Lama asked Hurlbert to point to the Bates numbers of the expert reports that had been disclosed in the numerous terabytes of discovery. Hurlbert responded that he did not have the Bates numbers off the top of his head but could provide them if given time.[169] Hurlbert also conceded that the prosecution had not provided the defense the Bates numbers that corresponded with the prosecution's expert reports. Ultimately, Judge Lama found the prosecution had engaged in a pattern of discovery violations amounting to "trial by ambush," which prejudiced the defense.[170] The pattern was not willful, Judge Lama concluded, but it had to be answered with sanctions. Judge Lama thus found that the prosecution violated the case management order, declined to give the prosecution another extension, and granted the defense's motion to exclude many of the prosecution's expert witnesses.[171] Respondent was aware of Judge Lama's ruling at the time it was made or within a week thereafter.[172]

---

[164] Stip. Facts ¶ 86.
[165] Stip. Facts ¶ 87.
[166] Stip. Facts ¶ 88.
[167] Stip. Facts ¶ 89; *see* Ex. S40.
[168] Ex. S40 at 8555.
[169] Ex. S40 at 8556.
[170] Ex. S40 at 8581.
[171] Ex. S40 at 8578-81.
[172] Stip. Facts ¶ 90.

*The Change.Org Petition*

The prosecution team—Respondent, Hurlbert, Weiner, and Grosgebauer—was upset. According to Hurlbert, no jurist had ever treated him as badly as Judge Lama did during the hearing on March 10, 2022. In a text message thread with the team, Hurlbert accused Judge Lama of "messing" with the prosecution "again."[173] Grosgebauer confirmed that Judge Lama "clearly did not trust" Hurlbert's representations, in part because Hurlbert's statements to the court were "inartful." According to Respondent, at first Hurlbert questioned whether Judge Lama had a particular antipathy toward him; as more information trickled in, however, the team wondered if Iris Lama, Judge Lama's former spouse, was the "lynchpin."

On March 12, 2022, two days after the hearing on the prosecution's deficient expert disclosures, Respondent circulated to the prosecution team a link to an online change.org petition written by Julez Wolf.[174] Neither Respondent nor the other prosecutors participated in creating the petition.[175] Respondent could not recall how she learned of the petition, though she was certain Julez Wolf did not send it to her. The petition called for investigating and possibly removing Judge Lama from the Morphew case due to an apparent conflict of interest, citing three bases: (1) that the judge excluded evidence of domestic violence in the Morphew case; (2) that Iris Lama was an "advocate of Suzanne Morphew and victims of Domestic abuse"; and (3) that Iris Lama and Barry Morphew belonged to the same gym.[176]

In response, Hurlbert texted that he was contemplating a motion to recuse; Respondent agreed the team should file a motion, cautioned that she could not be sure of the petition's truth or the author's credibility, and remarked, "But it could DEFINITELY explain why he hates us so much."[177] Weiner exclaimed, "Holy crap!! Yes let's go after him! He should have disclosed this. We need to confirm asap."[178] And Hurlbert messaged the group, "He is obviously biased. I have realized him asking me the [Bates] numbers on the expert reports was because he didn't believe me when I said we gave the defense reports."[179] When Respondent proposed getting an investigator "on it," Weiner suggested pulling Judge Lama's divorce case and asserted that Judge Lama should "not be on the bench."[180] But Hurlbert and Respondent hedged, positing that only parties to a divorce case could get copies of filings; Weiner replied, "Maybe start with interviewing her."[181] Respondent agreed, messaging, "I looked into this organization, change dot org. Anyone can start a petition. So we don't know if any of it is true. The only way to know is to

---

[173] Ex. S39 at 13038. Some portions of exhibit S39 are numbered as "HURLBERT_######."
[174] Stip. Facts ¶ 91; Ex. S39 at 13040; Ex. S51.
[175] Stip. Facts ¶ 91.
[176] Stip. Facts ¶ 92; Ex. S51.
[177] Ex. S39 at HURLBERT_000231.
[178] Ex. S39 at HURLBERT_000231.
[179] Ex. S39 at HURLBERT_000232.
[180] Ex. S39 at HURLBERT_000232.
[181] Ex. S39 at HURLBERT_000233.

talk to his ex-wife. And BTW, he has custody of his kid."[182] Respondent also stated, "But the person who started the petition is Julez Wolf. She has a YouTube channel. I'm not sure that's a credible source."[183]

Respondent assessed much of the information in the petition to be true, and she considered Judge Lama's rulings against the prosecution to be "so egregious" that she suspected the judge was trying to "get back" at his former spouse through his rulings, making the case impossible to prosecute. She also independently posited, based on rumors within the community, that Judge Lama might himself have committed domestic violence. The totality of these allegations led her to think that she needed to run the rumors to ground. At the disciplinary hearing, Respondent was asked on several occasions to explain her goal in probing further, and her reasons were tangled and multi-faceted. Teasing them out, however, she articulated at core two disparate purposes. On the one hand, mindful that the prosecution did not look poised to secure a conviction, the goal was to try to show why the judge might be biased, including whether he abused Iris Lama, which would provide the prosecution grounds to recuse. On the other hand, in anticipation that the prosecution would secure a conviction, the goal was to protect the appellate record against the defense's potential claims of judicial bias by looking into the allegations, which she believed the prosecution was required to do out of an abundance of caution.

Hurlbert testified that the team was "just throwing out ideas" in the text string. But in his view, there was some evidence that the petition was accurate, including that he perceived Judge Lama's rulings to be "so far off the mark"; that Iris Lama was a member of The Alliance Against Domestic Abuse; that Iris Lama was doing a fundraiser for missing persons on social media, using a picture of Suzanne Morphew; and that another of Iris's social media postings depicted her posing with two people, one of whom was Shoshona Darke, Barry Morphew's girlfriend at the time and the impetus for Judge Murphy's recusal. Hurlbert was not aware of any evidence that would have suggested Judge Lama committed domestic violence, however.

Weiner testified that this team text exchange took place at night during a time when he was getting three hours of sleep. He said that although he was simply "spitballing ideas," he believed that Judge Lama ought to have disclosed this information about his former spouse, if he knew about it. Weiner testified that he agreed the prosecution should look into judicial bias because he knew "for a fact" that it would come up on appeal if Barry Morphew were convicted. The discussions, Weiner said, were about protecting the integrity of the process.

The team resolved to interview Iris Lama. According to Hurlbert, the interview was conceived of as a device to uncover a conflict of interest, but within five days it had morphed into a method of protecting the record on appeal. The team agreed that the interview should be conducted on Iris Lama's terms, without any pressure. Weiner testified that at some point he recommended Respondent find someone outside of the direct prosecution team to conduct the

---

[182] Ex. S39 at HURLBERT_000233.
[183] Ex. S39 at HURLBERT_000233.

interview. Hurlbert also remembered that someone raised the idea of a special prosecutor, with an eye to putting distance between the interviewer and the Morphew case to avoid the appearance that the prosecution team was attempting to influence the court. Respondent testified that she did not recall anyone suggesting that she ask a different agency or district to conduct the investigation so as to ensure it was impartial and independent. Respondent did not think the interview risked the appearance of intimidating Judge Lama.

In late March or early April 2022, Respondent and Weiner called Walker at the sheriff's office and asked if he had an employee who could investigate an allegation of prior domestic abuse by Judge Lama.[184] Walker refused to interview Iris Lama.[185] Walker's impression was that the prosecution team was frustrated with Judge Lama, whom they wanted removed from the case. Walker testified that he declined Respondent's invitation because he typically investigated domestic violence allegations only if they were made by an adult victim. According to Walker, he encouraged Respondent to use an independent investigator. Respondent then asked Kirby Lewis from CBI, who also declined; Lewis told her that the CBI did not want to invite the appearance of a conflict, as the CBI was already involved in the Morphew case.

Around the same time, Iris Eytan, lead counsel for Barry Morphew, emailed Hurlbert to alert him that an individual whom the prosecution had formerly listed as a witness had publicly posted Judge Lama's home address online.[186] Eytan considered this posting "concerning" and urged Hurlbert to "handle" the matter.[187] Hurlbert agreed to forward the email to law enforcement, although he questioned what crime had been committed. At the next hearing in the Morphew case, on March 30, 2022, Eytan showed the posting to Judge Lama, who said he planned to mention the matter to security.[188]

*Findings of Additional Discovery Violations*

On March 30, 2022, Grosgebauer participated in a *Shreck* hearing concerning expert Doug Spence's qualifications and the scope of his opinion.[189] Spence's initial and supplemental expert endorsement, which included a statement drafted by Hurlbert and Walker, indicated that he would offer an opinion based on a law enforcement canine, Rosco, who followed a scent down to a creek in the direction of the Morphew home.[190] The day before the hearing, Grosgebauer and Spence spoke together by telephone,[191] during which Spence never mentioned authoring a report

---

[184] Stip. Facts ¶ 94. Walker testified that he left the 11th Judicial District Attorney's Office at the end of May 2021.

[185] Stip. Facts ¶ 95.

[186] Ex. S41.

[187] Ex. S41.

[188] Ex. S43 at 8814-16.

[189] Stip. Facts ¶ 96; Ex. S43.

[190] Stip. Facts ¶ 98; *see also* Ex. S38.

[191] Stip. Facts ¶ 97.

of his own. But during that conversation, Spence expressed opinions that were not entirely consistent with the content of the prosecution's expert endorsement.[192]

At the *Shreck* hearing, Grosgebauer conducted Spence's direct examination. During Spence's cross-examination, the defense elicited the fact that Spence had, in fact, authored his own report of his investigation, which he had not previously provided.[193] Grosgebauer realized that the prosecution could not proceed with Spence as an expert; he acknowledged in court that the prosecution endorsed Spence as an expert but failed to turn over Spence's authored report.[194] Thereafter, the *Shreck* hearing focused on a possible discovery violation based on the prosecution's failure to disclose an endorsed expert's report.[195] Grosgebauer proposed that the remedy was to strike Spence as a witness.[196] Judge Lama agreed and excluded Spence as an expert based on the prosecution's stipulation that it had failed to disclose his report.[197] Judge Lama concluded that there was not sufficient evidence to show a willful failure to disclose but deemed the prosecution's approach "reckless maybe, sloppy . . ."[198] On March 31, 2022, Grosgebauer disclosed the one-paragraph Spence report to the defense in an email.[199]

On April 1, 2022, Grosgebauer filed the prosecution's motion to partially reconsider sanctions for discovery violations.[200] The motion, penned by Grosgebauer, was intended to clean up the record and show both Judge Lama and a reviewing appeals court that well before February 2022, the defense had at its disposal the reports or statements of four key prosecution experts.[201] The prosecution team, including Respondent, convened about which experts to select as the subjects of Grosgebauer's motion to reconsider.[202] According to Grosgebauer, without those four experts, the prosecution had but a "thin chance" of prevailing in the Morphew case.

Grosgebauer testified that he spent a few weeks drafting the motion because discovery was disorganized, with duplicates and different numbering schemes, so he had difficulty finding information. He eventually located Bates numbers for the four experts' reports, which he hoped would demonstrate that the defense had already received in discovery much of the information Judge Lama deemed missing. The motion also "implored" Judge Lama to reconsider the "severe

---

[192] Stip. Facts ¶¶ 97-98.

[193] Stip. Facts ¶ 99; *see also* Ex. S44.

[194] Stip. Facts ¶ 101; Ex. S43 at 8664.

[195] Stip. Facts ¶ 100.

[196] Stip. Facts ¶ 102; Ex. S43 at 8666.

[197] Stip. Facts ¶ 103; Ex. S43 at 8793.

[198] Ex. S43 at 8794.

[199] Ex. S44.

[200] Stip. Facts ¶ 104; Ex. S46.

[201] These experts were Megan Duge, Ken Hicks, James Stevens, and Kevin Hoyland. *See* Ex. S46. Hoyland produced a final, peer-reviewed report the same day the motion to reconsider was filed. *See* Ex. S45.

[202] Stip. Facts ¶ 105.

sanction" of excluding Hicks, Hoyland, and Stevens due to the "one-day delay" in disclosing those experts' CVs.[203]

On April 8, 2022, Judge Lama granted another of the defense's motions for discovery violations sanctions, ruling: "[T]he [prosecution] failed to put in place a system to preserve emails as ordered by Judge Murphy on June 3 . . . [there is a] continuing pattern by the [prosecution] of an inability and failure to comply with its Rule 16 obligations as well as the [case management order]. . . ."[204] In that same order, Judge Lama excluded most of the prosecution's experts, finding that the prosecution's actions "amount[ed] to negligent, and arguably, reckless disregard for their Rule 16 obligations and duty to abide by court orders" and therefore "exclude[d] 11 out of 16 of the [prosecution's] endorsed expert witnesses," which Judge Lama concluded was a sanction that was "warranted based upon the record."[205] He noted that the trial was set to begin on April 28, 2022.[206]

The prosecution team informed Respondent that Spence had been excluded; that, of the sixteen experts the prosecution initially endorsed, fifteen had been excluded altogether; and that one expert's scope of testimony had been reduced.[207] Not all of these witnesses were excluded because of the prosecution's failure to comply with the case management order, however.[208]

*The Interview of Iris Lama*

In an email dated April 7, 2022, Respondent informed Hurlbert and others that Andrew Corey, a criminal investigator who worked for the 11th Judicial District Attorney's Office, would conduct the interview of Iris Lama.[209] Hurlbert said he understood the interview to encompass topics including whether Judge Lama talked to Iris Lama about the Morphew case and whether the marriage was troubled. Respondent testified that no one objected to using internal resources to conduct the interview, and she said she conducted no research about her ethical obligations or constraints before ordering that the interview go forward.

On April 9, 2022, Respondent asked Corey, her employee, to speak with Iris Lama.[210] Respondent conveyed to Corey it was "imperative" that if Iris Lama did not want to talk to him, he was not to push the issue. She instructed Corey to meet with Iris Lama "to make sure Judge Lama had not spoken to Iris about anything that would make him impartial [sic] to the Barry Morphew

---

[203] Ex. S46 at 16710.
[204] Stip. Facts ¶ 107; Ex. S47 at 11857, 11856.
[205] Stip. Facts ¶ 108; Ex. S47 at 11856-63.
[206] Stip. Facts ¶ 108.
[207] Stip. Facts ¶ 109.
[208] Stip. Facts ¶ 109.
[209] Stip. Facts ¶ 106; Ex. S48 at 2945.
[210] Stip. Facts ¶ 110.

case and if any domestic violence occurred in the relationship."[211] According to Corey, Respondent told him that there were "allegations" Judge Lama had committed domestic violence, a criminal offense.

Corey left his number for Iris Lama at her workplace. She then reached out to him via LinkedIn, and they texted on that platform.[212] Corey suggested that she might have information that could help the district attorney's office on a case.[213] But he did not mention that his questions pertained to Judge Lama because he "wanted to be able to talk with her in person," and he worried she might not speak with him if he brought up her former spouse. They met at Iris Lama's workplace; she was accompanied by a witness. He wore a suit and tie, rather than his official uniform. They talked for about thirty minutes. Corey testified that Iris Lama answered all of his questions without hesitation and that she did not appear to be concerned or afraid. At the end of the interview, Iris Lama asked Corey to remain LinkedIn contacts, if a question arose as to who she spoke to. Corey recorded the interview—which he says he lost when he tried to pull it from the computer—but he reduced his interview notes to a report, which memorialized the interaction. According to the report, Iris Lama informed Corey that Judge Lama "maintained a high level of professionalism," never discussed the Morphew case, and never engaged in any type of domestic abuse.[214]

On April 15, 2022, Respondent informed the team via email that Corey had interviewed Iris Lama. "Nothing there," she wrote, "All rumors. Even reporters keep contacting her because of the rumors. So that's a no-go."[215] Hurlbert responded, "Bummer."[216] At the disciplinary hearing, Hurlbert could not explain why he expressed such disappointment. "In the cold light of day," he said, it "wasn't a bummer that we couldn't get him off [the case], because at that point were trying to protect the appellate record."

A few days later—around April 17, 2022—Judge Lama learned from Iris Lama that someone in law enforcement had approached her for an interview. According to Judge Lama, Iris Lama reported that the interviewer had inquired about him, their marriage, whether he was abusive, and whether he talked to her about the Morphew case. These questions seemed to him to be consistent with the "ranting" of a conspiracy theorist he had seen on a YouTube video in early March 2022. In that video, Judge Lama testified, the YouTuber wore a bulletproof vest, showed Judge Lama's family, strongly implied that Judge Lama had committed domestic violence, speculated about the reasons for Judge Lama's divorce, insinuated that Iris Lama knew Barry Morphew, and called for Judge Lama to recuse from the Morphew case. Lama interpreted the video as a threat, akin to "You better get off [the case] or more is coming."

---

[211] Stip. Facts ¶ 110; *see also* Ex. 2.
[212] Ex. S49.
[213] Ex. S49.
[214] Ex. 2.
[215] Ex. S39 at 13061.
[216] Ex. S39 at 13061.

