**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Civil Action No. 1:23-cv-01108-DDD-JPO

BARRY MORPHEW,

     Plaintiff,

v.

CHAFFEE COUNTY, Colorado;
BOARD OF COUNTY COMMISSIONERS OF CHAFFEE COUNTY, Colorado;
CHAFFEE COUNTY SHERIFF'S DEPARTMENT;
LINDA STANLEY, District Attorney, in her official and individual capacities;
JOHN SPEZZE, Chaffee County Sheriff, in his official and individual capacities;
ALEX WALKER, Eleventh Judicial District Attorney's Office Investigator;
JEFFREY LINDSEY, Deputy District Attorney;
MARK HURLBERT, Deputy District Attorney;
ANDREW ROHRICH, Chaffee County Undersheriff;
JOHN CAMPER, Colorado Bureau of Investigation Director;
SCOTT HIMSCHOOT, Chaffee County Sheriff's Deputy;
JOSEPH CAHILL, Colorado Bureau of Investigation Agent;
MEGAN DUGE, Colorado Bureau of Investigation Agent;
CAITLIN ROGERS, Colorado Bureau of Investigation Agent;
DEREK GRAHAM, Colorado Bureau of Investigation Agent;
KEVIN KOBACK, Colorado Bureau of Investigation Agent;
KIRBY LEWIS, Colorado Bureau of Investigation Agent;
CHRIS SCHAEFER, Colorado Bureau of Investigation Deputy Director of Investigations; and
JOHN/JANE DOES 1-10, and other unknown employees of the Eleventh Judicial District Attorney, and other unknown officers of the Chaffee County Sheriff's Department,

     Defendants.

---

**ORDER GRANTING MOTIONS TO DISMISS**

---

On Mother's Day, 2020, Plaintiff's wife, Suzanne Morphew, disappeared. After a year of investigation, Plaintiff was charged with murdering her. Shortly before trial began, Plaintiff's legal team discovered that the government had not disclosed a variety of potentially exculpatory information to him and the court. Doc. 1 at 127-32. Prosecutors filed a motion to dismiss all charges against Plaintiff without prejudice, and the case was dismissed on April 19, 2022, just before it was set for trial. *Id.* at 134.

Plaintiff now sues the prosecutors, investigators, officers, and municipalities involved in his arrest and abandoned prosecution, alleging that they conspired to violate his rights and maliciously prosecute him. Specifically, Plaintiff alleges that the affidavit prosecutors submitted to justify his arrest was full of misrepresentations and omissions that led to his arrest and jailing without probable cause to believe he committed the crime. Doc. 1. The defendants have filed seven different motions to dismiss the claims against them. Docs. 87, 94, 95, 97, 98, 104, 108.[1] The motions are granted.

## BACKGROUND

Plaintiff is presumed innocent of his wife's murder, and at this stage of the case, the allegations in his complaint in this civil lawsuit are presumed true. Those allegations paint the following picture.

## I.    Mrs. Morphew's Disappearance

Mrs. Morphew disappeared on May 10, 2020. Plaintiff last saw her around 5:00 a.m. that day as he was preparing to leave their home in Chaffee County, Colorado for a previously scheduled landscaping job a few hours away in Broomfield, Colorado. Doc. 1 at 14. Around 3:00 p.m.

---

[1] A number of additional defendants have already been dismissed from the case with Plaintiff's consent. *See* Docs. 103, 126, 148.

that day, Plaintiff called and asked neighbors to go to his home and look for his wife because he and his daughters, who had been away on a road trip, were unable to reach her. *Id*. The neighbors could not find her and also did not see her mountain bike, which she rode almost daily. *Id*. Around 5:30 p.m., Plaintiff asked the neighbors to call the authorities while he packed up his things and drove back from Broomfield. *Id* at 15.

## II.    The Investigation

Shortly after law enforcement was contacted that evening, Mrs. Morphew's bike was discovered down a ravine off a dirt road near their home. *Id*. When Plaintiff arrived on the scene, he helped law enforcement try to track down his wife by providing them an article of her clothing for a scent dog. *Id*. The dog followed her scent to a river, where the scent disappeared. *Id*.

Suspecting that Plaintiff may have staged his wife's bicycle in the ravine to cover his tracks or to make it look like she had been abducted, law enforcement quickly began to focus on Plaintiff as the prime suspect in his wife's disappearance. *Id*. at 17. Investigators searched his residence, including vehicles parked in the garage. *Id*. at 18. They seized his truck and phone, his wife's car, and his daughters' phones. *Id*. They took DNA samples from his home as well as from his vehicle, his wife's vehicle, and the bicycle. *Id*. at 18. Over the course of the year leading up to his arrest, Plaintiff met with investigators more than sixty times. *Id*. at 19. He maintained his innocence throughout the investigation and still does. *Id*.

During the investigation, law enforcement discovered that Plaintiff's wife had been having an affair with another man for approximately two years prior to her disappearance. *Id*. They suspected that Plaintiff learned of this affair and became enraged. Doc. 1-1 at 59-66. They further theorized that he returned home from work on May 9, 2020,

around 2:30 p.m., chased his wife around the house, killed her using tranquilizer serum in a dart shot by a gun, disposed of her body and all evidence of the crime, and then created an alibi by going to Broomfield the next day, Sunday, May 10, 2020. Doc. 1 at 18.

## III.   The Arrest Affidavit

Despite not having discovered Mrs. Morphew's body,[2] the defendants, according to Plaintiff, crafted an investigation and prosecution to fit the preconception that he was guilty, rather than to objectively seek the truth. This culminated when prosecutors in Colorado's 11th Judicial District filed a misleading arrest affidavit. Doc. 1-1 at 1. This 129-page arrest affidavit, which outlined the prosecution's theory of the case, included many facts in support of its conclusion which do not appear to be disputed here, but also included a number of allegedly misleading assertions and omitted several potentially important exculpatory facts. This led to Plaintiff's arrest for the murder of his wife on May 4, 2021, and his subsequent months-long jailing before the charges were dismissed.

### A.   The Undisputed Inculpatory Facts

Law enforcement discovered a number of facts during the course of the investigation that supported its theory. While Plaintiff alleges that other exculpatory facts were overlooked and that the arrest affidavit ultimately charging him with murder fabricated additional evidence to

---

[2] Her remains were eventually found in September 2023. Thomas Piepert et al., Suzanne Morphew's remains found 3 years after she went missing in Colorado. What happened to her?, Associated Press News (Sept. 28, 2023, 4:53 PM), https://apnews.com/article/remains-found-missing-colorado-woman-suzanne-morphew-1ff32e64fe7d045b0359bb2a9fe6796b.

suggest his guilt, he does not dispute that the investigation yielded the following inculpatory facts:[3]

- Macy Morphew's admission that her parents argued a lot and that she feared they would separate or divorce. Doc. 1-1 at 6.