Judge Lama testified that his discussion with his former spouse left him concerned that the interview was conducted by someone with "nefarious objectives." Her account also caused him to fear for his safety, her safety, and their child's safety. So, in a "heightened state of fear" and vigilance, he placed a call to his security team, which eventually figured out who was behind the interview.

*Dismissing the Morphew Case*

On April 19, 2022, Respondent moved to dismiss the charges against Barry Morphew without prejudice.[217]

The prosecution team had thought about dismissing the case for some time. Respondent said that those discussions started as early as January 2022. Grosgebauer testified that he heard discussions about dismissal when he first began working on the Morphew case, around the time of the hearing on March 10, 2022. As time went on, Grosgebauer said, the question "what are we doing here?" kept percolating, particularly in early April 2022. Grosgebauer said that the decision to dismiss hinged on two factors: first, the team thought law enforcement was close to finding a body, but the weather and snowpack threatened to delay that effort; and second, the case would be hard to prosecute without experts. Respondent confirmed that the experts' exclusion affected the prosecution's case; she questioned if she wanted to try the case before Judge Lama if the prosecution's hands were "tied so much." But she also testified that the team delayed in dismissing the case to see if they could save it.

The motion to dismiss, which Grosgebauer drafted and Respondent signed, argued that the prosecution "and law enforcement believe we are close to discovering the victim's body. The [prosecution was] hopeful that the search for, and the discovery of, the victim's body would be concluded well before trial, but weather has complicated efforts."[218] Further, the motion argued:

Second, when this case was filed it was mainly premised on [Barry Morphew's] motive to harm the victim, his sole access to the victim at the exact time she was last communicating with anyone by phone, and his consistent dishonesty with law enforcement, which came to light given the truck telematics, phone, and location data recovered. [Judge Lama] functionally excluded the [prosecution's] best evidence to move forward in this case by severely limiting our expert's testimony. Even if [Judge Lama] were to partially reconsider its position on the need for such severe sanctions at this late hour, the [prosecution] would still be left without several key expert witnesses initially endorsed. Without this crucial evidence, and without the victim's body, the [prosecution] cannot move forward at this time in good faith. Ethics demand that prosecutors proceed to trial only in circumstances where a reasonable likelihood of success exists, which given the . . . current rulings

---

[217] Stip. Facts ¶ 111; Ex. S50.
[218] Stip. Facts ¶ 111; Ex. S50 at 7.

and the uncertainty of any further rulings, is impossible to completely ascertain. This assessment of the remaining evidence is an additional, good faith basis for this motion to dismiss without prejudice.[219]

Judge Lama granted the motion and dismissed the Morphew case without prejudice.[220] Only after the case had been dismissed did Lama learn that Respondent had orchestrated the interview of Iris Lama.

III.    **JACOBS AND CRAWFORD CASES: FINDINGS OF FACT**

*The Prosecution of Jacobs and Crawford*

On May 22, 2023, Respondent brought a child abuse case in Fremont County against William Henry Jacobs arising from the death of a ten-month-old child.[221] On June 2, 2023, Respondent charged Brooke Crawford, the mother of the child, as a codefendant.[222] The charges stemmed from an incident that occurred while the child was in Jacobs's care.[223]

Respondent later formally charged Jacobs with first-degree murder and two counts of felony child abuse resulting in the death of the ten-month-old child; he was also charged with misdemeanor animal cruelty.[224] Crawford was charged with felony child abuse resulting in serious bodily injury, misdemeanor child abuse, and misdemeanor animal cruelty.[225]

*Respondent's Interview with KRDO*

On July 12, 2023, Respondent appeared in court in the Jacobs and Crawford matters. Investigative reporter Sean Rice and photojournalist Peter Miller, both with Colorado Springs KRDO News Channel 13 Investigates, were also present in court that day. Rice testified that he and Miller traveled to the courthouse that day hoping to speak with Respondent, who did not often respond to his requests for statements or interviews. He had unsuccessfully tried to interview Respondent almost a dozen times, he said. After the hearing, Rice and Miller caught up with Respondent in the hallway adjacent to the courtroom. The camera was rolling, Rice had a mic in his hand, and he asked her for an interview while Miller filmed the interaction.

---

[219] Stip. Facts ¶ 111; Ex. S50 at 8-9.
[220] Stip. Facts ¶ 112.
[221] Stip. Facts ¶ 113; Ex. S55.
[222] Stip. Facts ¶ 114.
[223] Stip. Facts ¶ 115.
[224] Stip. Facts ¶ 116.
[225] Stip. Facts ¶ 117.

Respondent testified that she had a "history" with Rice. She believed Rice had written several unfavorable stories about her, many of which she felt were incorrect and geared toward the sensational rather than the factual. She was often irritated that Rice, whom she perceived as lacking an understanding of the criminal justice system, asked her loaded questions but failed to include her answers in his stories. And she wanted to defend her office but worried that if she did so, Rice's coverage would become yet more hostile. So, she did not usually go out of her way to talk to Rice.

But when Rice approached her in the hallway, she recalled a media training presented by Dan Rubinstein at the Colorado District Attorneys' Council ("CDAC") September 2022 conference. She remembered Rubinstein encouraging CDAC members to engage with members of the media to correct inaccuracies, which can snowball if not checked. She also recalled specific recommendations that district attorneys should engage and build relationships with journalists who write negative stories so that the district attorneys became trusted sources for accurate reporting.

As a result, Respondent agreed to talk with Rice, and she invited him and Miller to her office. Save for a few shots of Respondent walking through the courthouse hallway, all portions of their recorded conversation were filmed in her office. She was seated behind her desk, and her attention was often focused either across her desk at Rice or at her computer monitor. Rice's sole interview of Respondent was filmed that day.

Seated in Respondent's office, Rice and Respondent spoke off camera and off the record for approximately one hour. During that time, Miller was seated in a chair in the corner of Respondent's office. Rice and Respondent discussed the Jacobs case, judges, bond decisions, county commissioners, and Respondent's budget, among other topics. After the hour-long conversation, Rice testified, he noted his looming deadline to file a report for that evening's broadcast and asked Respondent if she would go on the record for an interview.[226] Respondent consented.

Miller left to fetch his tripod. He was away from the office for about ten minutes. During that time, Respondent testified, she told Rice that she could answer questions about open or sealed cases but her comments about those cases must be off the record. Respondent said she issued this warning with the CDAC training in mind; from that training, she said, she understood she could alternate between on- and off-the-record conversations by instructing the reporter in advance what she could and could not discuss. According to Respondent, Rice agreed to her parameters. She expected that Rice would relay the agreement to Miller, who would also comply. Respondent testified that she had no reason to believe that KRDO would violate the understanding, and she believed that Rice would abide by the professional standards she outlined based on her initial instruction. But Rice reported no such exchange. Instead, he testified that during Miller's absence, Respondent did not state she wished to be off the record.

---

[226] *See* Ex. S66 (Rice's preservation deposition video).

According to Rice, Miller returned and set up the video camera across from Respondent at an angle facing her desk. The large video camera—Rice estimated it at several feet long—was in plain sight, with an outward-facing red light visible to the person being recorded. Miller handed Respondent a wireless microphone, which she herself clipped to her jacket lapel. The microphone battery pack was positioned visibly on Respondent's desk. Rice interpreted Respondent's actions as a signal that she was prepared to speak on the record and, he said, she thereafter never explicitly asked to speak off the record. But Respondent contended that she was not aware of the camera's red light and was not told that the camera was rolling.

During the recorded portion of the interview (the "raw video"),[227] which lasted twenty-nine minutes and forty-two seconds, Miller started and stopped the video at various points. Rice said that no portion of the interview was removed or edited. He did explain, however, that the interview comprised four clips, which he transferred from Miller's SD card to his own computer. Rice then knitted the four recordings together into the single chronological raw video using an Adobe software program.[228]

The raw video begins in mid-sentence, with Respondent commenting on Jacobs's "violent" and "awful past," which included fondling his mother. "What kid fondles their mom?" Respondent asked rhetorically. Respondent testified that she made the comment when Rice himself brought the information to her attention. The discussion transitioned to whether Rice could gain access to Jacobs's juvenile records. While looking at her computer—Respondent testified that she was reading from Jacobs's juvenile files—she observed that Jacobs committed this juvenile offense in 2017, followed by, "so, if you do the math . . ." before trailing off. Respondent's comments seemed to imply that Jacobs was quite young when he committed this offense. She also advised Rice to visit the clerk's office for Jacobs's file, opining that certain juvenile records were publicly available by statute.

Respondent then commented about Crawford's motives and character. Respondent concurred with various social media commenters who questioned how Crawford could leave her baby with someone whom she allegedly had just met. Respondent remarked that she would not let anyone meet her children when she was raising them, and she editorialized that if someone had touched her children, she would "have went and killed them." She added, laughingly, "I have a firepit . . . I'm a prosecutor. I know how the hide the evidence." Around minute 5:10, Respondent remarked that Jacobs had just been released from custody—a fact Rice did not appear to know—and she predicted, "he's gonna be gone. He knows what's going on. He's no dummy to this process and what's happening and what he did."

---

[227] *See* Ex. S58.

[228] At Respondent's request, Tilo Voitel was qualified as an expert in forensic video analysis. Voitel observed that an early portion of the raw video contains two disjointed frames, one right after another, and he opined that something was missing between those two still frames. On cross-examination, he conceded that the disjunction could be explained if the videographer had started and stopped the recording. Given that Respondent testified she never explicitly asked to speak off the record, we do not find Voitel's testimony relevant.

Around minute 7:00 of the raw video, Rice asked about Respondent's rocky tenure over the prior several months. She replied, "I don't like to bring any DA business out in the public because that's a risky thing to do. That's victims and defendants and other things that are going on that I don't think I should necessarily respond to." Respondent then sidestepped Rice's questions about several cases that were dismissed in her district due to Crim. P. 16 violations, beginning at minute 13:05. She said, "I don't think my opinion matters. I'll let the public try to figure out what they think is going on."[229]

Beginning at minute 18:30 of the raw video, when Rice queried Respondent about the Morphew matter, she stated, "I can't comment on that. I won't. I can tell you that it is still being worked on, but I'm not going to go any more than that."[230] Rice pushed back, inquiring where that case might be headed. Respondent replied, "I'm not going to comment. C'mon Sean, really. . . Do you know how bad I want that guy? So, I'm not gonna comment."[231]

A little while later, Rice and Respondent segued into a frank conversation about whether Respondent had avoided KRDO's interview attempts, and Respondent complained about her inability to defend herself. At minute 21:20, she insisted, "I can't talk about an open case, right. I'm forbidden from it. Defense can do it all day long. I can't say a word about an open case." She said that she could not even mention a sealed case in a motion: "sealed cases can't be talked about." And she repeated, "I can't talk about an open case, I can't talk about a sealed case," adding, "I'm going to abide by, you know, what I have to abide by."

Toward the end of the interview, at minute 25:22, Respondent responded to Rice's claim that he had to track her down in open court in order to secure an interview. Respondent replied that she really wanted to press a button on her desk, but she told Rice, "I can't do that since we're recording."[232] Rice, confused, asked what she meant. Respondent proceeded to press the button, which produced a voiced message intoning, "If bullshit were money, you'd be a millionaire."[233] Respondent then chided Rice that he had no way of knowing she would be in court that day.

At the conclusion of the interview, Rice understood that KRDO could publish in written and videographic form the contents of the entire interview. In contrast, Respondent testified that at the conclusion of the interview, she understood that everything she said about open or sealed cases was off the record. In other words, she believed that nothing she said about Jacobs and Crawford would be published. As evidence, she pointed to several comments during the recording in which she reiterated that she was forbidden to speak about open or sealed cases. As to why she spoke about Jacobs and Crawford but refused to discuss the Morphew case, she reasoned that Rice had brought information to her about the Jacobs case, inquired about why he could not

---

[229] Ex. S58.
[230] Ex. S58.
[231] Ex. S58.
[232] Ex. S58.
[233] Ex. S58.

get records, and asked for guidance in navigating the juvenile confidentiality exceptions, whereas she figured the Morphew case would not be hers to prosecute "no matter what," and she did not want to affect it by discussing it.

*KRDO Airs Two Stories*

Different portions of the recorded interview aired on two separate days. One clip was broadcast on July 12, 2023. According to Rice, the story that aired on July 12, 2023, focused on the district attorney's office's Crim. P. 16 discovery violations and the community fallout from the resulting discovery sanctions. Respondent testified that the content of the story from July 12 was all on the record. An accompanying written article titled "Embattled 11th JD DA addresses allegations she's contributed to case dismissals, freed sexual predators," was posted on KRDO's website the same day.[234]

According to Respondent, Rice called her on August 1, 2023, asking for some information about juvenile cases, and she provided him with a cite for a statutory exception to the confidentiality of juvenile records. Rice did not alert her that another story featuring portions of their interview from July 12, 2023, would broadcast that night. Nor did he seek from her supplemental comments about the segment.

The story broadcast on August 1, 2023, interspersed Respondent's remarks with Rice's commentary and a summary of other statements Respondent made to him:

News Anchor: Tonight 13 Investigates is learning explosive new details about what lead up to a baby's death inside a Cañon City motel room. The 11th Judicial District Attorney, sounding off about the behavior of the 21-year-old Cañon City man charged with killing the child. Investigative Reporter Sean Rice is live in our newsroom to explain what the DA is revealing about that case tonight. Sean.

Rice: Hey Bart, 21-year-old Williams, William Jacobs is accused of shaking and killing a baby he was watching inside a Motel 6 room in May. District Attorney Linda Stanley says she feels so strongly about this case she is tapping herself as the lead prosecutor in the case of a death she says was completely avoidable.

Stanley: I think she saw a live-in babysitter. Now she can just really pound out the hours, right? She's got a live-in babysitter now she doesn't have to worry about anything, right?

Rice: DA Linda Stanley is speaking about Brooke Crawford, a Cañon City mom charged with child abuse resulting in death. Her 10-month-old son, Edward, was

---

[234] Ex. S56.

left in the care of William Jacobs back in May. Police say Jacobs told detectives he shook and slapped the baby on the back to get him to breathe.

Stanley: I just had so many buzzers going off when they said the boyfriend was watching him.

Rice: While police investigated the case, the baby died at Children's Hospital. That's when DA Stanley's office upgraded Jacobs' child abuse charges to first degree murder.

Stanley: There's no witnesses. There's no nothing. There's a whole lot of things indicative of prior - of a prior incident with that baby.

Rice: Prior abuse that Stanley says is the direct result of Jacobs having direct access to a child he didn't care about. She says the pair moved into a Motel 6 room together mere days after meeting one another. The DA tells 13 Investigates the criminal evidence points to a relationship where the child was not the first priority.

Stanley: Without the caring factor, without the love factor, then the baby's a pain in the ass.

Rice: The DA says just before the baby was killed, Jacobs had been released from a youth correctional facility. She says Jacobs was previously convicted of a sex crime and assault.

Stanley: I mean, I'm going to be very blunt here. He had zero investment in this child. Zero. He is watching that baby so he can get laid. That's it. And have a place to sleep. I'm sorry to be so blunt, but honest to God that's what's going on.

Rice: Today we reached out to Jacobs's attorney for comment on Stanley's view of his motives in this case. We're still awaiting his response. Jacobs will be due back in court later this month. . . .[235]

Rice testified that everything Respondent was quoted as saying came from an on-the-record conversation. Along with the clip, KRDO ran a written article on its website entitled "Fremont Co. District Attorney believes accused baby killer got with baby's mom just to 'get laid.'"[236] The majority of comments responding to the written article expressed outrage, condemned Jacobs and Crawford, or called for swift and harsh penalties.[237]

---

[235] Stip. Facts ¶ 118; Ex. S57.
[236] Ex. S59. At one time, KRDO's video and audio news story could be accessed at: https://krdo.com/news/2023/08/01/fremont-co-district-attorney-believes-accused-babykillergot-with-babys-mom-just-to-get-laid/. Stip. Facts ¶ 119.
[237] Ex. S61.

Respondent recounted that she learned about the segment from her then-ethics lawyer on August 2, 2023. She said she was "horrified" by the broadcast. Her statements were "over the top," she said, and she felt shocked and sick to her stomach, as though she were going to vomit. But she also testified that she was entitled to make each one of the statements off the record without running afoul of the Rules of Professional Conduct, that her statements were not likely to heighten the condemnation of Jacobs or Crawford, and that she was somewhat surprised people were shocked by what she said.

Respondent said she told her ethics lawyer that she understood her conversation with Rice was off the record, and she authorized her lawyer to contact Rice to convey that understanding. Soon after, she called Marijo Souza, the administrator for the 11th Judicial District Attorney's Office. Souza worked for Respondent, but they were also friends. According to Souza, Respondent was crying and very upset, displaying stress and emotion, and could not complete a sentence. According to Souza, Respondent was adamant that she had talked to Rice off the record.