- Mrs. Morphew's sister, Melinda Baumunk, described Plaintiff as one who lives a double life, a liar, an adulterer, a bully, one that has to have control, cunning, fools people a lot, and treats his wife and daughters as trophies. *Id.* at 11.

- Mrs. Morphew texted her sister two days before she disappeared: "Its hard dealing with the harsh abrasiveness and having to show respect. He's also been abusive, emotionally and physically. There's so much…I went thru a period of acceptance and I feel more angry now. Anger at what I've allowed." *Id.* at 12.

- Mrs. Morphew kept a list of grievances about her husband on the notes application on her phone, which included "Phys abuse," "Stalking Sheila and me in house without telling," "Chase me around resort and threatened," "Took phone," "Not safe alone with you. Can't be trusted," "Oppressive," and "Accused me of bf." *Id.* at 13.

- Mrs. Morphew texted her husband a few days before she disappeared: "I'm done. I could care less what you're up to and have been for years. We just need to figure this out civilly." *Id.*

- Plaintiff declined to submit to a polygraph examination regarding his memory of the events leading up to his wife's disappearance and his alibi. *Id.* at 21.

- Investigators observed scratches on Plaintiff's upper left arm three days after his wife disappeared. *Id.*

- Plaintiff thought it was "very suspicious" that his wife would not tell him about some of her communications, even if he did not know she was involved in a sexual relationship with another man. *Id.* at 22.

---

[3]  I note that the following facts are all drawn from Plaintiff's complaint and arrest affidavit referenced in and attached to the complaint. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (court may consider documents that complaint incorporates by reference and documents attached as exhibits to complaint); *cf. Cuervo v. Sorenson*, 112 F.4th 1307, 1312-13 (10th Cir. 2024) (district court erred by relying on documents outside of the pleadings).

- Plaintiff's conflicting statements about whether he went on a hike to Fooses Lake with his wife the day before her disappearance. *Id*. at 125.

- Plaintiff's conflicting statements about whether he used his tranquilizer or darts in Colorado, including his admissions that "I've shot two deer with my tranq gun, 'cause I used to raise deer, and I collect horns" and that "I've shot deer from that little breezeway from between the garage and the laundry room." *Id*. at 23 n.32, 86.

- Plaintiff's admission that he used BAM, Telazol, and Xylazine as tranquilizers and that he brought these chemicals, which he knew to be controlled substances, from Indiana. *Id*. at 119.

- Retired Colorado Parks & Wildlife Field Veterinarian Lisa Wolfe's surprise that a civilian would have these animal tranquilizers. *Id*. at 129.

- Plaintiff's admission that he kept the tranquilizer chemicals in vials and injected them into darts himself. *Id*. at 119.

- Mrs. Morphew's "spy pen" recorded her husband listening to several episodes of "Forensic Files"—including three episodes about murders—during a drive to Pueblo less than two months before she disappeared. *Id*. at 29.

- Plaintiff was originally scheduled to pick up an employee to drive to Broomfield for a landscaping job around 5:30 p.m. on the day his wife disappeared but instead left at 5:00 a.m., twelve hours earlier than planned. *Id*. at 47.

- Plaintiff was seen "carrying unknown items in his hands and placing items into two separate trash cans located on the edge of the McDonald's lot between 10:19 AM and 10:41 AM" on May 10, 2020, roughly six hours after Mrs. Morphew was last seen alive. *Id*. at 36.

- Plaintiff was the last person to see his wife alive. *Id*. at 112 n.79.

- Plaintiff could not recall the items that were in the trash bags, stating that they were "probably old clothes" or boots. He could also not recall why he pushed the trash to the extent that his shoulder was in the trash can. *Id*. at 27, 37.

- Plaintiff suggested saying "I don't recall" was code for not wanting to tell the truth but himself didn't recall a number of critical facts surrounding his wife's disappearance. *Id*. at 67.

- Plaintiff began to liquidate the family's assets within a month of his wife's disappearance. *Id*. at 45-46.

- 6 -

- Plaintiff was an avid hunter and a professional landscaper and may have possessed the tools and expertise necessary to kill his wife, bury her body, and dispose of the evidence. *Id*. at 18.

- Plaintiff became intimately involved in a relationship with another woman in the months immediately following his wife's disappearance (before her body had been discovered). *Id*. at 123.

- Mrs. Morphew's father felt it was odd that neither of his granddaughters or Plaintiff were home on Mother's Day, when Mrs. Morphew disappeared, and that it was unusual that Plaintiff would choose to work on the Sunday of Mother's Day when he seldom worked on Sundays. *Id*. at 52.

### B.    The Exculpatory Facts

These facts, however, do not paint the whole picture. The investigation into Mrs. Morphew's disappearance also discovered facts that were inconsistent with the prosecution's theory and that would have tended to support the conclusion that his wife was abducted by a stranger. These include the following:

- Partial unknown genetic profiles were recovered from his wife's car and, using a national DNA database called CODIS, identified as potential matches to unsolved sex crimes committed in other states. Doc. 1 at 20-21.

- Unknown male DNA was found in a number of locations inside his home and on his wife's bike. *Id*. at 29-30.

- Plaintiff tried to contact his wife on the day she disappeared. *Id*. at 79.

- A K-9 detected his wife's scent near the scene of the abandoned bicycle. *Id*. at 85.

- A K-9 did not alert to the scent of a cadaver in their home or vehicles. *Id*. at 89.

- His hotel room in Broomfield may have smelled like chlorine because it was above an indoor pool (not because Plaintiff was destroying evidence, as the affidavit suggested). *Id*. at 100.

- His wife's phone and computer exhibited activity into the evening of May 9, suggesting that she was alive past the time investigators theorized he had killed her. *Id*. at 53-63.

- The plastic needle cap allegedly found by investigators in Plaintiff's dryer was actually a hypodermic needle cap, not a tranquilizer dart cap. *Id.* at 67.

- A tranquilizer gun is the only method by which to shoot a tranquilizer dart and Plaintiff's tranquilizer gun, which was stored in a locked gun safe, was inoperable and had not been used in a long time. *Id.* at 68-69.

None of these facts was mentioned in the affidavit submitted by prosecutors to the court.

The affidavit also included a range of allegedly fabricated and unreliable information in an attempt to bolster the inference that the evidence against Plaintiff was overwhelming. This included the following:

- A "pushpin map" that was used to suggest that Plaintiff was chasing his wife around the house on the afternoon of May 9, immediately before killing her. Investigators knew this map was unreliable because of a phenomenon called "static drift," which would have been a better explanation for why his phone was moving around the house so quickly. Doc. 1 at 38-46.