Raynes, executive director of CDAC, also saw the KRDO news piece. Concerned about the story, he conferred with Dan Rubenstein, the elected district attorney in the 21st Judicial District and then-president of CDAC. They agreed that Respondent's comments violated her ethical duties, regardless of the context—whether on background or off the record—in which the statements were made. Raynes and Rubenstein concluded they had no choice but to notify disciplinary authorities about the comments. They also alerted Respondent that they had reported her conduct.

### Legal Consequences in Jacobs and Crawford Cases

Thom LeDoux, alternate defense counsel appointed for Crawford, heard about the news story from Jacobs's public defender. LeDoux was "appalled," "shocked," and "couldn't believe" what he heard. Immediately, LeDoux thought Respondent's statements met the elements of the doctrine of outrageous governmental conduct, which centers on whether a governmental actor's conduct violates fundamental fairness and is shocking to a universal sense of fairness. On August 7, 2023, LeDoux moved to dismiss Crawford's case, arguing that Respondent's comments were "breathtaking in their prejudicial nature."[238] In the motion, LeDoux contended that under the doctrine of outrageous governmental conduct, Respondent's comments to Rice were so egregious as to "justify the exercise of the courts' supervisory powers in dismissing" Crawford's criminal case.[239]

Deputy District Attorney Wendy Owens responded to Crawford's motion on the prosecution's behalf on August 10, 2023.[240] The response did not assert that portions of

---

[238] Stip. Facts ¶ 120; Ex. S62 ¶ 2.

[239] Ex. S62 ¶ 12.

[240] Stip. Facts ¶ 121; Ex. S63.

Respondent's interview had been conducted off the record. The filing acknowledged, however, that Respondent's comments did not reflect her "best judgment."[241] Respondent neither reviewed nor asked to review the response before Owens filed it.[242]

On December 18, 2023, 160 days after the story posted and more than one month after the complaint in this case was filed, Respondent wrote a letter to Rice requesting that he take the story down.[243] In that letter, Respondent upbraided Rice, "I repeatedly told you that I could not talk about any pending cases. You disregarded that request and broadcasted my statements about the Jacobs/Crawford cases."[244] She requested that he immediately remove the video from all media sources because he "knew it was off record, but also because [the video is] potentially causing harm to the case . . ."[245] Respondent conceded that she had not contacted Rice, demanded that KRDO retract the story or take it down, or issued a press release about Jacobs's and Crawford's presumption of innocence before that point; she did not take those steps, she said, because she did not want to resurrect the news story. She finally sent the letter in December 2023 on advice of her counsel.

Also in December 2023, Judge Thomas Flesher held a hearing on the defense's motion to dismiss in the Crawford case, which had been transferred to Pueblo.[246] On April 23, 2024, Judge Flesher granted Crawford's motion to dismiss for outrageous government conduct.[247] In the order dismissing Crawford's case, Judge Flesher observed the contradiction in Respondent's decision to invite KRDO into her office and her later remark, "I don't like to bring D.A. business out in the public because that's a risky thing to do."[248] Judge Flesher's order concluded that Respondent intentionally made statements about a pending case and ruled that those statements, which had no legitimate purpose, violated Crawford's due process rights and notions of fundamental fairness[249] The order dismissing Crawford's case was stayed for fourteen days to allow the prosecution to appeal. On May 7, 2024, Owens filed a notice of appeal; the appeal is currently pending.[250]

LeDoux reported that a different jurist also dismissed Jacobs's case on May 29, 2024. Judge Kaitlin Turner found that Respondent knew when she made the statements that she was being recorded, as evidenced by her placement of the microphone of her lapel, the visible camera

---

[241] Ex. S63 at 14900.
[242] Stip. Facts ¶ 122.
[243] Stip. Facts ¶ 119.
[244] Ex. S64.
[245] Ex. S64.
[246] At some point after Crawford's preliminary hearing, all of the judges in the 11th Judicial District recused from her case due to Respondent's KRDO interview; the case was then assigned to the 10th Judicial District.
[247] Stip. Facts ¶ 123; Ex. S67.
[248] Ex. S67 at 17835.
[249] Ex. S67 at 17839-39.
[250] Stip. Facts ¶ 124.

pointed directly at her, her acknowledgment that she was being recorded when she hit her "bullshit" button, and her omission of any direction to Rice that specific comments were off the record.[251] Judge Turner's order concluded that Respondent knew or reasonably should have known her comments would be disseminated by means of public communication; that the comments had a substantial likelihood of materially prejudicing the criminal cases and heightening public condemnation of Jacobs; and that the comments reflected knowing and intentional outrageous government conduct that violated Jacobs's rights to due process.[252]

## IV.    LEGAL ANALYSIS OF CLAIMS

### The Morphew Case

### Colo. RPC 1.3 (Claim I)[253]

Colo. RPC 1.3 requires a lawyer to act with reasonable diligence and promptness in representing a client. The People argue that Respondent failed to act with the requisite diligence in the Morphew case when, after learning of the prosecution's repeated problems in timely disclosing Crim. P. 16 information, Respondent failed to ensure that the prosecution team complied with its obligations to timely and completely disclose strategically vital expert endorsements. The People contend that as a result of Respondent's inattention, the prosecution's expert disclosures were neither timely nor complete—even after Judge Lama allowed the prosecution extra time to supplement those disclosures—resulting in the exclusion of fifteen of the sixteen tendered prosecution expert witnesses. Respondent counters that she was not personally involved in litigating the Morphew case and thus should not be held accountable for prosecution lapses in diligence or promptness.

The majority agrees with Respondent. We heard extensive testimony from Respondent and the entire prosecution team that she was not lead counsel on the Morphew case. She recognized that her experience did not equip her to competently spearhead the prosecution, so she delegated the case to others. In fact, witnesses pointed to Lindsey as lead counsel until October 2021, and then to Hurlbert or Weiner (or both or neither) as lead counsel thereafter. Respondent, meanwhile, attended to county court docket duties in Fremont County. In short, while Respondent had managerial and supervisory responsibilities in the Morphew case, it was not hers to prosecute.[254]

---

[251] Ex. 7 at 8.

[252] Ex. 7 at 11-14.

[253] The PDJ and Hearing Board member Caloia, as a majority, find no rule violation as to Claim I. Hearing Board member Harper would find a violation and dissents as to Claim I.

[254] Matthew Durkin, a career prosecutor, testified that in his experience lead prosecutors could largely do their jobs autonomously, without significant guidance from elected DAs, but that elected DAs nonetheless remained responsible for the prosecution. Respondent offered Durkin as an expert witness, but Durkin was not qualified as such for purposes of this hearing.

The full Hearing Board agrees with the People that Respondent is ultimately responsible for all actions taken in her name as the elected district attorney. But because several competent and experienced lawyers were assigned to the Morphew case, and because the prosecution team, despite our concerns with its structure and function, had primary responsibility for the day-to-day functions of the case, the majority cannot find by clear and convincing evidence that Respondent transgressed a duty of diligence in *prosecuting* the Morphew case—save for her role as supervisor, which we discuss below. Thus, a majority of the Hearing Board does not hold her responsible for violating Colo. RPC 1.3.

<u>Colo. RPC 3.6(a) (Claim II)</u>

Colo. RPC 3.6(a) states that a lawyer who participates in investigating or litigating a matter may not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter. According to the People, Respondent violated this rule on four occasions: (1) on May 5, 2021, when she told the media that Barry Morphew "was taken into custody and when asked questions he said he wanted a lawyer and all questioning ended"; (2) in late August and early September 2021, when Respondent appeared on "Profiling Evil" to discuss the Morphew case, and also when she publicly posted comments in the chat area after the podcast ended in response to poster Gian-Luc Brasseur; (3) on September 14, 2021, when on Facebook Messenger Julez Wolf of "True Crime with Julez" asked whether Barry Morphew might flee, and Respondent stated, "possibly"; and (4) in June 2021, when Respondent texted King in response to a Barry Morphew video, "we got him. No worries."

Respondent contends that she did not violate Colo. RPC 3.6(a). Among other defenses, she invokes her First Amendment right to speak her mind and to appear on shows of her choosing, regardless of the show's name or title. She also relies on the safe harbor provision of Colo. RPC 3.6(a)(2), which permits lawyers to state information contained in a public record. Finally, she argues that some of her comments are authorized by Colo. RPC 3.6(c), which allows a lawyer to make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client.

At the outset we must address Respondent's First Amendment defense. She raises this issue only generally, so we do not have the benefit of a detailed argument to guide our analysis. Without briefing on more specific constitutional precepts or cites to pertinent cases, we bring Respondent's attention to *Gentile v. Nevada*, the seminal United States Supreme Court case in this realm, which found a compelling state interest in both enacting and enforcing restrictions on lawyers' speech, as promulgated in portions of rules with analogs to Colo. RPC 3.6.[255] That Colorado rule, likewise, seeks to "strike a balance between protecting the right to a fair trial and

---

[255] 501 U.S. 1030 (1991).

safeguarding the right of free expression."[256] Under the rule, Colorado lawyers "remain accountable to the tribunals in which they appear for improper statements that they make, and attorneys may face sanctions or disciplinary action for violations of applicable court rules and rules of professional conduct in connection with their public statements."[257] We see no basis to find that Claim II encroaches on Respondent's First Amendment rights.

We turn, then, to the four specific communications underlying Claim II. First, the People assert that Respondent violated Colo. RPC 3.6(a) when, on May 5, 2021, she told the media that Barry Morphew "was taken into custody and when asked questions he said he wanted a lawyer and all questioning ended." According to the People, this response implicated Barry Morphew's right to counsel and his right to silence, which violated his constitutional rights and carried with it a substantial likelihood of materially prejudicing the case. Respondent contends that her comments did not adversely affect the Morphew case. Barry Morphew spoke at length during the investigation, she says, so the public likely would not have read into her statement an implication that he invoked his right to remain silent. Likewise, she maintains, Barry Morphew was widely known to have hired counsel well before his arrest, so her statement likely would not have been taken as commentary on his right to counsel. Finally, she implies that this portion of Claim II rests on Judge Lama's findings in his January 2022 order changing venue, which she criticizes as irredeemably flawed.

We find that Respondent's statement at the press conference on May 5, 2022, violated Colo. RPC 3.6(a). Respondent was aware that as the elected district attorney, her statement was being recorded by scores of reporters who would publicly disseminate the statement via media broadcasts, internet posts, and news articles. She acknowledged, in fact, that she knew her statements would receive widespread attention, so she needed to choose her words carefully. Her statement, moreover, had a substantial likelihood of materially prejudicing the Morphew case. On this point, we are swayed by the opinion of John Suthers, an expert in prosecutorial ethics. Suthers testified that it is "axiomatic" a prosecutor cannot comment on a defendant's constitutional rights to counsel or to remain silent. A substantial risk exists that the public will infer from such a comment that only "someone who has something to hide" asks for a lawyer, Suthers said. We agree. By remarking on Barry Morphew's request for counsel and linking that request to a cessation in questioning, Respondent risked invoking the inference Suthers warned of. Further, as prosecutorial ethics expert Stan Garnett remarked, the community often believes that an elected district attorney has "inside knowledge." For that reason, regardless of whether Chaffee County citizens understood that Barry Morphew had talked to investigators or hired counsel, Respondent's comment carried a special risk of prejudicing Barry Morphew's constitutional rights.[258]

---

[256] Colo. RPC 3.6 cmt. 1.

[257] *Killmer, Lane & Newman, LLP v. BKP, Inc.*, 2023 CO 47, ¶ 25.

[258] Our determination on this score is not premised in whole or in part on Judge Lama's change of venue order.

Second, the People allege that Respondent violated Colo. RPC 3.6(a) by appearing on "Profiling Evil" to discuss the Morphew case and by publicly posting comments in the podcast's chat area in response to poster Gian-Luc Brasseur. The People maintain that the title "Profiling Evil" is itself prejudicial. They also denounce Respondent's posts on the "Profiling Evil" comment page, most notably her exchange with Brasseur. That exchange, they claim, compared Barry Morphew to convicted murderers in cases where victims' bodies were not recovered, apparently to show that no-body prosecutions can be successful. Respondent contests this allegation, too. She argues that her mere appearance on a show called "Profiling Evil" did not have a substantial likelihood of materially prejudicing the Morphew case. And she argues that under Colo. RPC 3.6(c), she is entitled to rebut recent publicity she did not initiate to protect the case from substantial undue prejudice.

As to the allegation that Respondent's mere appearance on the podcast "Profiling Evil" violated Colo. RPC 3.6(a), Garnett opined that, given the podcast's title, Respondent's appearance on King's program was tantamount to a nonverbal derogation of Barry Morphew's character. Suthers demurred. Neither party presented case law addressing the issue. In the absence of precedent, we conclude that the People did not prove this claim by clear and convincing evidence. We believe Respondent's appearance on this show in her capacity as the elected district attorney, coupled with the show's title—one selected to suggest it exposes predatory behaviors and that could be interpreted as implying a criminal defendant's guilt—demonstrated incredibly poor judgment. We also reckon, as the People suggested, that she could have lessened the risk of prejudice by explaining to King's audience that Barry Morphew was presumed innocent until guilty and that her appearance was not intended to connote that he was "evil." But in the absence of compelling authority, we are uncomfortable effectively dictating which platforms a prosecutor can interview with, based solely on the platform's name.[259] And we are wary of discouraging elected district attorneys from agreeing to do interviews, as media appearances, if done correctly, can help district attorneys disseminate accurate information and educate the public about the legal process, fostering a greater confidence in the rule of law.

Respondent's written comments on "Profiling Evil's" chat forum, however, violated Colo. RPC 3.6(a). We adopt Garnett's opinion that by comparing the Morphew case to those of convicted murderers, Respondent conveyed her own personal view that Barry Morphew was guilty; by dismissing Brasseur's concerns with "bravado," Respondent signaled to readers that proving Barry Morphew's guilt would be easy. Suthers agreed—as do we—that Respondent's "rant" drew a parallel between the cases, suggesting that because the other defendants were guilty despite the absence of bodies in their cases, "ergo," Barry Morphew was also guilty. That Respondent used her own personal picture and email address in no way alters our assessment. Her comments discussed a case that the district attorney's office was prosecuting, referred to the

---

[259] Our decision here does not seek to cast aspersions on the trial court that found otherwise. We recognize the distinct burdens of proof between the issue before that tribunal and the one that applies here, and we acknowledge that tribunal's authority to manage its cases. Nor do we believe that this decision should limit trial courts' ability to regulate lawyers' extrajudicial statements in the cases before them.

prosecution with the first-person plural pronoun "we," and revealed that Barry Morphew was the last person to see his wife alive. These are indicia of an official speaking with official knowledge.

We reject unequivocally the argument that Respondent was entitled under Colo. RPC 3.6(c) to post her response to Brasseur. To the extent Respondent argues that she posted to defend or rehabilitate her personal reputation, we reject that justification: Garnett insisted that an elected district attorney cannot "rise to the bait" when personally attacked, and Suthers opined that her comments served no valid law enforcement purpose. Indeed, Respondent cannot be heard to argue that she posted her comment in a personal capacity while also contending that her post was meant to protect her client from substantial prejudice. But more important, no reasonable lawyer—including Garnett and Suthers—would view Respondent's comments as required to protect her client, the people of Colorado, and no reasonable lawyer—including Garnett and Suthers—would view Brasseur's comments as substantially or unduly prejudicing the Morphew prosecution.

Third, the People claim that Respondent violated Colo. RPC 3.6(a) when she responded "possibly" after Julez Wolf of "True Crime with Julez" asked her whether Barry Morphew might flee. The People, relying on Garnett's opinion, contends this comment was public and had no legitimate law enforcement purpose. Respondent argues that the comment was a statement reciting information in the public sphere and thus permissible under Colo. RPC 3.6(b)(2).

Colo. RPC 3.6(a)'s reach is limited by the safe harbor provisions of Colo. RPC 3.6(b), which permits a lawyer, among other things, to state "information contained in a public record." Established cases from other jurisdictions, which we find persuasive here, define "public records" as documents produced by or filed with the government and to which the public has access.[260] Building on this definition, these cases hold that the public record safe harbor extends only to "quotations from or references to the contents of the public record," and they mandate that a prosecutor "make clear that what is being disclosed is, in fact, the contents of the probable cause affidavit or other identified public document so the statements cannot be misunderstood to be the prosecutor's own opinion about the evidence or the suspect's guilt."[261] Suthers outlined the boundaries of this safe harbor by explaining that a lawyer cannot justify a statement by combing through the record post-hoc to find the communicated information.

Following established case law and heeding Suthers's expert opinion, we adopt this narrow construction of "public records" rather than the capacious definition—essentially, any information in the public domain—that Respondent advances.[262] Under that analysis, Respondent's safe harbor defense is not availing. Though Lindsey had previously argued against bond, Respondent

---

[260] *In re Brizzi*, 962 N.E.2d 1240, 1242 (Ind. 2012); *Attorney Grievance Comm'n of Maryland v. Gansler*, 835 A.2d 548, 567 (Md. 2003).

[261] *Brizzi*, 962 N.E.2d at 1247 (citing *Gansler*, 835 A.2d at 569).