- Plaintiff's alleged admission that he was probably chasing a chipmunk in response to being confronted with the "pushpin map." Investigators also knew this admission was unreliable because it was made in response to fabricated and deceptive evidence. *Id.* at 44.

- Unreliable conclusions regarding his phone being in "airplane mode" on May 9. *Id.* at 46-52.

- Unreliable conclusions drawn from the "telematics" and odometer of his truck. *Id.* 87-89.

- The false statement that he knew about his wife's affair. *Id.* at 110.

- The false statement that he admitted to keeping tranquilizer chemicals on his work bench. *Id.* at 74.

- That his wife's bicycle was "discarded." *Id.* at 77.

- That his alibi was "created" to account for her disappearance. *Id.*

- That his tools were "staged" in the Broomfield hotel lobby. *Id.* at 82.

- That his wife "wanted out" of their marriage. *Id*. at 91.

- That his wife bought a spy pen for "safety" reasons. *Id*. at 93.

- That his wife's romantic partner refused to travel to Colorado because Plaintiff had security cameras all over the house. *Id*. at 95.

- That there was "suspected blood" near Plaintiff's garage. *Id*. at 97.

- That it was fair to assume his wife was dead because there were no records of her entering another country or using a credit card. *Id*. at 98.

- That he was having an affair. *Id*. at 100.

- That he used his Bobcat skid steer to dispose of his wife's body. *Id*. at 107.

- That he lied about having "steaks" for dinner with his wife the night before she disappeared. *Id*. at 114.

- That he "blamed" a mountain lion for his wife's disappearance. *Id*. at 116.

- That he "blamed" a turkey for why he was down by the creek while his wife was on the phone with her lover the afternoon before she disappeared. *Id*. at 117-18.

- That he used the "firing of a gun" to "describe" his violence towards his wife on the day she disappeared. *Id*. at 119.

- That he described his wife's breathing as "labored" the last time he saw her. *Id*. at 120.

- That he admitted to taking his wife's phone once or twice in the past to monitor what she was doing. *Id*. at 121.

The affidavit's case synopsis, which included these alleged fabrications, was prepared by investigator Alex Walker with the assistance of FBI Special Agent Jonathan Grusing. Doc. 1-1 at 2. The affidavit states it was reviewed and edited by FBI Special Agent Kenneth Harris as well as CBI Agents Joseph Cahill and Derek Graham. *Id*. It also states that the affidavit and warrant were reviewed by District Attorney Linda Stanley and Senior Deputy District Attorney Jeff Lindsey. *Id*. at 126.

## IV.    Procedural History

On May 2, 2023, after the charges against him were dismissed, Plaintiff filed the complaint in this case. In it, he brings claims under 42 U.S.C. § 1983 for (1) malicious prosecution, (2) fabrication of evidence, (3) arrest-affidavit violations under *Franks v. Delaware*, 438 U.S. 154 (1978), (4) conspiracy, (5) unlawful retention of property, (6) failure to intervene, (7) reckless investigation, and (8) municipal liability under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). He also brings parallel state-law claims for malicious prosecution, fabrication of evidence, arrest-affidavit violations, conspiracy, and unlawful deprivation of property. Defendants subsequently moved to dismiss the case in seven separate motions. Docs. 87, 94, 95, 97, 98, 104, 108. A hearing was held on these motions on August 21, 2024. Doc. 157.

### LEGAL STANDARD

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) requires a court to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). In doing so, the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will

not suffice." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). A court will "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Id.* At this stage, the well-pleaded facts underlying a plaintiff's allegations must articulate a viable legal claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555.

## DISCUSSION

The defendants named here were all involved in investigating, charging, and prosecuting Plaintiff to one degree or another. The allegations against them, if true, show an investigation and prosecution that was, in a number of senses, *wrongful*. Plaintiff alleges that prosecutors omitted significant evidence, failed to follow up on or answer questions that may have undermined the case against him, and misrepresented material facts. All are wrongful, and all undermine the criminal justice system in serious ways. There should be, and are, consequences for that conduct.[4] But civil liability for money damages is not necessarily one of those consequences. All of Mr. Morphew's asserted causes of action suffer from one or more legal deficiencies. Chief among those deficiencies is that, despite the failings of the investigation and prosecution, there was still probable cause to arrest and charge him with murder. For this and the other reasons set forth below, Plaintiff's claims must be dismissed.

---

[4]   Besides the implosion of the prosecution of Plaintiff and the need to restart the investigation into Mrs. Morphew's death, consequences can, and have, included sanctions both in court and through the professional oversight processes. *See, e.g.*, Doc. 159-1.

I.   **Probable Cause:**
     **Claims One, Two, Three, Four, Six, and Eight**
     **as to All Named Defendants**

The core of Plaintiff's complaint and nearly all of his claims is that the affidavit that led to his arrest and prosecution was misleading, and he should not have been arrested. His claims for malicious prosecution, fabrication of evidence, *Franks* violations, conspiracy, failure to intervene, and *Monell* liability (except as to unlawful retention of property)[5] all turn on whether law enforcement had probable cause to arrest and charge him for his wife's murder in May 2021.[6] That is because each of these claims requires a showing that any misconduct by the defendants was material to a violation of Plaintiff's rights, or, in other words, that there would have been no probable cause to arrest and charge him had it not been for the alleged misconduct. *See Taylor v. Meacham*, 82 F.3d 1556, 1558 (10th Cir. 1996) (malicious-prosecution claim requires showing that there was no probable cause to arrest); *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021) ("[A] plaintiff must assert a

---

[5]   Plaintiff's retention-of-property claim is addressed separately below.

[6]   As to Plaintiff's claim for "reckless investigation," there is something of a circuit split on whether such a cause of action should exist, with some courts recognizing the claim but others rejecting it. *See Parker v. City of Tulsa*, 745 F. App'x 79, 81 n.1 (10th Cir. 2018) ("As far as this court can tell, the Eighth Circuit stands alone in recognizing the existence of such a cause of action."). The Tenth Circuit, however, has not recognized any such constitutional claim. In the absence of any binding Supreme Court or Tenth Circuit precedent on point, I am persuaded by the majority of other courts that have held there is no such cause of action. *See Brooks v. City of Chi.*, 564 F.3d 830, 833 (7th Cir. 2009) (plaintiff cannot state a due-process claim "by combining what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment"); *see also Parker*, 745 F. App'x at 81 n.1 ("[T]here exists serious reason to doubt the existence of [this] claim . . . ."). Plaintiff's Claim Seven is therefore dismissed.

causal connection between the fabrication of evidence and the deprivation of liberty."); *United States v. Moses*, 965 F.3d 1106, 1113 (10th Cir. 2020) (*Franks* claim requires showing that excluded information would have been material to a finding of probable cause); *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990) ("[T]o recover under a § 1983 conspiracy theory, a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights."); *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022) (a failure-to-intervene claim requires a preliminary showing that a government actor violated a plaintiff's constitutional rights); *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1226 (10th Cir. 2020) (finding plaintiff's *Monell* claim failed because "he was arrested with probable cause"); *see also Kerns v. Bader*, 663 F.3d 1173, 1187 (10th Cir. 2011) (Finding probable cause to be the "easiest and most economical" piece "of common ground" to resolve a number of constitutional claims requiring "a variety of different elements").