[262] *See Brizzi*, 962 N.E.2d at 1247 (warning that embracing an expansive concept of a public record, including all publicly accessible media, "would permit the public record safe harbor to swallow the general rule of restricting prejudicial speech").

did not quote or reference the prosecution's filings or refer to the prosecution's arguments at specific hearings.[263] Because she failed to do so, her comment could be misunderstood to convey her own opinion, rather than the public record.

Despite finding that Colo. RPC 3.6(b)(2) offers Respondent no solace, however, we decline to find that her response to Julez Wolf violated Colo. RPC 3.6(a). We believe her equivocal one-word answer regarding whether Barry Morphew was a flight risk had no substantial likelihood of materially prejudicing the Morphew case. We find, as Suthers opined, that Respondent's comment was innocuous.

Finally, the People argue that Respondent violated Colo. RPC 3.6(a) when Respondent texted King about Barry Morphew, "we got him. No worries." The People have not proved this claim by clear and convincing evidence. They did not show that Respondent knew or reasonably should have known that her private text exchange with King would be disseminated by means of public communication. Respondent and King enjoyed an established friendship, and she trusted him to keep their communications private. He met those expectations; he kept her confidences and never published or otherwise released their communications. Thus, although King hosts a public podcast with a significant audience base, we see little evidence that Respondent knew or reasonably should have known her text to him would be disseminated.

Colo. RPC 3.8(f) (Claim III)

Criminal prosecutors have special responsibilities under Colo. RPC 3.8(f), which instructs them to refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused unless the comments serve a legitimate law enforcement purpose, are necessary to inform the public of the nature and extent of the prosecutor's action, or are permitted under Colo. RPC 3.6(b).

The People maintain that Respondent violated this rule five times: (1) on May 5, 2021, when she told the media Barry Morphew "was taken into custody and when asked questions he said he wanted a lawyer and all questioning ended"; (2) in August 2021, when Respondent appeared on the YouTube channel "Profiling Evil" to discuss the Morphew case; (3) in August or September 2021, when Respondent publicly posted comments after her segment on "Profiling Evil" ended in response to poster Gian-Luc Brasseur; (4) on September 14, 2021, when on Facebook Messenger Julez Wolf of "True Crime with Julez" asked whether Barry Morphew might flee, and Respondent stated, "possibly"; and (5) in June 2021, when Respondent texted King about Barry Morphew, "we got him. No worries."

---

[263] Garnett and Suthers opined that shielded by the safe harbor provision, Respondent could have acceptably stated, "At the hearing on bond, my deputy, Lindsey, stated on the record that Barry Morphew was a flight risk," or another comment of that ilk.

The Hearing Board's opinion here largely rests on the same legal analysis it laid out for the People's Colo. RPC 3.6(a) claim, even though some salient differences exist between the two ethical rules. Whereas the "substantial likelihood of materially prejudicing the adjudicative proceeding" formulation of Colo. RPC 3.6(a) differs somewhat from Colo. RPC 3.8(f)'s inquiry whether a prosecutor's comments had a "substantial likelihood of heightening public condemnation of the accused," we find sufficient correspondence between the two to rely in significant measure on our findings regarding Claim II.

As such, we conclude that the People have proved the first and third allegations, as set forth above. Respondent violated Colo. RPC 3.8(f) when, on May 5, 2021, she told the media that Barry Morphew "was taken into custody and when asked questions he said he wanted a lawyer and all questioning ended," and when, in August or September 2021, she publicly posted comments on "Profiling Evil" in response to poster Gian-Luc Brasseur. Neither comment had a legitimate law enforcement purpose, neither comment was necessary to inform the public about the Morphew case, and neither comment was permitted under Colo. RPC 3.6(b).

Likewise, for the reasons set forth as to Claim II, we do not find that the People have met their burden to prove their second and fourth allegations, as described above. Thus, we cannot conclude that Respondent violated Colo. RPC 3.8(f) when, in August 2021, she appeared on the YouTube channel "Profiling Evil" to discuss the Morphew case and when, on September 14, 2021, she responded "possibly" after Julez Wolf asked her whether Barry Morphew might flee. We decline to find in this instance that Respondent's appearance on a podcast—however inadvisable—was violative based on the podcast's title alone. And we are not convinced that Respondent's one-word comment to Julez Wolf, "possibly," carried with it a substantial likelihood of heightening public condemnation of Barry Morphew.

Last, we consider whether Respondent violated Colo. RPC 3.8(f) when, in June 2021, Respondent texted King in response to a Barry Morphew video, "we got him. No worries." Our analysis of this statement under Colo. RPC 3.8(f) diverges from our analysis under Colo. RPC 3.6(a). This is because, unlike Colo. RPC 3.6(a), which governs all Colorado lawyers, Colo. RPC 3.8(f), which applies only to Colorado prosecutors, does not require proof that a prosecutor reasonably expects the comment in question to be publicly disseminated. Instead, the operative element in Colo. RPC 3.8(f) focuses exclusively on whether the comment has a substantial likelihood of heightening public condemnation of the accused. In our view, the absence in Colo. RPC 3.8(f) of the public dissemination element underscores prosecutors' obligation to act as ministers of justice by always exercising prudence in their communications, regardless of the audience. This interpretation recognizes that prosecutors wield significant power and authority in the criminal justice system. It also accords with both Suthers's and Garnett's opinions that under Colo. RPC 3.8(f), a prosecutor cannot make a statement in private that would be violative if uttered in public. We see good reason for such a restriction. Otherwise, unscrupulous prosecutors could leverage their private comments to indirectly move the needle of public opinion, which could heighten public condemnation of the accused.

Here, Respondent's comment implies that she personally believed Barry Morphew was guilty and that the case's outcome was inevitable, an inference that a prosecutor must avoid summoning.[264] Respondent communicated this inference though a text to King, a well-known podcaster with an audience that avidly tracks high-profile criminal cases. Respondent's comment to King had a substantial likelihood of heightening public condemnation of Barry Morphew; by influencing King's own assessment of Barry Morphew's innocence or guilt, and by suggesting that conviction was a foregone conclusion, Respondent's comments cemented King's own assessment of the strength of the prosecution's case. This, in turn, had a substantial likelihood of intensifying King's messages that Barry Morphew had murdered his wife. As a result, we conclude that Respondent violated Colo. RPC 3.8(f) when, on June 21, 2021, she texted King, "no worries. We got him."

<u>Colo. RPC 5.1(a) and Colo. RPC 5.1(b) (Claim IV)</u>[265]

Colo. RPC 5.1(a) and (b) address the responsibilities of a partner or supervisory lawyer. Section (a) of that rule provides that a partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm or organization, must make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct. Section (b) requires a lawyer with direct supervisory authority over another lawyer to make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.

The People claim that Respondent violated Colo. RPC 5.1(a) by failing to make reasonable efforts to ensure the 11th Judicial District Attorney's Office had in effect measures providing reasonable assurance that all prosecutors in her office conformed to the Rules of Professional Conduct, including Colo. RPC 3.4(c) and Colo. RPC 3.8(d). They allege that Respondent also failed to make reasonable efforts to ensure subordinate prosecutors were adequately trained regarding disclosures, including expert disclosures, and failed to make reasonable efforts to implement adequate office procedures to facilitate compliance with Crim. P. 16 discovery obligations. Finally, the People assert that Respondent failed to make reasonable efforts to implement adequate measures to ensure that her employees would consistently comply with the Rules of Professional Conduct.

---

[264] *See* Colo. RPC 3.8 cmt. 5 ("Paragraph (f) supplements the prohibition in Rule 3.6 . . . [by recognizing that] a prosecutor's extrajudicial statement can create the additional problem of increased public condemnation of the accused. . . ."); Colo. RPC 3.6 cmt. 5(4) (identifying "certain subjects that are more likely than not to have a material prejudicial effect on a proceeding," particularly when they refer to a criminal matter, including "any opinion as to the guilt or innocence of a defendant or suspect in a criminal case or proceeding that could result in incarceration").

[265] The PDJ and Hearing Board member Harper, as a majority, find that the People proved Colo. RPC 5.1(b) as pleaded in Claim IV. Hearing Board member Caloia would find no violation of Colo. RPC 5.1(b) and thus dissents as to Claim IV.

Concomitantly, the People claim that Respondent violated Colo. RPC 5.1(b) by failing to make reasonable efforts to ensure the Morphew prosecution team complied with the Rules of Professional Conduct. The People aver that even after Respondent was on notice her prosecution team had been sanctioned for discovery violations, she failed to verify that the team interviewed designated experts about the scope of their opinion before the experts were disclosed, reviewed expert disclosures before filing them, disclosed all material in support of the expert disclosures, and made timely disclosures. The People argue that Respondent therefore violated section (b) of Colo. RPC 5.1.

Respondent challenges Claim IV. She contends that she managed to put together a first-rate team of highly qualified prosecutors in a rural jurisdiction strapped for resources. She notes that she regularly hounded Raynes for support, thereby securing administrative help from the 4th Judicial District and a last-minute assist from Grosgebauer out of the 18th Judicial District. She boasts of her routine oversight of the case, pointing to her weekly evening calls with the prosecution team, and she highlights her active engagement with the case at its inception and its conclusion. Taking into consideration the many obstacles her district faces, she contends she made reasonable efforts to ensure that all prosecutors in her office—including the Morphew prosecutors—conformed to the Rules of Professional Conduct.

In deciding this claim, the Hearing Board first considers comments to Colo. RPC 5.1. Comment 2 to the rule notes that section (a) requires managing lawyers to make reasonable efforts to establish internal policies and procedures to create a culture of ethical compliance. The thrust of the People's Colo. RPC 5.1(a) claim foregrounds the same elements: whether Respondent provided reasonable training, enacted appropriate office procedures to ensure full and timely discovery, and implemented adequate measures to confirm that her office abided by the Rules of Professional Conduct.

The Hearing Board received little to no testimony or evidence on these questions. To the extent we did, we heard that Respondent budgeted amply for training, sent prosecutors and investigators to conferences, and provided new hires an employee manual. The People did not present clear and convincing evidence to suggest that these general measures were deficient. Nor did they point to other office-wide procedures, policies, or systems that Respondent should have implemented but did not. We cannot find that the People shouldered their burden to prove the Colo. RPC 5.1(a) allegations detailed in their complaint.

With that, we turn to the People's claim under Colo. RPC 5.1(b), which implicates Respondent's efforts to ensure the Morphew prosecution team complied with the Rules of Professional Conduct. Garnett's expert opinion about an elected district attorney's role in supervising line prosecutors informs the majority's decision here. Garnett opined that Respondent fell down in her supervisory capacity, citing three specific shortcomings. First, Respondent did not appropriately intervene to ensure discovery issues were remedied, Garnett said; Judge Murphy's July 2021 minute order finding discovery violations just six weeks after the case was filed should have been "a red flag for anyone paying attention to the case," he testified. Garnett opined that a

reasonable district attorney would have gotten involved to send a message to the team that discovery violations were inacceptable, because a reasonable district attorney would not let discovery violations "fester." Second, Garnett said, Respondent failed to designate lead counsel after Lindsey's departure, kindling a "chain of command confusion." A reasonable district attorney, Garnett stated, would have clarified for the team who was directing the Morphew prosecution, because "you cannot fight a war by committee." Third, and relatedly, Garnett declared that Respondent failed utterly to rectify the expert witness endorsement issues when they surfaced in February 2022. A reasonable district attorney would have stepped in to solve the problem, Garnett said, given that expert endorsements were so "fundamental" to the case.

The majority largely adopts Garnett's assessments. Respondent was aware, from the time the sheriff's office delivered to her office a ten-terabyte hard drive of information, that the sheer volume of disorganized, unlabeled discovery promised to pose a problem for the prosecution. These issues were underscored by Judge Murphy's order in summer 2021 that the prosecution team violated discovery rules. As the People concede, "discovery issues are somewhat common and straight-forward to resolve,"[266] but according to Garnett, Respondent, as the elected district attorney overseeing this high-profile first-degree murder case, should have immediately intervened to assess the problem's source and scope and then quickly mobilized resources to rectify it. Instead, Lindsey testified, Respondent was mostly disengaged from the case until he resigned in October 2021. Even the 4th Judicial District Attorney's administrative support that Respondent eventually marshalled began the project of organizing discovery several months later than the administrative team's availability dictated.

As a result, discovery issues, including accusations that the prosecution did not disclose material information, continued to plague the prosecution throughout the life of the Morphew case. Indeed, in the majority's view, the prosecution never truly had a command of the universe of discovery, which contributed in large measure to its failure to file compliant expert endorsements, Hurlbert's in-court inability to identify the Bates numbers of expert reports that had been disclosed in discovery, and Grosgebauer's difficulties in finding information when drafting the motion for reconsideration. Considering the progression of the case, Respondent failed to promptly make timely and reasonable efforts to facilitate the prosecution's compliance with its disclosure obligations, thereby losing, at a minimum, several precious months that could have been spent in labeling and categorizing discovery.

Until October 2021, when Lindsey resigned from the district attorney's office, the Morphew prosecution team had a clearly designated leader. When Lindsey left, the prosecution team was left in disarray, and Respondent's failure to either take the lead herself or to designate a new point person resulted in confusion. Lawyers pointed us to no one—or worse still, to one another—when asked to identify lead counsel. Hurlbert and Weiner, who were both attending to other professional responsibilities, inaccurately assumed that the other (or Edwards) was looking after essential matters. Hurlbert assumed that both Edwards and Weiner had access to full discovery when neither in fact did. Hurlbert mistakenly expected that Edwards could draft a bill of particulars;

---

[266] People's Hr'g Br. at 5.

later, Hurlbert and Weiner incorrectly assumed that Edwards had been apprised of the decision to confess Counts 3 and 5. And in winter 2022, no one satisfactorily articulated the theory of the case when questions arose about the short rifle. As Garnett said, "things f[e]ll through the cracks."

While the majority does not adopt Garnett's viewpoint that all cases need a *sole* lead counsel, we do believe that all cases require accountability and, at a minimum, clearly delineated and communicated spheres of responsibility. The Morphew case lacked that structure. After October 2021, certain essential activities—tracking calendaring, ensuring all tasks were accounted for, and developing a reasonably comprehensive command of the evidence—had no identifiable point person. This was Respondent's failing. Respondent did not designate chains of command. She did not appear to appreciate that because her human resources were stretched thin, they might overlook tasks that were not obviously in their bailiwicks. She did not exercise appropriate supervision to guarantee the team had developed, vetted, and internally communicated a coherent theory of the case. In short, she failed to take reasonable measures to establish a leadership structure that ensured accountability within the Morphew prosecution team.

This leads the majority to what it believes was Respondent's third supervisory failing. In February 2022, the weaknesses inherent in the prosecution's effort to "fight a war by committee" were laid bare. One week before the expert witness disclosures deadline, Edwards, whose remit as best as we can tell did not in any way encompass expert endorsements, noticed the team had made no headway on this crucial project. In the absence of other leadership, Edwards volunteered to compile the endorsements. Respondent did not so much as inquire about the project's status. She did not offer resources. Nor did she respond to the two increasingly urgent emails Edwards sent in the days before the deadline. She assumed but did not confirm that Hurlbert and Weiner were taking care of the project. They, in turn, were distracted by other matters and assumed that Edwards was not just organizing the endeavor but singlehandedly completing the work. As a result, on the day before the endorsements were due, at least two anticipated experts—Walker and Spence—had not talked to any prosecutor about the disclosures. At least four experts—Spence, Wolfe, McConnell, and McDermott—had not produced reports or statements. And no domestic violence expert was identified. As Weiner and Edwards conceded, and as Judge Lama found, the endorsements did not comply with the case management order.

But it is Respondent's inattention to this matter after February 14, 2022, that the majority faults the most. By that point, Respondent was aware that her experienced motions lawyer was embarrassed by the endorsements. On February 22, 2022, she discovered that the defense sought to exclude the prosecution's experts. And on February 24, 2022, she learned that Judge Lama found the prosecution's endorsements wanting but granted the team a brief reprieve to cure the deficiencies. The team therefore had just a few days to address the defense's arguments and salvage expert testimony widely deemed essential in successfully prosecuting the case.