In hindsight, it appears everyone involved now agrees that Mr. Morphew should not have been arrested, at least not at that time. As some defendants pointed out behind the scenes at the time, the investigation wasn't complete, there were loose ends to tie up, and there were too many questions to answer before a case against Plaintiff could be proved beyond a reasonable doubt. *See* Doc. 1 at 24 ("Defendants Cahill and Graham were highly critical of the affidavit and opposed the impending arrest of Barry, citing the need for more forensic testing, evidence collection, and review and analysis of the investigation and materials seized up to date."). But the question for this Court isn't whether the decision to arrest Plaintiff was wise or whether the government would have been able to prove its case to a jury beyond a reasonable doubt. The question is whether arresting and prosecuting him at that time was

unlawful. That depends on whether law enforcement had probable cause to arrest and charge him for his wife's murder, which is a significantly different inquiry.

### A.    Applicable Law

Probable cause is not a concept that can be reduced to percentages or formulas. It requires more than mere suspicion, but allows for reasonable doubts, and indeed does not even require showing that guilt is more likely than not. *See Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) ("Probable cause is not a precise quantum of evidence—it does not, for example, require the suspect's guilt to be more likely true than false. Instead, the relevant question is whether a substantial probability existed that the suspect committed the crime, requiring something more than a bare suspicion." (internal quotation marks omitted)). It requires far less than the "beyond a reasonable doubt" standard needed to convict, though more than "bare suspicion." *United States v. Johnson*, 43 F.4th 1100, 1107 (10th Cir. 2022) ("The probable-cause standard requires only a fair probability, a standard understood to mean something more than a bare suspicion but less than a preponderance of the evidence at hand." (internal quotation marks omitted)).

The probable-cause inquiry is an objective one, meaning it asks what a reasonable person in the circumstances would believe, not what any particular defendant or anyone else might have actually believed. *See, e.g., Mglej v. Gardner*, 974 F.3d 1151, 1161 (10th Cir. 2020) ("[P]robable cause is measured by an objective standard."). In a case such as this where defendants are alleged to have fabricated evidence and omitted exculpatory facts from an arrest affidavit, the existence of probable cause is determined by ignoring the allegedly false information, accounting for the exculpatory omissions, and inquiring whether the accurate picture "would still have given rise to probable cause for the warrant."

*Taylor*, 82 F.3d at 1562. While this can be a question for a jury, it is not always. The Tenth Circuit has held, for example, that "whether an officer had probable cause to arrest [is] a 'proper issue for the jury if there is room for a difference of opinion.'" *Bruner v. Baker*, 506 F.3d 1021, 1028 (10th Cir. 2007) (quoting *DeLoach v. Bevers*, 922 F.2d 618, 623 (10th Cir. 1990)). But where "the evidence supports only one conclusion, which is that the arrest of [the] plaintiff . . . was lawful because probable cause existed," it is proper for a court to resolve the question. *Karr v. Smith*, 774 F.2d 1029, 1031 (10th Cir. 1985); *see also Easton v. City of Boulder*, 776 F.2d 1441, 1446 (10th Cir. 1985) (claims properly dismissed where there was "no basis upon which a jury could have reasonably concluded that" probable cause was lacking).

### B.   Analysis

Even including the facts that Plaintiff alleges  were misleadingly omitted from the affidavit and setting aside those he says were wrongfully included or fabricated, no reasonable person could have looked at the allegations in it and found that probable cause was lacking. As alleged in the complaint and summarized above, the investigation developed hundreds of facts that support probable cause that Plaintiff does not dispute. Out of the 129-page arrest affidavit, Plaintiff only disputes the facts discussed in the background section above. Accepting, as I must at this stage of the case, that Plaintiff's allegations are true, there remains ample reason to find probable cause that he was involved in the murder of his wife.

Plaintiff is correct that the exculpatory information omitted from the arrest affidavit was material and may have undercut the prosecution's theory by supporting the alternative conclusion that his wife was abducted by a stranger. Particularly significant in this regard are the facts that unknown DNA swabbed from Mrs. Morphew's car potentially

matched DNA found in three out-of-state unsolved sexual assault inves-
tigations, that unknown male DNA was discovered in several places on
her discarded bike and in their home, and that her scent was found near
the area where her bicycle was found, possibly suggesting that this scene
was not staged. Doc. 1. at 20-21, 29-30, 85, 127.[7] These facts explain why
proceeding with the arrest and charges at the time the affidavit was filed
was at the very least unwise: the uncertainties raised by some of this
evidence would have made it very difficult for the prosecution to secure
a conviction at trial beyond a reasonable doubt, and prosecutors, gener-
ally, understand they have an ethical obligation not to bring charges
that they cannot prove beyond a reasonable doubt.

But as noted above, not every unwise decision is unconstitutional,
and the *legal* (if not ethical) standard for an arrest does not require the
same level of certainty as that for a conviction. The question here is not
whether the evidence was sufficient to show beyond a reasonable doubt
that Plaintiff murdered his wife, but whether the uncertainties raised
by the omitted and misrepresented evidence erased any substantial
probability that Plaintiff was involved. The evidence, even as presented
by the Plaintiff's complaint, still supports only one conclusion: that there
was such probable cause. *See Karr*, 774 F.2d at 1031 ("[W]e believe that

---

[7]   While it is not clear whether he considered the other exculpatory
omissions mentioned in the complaint, Judge Murphy, who presided
over the proof-evident-presumption-great hearing, expressly considered
the CODIS matches. The complaint states that Judge Murphy "specifi-
cally found that the unknown male DNA profile was 'particularly signif-
icant because while it doesn't prove a stranger abduction theory, it does
at least support it.'" Doc. 1 at 131. Yet Judge Murphy still found proba-
ble cause to arrest Plaintiff existed. *Id.* at 130. *See Stonecipher*, 759 F.3d
at 1141 ("A neutral magistrate judge's issuance of a warrant is 'the
clearest indication that the officers acted in an objectively reasonable
manner . . . .'").

the evidence supports only one conclusion, which is that the arrest of plaintiff Karr was lawful because probable cause existed.").