Respondent acknowledged that her contributions during this time consisted of a few telephone calls and emails with Hurlbert and Weiner. Neither she nor any other witness could describe the content of the calls, and we were never shown any of the alleged emails. As such, the majority must conclude that although Respondent was aware of these very serious developments,

she paid little attention to the five-alarm fire and instead relied on Hurlbert and Weiner to extinguish the blaze. That her subordinate prosecutors were accomplished and well-regarded may have justified reduced oversight, but their experience did not permit her to completely abdicate her supervisory duties, especially after receiving notice that the prosecution team was struggling. Indeed, "neither organizational duties nor a belief in the competency of subordinates is sufficient to justify inadequate supervision, particularly after knowledge of the existence of problems is acquired."[267]

The majority concludes its analysis of this claim by addressing the dissent's framing of the rule violation at issue here. The dissent raises *Solano v. Newman*, a newly issued Court of Appeals opinion, to observe that because prosecutors cannot provide discovery that they do not have, prosecutors are, in effect, at the mercy of law enforcement.[268] *Solano* is not relevant to Claim IV, however. Claim IV does not invite review as a factual matter as to whether law enforcement timely provided discovery to the prosecution team, and Respondent does not in fact raise lack of law enforcement compliance as a defense. Nor does Claim IV ask as a legal matter whether Respondent should be sanctioned for the prosecution's failure to provide discovery that it did not have in its possession. Rather, Claim IV inquires whether, after being placed on notice that her prosecution team had been sanctioned for discovery violations, Respondent failed to make reasonable supervisory efforts to ensure the prosecution team filed timely, accurate, and complete expert witness endorsements—information underlying which was in the prosecution team's control. The majority concludes that Respondent failed to make those reasonable efforts. In Respondent's capacity as supervisor, it was her responsibility to give her team the tools to gain mastery of the breadth of information in its control; it was her obligation to ensure that her team had identified, interviewed, and adequately disclosed the prosecution's experts; and it was her duty to hold her subordinate lawyers' feet to the fire when she learned they had failed to meet Judge Lama's expectations, whatever the nature of those expectations. She did none of those things.

Because Respondent did not appropriately supervise the prosecution team even after Judge Murphy and Judge Lama repeatedly found that the prosecution committed discovery violations, the majority concludes that she exposed her subordinate lawyers to professional liability, her office to public embarrassment, and, as the sanctions demonstrated, the Morphew case to detriment. The majority simply cannot overlook Respondent's failure to rise to the moment when so much was at stake. As a result, the majority has no trouble finding by clear and convincing evidence that Respondent's failure to ensure her team interviewed experts, reviewed expert

---

[267] *In re Weston*, 442 N.E.2d 236, 239 (Ill. 1982); *see also In re Ritger*, 556 A.2d 1201, 1203 (N.J. 1989) (concluding that "when lawyers take on the significant burdens of overseeing the work of other lawyers, more is required than that the supervisor simply be 'available'").
[268] 2024 COA 93.

reports and statements, and disclosed all facts and data underlying those statements represents an abdication of her supervisory duties under Colo. RPC 5.1(b).[269]

### Colo. RPC 8.4(a) and Colo. RPC 8.4(d) (Claim V)[270]

Colo. RPC 8.4(d) forbids a lawyer from engaging in conduct that is prejudicial to the administration of justice, whereas Colo. RPC 8.4(a) prohibits a lawyer from attempting to violate the Rules of Professional Conduct, knowingly assisting or inducing another to do so, or doing so through the acts of another. The People argue that Respondent violated these rules by instructing her chief investigator, Andrew Corey, to interview Iris Lama, Judge Lama's former spouse, while Judge Lama was presiding over the Morphew case. According to the People, Respondent did so in an effort to uncover information about Judge Lama that would require him to recuse or disqualify from continuing to preside over the Morphew case. Respondent took this approach, the People allege, even though she had no credible reason to suspect that Judge Lama had physically abused her former spouse or had engaged in other conduct that would justify a criminal investigation. Respondent thus used her position and her office's resources in a manner intended to prevent Judge Lama from effectively performing his role in the criminal justice system, the People claim. They conclude that Respondent thereby abused her power as an elected district attorney, contravened her prosecutorial responsibility to act as an officer of the court, and attempted to prejudice the administration of justice.

Respondent counters that the People's Claim V amounts to an attack on her prosecutorial discretion that offends the separation of powers. She also insists that she did not prejudice or attempt to prejudice the administration of justice, emphasizing that the change.org petition, which was signed by thousands of people, set forth concerning allegations; that she asked an employee to interview just one witness about these allegations of judicial misconduct; that she took appropriate steps to ensure the interview was discreet and non-coercive; and that she was required to look into allegations of undisclosed judicial bias in order to protect the record.

---

[269] We need not, and should not, make findings here as to whether Respondent's subordinate lawyers violated the Rules of Professional Conduct, as one finding does not ineluctably lead to the other. *See* Douglas R. Richmond, *Law Firm Partners As Their Brothers' Keepers*, 96 Ky. L.J. 231, 241 (2008) ("Indeed, because Rule 5.1(b) imposes upon supervisory lawyers an obligation to make reasonable efforts to ensure that the lawyers they directly supervise conform to ethics rules, a partner may be disciplined even where the lawyers [whom] she is responsible for violate no rules themselves."); Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 42.2, at 42-4 (3d ed. 2001, Supp. 2010) ("A supervisory lawyer violates Rule 5.1(a) or (b) by failing to take reasonable precautions against violations of the Rules by others. Violation of this independent duty can occur whether or not the supervisor participates in a subordinate's violation, and even if no substantive violation of the Rules occurs.").

[270] The PDJ and Hearing Board member Harper, as a majority, find that the People proved Claim V. Hearing Board member Caloia would find no violation and dissents as to Claim V.

To begin, the full Hearing Board rejects Respondent's argument that under the separation of powers doctrine the disciplinary system lacks authority to regulate prosecutorial conduct. As the PDJ ruled in his "Omnibus Order Resolving Questions of Law Under C.R.C.P. 56(h) and Denying Respondent's Motion to Dismiss Claim V," Respondent is subject to disciplinary oversight because she is a licensed lawyer in Colorado.[271] Comment 5 to Colo. RPC 8.4 alludes to this dynamic; its invocation of "[l]awyers holding public office" intimates that those who abuse their roles as public officers—including prosecutors—are not exempt from regulation.[272]

Even though we reject Respondent's separation of powers argument, we do acknowledge as a backdrop to deciding this claim that prosecutors have exceedingly wide discretion to select matters for investigation; a prosecutor may initiate a criminal investigation without any particularized suspicion or predicate.[273] As Suthers testified, there are "no investigative standards" for prosecutors: no minimum standard exists, such as probable cause or reasonable suspicion, to initiate an investigation.

Nevertheless, as Garnett observed, prosecutors' discretion is not illimitable. For example, a prosecutor should not initiate or continue an investigation based on improper political or personal considerations, or, with limited exceptions, based on the personal characteristics of the potential investigative subject.[274] And as relevant here, the American Bar Association ("ABA") *Standards for Criminal Justice, Prosecutorial Investigations* ("*Prosecutor Standards*") recommends that a prosecutor investigate a judicial officer only on a reasonable belief that the judicial officer committed criminal conduct.[275] If the prosecutor decides to investigate, the prosecutor should "protect against the use of false allegations as a means of harassment or abuse that may impact the independence of the judiciary."[276]

---

[271] *See* C.R.C.P. 242(a)(1).

[272] *See also People v. Chambers*, 154 P.3d 419, 427 (Colo. O.P.D.J. 2006) (finding that "prosecutors, like all other lawyers, must act within the bounds of professional ethics," and noting that the "responsibility to enforce the laws in her judicial district grants her no license to ignore those laws or the Code of Professional Responsibility") (cleaned up); *Massameno v. Statewide Grievance Comm.*, 663 A.2d 317, 337 (Conn. 1995) (holding that the judiciary may sanction the conduct of a prosecutor without violating the separation of powers doctrine); *Comm'n for Law. Discipline v. Webster*, 676 S.W.3d 687, 698-99 (Tex. App. 2023) (rejecting an argument that separation of powers prohibits regulating a lawyer serving in the Attorney General's office); *cf.* American Bar Association *Criminal Justice Standards for the Prosecution Function* § 3-1.12(c) (setting forth conditions under which a prosecutor must report another prosecutor's misconduct "to appropriate judicial, regulatory, or other government officials not in the prosecutor's office").

[273] Ex. S53.

[274] Ex. S53.

[275] Ex. S52. *Prosecutor Standard* 26-3.2(d) provides, "If the prosecutor's office has a reasonable belief that a member of the judiciary has engaged in criminal conduct, the prosecutor's office should initiate, or seek the initiation of, a criminal investigation."

[276] Ex. S52.

The *Prosecutor Standards* also urges prosecutors to take "reasonable steps to assure the independence of any investigation of a judge before whom the prosecutor's office practices," including seeking the appointment of a pro tem or special prosecutor.[277] Suthers endorsed this guidance, opining that a prosecutor must show "absolute independence" when investigating a judge who is presiding over an open case. Suthers also mentioned that CDAC has processes for just this kind of circumstance: to avoid any appearance that the prosecution is attempting to intimidate or retaliate against a judge, a prosecutor can contact CDAC to arrange for appointment of a special prosecutor.

The majority concludes that Respondent violated Colo. RPC 8.4(a) and Colo. RPC 8.4(d) for several reasons. As an initial matter, the majority cannot find that the change.org petition supplied a "reasonable belief" to justify investigating whether Judge Lama committed a crime. The petition does not, in fact, allege that Judge Lama ever perpetrated domestic abuse or committed any other criminal conduct. The petition demands Judge Lama's recusal based solely on his rulings, Iris Lama's advocacy for victims of domestic abuse, and Iris Lama's and Barry Morphew's membership in the same gym. On its face, the petition does not meet the minimum threshold that *Prosecutor Standard* 26-3.2(d) recommends to initiate an investigation of a sitting judge.[278]

Nor did Respondent have any other basis to launch an investigation. No victim complained, nor did any witness report possible criminal conduct. Instead, Respondent acted on a combination of swirling rumors and her own wild speculation to investigate the personal life of a sitting judge. Respondent's decision to order the interview flouted the *Prosecutor Standards'* warning that a district attorney must protect against the use of false allegations as a means of harassment or abuse that may impact the independence of the judiciary.

The majority also regards as pretextual Respondent's testimony that she was obligated to interview Iris Lama to protect the appellate record. Rather, as the majority sees it, the petition served as convenient excuse to conduct a fishing expedition for some basis to disqualify Judge Lama. When Respondent came across the petition, the prosecution team's orientation toward the case was not hopeful. By early March 2022, after a series of adverse rulings, the team did not expect a successful prosecution that would require it to defend the record against an appeal by Barry Morphew. At that juncture, the team could have acknowledged how its own errors contributed to the unfavorable rulings. But it did not. Instead, the prosecution team jumped to the conclusion that only Judge Lama's bias could explain the adverse rulings and, therefore, that he was "messing" with them. The team leaped to this assumption even though Judge Murphy had

---

[277] Ex. S52.

[278] Respondent argues that the *Prosecutor Standards* are but mere guidance and are not binding on district attorneys. Although the Colorado Supreme Court has not bound prosecutors to the *Prosecutor Standards*, the majority finds the authority is strongly persuasive. Respondent also asserts that she was either unaware of or lacked access to the *Prosecutor Standards*. The majority cannot credit this testimony: she cited the *Prosecutor Standards* in her motion to dismiss the Morphew case. *See* Ex. S50 at 7.

issued similar adverse rulings as early as the first weeks of the Morphew case due to the prosecution's discovery failures.[279]

Within this context, Iris Lama's interview represented a last ray of hope: if the investigation exposed domestic abuse, the team might be able to disqualify Judge Lama and "save" the prosecution's case, which was slated to go to a jury trial fewer than two months later. Given this compressed timeline, the majority concludes that Respondent's decision to authorize the investigation was fueled by her desire to remove Judge Lama from the case, not by her duty to protect the appellate record. This same motivation is why, when Corey reported that Judge Lama had never abused his former spouse, Respondent texted the prosecution team that there was "nothing there" and it was a "no go." It was also why Hurlbert responded, "bummer." If the prosecution had genuinely wished to protect the record, the tone of the team's texts would have been positive, relieved, and optimistic. Instead, the messages evince disappointment, conflicting with Respondent's narrative. The majority thus finds incredible Respondent's assertion that she authorized Iris Lama's interview merely to protect the record.[280] As a corollary, the majority concludes that Respondent's efforts on the eve of trial to find a reason to remove a sitting judge from a high-profile murder case after he had issued a string of adverse rulings clearly and convincingly demonstrates her intentional attempt to prejudice the administration of justice in violation of Colo. RPC 8.4(a).

But even if we were to overlook the *Prosecutor Standards'* recommendation that a prosecutor investigate a presiding judge only on a "reasonable belief" and instead find that Respondent, in her broad discretion, had a legitimate reason to order the investigation, the majority would still find that the manner in which the investigation was conducted created an appearance of attempting to influence or intimidate Judge Lama, thus prejudicing the administration of justice. Respondent approached at least two different law enforcement agencies to conduct the Iris Lama interview. Walker, representing the sheriff's office, declined and advised Respondent to use an independent agency. The CBI also refused, explicitly voicing concern that

---

[279] Garnett testified that in his experience, not many judges would have issued orders that differed substantially from those that Judge Murphy and Judge Lama issued, given the "mess" the prosecution presented to the bench. Garnett characterized Judge Lama's orders as "extraordinary," opining they were "careful," "carefully reasoned," "carefully laid out," and "measured." Garnett also observed that Judge Lama did not impose the full panoply of sanctions he could have levied against the prosecution team.

[280] Nor can the majority find credible the notion that the team resolved to dismiss the case before Respondent decided to interview Iris Lama. On March 14, 2022, Respondent asked an investigator to interview Iris Lama. Ex. S39 at HURLBERT_000238. On the same date, Respondent communicated about preparing for an appeal. Ex. S39 at 13046. On March 17, 2022, the prosecution team discussed filing a C.A.R. 21 petition. S39 at 13051. If the prosecution had already decided not to move forward with the case and instead to seek dismissal, one would reasonably question why Respondent would proceed with the Iris Lama interview and why the prosecution team did not move to dismiss immediately before or after making that decision, rather than letting the Morphew prosecution linger for nearly another month.

conducting the investigation would invite the appearance of a conflict. Moreover, Weiner testified that he recommended Respondent find someone outside of the district attorney's office to conduct the interview in order to avoid the appearance that the prosecution team was attempting to influence or intimidate Judge Lama. Despite these warnings, Respondent never contacted CDAC and never consulted the *Prosecutor Standards*.

Suthers testified that Respondent's failure to outsource the interview to a neutral investigator ran afoul of prosecutorial norms as well as the ABA's guidance. He also pointed to *In re Aubuchon,* an Arizona disciplinary case, for the proposition that a prosecutor must refrain from conduct that could have the appearance of intimidating judges or undermining the proper functioning of the judicial system.[281] Garnett testified similarly, opining that professional standards required the appointment of a special prosecutor. In Garnett's view, asking the sheriff's office to interview Iris Lama did not provide nearly enough "daylight" between Respondent's office and the investigating agency.

Suthers's and Garnett's expert testimony convinces the majority that Respondent did not comport herself in accordance with the established professional norms for district attorneys in Colorado. Nor did she comport herself in accordance with the *Prosecutor Standards*. She thereby risked, at a minimum, creating the appearance that the investigation was not independent from her office's interests—after all, Respondent employed, directed, and paid Corey. Likewise, she reasonably should have foreseen that Judge Lama would learn of the interview, discover that it had been conducted at her behest, and view it as an attempt to influence or intimidate him.[282] Accordingly, the majority concludes that Respondent's decision to order Corey to interview Iris Lama offended professional norms; disregarded persuasive ABA guidance; created an appearance of attempting to influence or intimidate Judge Lama; and thus prejudiced the administration of justice in violation of Colo. RPC 8.4(d).

### The Jacobs and Crawford Cases

#### Colo. RPC 3.6(a) (Claim VI)

The People argue that Respondent violated Colo. RPC 3.6(a) in the Jacobs and Crawford cases by making brazen extrajudicial statements, even after she had already suffered the consequences of issuing extrajudicial statements in the Morphew case. Specifically, they claim, Respondent violated this rule when she made extrajudicial statements to KRDO reporter

---

[281] 309 P.3d 886, 894 (Ariz. 2013) (finding that a prosecutor's "improper requests [to interview a judge] prejudiced the administration of justice because they appeared designed to pressure the court to assign [a matter] to another judge").

[282] That Respondent did not intend to influence or intimidate Judge Lama is beside the point for purposes of Colo. RPC 8.4(d). What is relevant here is that her decision to authorize Corey to pursue the investigation created an appearance of attempting to influence or intimidate Judge Lama, which itself prejudiced the administration of justice.

Sean Rice, which she knew or reasonably should have known would be disseminated by means of public communication and would have a substantial likelihood of materially prejudicing an adjudicative proceeding in the Jacobs and Crawford cases. Respondent disputes this claim by invoking the defense of mistake of fact. She argues that she believed her statements to Rice about the Crawford and Jacobs cases were off the record and would not be published. As such, she says, she could not have known or reasonably known that her statements would be disseminated by means of public communication or that they would have a substantial likelihood of materially prejudicing the Morphew case.

To decide this claim, the Hearing Board takes into account comment 5 to Colo. RPC 3.6, which enumerates "certain subjects that are more likely than not" to materially prejudice a proceeding, particularly when made about a criminal matter. As pertinent here, these subjects relate to the character, credibility, reputation, or criminal record of a suspect in a criminal investigation; any opinion as to the guilt or innocence of a criminal defendant; information that the lawyer knows or reasonably should know is likely to be inadmissible as evidence at trial and that would, if disclosed, create a substantial risk of prejudicing an impartial trial; and the fact that a defendant has been charged with a crime, unless the comment is accompanied by a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty. Comment 6 to the rule also emphasizes that the nature of the proceeding itself is a factor in determining prejudice, noting that "[c]riminal jury trials will be most sensitive to extrajudicial speech."