Accounting for the exculpatory omissions and leaving out the allegedly fabricated or misleading evidence Plaintiff depends on, the arrest affidavit would tell an objective observer the following:

- Plaintiff was controlling and both physically and emotionally abusive according to his wife. He was suspicious that she was cheating, at least emotionally, and they fought frequently. She didn't feel safe at home with him and tried to break up with him a few days before she disappeared.

- Plaintiff's behavior on the Sunday of her disappearance was unusual. He had a job planned in Broomfield and was supposed to pick up an employee at 5:30 p.m. to drive to Broomfield and stay overnight in a hotel that he had booked over a week in advance. But he instead left his house at 5:30 a.m. and drove to Broomfield alone. This was Mother's Day, and according to Plaintiff's father-in-law, it was strange that he would work the Sunday of Mother's Day, as he rarely worked on Sundays. He was observed throwing trash away in a McDonald's parking lot in Broomfield around 10:00 a.m. and when questioned couldn't remember what it was, stating it was "probably old clothes" or an old pair of boots. He tried to call and text his wife several times throughout this day.

- Plaintiff was the last person to see his wife alive. By his own admission, he was alone with her from the afternoon of May 9 until the morning of May 10, when she disappeared, and he would have had time to murder her and dispose of the evidence. His wife's computer and phone exhibited activity late into the evening of May 9, however, indicating she may still have been alive at that time.

- His memory regarding the events leading up to his wife's disappearance is fuzzy, and he gave conflicting statements about those events, including about whether they went on a hike together the day before her disappearance. He had scratches on his arm after she disappeared.

- He suggested that saying "I don't recall" is code for not wanting to tell the truth, but himself stated that he didn't recall a number of key events leading to his wife's disappearance.

- He has previously bought and used tranquilizer chemicals in darts that he filled himself. He had a tranquilizer gun, but it was not operable and hadn't been used recently. He gave conflicting statements about whether he had used the tranquilizer darts in Colorado. An expert was surprised that a civilian would have those tranquilizer chemicals.

- He started liquidating assets and seeing another woman shortly after his wife disappeared, long before her body was found.

- His wife's mountain bike was found in a ravine near their home, and dogs detected her scent in that area. Unknown male DNA was found on the bike, on the carpet by their bed and on a stair in their house, and in her car. The DNA from her car potentially matched that from unsolved sexual assault investigations.

- Cadaver dogs did not alert to Plaintiff's truck, and GPS data indicated that his Bobcat skid steer had not been moved since before his wife's disappearance.

- Plaintiff is a skilled hunter and a landscaper and may have had the tools and expertise to kill his wife, bury her body, and destroy the evidence.

On these facts, I find no room for debate that the relatively low bar of probable cause was met. That is not to say that the prosecution's theory was airtight, particularly at the time of the arrest. The excluded evidence, had it been included, indeed would have raised some doubts about others' possible involvement in Mrs. Morphew's death. But while those doubts may have been enough to acquit Plaintiff of a criminal charge, or even to permit debate about whether it was more likely than not (under that evidence) that he was guilty, neither of those questions is relevant to this case. Indeed, whether Plaintiff is actually guilty of murder is irrelevant here—the Constitution protects both the guilty and the innocent. But even with the full picture as Plaintiff has presented it in his complaint, there was still evidence that Plaintiff had a motive, means, and opportunity to kill his wife; that his alibi was fabricated (as it was uncorroborated and supported only by his own self-serving

statements); and that his credibility was dubious (given his conflicting statements to investigators).

While the full picture undermines the certainty expressed in the affidavit and might suffice to create some reasonable doubt, there remains far more than a "bare suspicion," and more than a "fair probability" that Plaintiff was involved in his wife's murder. *See Johnson*, 43 F.4th at 1107. By any reasonable, objective measure, this evidence goes well beyond the standard required for probable cause to arrest and charge Plaintiff for the murder of his wife.[8] *See, e.g.*, *Mallory v. Holdorf*, 575 F. App'x 108, 109 (4th Cir. 2014) (affirming district court's finding that probable cause existed to arrest plaintiff who was later acquitted of murdering his wife where he had an opportunity to commit the murder, witnesses heard him arguing with his wife, and plaintiff lacked credibility with investigators).

Did the investigators and prosecutors have an obligation to Plaintiff and the state courts to be more careful and candid? Yes. Did they fail to live up to that duty? By all appearances, yes.[9] Do the full facts as alleged

---

[8]   It is worth emphasizing, again, that it is not necessary that the evidence support only one possible conclusion about Plaintiff's guilt; that would be akin to proof beyond a reasonable doubt. *See United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010) ("As the standard itself indicates, *probable* cause does not require metaphysical certitude or proof beyond a reasonable doubt.") (emphasis in original). Nor is it even necessary that the evidence support the conclusion that Plaintiff's guilt is more likely than not. *Johnson*, 43 F.4th at 1107. The question is whether the evidence is strong enough to raise a "fair probability" that Plaintiff was involved in the crime. *See United States v. Denson*, 775 F.3d 1214, 1220 (10th Cir. 2014). The evidence here, as in *Karr*, was sufficient to raise such a fair probability, so his arrest, while foolish and flawed, was not unlawful.

[9]   *See* Doc. 159-1 at 1-2 (disbarring District Attorney Linda Stanley in part because she "did not adequately supervise the prosecution of the case" against Plaintiff).

here raise some doubt about the theory presented in the affidavit and the certainty that Plaintiff was solely responsible for Mrs. Morphew's death? Yes. But do they eliminate even a "fair probability" that he was involved? The answer to that can only be no. For all its infuriating flaws, then, the prosecution of Plaintiff was not unlawful, and his Section 1983 claims for malicious prosecution, fabrication of evidence, *Franks* violations, conspiracy, failure to intervene, and *Monell* liability[10] must be dismissed on the basis of the existence of probable cause.

## II.   Claims Against Non-Prosecutorial Defendants in Their Individual Capacities

### A.   Causation and Personal Participation: Claims One, Two, and Three

Even if one assumes that the alleged misrepresentations in and omissions from the arrest affidavit obviated probable cause to arrest Plaintiff, there are other problems with his effort to state viable legal claims as to the non-prosecutorial defendants (Defendants Spezze, Rohrich, Camper, Himschoot, Cahill, Duge, Rogers, Graham, Koback, Lewis, and Schaefer). He has failed to directly link these defendants to his alleged injury, both as a matter of legal causation and because his allegations are insufficiently specific as to the role each played in causing his arrest. His claims for malicious prosecution, fabrication of evidence, and *Franks* violations against these defendants thus must be dismissed for this reason in addition to the existence of probable cause.