The Hearing Board begins its analysis by examining whether Respondent's statements were, in fact, off the record. Respondent, of course, insists that *she* believed they were. This is so, she says, because she told Rice which topics she could discuss only off the record. Witnesses' testimony could support differing inferences as to whether Respondent had such a subjective belief. Souza reported that almost immediately after learning of the broadcast, Respondent told her that the interview had been off the record. But LeDoux testified that Respondent never briefed this mistake-of-fact defense when responding to his outrageous government conduct allegations. Because these witnesses' testimony hangs in the balance, we do not find clear evidence that would lead us to conclusively find that Respondent knew her statements to Rice would be publicly disseminated.

Respondent also implicitly contends that she could not reasonably have known her statements would be publicly disseminated, particularly because she repeatedly emphasized during the interview that she could not say a single word about an open or sealed case. We cannot credit that argument for several reasons. As an initial matter, Respondent already had been judicially sanctioned in part for extrajudicial statements she made during the Morphew case. Regardless of whether those sanctions were premised on accurate factual findings, Respondent was on notice of the landmines inherent in making extrajudicial statements. One would have expected her to exercise more, not less, vigilance in interacting with members of the media.

More important, as an elected official with professional obligations, Respondent had a responsibility to ensure that her directives governing her recorded conversation with Rice were

absolutely clear. But her instructions to Rice were not explicit, precise, or consistent. Respondent testified that at the outset she told Rice that she could answer questions about open or sealed cases but that her comments about those cases were off the record. During the interview, however, Respondent reiterated several times that she could not *talk* about open or sealed cases.[283] Even so, she went on to talk at length, acting in complete contravention of her own instructions. She spoke openly and freely about the Jacobs and Crawford cases, both of which were open criminal cases. In contrast, she refused to answer questions about the Morphew case, which was closed after she moved to dismiss it without prejudice. Several times she acknowledged that she knew she must, and should, limit her remarks; at one point she confided, "I don't like to bring DA business out in the public because that's a risky thing to do," even though she proceeded to do that very thing. Injecting even more confusion, at the end of the interview Respondent shied away from hitting her "bullshit" button because KRDO was recording, even though she never intimated that off-color language fell within the ambit of topics that ought to be off the record.

Respondent expected Rice to decipher these mixed messages while relying almost entirely on her initial unrecorded blanket instruction to him that she would not discuss open cases on the record. In effect, she carelessly outsourced to Rice the onus of monitoring whether her statements related to open cases and designating those statements as off the record. We find Respondent failed to exercise adequate caution by delegating her professional responsibilities to an investigative reporter with whom she had never had any meaningful interaction and whom she believed had inaccurately reported on her in the past. Respondent's belief that she was off the record when discussing the Jacobs and Crawford cases was unreasonable, and she reasonably should have known that her interview with Rice would be publicly disseminated by KRDO.

Ultimately, we consider this context while evaluating the outward indicia signifying that the conversation was on the record. Objectively speaking, a reasonable outside observer could only conclude that the recorded interview was on the record. After speaking casually off the record for an hour, Rice stated that he wanted to go on the record. Respondent consented. Miller retrieved his camera, which was conspicuously pointed toward Respondent. Respondent affixed a wireless microphone to her own lapel. She began speaking freely about Jacobs and Crawford, and she never requested to go off the record for the duration of the raw video. At one point, toward the end of the video, Respondent explicitly acknowledged that the KDRO team was recording. A reasonable person would objectively view this sequence of events as clearly and convincingly demonstrating that the videotaped interview was on the record. Accordingly, we reject Respondent's mistake-of-fact defense and find that Respondent reasonably should have known that KRDO would publicly disseminate the contents of the interview.

The second element of this claim—whether Respondent's comments had a substantial likelihood of materially prejudicing the Jacobs or Crawford proceedings—is essentially undisputed. In the recording, Respondent effectively pronounced that Jacobs was guilty. She

---

[283] Notably, Respondent repeated that formulation in her December 2022 letter to Rice, in which she wrote, "I repeatedly told you that *I could not talk* about any pending cases." Ex. S64 (emphasis added).

divulged inadmissible details about Jacobs's past record and assessed him to be a flight risk. She expressed her personal opinion of Crawford's and Jacobs's motives and characters. And she never stated that Jacobs and Crawford were presumed innocent until and unless proven guilty. Her statements, in short, touch on at least four subjects listed by comment 5 to Colo. RPC 3.6 that are more likely than not to materially prejudice a proceeding.

Suthers and Garnett were scathing in their denunciation of Respondent's recorded statements. Suthers said he could not bring to mind a more "egregious" example of prejudicial extrajudicial statements. He scoffed at the notion that Respondent's "salacious" statements had a legitimate law enforcement purpose and expressed incredulity that they would not create a substantial likelihood of prejudicing the Jacobs and Crawford cases. "I don't think I've ever seen anything as bad as this," Suthers said. Garnett echoed the sentiment. "If any deputy of mine had said these things, they'd have been fired," he declared.

The Hearing Board has no trouble finding that Respondent's statements during her interview with Rice had a substantial likelihood of materially prejudicing both defendants' criminal proceedings. Her comments imperiled Crawford's and Jacobs's due process rights, rights to a fair trial, and rights to an impartial jury pool. Indeed, we need not speculate about whether her statements had a prejudicial effect: as LeDoux testified, two tribunals found that Respondent's conduct constituted outrageous government conduct. As a result, both Jacobs's and Crawford's cases were dismissed. The People proved this claim, exceeding by a wide margin their clear and convincing burden of proof.

## Colo. RPC 3.8(f) (Claim VII)

The People's final claim avers that Respondent violated Colo. RPC 3.8(f) because her statements to Rice concerning Crawford's character, intent, and judgment had a substantial likelihood of heightening the public's condemnation of Crawford. Likewise, the People assert that Respondent's statements to Rice regarding Jacobs's intent, his prior juvenile conviction, and his guilt had a substantial likelihood of heightening the public's condemnation of Jacobs. Respondent again defends her conduct by asserting that she was mistaken in believing that Rice would treat her comments about these cases as off the record. Had Rice honored their agreement, she argues, her statements would not have had a substantial likelihood of heightening public condemnation of Crawford or Jacobs.

The Hearing Board incorporates by reference many of its findings on Claim VI. Specifically, we reject Respondent's mistake-of-fact defense. Even if Respondent subjectively believed her comments were off the record, that is no defense under Colo. RPC 3.8(f). As Suthers and Garnett opined, and as we discussed in our analysis of Claim III, a prosecutor cannot go off the record in order to commit an ethical violation.

Moreover, Respondent's statements had a substantial likelihood of heightening public condemnation of Crawford and Jacobs. Garnett testified that Respondent's comments about

Jacobs's bad character were improper and disparaging and affected the public's perception of him. We agree. Respondent's statements telegraphed to the Cañon City community that Jacobs and Crawford were guilty and that the defendants are bad people who made bad choices. Regarding Jacobs specifically, Respondent's comments portrayed him as a sex offender and a delinquent. As for Crawford, Respondent's comments painted her as a promiscuous person and a bad mother who did not care about her child and whose sole concern was making money. The inflammatory online comments responding to the print article confirms that Respondent's words had a negative effect on the community's perception of the defendants.

Had Rice not published Respondent's comments, her conduct nevertheless would have had a substantial likelihood of heightening public condemnation of Crawford and Jacobs. When Respondent communicated these messages to Rice, she implied that she was aware of the evidence, all of which showed that these defendants were not only guilty but also morally bankrupt. Even if Rice had a preconceived negative view of the defendants, Respondent's comments substantially risked unfavorably shaping Rice's coverage of these defendants for the worse, thus heightening the public condemnation of the defendants.

Finally, the Hearing Board finds that Respondent's comments were not necessary to inform the public of the nature and extent of her action, nor did they serve any legitimate law enforcement purpose. We conclude Respondent's comments to KRDO regarding the Jacobs and Crawford cases violated Colo. RPC 3.8(f).

## V.    SANCTIONS

The American Bar Association *Standards for Imposing Lawyer Sanctions* ("ABA *Standards*")[284] and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[285] When deciding on a sanction after a finding of lawyer misconduct, hearing boards must consider the duty the lawyer violated, the lawyer's mental state, and the actual or potential injury the lawyer's misconduct caused. These three variables yield a presumptive sanction that hearing boards may then adjust based on aggravating and mitigating factors.

### ABA *Standard* 3.0 – Duty, Mental State, and Injury

*Duty*. "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate" and thus has "specific obligations to see that the defendant is accorded procedural justice, that guilt is decided upon the basis of sufficient evidence, and that special precautions are taken to prevent and to address the conviction of innocent persons."[286] By failing to abide by rules governing extrajudicial statements, Respondent acted in derogation of her duties to the legal

---

[284] Found in ABA *Annotated Standards for Imposing Lawyer Sanctions* (2d ed. 2019).

[285] *See In re Roose*, 69 P.3d 43, 46-47 (Colo. 2003).

[286] Colo. RPC 3.8 cmt. 1.

system, and she misused her public office to the detriment of the citizens in her judicial district. The majority also finds that Respondent violated her duties to the legal system by launching an investigation of Judge Lama in an attempt to find reasons to remove him from the Morphew case, which created the appearance that she was trying to influence or intimidate him. Respondent also flouted her professional duties to adequately supervise her subordinate prosecutors.

*Mental State*: As to Respondent's violations of Colo. RPC 3.6(a) and Colo. RPC 3.8(f), the Hearing Board concludes that Respondent acted negligently while issuing statements during the press conference on May 5, 2021; intentionally when responding to Gian-Luc Brasseur's posts in the "Profiling Evil" comment forum; and knowingly when, in June 2021, she texted King about Barry Morphew, "no worries. We got him." Finally, the Hearing Board finds that Respondent recklessly violated Colo. RPC 3.6(a) and knowingly violated Colo. RPC 3.8(f) when she traduced Jacobs and Crawford during her KRDO interview.[287]

As to Respondent's supervisory violation of Colo. RPC 5.1(b), the majority concludes she acted knowingly. Further, the majority concludes that Respondent intentionally attempted to prejudice the administration of justice by trying to find reasons to remove Judge Lama from the Morphew case after he issued a string of adverse rulings on the eve of trial. The majority also finds that Respondent knowingly prejudiced the administration of justice when she failed to ensure that the interview of Iris Lama did not create the appearance that the district attorney's office was attempting to influence or intimidate Judge Lama.

*Injury*: Respondent's derogatory remarks in the Crawford and Jacobs cases inflicted significant reputational harm on the defendants. Her statements also violated Crawford's and Jacobs's due process rights. To address this outrageous government conduct, a judge dismissed Crawford's case. Later, a separate tribunal dismissed Jacobs's case. In those dismissals, Suthers testified, the people of the State of Colorado sustained grievous injury, as Colorado citizens were deprived a trial to determine the guilt or innocence of defendants charged with the death or abuse of a ten-month old baby.

The many extrajudicial statements Respondent issued in the Morphew case likewise caused actual and potential harm. Her comments served, in part, as the basis for Judge Lama's decision to change the Morphew case's venue to Fremont County. Changing venue is a burdensome and resource-intensive process that poses logistical challenges in finding a courtroom, rearranging dockets, blocking time off calendars, and relocating staff. That change in venue also robbed the citizens of Chaffee County the opportunity to adjudicate the Morphew case. Further, Respondent's extrajudicial statements imperiled Barry Morphew's constitutional rights, as those statements threatened to corrupt the jury process by tainting the jury pool.

Less tangibly, but no less detrimentally, Respondent's extrajudicial statements in the Morphew, Jacobs, and Crawford cases seriously undermined the integrity of the criminal justice

---

[287] For purposes of applying the ABA *Standards*, a reckless state of mind equates to a knowing one. *See* Colo. RPC 1.0 cmt. 7A.

system and eroded public confidence in fair judicial proceedings. According to LeDoux, the public must have faith and trust in the workings of the justice system, which is the cornerstone of the rule of law. But, he said, Respondent's statements shortcut the procedures and protections inherent in due process, instead trying the cases in the court of public opinion.[288] Similarly, Garnett opined that a lawyer's improper extrajudicial statements substitute mob rule for the judicial system, creating the impression that the system is merely a game that plays out without regard to actual justice. When a prosecutor makes improper extrajudicial statements, he said, this impression is even more pronounced, as the prosecutor's "words carry the authority of the government and are especially persuasive in the public's eye."[289] Indeed, when a community sees prosecutors acting contrary to their duties, the public takes a dimmer view not only of prosecutors and the district attorney's office but of the justice system in general.

_Further Injury_:[290] The criminal justice system sustained serious injury when Respondent directed her own employee to conduct a baseless investigation into the personal life of a judge who was slated to preside over a high-profile murder trial that her prosecutors planned to try fewer than two months later. The interview seriously threatened to interfere with the integrity of the legal process, as Respondent intentionally sought to replace a presiding judge in a serious felony case and thus gain a perceived advantage in the litigation.

Further, as Judge Lama explained, a healthy judiciary depends on jurists' independence and the appearance thereof; judges must feel free to follow the law and to issue rulings regardless of popular opinion. If judges are subject to prosecutorial pressure, influence, or intimidation, their independent judgment could be imperiled, actually prejudicing the administration of justice. Similarly, if judges are perceived to be subject to prosecutorial pressure, influence, or intimidation, public confidence in the rule of law may be weakened, leading litigants to question whether the justice system can deliver fair and impartial outcomes.

Judge Lama was also personally harmed by Respondent's conduct. At the time Judge Lama learned that his former spouse had been interviewed, he was aware of a YouTube video in which an agitated speaker wore a bulletproof vest and showed Judge Lama's family. Judge Lama

---

[288] _See Gentile_, 501 U.S. at 1070 ("The outcome of a criminal trial is to be decided by impartial jurors, who know as little as possible of the case, based on materials admitted into evidence before them in a court proceeding. Extrajudicial comments on, or discussion of, evidence which might never be admitted at trial and ex parte statements by counsel giving their version of the facts obviously threaten to undermine this basic tenet."); _see also Patterson v. Colorado ex rel. Attorney General of Colorado_, 205 U.S. 454, 462 (1907) ("The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.").

[289] _Gansler_, 835 A.2d at 572 (citing Scott M. Matheson, Jr., _The Prosecutor, The Press, and Free Speech_, 58 Fordham L. Rev. 865, 886 (1990)) ("When the prosecutor speaks publicly about a pending case, [they] cannot separate [their] representational role from [their] speech, and [the prosecutor] thereby involves the state in the extrajudicial comment.").

[290] Hearing Board member Caloia does not join in finding this further injury.

interpreted the video as a threat. Also at the time Judge Lama learned of the interview, Iris Eytan had already informed him—with Hurlbert present—that someone had published his home address on a publicly available website. As such, until Judge Lama's security team informed him that it was Respondent who had orchestrated the interview, Judge Lama lived in a "heightened state of fear" for his and his child's safety, worried that the interview presaged violence by a member of the public who disliked his rulings in the Morphew case.

Finally, Respondent's delay in securing administrative help with discovery in the early phases of the Morphew case put the prosecution's efforts to organize, label, and understand the discovery behind by several months. At a minimum, this delay contributed to repeated judicial findings that the prosecution team had not satisfied its discovery obligations. After Lindsey resigned, Respondent failed as a supervisor to establish a leadership structure that ensured accountability within the Morphew prosecution team. That failure resulted in confusion amongst prosecution team members and led to tasks falling through the cracks, including expert witness endorsements. As a result, Judge Lama ultimately found that the prosecution violated the case management order, and he excluded many of the prosecution's expert witnesses. Those expert exclusions were one of just two reasons the prosecution team cited for seeking to dismiss the Morphew case without prejudice, thus ending a prosecution that consumed vast amounts of time and treasure belonging to the citizens of the 11th Judicial District, the defendant, and the judiciary.

### ABA *Standards* 4.0-7.0 – Presumptive Sanction

The presumptive sanction for Respondent's extrajudicial statements in the Morphew, Jacobs, and Crawford cases is suspension. Under ABA *Standard* 5.22, which applies to Respondent's violations of Colo. RPC 3.6(a) and Colo. RPC 3.8(f), suspension is generally appropriate when a lawyer in an official or governmental position knowingly fails to follow proper procedures or rules, injuring or potentially injuring a party or the integrity of the legal process.[291]

ABA *Standard* 7.2 applies to Respondent's inadequate supervision of her subordinate prosecutors in the Morphew case. That *Standard* likewise provides for suspension as a presumptive sanction when a lawyer knowingly engages in conduct that violates a duty owed as a professional, thereby injuring or potentially injuring a client, the public, or the legal system.