The injury Plaintiff alleges is being wrongfully arrested and then jailed and prosecuted. While the evidence does not support that assertion as explained above, even if it did, what caused it was the decision of the prosecutors to submit the arrest affidavit and move forward with

---

[10]  Except as to unlawful retention of property, which is addressed below.

the case when and how they did. None of the allegations against these defendants shows that they played a material role in that action.

As to the investigation, the allegations are that defendants ignored exculpatory evidence and ginned up unreliable evidence to include in the affidavit. But the allegations are not that the prosecutors were misled by the investigators or duped into believing fabricated evidence. To the contrary, the allegations point to the prosecutors as ringleaders. *See*, *e.g.*, Doc. 1 at 21 ("[H]ighly exculpatory information was not disclosed in the affidavit for Arrest Warrant prepared by Defendants Walker, Stanley, Lindsey, Cahill, and other defendants and co-conspirators."). Most of the defendants are simply accused of not preventing the misleading information from being included in the affidavit (or the exculpatory information from being excluded), or not preventing the affidavit from being filed at all. *See, e.g., Id.* at 27 ("Even though only Defendant Walker subscribed and swore to the Arrest Affidavit, all Defendants identified above . . . personally participated in meetings and conversations and exchanged emails and other communications as participation in drafting of the Arrest Affidavit."). But those are all different ways of saying they failed to prevent the prosecutors from violating Mr. Morphew's rights. As explained below, failure to intervene was not recognized as a separate claim in these circumstances until after the events of this case. As to Claims One, Two and Three for malicious prosecution, fabrication of evidence, and *Franks* violations, the prosecutors took the action that injured Plaintiff, not the defendants who didn't stop them.

To be sure, if an investigator or officer conceals or misrepresents material facts to a prosecutor who then acts on that false information, a claim may be stated. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1292-93 (10th Cir. 2004) (finding that a plaintiff can state a claim for malicious prosecution against the district attorneys who filed charges as well as

"officers who conceal and misrepresent material facts to the district attorney"). But that is not what is alleged in Plaintiff's complaint.

There is one possible exception, but even there the complaint stops short of asserting facts sufficient to support a claim. At times, Plaintiff seems to insinuate that Defendant Himschoot planted the hypodermic needle cap in Plaintiff's drying machine, but he never directly alleges that Mr. Himschoot planted evidence, only that he might have had the opportunity. *See, e.g.*, Doc. 1 at 19. While planting evidence likely would be the sort of allegation that, if it obviated probable cause, would suffice, the complaint is too oblique on this point to state a claim. The prosecutorial defendants are therefore the only ones who could have been responsible for any alleged injury.

Plaintiff also impermissibly uses group allegations against the non-prosecutorial defendants. Though he repeatedly asserts that various groups of defendants were responsible for his alleged injury, these allegations are often unaccompanied by factual support showing why each individual defendant is included in the group. *See Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013) ("[I]t is particularly important . . . that the complaint make clear *who* is alleged to have done *what to whom*, to provide each individual with fair notice as to the basis of the claims against him.") (emphasis in original). At times, Plaintiff's allegations as to individuals actually contradict his allegations as to the groups in which those individuals are included. Plaintiff alleges, for example, that "Defendants who authored the Arrest Affidavit, individually, jointly, and in conspiracy with one another . . . deprived Barry Morphew of his constitutional rights." Doc. 1 at 149. But he also admits, incongruently, that Defendant Cahill, who is explicitly included in this group, was actively counseling against filing the arrest affidavit in May 2021. *See* Doc. 1 at 26, 42.

As to the arrest affidavit, many of the non-prosecutorial defendants are only alleged to have "edited" or "reviewed" this document. *See* Doc. 1-1 at 2 ("This affidavit was edited and reviewed . . . by CBI Agents Joseph Cahill and Derek Graham."). This is insufficient to show that these defendants caused the prosecutors to initiate a malicious prosecution based on material falsehoods or omissions, and it does not negate the fact that the prosecutors were ultimately responsible for submitting the affidavit they did. Though Mr. Morphew might have adequately pleaded his claims if he had alleged that the investigators and sheriffs concealed facts from the prosecutors, such as, for example, the exculpatory CODIS matches, that is not what he has alleged. To the contrary, the complaint is clear that the prosecutors were also aware of this evidence and simply chose not to include it in the affidavit they were responsible for authoring. *See*, *e.g.*, Doc. 1 at 129 ("Defendant Hurlbert was involved in numerous of the meetings and conversations about the CODIS matches."). That certain defendants "reviewed" and "edited" the affidavit before it was filed is insufficient to establish the causation necessary to state a claim in this context.

Other defendants are not even alleged to have reviewed the affidavit at all. Defendant Koback, for example, is only alleged to have known about certain exculpatory material that was omitted from the affidavit. *Id.* at 79. As with the other allegations regarding reviewing and editing the affidavit, this is insufficient to state a claim where it is not also coupled with the assertion that Mr. Koback actually concealed information or misled the prosecutors.

For these reasons, Mr. Morphew has failed to adequately allege that Defendants Spezze, Himschoot, Rohrich, Camper, Cahill, Duge, Rogers, Graham, Lewis, Koback, and Schaefer caused the injury that underlies

Plaintiff's malicious prosecution, fabrication of evidence, and *Franks* claims.

### B.   Qualified Immunity: Claim Six

Plaintiff's failure-to-intervene claim does not require a showing that each defendant legally caused his alleged injury. It only requires a showing that Plaintiff's rights were violated and that others, knowing of this violation, failed to intervene. *See Bledsoe*, 53 F.4th at 616. But until late 2022, failure-to-intervene claims were limited exclusively to the excessive-force context. *Id.* at 617; *see also Shaw v. Schulte*, 36 F.4th 1006, 1020 (10th Cir. 2022) (noting that the duty to intervene is limited to the excessive-force context and holding that Tenth Circuit law did not "clearly establish that an officer must intervene to prevent an illegal search and seizure"). Because all of the alleged misconduct here took place before then, all of the individual defendants (including the prosecutors) are entitled to qualified immunity on his failure-to-intervene claim, as none of their alleged actions would have violated a clearly established constitutional right at the time those actions took place. *Cuervo*, 105 F.4th at 1292 (qualified immunity applies if constitutional right violated was not "clearly established at the time of the violation").

### III.   Claims Against Prosecutorial Defendants in Their Individual Capacities

#### A.   Absolute Immunity: Claims One, Two, Three, Four, Five, and Six as to Defendants Stanley, Lindsey, and Hurlbert

Plaintiff's claims against the prosecutors (Defendants Stanley, Lindsey, and Hurlbert) therefore are better supported by the factual allegations in the complaint. But they must also be dismissed because they are blocked by the legal doctrine of absolute prosecutorial immunity. *See Mink v. Suthers*, 482 F.3d 1244, 1258 (10th Cir. 2007) ("Absolute

prosecutorial immunity is a complete bar to a suit for damages under 42 U.S.C. § 1983.").