Respondent's attempt to prejudice the administration of justice is governed by ABA *Standard* 5.21, which calls for disbarment when a lawyer in an official or governmental position knowingly misuses the position with the intent to obtain a significant benefit or

---

[291] Even though Respondent intentionally posted on the "Profiling Evil" chat forum, ABA *Standard* 5.21, which calls for disbarment, is not a good fit for her post, as she did not post to obtain a significant benefit or advantage for herself. Similarly, while Respondent negligently issued an improper press statement after Barry Morphew's arrest on May 5, 2021, ABA *Standard* 5.23 is not apt in this circumstance because she seriously harmed both Barry Morphew and the criminal justice system when she made the statement.

advantage for himself or another, or with the intent to cause serious or potentially serious injury to a party or to the integrity of the legal process. [292]

Because the "ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations" but "might well and generally should be greater than the sanction for the most serious misconduct," the majority begins its analysis with a presumptive sanction of disbarment.[293]

### ABA *Standard* 9.0 – Aggravating and Mitigating Factors

Aggravating factors include considerations that may justify an increase in the degree of the sanction to be imposed, while mitigating factors may merit a reduction in the severity of the sanction.[294] As explained below, eight factors apply in aggravation, one of which warrants great weight. No factors merit mitigation.

### Aggravating Factors

*Prior Discipline – 9.22(a):* Respondent was publicly censured in 2018, which warrants moderate aggravating weight.[295]

Respondent's prior discipline arose out of her conduct while in private practice. In February 2017, Respondent agreed to represent a client in a civil case. Eight days after she executed the engagement letter, she accepted employment as a hearing officer for the Colorado Department of Revenue. She began working for the state ten days thereafter. But Respondent did not advise the client that she left private practice. Instead, she sent the client a past-due invoice, assessing late fees. When the client learned of Respondent's new position, the client confronted her. Respondent merely replied that the client owed fees and stated that she would find substitute counsel. When the client did not pay her invoice, Respondent threatened to send his account to collections and told the client that she could not in good faith refer his case to another lawyer. About four months after they signed the engagement letter, Respondent's client told the court he was concerned about the representation. By this time, a three-day jury trial had been set in the case. The next month, Respondent attempted to withdraw from the client's case, but her filing was rejected due to errors in the caption and an improper form. She soon tried to file another motion to withdraw, but that motion too was rejected, this time because she had filed it in the wrong court. Respondent did not successfully file a motion to withdraw until a few months later. Around the same time, the client filed a pro se motion to terminate the representation, and the court set a hearing on the motion. But Respondent failed to appear, so the court ordered her to

---

[292] Hearing Board member Caloia does not join in applying ABA *Standard* 5.21.
[293] ABA *Annotated Standards for Imposing Lawyer Sanctions* at xx.
[294] *See* ABA *Standards* 9.21 and 9.31.
[295] The PDJ abstains in deciding whether to apply this aggravating factor.

personally appear at another hearing. Before that hearing, Respondent filed a response to the court's order, in which she revealed numerous client confidences. Three days before the hearing, the court granted Respondent's motion to withdraw. She stipulated to a sanction of public censure and agreed that she violated Colo. RPC 1.3; Colo. RPC 1.4(a)(3) (a lawyer must keep a client reasonably informed about the status of the matter); Colo. RPC 1.6(a) (a lawyer must not reveal information relating to the representation of a client unless the client gives informed consent); and Colo. RPC 1.16(d) (a lawyer must protect a client's interests when the representation terminates, including by giving the client reasonable notice).

*Dishonest or Selfish Motive – 9.22(b):* The Hearing Board does not find that Respondent acted dishonestly. We do conclude, however, that she made some improper extrajudicial statements fueled by selfish motives. Respondent responded to Brasseur on "Profiling Evil's" chat area to defend herself from personal attacks, which we regard as selfish. Even though portions of King's audience expressed apprehension about her plan to again appear on the podcast to discuss the Morphew case, she nevertheless posted on the podcast's website to rehabilitate her reputation, which she considers "priceless." Moreover, we find that Respondent demeaned Jacobs and Crawford in violation of Colo. RPC 3.8(f) to curry favor with Rice in the hopes of building a better relationship and securing more favorable press from him. We give this factor modest weight in aggravation.[296]

*Pattern of Misconduct – 9.22(c):* Over a period of two years, Respondent issued several improper extrajudicial statements about open cases, despite repeated warnings from her prosecution team, King's audience members, Judge Murphy, and Judge Lama. Given this pattern, the Hearing Board has no choice but to conclude that this is a prosecutor who appears to have lost sight of her duty when engaging with the media to see that justice is done. This pattern of misconduct aggravates Respondent's underlying behavior.

*Multiple Offenses – 9.22(d):* Respondent committed three distinct types of misconduct in the Morphew case: even while she abandoned her supervisory duties to ensure that the Morphew case was professionally prosecuted, she made improper extrajudicial statements about the case and enlisted her own employee to initiate a criminal investigation against the judge presiding over the case. The majority applies this aggravating factor but accords it limited weight.

*Refusal to Acknowledge Wrongful Nature of Conduct – 9.22(g):* The majority weighs this aggravating factor heavily. Throughout the disciplinary hearing, Respondent never acknowledged that she engaged in wrongful conduct. Nor did she recognize that her actions exhibited poor judgment. Most compelling, however, is that she did not express any awareness of or concern

---

[296] For the same reasons, we decline to apply the mitigating factor of absence of dishonest or selfish motive, as Respondent urges.

about her conduct's effect on Morphew, Crawford, Jacobs, her prosecution team, the judicial system, or the Coloradans she represents.[297]

    _Vulnerability of Victim – 9.22(h)_: Respondent betrayed the trust that the citizens of the 11th Judicial District reposed in her, leading to the dismissal of three criminal cases without justice having been done. As the elected district attorney, Respondent was responsible for carrying out an important law enforcement function, and her constituents depended on her to diligently accomplish the work she was elected to do. Rather than instilling confidence in the criminal justice system, however, she engaged in conduct that imperiled all three cases, frustrating the public's interest. For this reason, we consider her constituents vulnerable victims and accord this aggravating factor modest weight.

    _Substantial Experience in the Practice of Law – 9.22(i)_: Respondent was admitted to practice law in Colorado in 2012. At the time of her misconduct, she had been admitted to the bar for around a decade. While that level of experience just edges past what typically qualifies as "substantial,"[298] Respondent had only just begun serving as an elected district attorney when she first committed misconduct in the Morphew case. As such, this aggravating factor warrants only minimal weight.

    _Additional Aggravation – 9.22_: Conscious that ABA _Standard_ 9.22 sets forth a non-exhaustive list of aggravating factors,[299] we apply one additional aggravating factor not yet enumerated: because Respondent is both a prosecutor and public official, she has "assumed an even greater responsibility to the public than have other lawyers."[300] Respondent's status as a public official carries average weight as an aggravating factor.

Mitigating Factors

    _Timely Good Faith Effort to Rectify Consequences of Misconduct – 9.32(d)_: Respondent urges application of this mitigating factor because in the immediate aftermath of her KRDO interview, her then-ethics lawyer promptly complained to Rice about the broadcast. We will not apply this mitigator, however, as Respondent's remedial actions were not timely. Neither Respondent nor anyone at her behest asked Rice or KRDO to actually remove the video from public consumption for more than 160 days after the video posted. Indeed, Respondent sent a

---

[297] For the same reasons, we will not apply the mitigating factor of remorse, as Respondent requests. We believe she was "horrified" that Rice published her comments, not that she made them. Hearing Board member Caloia does not join in this finding.

[298] _See People v. Rolfe_, 962 P.2d 981, 983 (Colo. 1998) (finding that ten years in practice qualifies as substantial experience in legal practice).

[299] _See In re Rosen_, 198 P.3d 116, 121 (Colo. 2008) ("While the ABA _Standards_ enumerate a number of . . . aggravating and mitigating factors, they are expressly intended as exemplary and are not to be applied mechanically in every case.").

[300] _See People v. Groland_, 908 P.2d 75, 77 (Colo. 1995).

letter to Rice demanding he take the video down only after the filing of the complaint in this disciplinary matter. Respondent also argues that Grosgebauer's motion to reconsider in the Morphew case should be treated as her own effort to rectify the consequences of her misconduct. The Hearing Board rejects this argument. A motion to reconsider is not an effort to rectify the movant's misconduct but rather a petition to the tribunal to correct what the movant believes to be the tribunal's errors.

_Delay in Disciplinary Proceeding – 9.32(j)_: Respondent contends that the People took an inordinate amount of time to investigate and file the disciplinary complaint in this matter and prolonged the proceeding by unsuccessfully seeking interim suspension. Respondent's misconduct in the Morphew matter occurred in 2021 and 2022, and that case was dismissed in 2022. Respondent committed misconduct in the Jacobs and Crawford matters in 2023. The People's complaint was filed in October 2023, and the matter was tried in June 2024. By this count, about eighteen months elapsed between the end of the Morphew case and the People's filing their complaint, and about eight months elapsed between the complaint's filing and the hearing in this matter. Neither time span strikes the majority as excessive, especially when measured against the size and scope of this disciplinary matter. Further, Respondent does not aver that she was harmed by these intervals. These circumstances do not merit mitigating weight.

_Remoteness of Prior Offenses – 9.32(j)_: Respondent advances this mitigating factor for consideration, noting that her prior misconduct, which occurred in 2017, was neither recent nor committed while she was working as a prosecutor.[301] We see no reason to give this factor mitigating weight, as just five years passed between the time of her prior misconduct and the bulk of her misconduct in the Morphew case.[302]

_Additional Mitigation – 9.32:_ Throughout the disciplinary hearing, Respondent argued that her ability to prosecute the Morphew case was limited by inadequate financial and human resources. Though she does not raise these resource challenges as a mitigating factor, the majority chooses to address them here as an independent factor, if only to dispense with it. Rural Colorado jurisdictions indisputably have more limited financial, administrative, and technological resources than urban jurisdictions. And undoubtedly the 2020-2022 period was a very challenging time to recruit and retain prosecutors. But Respondent testified that she had at her disposal a fund of more than $500,000.00 as a cushion to cover expenses associated with prosecuting large cases. Given her testimony on this point, the majority cannot justify giving her mitigating credit to account for her office's budgetary constraints.[303]

---

[301] The PDJ abstains in deciding whether to apply this mitigating factor.

[302] _See In re Hickox_, 57 P.3d 403, 407 (Colo. 2002) (rejecting the argument that prior disciplinary offenses seven, five, and four years old were remote, and stating that "prior disciplinary offenses need not be of a similar nature in order to be an aggravating factor").

[303] Hearing Board member Caloia does not join in this finding.

## Analysis Under ABA Standards and Case Law

The Colorado Supreme Court directs the Hearing Board to exercise discretion in imposing a sanction because "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[304] As such, we determine the appropriate sanction for a lawyer's misconduct on a case-by-case basis, looking to the ABA *Standards* for guidance in the exercise of that discretion.[305] The ABA *Standards* give us "the flexibility to select the appropriate sanction in [a] particular case" after carefully considering the applicable aggravating and mitigating factors.[306] Thus, while prior decisions regarding the imposition of sanctions for lawyer misconduct can be persuasive, we are free to distinguish those cases and deviate from the presumptive sanction when appropriate.[307]

We first consider Respondent's failure to supervise the prosecution team in the Morphew case and her extrajudicial statements in the Morphew, Jacobs, and Crawford cases. Under the ABA *Standards,* the presumptive sanction for this misconduct is suspension. And in Colorado, the baseline period for a suspension in Colorado is six months.[308] Here, Respondent's failure to adequately supervise the Morphew prosecution, a major first-degree murder case, resulted in a cascading series of adverse rulings, leading to the exclusion of most of the prosecution's experts, which in turn gave rise to the ultimate decision to dismiss the case. Further, on four separate occasions, Respondent made improper extrajudicial statements. Three statements contributed to a judge's decision to change venue in the first-degree murder trial. The other statement resulted in the dismissal of criminal charges against two people in connection with the death or abuse of a ten-month old baby. In short, Respondent's misconduct reoccurred several times. And the harm she caused is serious and far-reaching. Because Respondent made four separate violative extrajudicial statements, coupled with abdicating her supervisory responsibilities in the Morphew case, she committed five serious acts of misconduct.[309] Each act, we find, warrants imposition of a served suspension. On those facts alone, we find that her misconduct justifies a lengthy suspension, at a minimum.

---

[304] *See In re Attorney F.*, 2012 CO 57, ¶ 20 (quoting *In re Rosen*, 198 P.3d 116, 121 (Colo. 2008)).

[305] *Id.* ¶ 15.

[306] *Id.* ¶ 20.

[307] *Id.*

[308] *See* ABA *Standard* 2.3.

[309] *See e.g., People v. Ruybalid,* 2010 WL 11020220, at *1 (Colo. O.P.D.J. 2015) (suspending by stipulation an elected DA for six months, all stayed on the successful completion of a twenty-three-month probationary period, for conduct that violated Colo. RPC 1.3, Colo. RPC 5.1(b), and Colo. RPC 8.4(d); as relevant here, the DA failed to supervise his deputies and failed to ensure that they maintained a sufficient flow of information between investigative personnel and the prosecutor's office; they also neglected to produce impeachment information, did not comply with the Victim's Rights Act, disobeyed court orders, and did not make appropriate and timely discovery disclosures).

When Respondent's extrajudicial statements are viewed in conjunction with the overwhelming predominance of aggravators and the total absence of mitigators in this matter, the majority concludes in our discretion that nothing short of disbarment would adequately address Respondent's betrayal of the public trust. Although Respondent's extrajudicial statements have no real parallel or precedent, at least two cases provide touchpoints that guide us in this determination.[310] Given the extreme injury her extrajudicial statements caused, the majority feels strongly that disbarment is warranted on the basis of those statements alone, and we would exercise our discretion to impose that sanction.

But disbarment is also the presumptive sanction for Respondent's decision to coordinate an in-house investigative interview of Iris Lama weeks before the Morphew trial in an attempt to find evidence to disqualify Judge Lama from the case. This presumptive sanction is concordant with available case law.[311] While disbarment is the most extreme form of discipline available, the majority believes that given the totality of Respondent's misconduct, the many circumstances that aggravate her misconduct, and the grave injury she caused, imposing disbarment is an important step in rebuilding the public's trust and confidence in prosecutors and the criminal justice system.

By virtue of Respondent's role as the constitutionally elected district attorney of the 11th Judicial District, she is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."[312] Respondent lost sight of that imperative and gravely abused her position of trust as a public official and minister of justice. In the majority's estimation, the Colorado legal profession and its prosecutorial community cannot rely on Respondent's sense of integrity, probity, or righteousness to protect the public interest or to faithfully pursue justice for the citizens of the State of Colorado. Her disbarment is therefore warranted.

---

[310] *See In re Perricone,* 263 So. 3d 309, 317 (La. 2019) (disbarring a prosecutor for posting anonymous "caustic" and extrajudicial comments online about cases the prosecutor's office was prosecuting in violation of Rules 1.7(a)(2), 3.6, 3.8(f), 8.4(a), and 8.4(d); the Supreme Court of Louisiana concluded that the prosecutor acted intentionally in that he intended his posts would have the effect of heightening public condemnation of the defendants who were charged, and it found that his misconduct seriously harmed individual defendants and the legal profession); *In re Duncan*, 533 S.E.2d 894 (S.C. 2000) (indefinitely suspending a defense lawyer who released to the media a videotaped conversation with a client in jail to influence a murder trial and expose the actions of the sheriff's office, and who also falsely testified before a grand jury and was criminally convicted for that false declaration).

[311] *See Aubuchon*, 309 P.3d at 897-98 (disbarring a lawyer who, among other misconduct, repeatedly sought to interview or depose judges in support of a motion to recuse the judge presiding over the prosecution, filed a civil complaint against judges who were absolutely immune, and sought to prosecute a judge who had made rulings adverse to the prosecution in underlying criminal proceedings).

[312] *Berger v. United States*, 295 U.S. 78, 88 (1935).

## VI.     <u>CONCLUSION</u>

In their opening statement, the People likened Respondent's handling of the Morphew prosecution to that of a ship's captain who never appeared on the bridge. In some ways, this analogy is apt. Respondent's absence at the helm during key phases of the prosecution—even when she was warned that it faced rough waters—led to a series of events that ended with the first-degree murder case running aground.

The analogy captures Respondent's dereliction of her duty as an elected official and the top prosecutor in her district. In that role, her obligation was not to win or to protect her reputation but to see justice done. Instead, her unjustifiable extrajudicial statements in the Jacobs and Crawford cases led to the opposite result, prejudicing each criminal defendant and torpedoing the criminal cases against them. And her baseless decision to launch an in-house investigation of a judge presiding over a case that was close to trial prejudiced the administration of justice and abused her position of trust. She must be disbarred.