A prosecutor is "fully protected by absolute immunity when performing the traditional functions of an advocate." *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997). Such functions include anything associated with the "judicial phase of the criminal process," as opposed to the investigative phase, and encompass "initiating a prosecution" and "presenting the State's case." *Imbler v. Patchman*, 424 U.S. 409, 431 (1976). The Tenth Circuit, moreover, has held that it is a "well-settled rule that prosecutors are entitled to absolute immunity for the malicious prosecution of someone whom [they] lacked probable cause to indict." *Warnick v. Cooley*, 895 F.3d 746, 752 (10th Cir. 2018) (internal quotation marks omitted). It has also held that "a prosecutor has absolute immunity from a civil damages suit, even if he deliberately withholds exculpatory information." *Hartz v. Campbell*, 680 F. App'x 703, 707 (10th Cir. 2017) (internal quotation marks omitted).

The allegations as to defendant prosecutors Stanley, Lindsey, and Hurlbert fall squarely within the ambit of prosecutorial function protected by absolute immunity. Despite the complaint's conclusory assertion that all "acts by Defendant DAs Stanley, Lindsey, and Hurlbert alleged herein were performed in an investigative and/or administrative phase of the case," the factual allegations show otherwise. *See Kalina*, 522 U.S. at 130 ("[T]he selection of the particular facts to include in the certification to provide the evidentiary support for the finding of probable cause required the exercise of the judgment of the advocate."). None of these three defendants is alleged to have done more than draft, review, and select which facts to include in the affidavit, and none is alleged to have acted as a complaining witness and personally vouched for the truth of facts included in the affidavit. *See Chilcoat v. San Juan*

*Cnty.*, 41 F.4th 1196, 1212 (10th Cir. 2022) ("A public prosecutor assumes the role of a complaining witness, and is not entitled to absolute immunity, when personally vouching for the truth of facts that provide the evidentiary basis for a finding of probable cause."). In fact, Plaintiff readily admits that "only Defendant Walker subscribed and swore to the Arrest Affidavit." Doc. 1 at 27; *see Chilcoat*, 41 F.4th at 1212 ("We have likewise observed the distinction between sworn and unsworn statements when deciding whether a prosecutor functioned as an advocate or a complaining witness."). Because Defendants Stanley, Lindsey, and Hurlbert are only alleged to have participated in the construction of the arrest affidavit in their roles as advocates for the County, they are entitled to absolute prosecutorial immunity.[11]

### B.   Qualified Immunity: Claims One, Two, Three, Four, and Six as to Defendant Walker

Defendant Walker is not entitled to absolute immunity because he swore to the truth of the arrest affidavit and thus acted as a complaining witness. He is, however, entitled to qualified immunity.[12] Even assuming one could say the facts as alleged in the complaint arguably fall short of showing probable cause (and I do not think they could for the reasons

---

[11]   Plaintiff argues that the doctrine of absolute immunity should be abolished. Perhaps. But that is not for a court at this level to say. It is well-established, binding precedent, and to the extend he argues I should ignore it, I am obliged to apply the law as it is, regardless of what I think it ought to be.

[12]   Even if Plaintiff's complaint adequately alleged causation and personal participation as to the non-prosecutorial defendants and failure to intervene was a clearly established legal claim at the time, and even if the prosecutors were not entitled to absolute immunity, the non-prosecutorial defendants and the prosecutors would all still be entitled to qualified immunity for the exact same reasons explained in this section as to Defendant Walker.

discussed above), qualified immunity would still apply to Mr. Walker because that conclusion is not so obvious that any reasonable official in his position would have believed that the alleged fabrications and omissions were immaterial to a finding of probable cause. *See A.M. v. Holmes*, 830 F.3d 1123, 1140 ("in the § 1983 qualified-immunity context, an officer may be mistaken about whether he possesses *actual* probable cause to effect an arrest, so long as the officer's mistake is reasonable—*viz.*, so long as he possesses 'arguable probable cause'" (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1121 (10th Cir. 2007) (en banc))). That is because the facts, even as alleged, still show that Plaintiff had a motive and an opportunity to kill his wife, dubious credibility, and a suspicious alibi. That is enough to entitle Mr. Walker to qualified immunity on the claims raised in the complaint. *See Stonecipher*, 759 F.3d at 1141 (defendant "is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff").

## IV. Conclusory Allegations: Claims Four and Five as to All Named Defendants

### A. Claim Four – Conspiracy

Plaintiff's conspiracy claim also fails as to all named defendants because it is supported only by conclusory allegations. To properly plead a claim for conspiracy, a plaintiff must allege "specific facts showing an agreement and concerted action among defendants." *Bledsoe*, 53 F.4th at 609. He does not do so here. He instead relies wholly on conclusory allegations, like that defendants "conspired . . . to manufacture probable cause that [Plaintiff] committed murder." Doc. 1 at 124. He does not allege any facts that would tend to show the defendants entered into an agreement to deprive Plaintiff of his constitutional rights. He generally posits that "defendants worked closely together, sharing information,

[and] strategizing," but does not explain why this allegation amounts to evidence of a conspiratorial agreement as opposed to the standard collaboration of investigators and law-enforcement officials doing their jobs.[13] *Id.* He alleges many instances of parallel conduct, but the Tenth Circuit and Supreme Court have both held that "an allegation of parallel conduct absent context implying a meeting of the minds 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Gee*, 627 F.3d at 1183 (quoting *Twombly*, 550 U.S. at 557, and holding this standard is not limited to the antitrust context). Indeed, the complaint includes various allegations showing that there was no meeting of the minds as to at least a number of the defendants. *See, e.g.*, Doc. 1 at 42. Plaintiff's conspiracy claim therefore fails as a matter of law and is subject to dismissal for this reason, in addition to the existence of probable cause.

## B.   Claim Five – Unlawful Retention of Property

Plaintiff's claim for unlawful retention of property is grounded in legitimate concerns about the ability of the state to retain his property indefinitely. *See U.S. v. Rodriguez-Aguirre*, 264 F.3d 1195, 1213 (10th Cir. 2001) ("After the criminal proceedings conclude, however, the government has no right to retain the property as evidence, absent the commencement of forfeiture proceedings, and its continued retention of the property from that point forward could legitimately be viewed as a deprivation of the defendant's due process rights."). The claim fails at this point, however, because his allegations are either conclusory or not

---

[13]   Plaintiff also does not explain how all defendants could have been engaged in a conspiracy when, as mentioned above, some defendants were actively counseling against charging him at the time the arrest affidavit was filed.

sufficient to explain how the state process for seeking return of confiscated property is unconstitutional.