**HEARING BOARD MEMBER SHERRY A. CALOIA,** *dissenting as to Claims IV and V and dissenting as to the sanction, but concurring as to Claims I-III and VI-VII:*

*Claim IV*

I would be remiss if I did not set forth the particularities of practicing criminal law in a small rural jurisdiction and the accepted practices of criminal lawyers and district attorneys. The problems that exist with respect to providing discovery to defendants in a criminal case in Colorado are many and widespread. The practice of responding to motions and filing expert witness reports varies from jurisdiction to jurisdiction and judge to judge. I am concerned that the Morphew case has undergone an extensive amount of Monday-morning quarterbacking. Practices common to a civil arena are not always common to a criminal case. There are various accepted practices and discovery issues that are particular to criminal law that need to be considered.

As outlined in the recent case of *Solano v. Newman* issued by the Court of Appeals on August 15, 2024, the prosecutor is mandated by Crim. P. 16 to provide all discovery in a criminal case to the defendant.[313] However, the police agencies are the entities that generate and are in control of discovery. It is the police agencies that provide discovery to the prosecution, and the agencies are under no mandate to do so. Crim. P. 16 does not apply to them. In *Solano,* the Court of Appeals recognized that sheriffs are not subject to Crim. P. 16 as the prosecution is. If a sheriff does not supply the information, the district attorney is hamstrung and cannot provide it to the defense. In fact, the district attorney does not always know the extent of the discovery. The district attorney of the 3rd Judicial District, Henry Solano, sued the Sheriff, Bruce Newman, for injunctive relief to require that he provide all discovery on all cases in a timely manner. This was a novel way for a district attorney to get discovery and also to tell the court that the prosecution could not comply with Crim. P. 16 (and should not be subject to ethical violations) without the assistance of the sheriff. The Court of Appeals was quite sympathetic to the district attorney in *Solano*. This problem with discovery exists in varying degrees within all of the twenty-two judicial districts of the State of Colorado.

Should discovery not be tendered within the time periods set forth in the criminal rules of procedure (twenty-one days from initiation of the case), sanctions can be imposed by the judge against the prosecution. Discovery violations are alleged against the prosecution in so many cases across Colorado that defense lawyers have a stock motion ready to be filed in any case. Does the failure to provide discovery that the prosecution does not even have in its possession then result in an ethical violation for said lawyer if not provided to the defense in a timely manner? I believe not. Unless the district attorney has a way to determine that something is missing, the district attorney cannot be guilty of an ethical violation.

As to the first allegation of missing discovery in the Morphew case, Judge Murphy ruled that there was a violation. This was for a failure to deliver the back-up data of the cell phone dump

---

[313] 2024 COA 93.

done by Sheriff Spezze. The motion was filed and ruled on less than two months after the Morphew case was filed. As testified to by the witnesses, no one was aware that this data was missing from the huge volume of material provided by the police agencies, none of which were accustomed to providing this information as a matter of course in cases. While Judge Murphy found that there was a violation, I cannot attribute this to a failure by the prosecution or conclude that the failure constituted a violation of an ethical duty as alleged by the People in this case.

In addition, the Spence report was something that was not in the possession of the prosecution team, which was unaware of it. This report had never been provided to the prosecution by Spence or by the sheriff's office. There was no reference to the existence of a report in any of the other reports. Judge Lama found that there was a discovery violation, but this does not rise to the level of an ethical violation.

The case management order did not include CVs as a required disclosure. The late disclosure of the CVs (by less than one day) should not represent an ethical violation, as the judge never required them, and the delay was not significant. Further, the late filing of the CVs was not something that Respondent could have prevented.

The decision by Judge Lama to exclude most of the prosecution's expert witnesses for failing to provide reports was a very harsh sanction in this case. All but four of the reports were within the discovery already provided. Hurlbert did not anticipate an objection or the need to know the Bates numbers of the reports. He clearly testified that he typically does not provide reports a second time when they are in discovery. He testified that he has not had a problem with this practice. Indeed, Hurlbert's testimony that his disclosures of experts were consistent with disclosures he has made in multiple other criminal cases is crucial to my belief that his disclosures were done in the manner that was generally accepted. Judge Lama issued a very harsh ruling and did not allow the prosecution team to supplement the record as requested. While Judge Lama was within his right to exclude these witnesses, this does not rise to the level of an ethical violation in my view.

The absence of four reports of the listed potential experts also does not mean that an ethical violation was committed. These witnesses may never be called. In fact, a domestic violence expert was arguably not something that Judge Lama would have allowed the prosecution to call in light of his ruling excluding all of the previous allegations of domestic violence between the victim and the defendant. This is also not a violation of a court order. It is a readily accepted practice that witnesses who are not properly endorsed will probably not be allowed to testify. The prosecution team knew this. Was this a dereliction of duty or ethical violation? I believe not under these circumstances.

The strategy of not responding to the bill of particulars is also something that is not a violation of a lawyer's ethical duties. This was arguably a strategy employed by the prosecution. Since the prosecution team did not intend to prosecute the charge, responding to the motion was not necessary. Again, the prosecution knew that Judge Lama would dismiss the charge. It is a very common practice in criminal law to respond to motions that are contested and not the others.

Respondent put very capable and experienced lawyers in charge of the Morphew case. She relied on their knowledge and expertise in having them prosecute the case. The failings of the prosecution in the case are easy to pick apart. The prosecution stood a formidable challenge in the Morphew case and had a noticeable lack of evidence. It is uncontroverted that matters could have been handled differently and probably with more success. It does appear that the case was filed prematurely and without enough resources to counter the attacks from the defense and the concerns of a judge who seemed sympathetic to the defense's positions. This is not to criticize the defense or the court or the rulings that were made. Respondent was inexperienced in the prosecution of serious felonies and had not prosecuted a murder case such as this.

However, the Hearing Board's charge is not to decide whether the prosecution team could have better litigated the Morphew case. Instead, the Hearing Board is tasked with the responsibility of determining whether Respondent violated her Colo. RPC 5.1(b) duties regarding her handling of the case. As to that question, I dissent as to Claim IV because I cannot find that Respondent was deficient in her ethical responsibilities. I do not believe that the People have sustained their burden to prove Claim IV. The discovery violations, the late disclosures regarding the experts, and the failures to respond to motions were items that were attended to by all of the lawyers involved. I do not believe that Respondent ignored the importance of these tasks and issues. She and the prosecution team expended much effort and time trying to comply. While these tasks were not resolved to the satisfaction of Judge Lama, his ruling against the prosecution does not necessarily mean that Respondent committed an ethical violation. I cannot find that the People established that Respondent failed to make reasonable efforts to ensure other lawyers conformed to the Rule of Professional Conduct.

*Claim V*

I also dissent as to the majority's finding as to Claim V. While I recognize the persuasive guidance of the *Prosecutor Standards*, I also realize that, per Garnett, the *Prosecutor Standards* is a best practices manual. In other words, a prosecutor's deviation from the *Prosecutor Standards* does not necessarily equate to an ethical violation.

This is such a situation. Here, the majority concludes the People have not proved that Respondent's decision to interview Iris Lama either prejudiced or attempted to prejudice the administration of justice. Respondent's decision to seek an interview with Iris Lama had some grounding—most specifically, Judge Lama's decision to exclude evidence of domestic violence in the Morphew case. That, coupled with Iris Lama's position with the Alliance Against Domestic Abuse and her public advocacy for missing people, including Suzanne Morphew, was sufficient to justify exercise of Respondent's sweeping discretion to look into the change.org petition's allegations.

I am even more influenced by the manner in which Respondent chose to inquire into potential judicial bias. Though best practices would dictate that an outside agency conduct the

interview, Respondent did solicit help from the Chaffee County Sheriff and the CBI; both agencies declined to participate. After settling on Corey to interview Iris Lama, Respondent took reasonable steps to ensure that the interview was both voluntary and entirely confidential. Corey met on Iris Lama's terms, wore civilian clothes, and conducted the interview in a conversational, low-pressure way. The prosecution took no further investigative action. As I see it, the interview was something short of a criminal investigation and did not clearly evince an attempt to prejudice the administration of justice. Further, because Respondent did not make public the allegations or the fact of the interview, I assess the risk as rather low that the interview took on the appearance of harassment, intimidation, or retaliation. Ultimately, the case was dismissed shortly after the interview, so no prejudice to the justice system accrued.

I conclude that Respondent's decision to interview Iris Lama was within the bounds of Respondent's prosecutorial discretion. In making this determination, I am particularly mindful that an opposite conclusion could send the message that prosecutors are prohibited from merely asking citizens questions about intimations of wrongdoing. Had Respondent gone further—if, for example, she had made Judge Lama aware of the interview, approached him for an interview, taken other additional actions, or more conspicuously invoked the authority of her office—I would find differently.[314] But under these specific circumstances, I cannot conclude the People have proved that Respondent prejudiced or attempted to prejudice the administration of justice.

<em>Sanctions</em>

Finally, I dissent as to the appropriate sanction in this case. I believe that Respondent should not be disbarred but instead should be suspended for a period of two and a half years, with the requirement that before she returns to the practice of law she must prove she can practice law in conformity with the Rules of Professional Conduct. Suspension, rather than disbarment, is a more suitable sanction for several reasons. I do not believe that the matters charged in Claims I, II (2 of 4), III (2 of 5), IV, and V were proven by clear and convincing evidence; this leaves Respondent's extrajudicial media statements as the only allegations proved (Claims II (2 of 4), III (3 of 5), VI, and VII). This is considerably fewer claims than the majority found were violated, mandating a review of the sanction imposed by the majority.

First, I note that suspension is the presumptive sanction for the proven extrajudicial statement violations. In addition, suspension is in line with the cases cited by the majority, namely

---

[314] *Cf., e.g., In re Aubuchon*, 309 P.3d 886, 894-96 (Ariz. 2013), *as amended* (Oct. 25, 2013) (affirming that a prosecutor violated Arizona Rule 8.4(d) by approaching a judge, improperly requesting the judge sit for interviews in order to compel the judge to reassign a case, and filing a criminal complaint against a judge without probable cause to compel him to recuse himself from grand jury matters); *In re Alexander*, 300 P.3d 536, 547 (Ariz. 2013) (affirming that a prosecutor impeded the administration of justice by demonstrating to judges that they risked having to defend against a civil damages lawsuit if they made rulings that displeased the county attorney's office).

*In re Perricone*, which involved intentional behavior by the lawyer and is not present here; *People v. Ruybalid*, which involved several violations, including discovery; for which the lawyer stipulated to a six-month suspension; and *In re Duncan*, in which an indefinite suspension was ordered for an intentional targeted violation. Second, I believe that Respondent expressed extreme remorse about the statements she made to Rice about the Crawford and Jacobs cases. Third, Respondent was relatively inexperienced for her position as district attorney, and she did not have much experience in felony criminal law or in dealing with the media.

Although I do not believe that disbarment is appropriate, I conclude that a lengthy suspension is necessary due to the quantity, content, and context of Respondent's extrajudicial statements. Respondent did not consult with others about her limitations in making media statements. Further, she made statements on several occasions in two different matters and after judicial orders were issued regarding such. The statements she made to Rice about the Crawford and Jacobs cases were egregious, and the consequences of her statements—dismissal of two serious cases—were severe. Likewise, her statements on the "Profiling Evil" public blog forum were inappropriate, and commenting on such a public forum invited ethical problems like the ones that eventuated. Finally, I am influenced by the fact that Respondent has a prior ethical violation.

For the reasons stated above, I respectfully dissent as to Claim IV, Claim V, and the majority's recommended sanction.

**HEARING BOARD MEMBER MELINDA M. HARPER,** *concurring as to the sanction and as to Claims II-VII, but dissenting as to Claim I:*

I join with the majority in its findings of fact and its sanctions disposition: I agree that Respondent should be disbarred for her misconduct. I also join the majority's analysis of Claims II-VII. I write separately because I disagree with the majority as to its analysis of Claim I, which alleges that Respondent violated Colo. RPC 1.3. Because I believe that the People proved by clear and convincing evidence that Respondent failed to exercise reasonable diligence in prosecuting the Morphew case, I respectfully dissent in part here.

The majority concludes that because Respondent had delegated to other more experienced prosecutors the task of litigating the Morphew case, she cannot be held accountable under Colo. RPC 1.3 for failing to exercise diligence in the case. But as I see it, Respondent's direct responsibilities extended to ensuring that her prosecution team was setting priorities and coordinating effectively in managing the Morphew case, so her failure to exercise diligence in her oversight role in the case was in itself a violation of Colo. RPC 1.3. The lack of coordination and direction was evident from the testimony of her prosecution team about their actions. Respondent had ultimate responsibility to see that her team of largely experienced lawyers and some relative newcomers to the law or to a case of this size and nature were working effectively. In a large and complex case like this, having a team of experienced lawyers is not a guarantee of effectiveness of the team. Also, Respondent's failure to recognize the consequences of inexperienced, overburdened administrative support staff led directly to problems with availability of and access to documents by the legal team, the credibility of information provided, and the timeliness of responses to requests or orders for production. Respondent's failure to provide leadership was also evident in the variety of views expressed during her team's testimony about how, if, or when Respondent expressed leadership and provided overall direction so that the team could function effectively. I conclude from the testimony that Respondent did not make reasonable efforts to communicate her strategy for the case or to evaluate whether the team was working effectively to meet the case goals and deadlines. The lack of teamwork resulted in failure to provide discovery in a timely and complete manner, to formally or even informally appoint a successor to Lindsey, to attract or retain staff, or to ensure responses to Edwards's alarm-raising emails. The exercise of these appropriate leadership and management functions would not have required the level of involvement of actually "pitching in" to help in specific problematic situations, and in fact exercising those responsibilities may reasonably have obviated the need for such "pitching in," which Respondent believed she was unable to do. I found Garnett's testimony helpful in my assessment of the manner in which a district attorney can exercise leadership and management responsibilities while not second-guessing the legal work of experienced lawyers.

Whether Respondent's lack of diligence can be attributed to her inexperience, her inattention, her overall lack of good judgment, or a cavalier attitude is somewhat beside the point. As the elected district attorney, Respondent is responsible to her client, the residents of the 11th Judicial District, to whom she owes a duty to seek justice in the public interest.[315] Respondent

---

[315] *See* ABA *Prosecutor Standards* 3-1.2(b), 3-1.3.

is also ultimately responsible for all actions in her office, including the prosecution team's failures that resulted in the case's dismissal—an outcome decidedly not in the public interest. In short, the Morphew case suffered because she did not act with reasonable diligence in exercising appropriate leadership and assuming appropriate managerial responsibilities. As a result, I would find that Respondent violated Colo. RPC 1.3.

For these reasons, I respectfully dissent as to Claim I.

## VII.     ORDER

The Hearing Board **ORDERS:**

1. **LINDA STANLEY**, attorney registration number **45298**, is **DISBARRED**. The disbarment will take effect upon issuance of an "Order and Notice of Disbarment."[316]

2. Respondent **MUST** promptly comply with C.R.C.P. 242.32(b)-(e), concerning winding up of affairs, notice to current clients, duties owed in litigation matters, and notice to other jurisdictions where she is licensed or otherwise authorized to practice law.

3. Within fourteen days of issuance of the "Order and Notice of Disbarment," Respondent **MUST** file an affidavit with the PDJ under C.R.C.P. 242.32(f), attesting to her compliance with C.R.C.P. 242.32. As provided in C.R.C.P. 242.41(b)(5), lists of pending matters, lists of clients, and copies of client notices under C.R.C.P. 242.32(f) must be marked as confidential attachments and filed as separate documents from the affidavit.

4. The parties **MUST** file any posthearing motions **no later than Tuesday, September 24, 2024**. Any response thereto **MUST** be filed within seven days.

5. The parties **MUST** file any application for stay pending appeal **no later than the date on which the notice of appeal is due**. Any response thereto **MUST** be filed within seven days.

6. Respondent **MUST** pay the costs of this proceeding. The People **MUST** submit a statement of costs **no later than Tuesday, September 24, 2024**. Any response challenging the reasonableness of those costs **MUST** be filed within seven days thereafter.

---

[316] In general, an order and notice of sanction will issue thirty-five days after a decision is entered under C.R.C.P. 242.31(a)(6). In some instances, the order and notice may issue later than the thirty-five days by operation of C.R.C.P. 242.35, C.R.C.P. 59, or other applicable rules.



DATED THIS 10th DAY OF SEPTEMBER, 2024.

BRYON M. LARGE
PRESIDING DISCIPLINARY JUDGE

SHERRY A. CALOIA
HEARING BOARD MEMBER

MELINDA M. HARPER
HEARING BOARD MEMBER

Copies to:

| | |
|---|---|
| Erin R. Kristofco | Via Email |
| Jonathan P. Blasewitz | e.kristofco@csc.state.co.us |
| Office of Attorney Regulation Counsel | j.blasewitz@csc.state.co.us |
| | |
| Steven L. Jensen | Via Email |
| Respondent's Counsel | jensen.guziak@comcast.net |
| | |
| Linda Stanley (served at Jensen's request) | Via Email |
| Respondent | |
| | |
| Sherry A. Caloia | Via Email |
| Melinda M. Harper | |
| Hearing Board Members | |
| | |
| Cheryl Stevens | Via Email |
| Colorado Supreme Court | |