Plaintiff admits, on the one hand, that "On May 6, 2022, four days after the Complaint was filed in this case, Morphew filed a motion for return of property in the Fremont County District Court." Doc. 134 at 11. He notes that this motion was opposed by two of the prosecutors named as defendants in this case, that there was a hearing on October 25, 2022, and that the state district court ordered his property not to be returned "because the property had been seized pursuant to a search warrant." *Id.* He then asserts, on the other hand, that "Colorado's purported post-deprivation procedures do not satisfy due process because, after a trial court lacks subject matter jurisdiction over the criminal case, the court has no jurisdiction to rule on a motion to return property." *Id.* at 12. While it may be that he could state a claim in this context if his property request were denied on these jurisdictional grounds, his allegations are not clear enough to do so at this stage. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (intentional deprivations of property violate the Due Process clause if adequate state post-deprivation remedies are not available). He has not, for example, attached a copy of the state-court order that might show the basis for that court's decision—or the process he was afforded. Given this, all that supports this claim are conclusory assertions that the County's process is inadequate, along with his contradictory allegation that he was afforded a hearing on his request. For this reason, his retention-of-property claim is dismissed as insufficiently pled.

## V.   Claims Against Entity Defendants and Stanley and Spezze in Their Official Capacities: Claim Eight

As with his claim for conspiracy, Plaintiff's assertions in support of municiapal liability are conclusory.[14] He claims *Monell* liability on failure-to-train and failure-to-supervise theories, but he fails to allege with any specificity what training or supervision was not provided or why what was provided was insufficient. He also does not give examples of similar constitutional violations by the County, Sheriff's Department, or DA's office in other cases. *See, e.g., Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for the purposes of failure to train.").

His allegations as to policy and custom are similarly lacking. Plaintiff again simply recites the elements of this form of liability without actually pointing to a specific policy or custom to substantiate his claim. He argues that his inability to identify policy, custom, lack of training, or lack of supervision with specificity is due to the fact that he "has been unable to conduct discovery." Doc. 134 at 14. But this argument has repeatedly been rejected. *See, e.g., Frazier v. Jordan,* No. 06-1333, 2007 WL 60883, at *6 (10th Cir. Jan. 10, 2007) (affirming dismissal where plaintiff admitted "he could only make assumptions as to relevant policies or customs because he was denied discovery on this issue" but "fail[ed] to describe any policy or custom in place"). Plaintiff's allegations on these points are conclusory and insufficient to state claims.

---

[14] In this context, claims against defendants in their official capacities are treated as claims against the corresponding entity or municipality. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Plaintiff's allegations as to ratification and final policymaking authority are also conclusory. He offers no factual averments demonstrating that the alleged final policymakers actually exercised that authority in this case. And as to ratification he simply offers more conclusory allegations—allegations that do not suffice to provide the factual context necessary to state a claim under the law in this context. *See Bryson v. Okla. City*, 627 F.3d 784, 790 (10th Cir. 2010) ("[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions."). Plaintiff's claims as to municipal liability are therefore dismissed for this reason in addition to the fact that he has not adequately pled any underlying constitutional violation for the reasons discussed above.

## VI.   Claims Against Doe Defendants: All Claims

Plaintiff's complaint purports to assert claims against "John/Jane Does 1-10, and other unknown employees of the Eleventh Judicial District Attorney, and other unknown officers of the Chaffee County Sheriff's Department." Doc. 1 at 2. Claims against unnamed defendants may be dismissed if the plaintiff's allegations "are vague and fail to meet the pleading standards under . . . *Twombly*, 550 U.S. 544." *Culp v. Williams*, No. 10-cv-00886-CMA-CBS, 2011 WL 1597686, at *3 (D. Colo. Apr. 27, 2011), *appeal dismissed as frivolous*, 456 F. App'x 718 (10th Cir. 2012). Such is the case here, as Plaintiff's complaint contains no specific factual allegations as to what the unnamed defendants did or failed to do that would support a cause of action against them; indeed, the complaint does not even identify what cause or causes of action is or are asserted against the unnamed defendants. *See generally* Doc. 1. Plaintiff's claims against the Doe defendants and other unknown defendants must therefore be dismissed. *Cf. Sweets v. Wyo. Dep't of Emp't*,

589 F. App'x 887, 890 (10th Cir. 2014) (affirming dismissal of unnamed defendants where complaint "contained no facts showing that they had personally participated in any constitutionally impermissible conduct"); *McNees v. Ocwen Loan Servicing, LLC*, No. 16-cv-01055-WJM-KLM, 2017 WL 1386360, at *7 (D. Colo. Feb. 16, 2017) (R. & R.) (recommending dismissal of claims against unnamed defendants where claims relied on same underlying factual allegations asserted against named defendant, against whom plaintiff had failed to state a claim), *adopted by* 2017 WL 1390676 (D. Colo. Mar. 15, 2017); *Jensen v. Nucor Corp.*, No. 1:21-CV-00100-DAK-JCB, 2021 WL 4748453, at *2 to *3 (D. Utah Oct. 12, 2021) (dismissing unnamed defendants where plaintiff "fail[ed] to sufficiently describe" and "failed to provide any allegations relating to" them); *Silva v. US Bank, Nat'l Assoc.*, 294 F. Supp. 3d 1117, 1134-35 (D. Colo. 2018) (R. & R.) (recommending dismissal without prejudice of Doe defendants where all claims against named defendants were dismissed), *adopted by* No. 17-cv-1529-WJM-KLM, 2018 WL 10561514 (D. Colo. Mar. 19, 2018).

## VII.  Subject-Matter Jurisdiction Over State-Law Claims: Claims Nine, Ten, Eleven, Twelve, and Thirteen

Having granted the defendants' motions to dismiss as to all of Plaintiff's federal claims, I decline to exercise jurisdiction over his state claims. *See* 28 U.S.C. § 1367(c)(3); *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

## CONCLUSION

Plaintiff, like anyone accused of a crime, deserves better than what happened here. The People of the State of Colorado, on whose behalf and in whose name the charges against Plaintiff were brought, deserved

better. And Suzanne Morphew certainly deserved better. Perhaps Plaintiff is right that immunity doctrines ought to be revisited and it should be easier to sue those who mishandle prosecutions like this for damages in federal court. But that is a question for another day and another court. This court must apply the law as it is, and that requires the motions to be granted and the Plaintiff's claims to be dismissed.

Therefore, it is **ORDERED** that:

the motions to dismiss, **Docs. 87, 94, 95, 97, 98, 104, 108**, are **GRANTED**, and all claims are **DISMISSED WITHOUT PREJUDICE**.

DATED: September 24, 2024        BY THE COURT:

~~Daniel~~ D. Domenico
United States District Judge