# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-1108

BARRY MORPHEW,

          Plaintiff,

V.

Chaffee County, Colorado,
Board of County Commissioners of Chaffee County, Colorado,
Chaffee County Sheriff's Department,
District Attorney Linda Stanley, in her individual capacity,
Chaffee County Sheriff John Spezze, in his individual and official capacity,
Chaffee County Undersheriff Andrew Rohrich,
Eleventh Judicial District Attorney's Office Investigator Alex Walker,
Deputy District Attorney Jeffrey Lindsey,
Deputy District Attorney Mark Hurlbert,
Chaffee County Sheriff's Deputy Scott Himschoot,
Colorado Bureau of Investigation Agent Joseph Cahill,
Colorado Bureau of Investigation Agent Megan Duge,
Colorado Bureau of Investigation Agent Caitlin Rogers,
Colorado Bureau of Investigation Agent Derek Graham,
John/Jane Does 1-10,
and other unknown employees of the Eleventh Judicial District Attorney,
and other unknown officers of the Chaffee County Sheriff's Department.

---

## FIRST AMENDED CIVIL RIGHTS COMPLAINT
## WITH DEMAND FOR TRIAL BY JURY

---

1

Plaintiff, Barry Morphew, by and through his attorneys, Fisher & Byrialsen, PLLC, Samler & Whitson, PC, and Eytan Law LLC brings claims against the above-listed Defendants in their individual and official capacities and requests trial by jury.

## I.    PRELIMINARY STATEMENT

1.    This civil rights action concerns a wrongful arrest, malicious prosecution and continued malicious prosecution, by the above-named defendants against Barry Morphew.

2.    As set forth below, the misconduct was committed by Defendants Chaffee County and the Chaffee County Sheriff's Department, Chaffee County Sheriff John Spezze, Andrew Rohrich,  Scott Himshoot, Alex Walker, Joseph Cahill, Derek Graham, Megan Duge, Caitlin Rogers, Linda Stanley, Jeffrey Lindsey, Mark Hurlbert, other unknown employees of the Eleventh Judicial District Attorney, and other unknown officers of the Chaffee County Sheriff's Department.

3.    Each Defendant acted under color of law and within the scope of their employment when engaging in the misconduct described herein. They are being sued in their official and individual capacities.

4.    Plaintiff Barry Morphew asserts that his Constitutional rights were

violated as a result of the actions and omissions of the Defendants as well as the policies, procedures, lack of procedures, customs and/or practices of the Chaffee County Sheriff's Department and the inadequate supervision and training by by the Chaffee County Sheriff's Department and by Chaffee County, Colorado.

## II.    JURISDICTION AND VENUE

5.    This action is brought pursuant to 42 U.S.C. §§ 1983, 1988 to redress the Defendants' deprivation of Mr. Morphew's rights secured by the U.S. Constitution.

6.    This Court has jurisdiction over Mr. Morphew's federal claims pursuant to 28 U.S.C. §§ 1331, 1343. Supplemental jurisdiction over Barry Morphew's state law claim exists pursuant to 28 U.S.C. § 1367(a).

7.    Venue is proper under 28 U.S.C. § 1391(b). The majority of the Defendants reside in this judicial district, and the events and omissions giving rise to Mr. Morphew's claims occurred within the State of Colorado.

## III.    PARTIES

8.    At all times relevant to this Complaint, Plaintiff Barry L. Morphew was a citizen and resident of the State of Colorado.

9.    Defendant Chaffee County, located in the state of Colorado, ("Chaffee County"), is a municipality organized under the laws of the State of Colorado.

3

Defendant Chaffee County enforces local and state law through its law enforcement agency, the Chaffee County Sheriff's Department ("CCSD").

## A. DEFENDANT PROSECUTORS

10.    At all times relevant to the allegations in this Complaint, Defendants Linda Stanley, Jeff Lindsey, and Mark Hurlbert were acting under the color of state law in their capacities as District Attorney (Stanley) and Deputy District Attorney (Lindsey and Hurlbert). Each defendants' acts or omissions were conducted within the scope of their official duties or employment.

11.    At all times relevant to this Complaint, Defendant Linda Stanley was acting within the scope of her official duties and employment and under color of state law in her capacity as the elected District Attorney for the 11th Judicial District at the Eleventh Judicial District Attorney's Office ("EJDAO"). At all relevant times, Defendant Stanley was a citizen of the United States and resident of the State of Colorado.

12.    At all times relevant to this Complaint, Defendant Jeff Lindsey was acting within the scope of his official duties and employment and under color of state law in his capacity as a Chief Deputy District Attorney for the 11th Judicial District. At all relevant times, Defendant Lindsey was a citizen of the United States and resident of the State of Colorado.

4

13.    At all times relevant to this Complaint, Defendant Mark Hurlbert was acting within the scope of his official duties and employment and under color of state law in his capacity as a Deputy District Attorney for the 11th Judicial District. At all relevant times, Defendant Hurlbert was a citizen of the United States and resident of the State of Colorado.

14.    All acts by Defendants Stanley, Lindsey, and Hurlbert alleged herein were performed in an investigative and/or administrative phase of the case and not in their prosecutorial roles as an advocate for the state. To the extent any of the allegations herein assert conduct undertaken in these defendants' role as an advocate, it is Plaintiff's contention that the doctrine of absolute prosecutorial immunity should be abolished.

15.    As set forth in more detail below, some of the acts by Defendants Stanley, Lindsey and Hurlbert alleged herein were performed in violation of court order and in violation of the Rules of Professional Responsibility.

## B. DA INVESTIGATOR ALEX WALKER

16.    At all times relevant to this Complaint, Defendant Alex Walker was acting within the scope of his official duties and employment and under color of state law in his capacity, first as a Criminal Investigator with the EJDAO and, beginning in June 2021, as a CCSD Investigations Commander. This defendant's

acts or omissions were conducted within the scope of his official duties or employment.

17.    At all relevant times, Defendant Walker was a citizen of the United States and resident of the State of Colorado.

18.    At all times relevant to the allegations in this Complaint, Alex Walker was a "peace officer" under Colo. Rev. Stat. § 24-31-901(3).

## C. CHAFFEE COUNTY SHERIFF'S DEPARTMENT DEFENDANTS

19.    At all times relevant to the allegations in this Complaint, the Individual CCSD Defendants – John Spezze, Andrew Rohrich, and Scott Himschoot,  – were "peace officers" under Colo. Rev. Stat. § 24-31-901(3) and were employed by a local government and as such, were acting under color of state law and within the course and scope of their employment. Each of these defendant's acts or omissions were conducted within the scope of their official duties or employment.

20.    At all times relevant to this Complaint, Defendant John Spezze was the Chaffee County Sheriff, elected pursuant to Colo. Const., Const. art. 14, § 8 and a citizen of the United States and resident of the State of Colorado.

21.    Defendant Spezze acted in a supervisory capacity over Defendants Rohrich, Himschoot, and (after June 2021) Walker at all times relevant to this Complaint.

22.     The constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct within the CCSD, which occurred with the knowledge and consent of Defendant Spezze and Defendant Undersheriff Andrew Rohrich.

23.     Defendants John Spezze and Andrew Rohrich had personal knowledge about and participated in, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation by their actions or by their deliberately indifferent failure to act.

24.     As the Sheriff of Chaffee County, Defendant Spezze oversees the CCSD, which, at the time of the events alleged herein, employed Defendants Andrew Rohrich,  Scott Himschoot, Alex Walker, and other unknown officers of the CCSD. The Chaffee County Sheriff is also responsible for the policies and practices of the CCSD.

25.     At all times relevant to this Complaint, Defendant Andrew Rohrich was acting within the scope of his official duties and employment and under color of state law in his capacity as the Chaffee County Undersheriff. At all relevant times, Defendant Rohrich was a citizen of the United States and resident of the State of Colorado.

26.     At all times relevant to this Complaint, Defendant Scott Himschoot

7

was acting within the scope of his official duties and employment and under color
of state law in his capacity as a CCSD Deputy. At all relevant times, Defendant
Himschoot was a citizen of the United States and resident of the State of Colorado.

### D. COLORADO BUREAU OF INVESTIGATION DEFENDANTS

27.     At all times relevant to the allegations in this Complaint, the Defendants
– Joseph Cahill, Megan Duge, Caitin Rogers, and Derek Graham, were employed
by a Colorado state agency, the Colorado Bureau of Investigation ("CBI") and as
such, were acting under color of state law and within the course and scope of their
employment. Each of these defendant's acts or omissions were conducted within the
scope of their official duties or employment.

28.     At all times relevant to this Complaint, Defendant Joseph Cahill was
acting within the scope of his official duties and employment and under color of
state law in his capacity as a CBI Agent. At all relevant times, Defendant Cahill
was a citizen of the United States and resident of the State of Colorado.

29.     At all times relevant to this Complaint, Defendant Derek Graham was
acting within the scope of his official duties and employment and under color of
state law in his capacity as a CBI Agent. At all relevant times, Defendant Graham
was a citizen of the United States and resident of the State of Colorado.

30.     At all times relevant to this Complaint, Defendant Megan Duge was

acting within the scope of her official duties and employment and under color of state law in her capacity as a CBI Agent. Defendant Duge was a citizen of the United States and resident of the State of Colorado.

31.    At all times relevant to this Complaint, Defendant Caitlin Rogers was acting within the scope of her official duties and employment and under color of state law in her capacity as a CBI Agent. At all relevant times, Defendant Duge was a citizen of the United States and resident of the State of Colorado.

## IV.    FACTUAL ALLEGATIONS

### A. DISAPPEARANCE OF SUZANNE MORPHEW

32.    Suzanne Morphew of Maysville, Colorado disappeared on May 10, 2020.

33.    Barry and Suzanne Morphew had been married for more than 20 years. They have two daughters, Mallory, then 20-years-old and Macy then 16-years-old.

34.    On May 10, 2020, Barry Morphew, who owned a landscaping business, went to Broomfield (a Denver, Colorado suburb) to prepare for a previously-contracted landscaping job to commence on May 11, 2020.

35.    Barry last saw Suzanne in their bed sleeping around 5:00 a.m. on May 10, 2020, before he left to drive to Broomfield.

36.    The daughters, Mallory and Macy, were on a road trip in Utah and

planned to get home on May 10 or May 11, 2020.

37.    On May 10, 2020, Barry ,Mallory and Macy Morphew had been calling and texting Suzanne's phone numerous times throughout the day, but she did not answer.

38.    At approximately 3 p.m. on May 10, 2020, Barry Morphew called a neighbor to go to the Morphew home and look for Suzanne because he and his daughters had been unable to reach her.

39.    The neighbors drove to the Morphew home and were unable to find Suzanne. They also did not see her mountain bike that she rode almost daily.

40.    At approximately 5:30 p.m. Barry asked the neighbors to call the authorities while he packed up his things and drove from Broomfield back to their home.

41.    Shortly after law enforcement was contacted, on May 10, 2020, Chaffee County Sheriff's Deputies Damon Brown and Lamine Mullenax found a mountain bike off a dirt road, down a ravine, near the Morphew home.

42.    Deputies Brown and Mullenax moved the bike from the location where it was laying in the ravine, up to the dirt road.

43.    There was no cell phone reception in or around Maysville, the Morphew home, or where the bike was found, so the Deputies could not use their

cell phones to reach Barry.

44.    Using their radio, Brown and Mullenax  requested that emergency dispatch contact Barry Morphew while he was driving back to confirm that the bike they found matched the description of Suzanne's bike.

45.    Dispatch contacted Barry who confirmed the description matched Suzanne's bike.

46.    Defendants Walker and Rohrich arrived on the scene and remained personally involved in every step of the investigation described herein.

47.    Defendant Walker personally directed the investigation on the scene.

48.    While Defendant Spezze was not personally present on the scene for every step of the investigation described herein, he maintained constant contact with law enforcement present on the scene and, with Defendant Walker, personally directed the investigation.

49.    Defendants Spezze and Walker immediately suspected Barry Morphew was the perpetrator.

50.    Barry arrived from Broomfield two and a half hours later and wanted to help search for Suzanne.

51.    As can be seen on law enforcement body-worn cameras, when Barry arrived, Defendants Walker, Rohrich and Spezze were permitting dozens of people

to mill around the dirt road where Suzanne's bike was located.

Permitting dozens of people to mill about a crime scene contaminated the crime scene.

52.     Defendant Rohrich asked Barry to assist law enforcement in finding an article of Suzanne's clothing from Suzanne's closet to use in a search for Suzanne. Barry was willing and followed Defendant Rohrich's directions.

53.     As part of the emergency search and rescue operation to find Suzanne, an employee of the Colorado Department of Corrections (CDOC), Doug Spence was called in to assist.  Spence brought his scent dog, Rosco.

54.     Doug Spence gave the article of clothing provided by Barry to his scent dog ("Rosco") to smell Suzanne's scent. Rosco was then deployed to the area near where Suzanne's bike was found.

55.     Rosco alerted to Suzanne's scent and followed it down to a rushing river where Suzanne's scent then disappeared.

56.     Rosco's discovery of Suzanne's scent and trail was evidence that she had been at the location.

57.     Rosco's discovery of Suzanne's scent and trail was exculpatory evidence showing that Suzanne may have been abducted on a bike ride on May 10, 2020, contrary to the suspicions of Defendants Walker, Rohrich, and Spezze that

Barry killed Suzanne on May 9, 2020 and "staged" the scene by throwing her bike into the ravine to make it appear as though she had been abducted on a bike ride on May 10, 2020.

58.    The highly exculpatory facts about Rosco's alert (described in the preceding paragraphs of this Amended Complaint) were not disclosed in the Arrest Affidavit, even though these facts were known by Defendants Walker, Rohrich, and Spezze.

59.    Defendants Walker, Rohrich, and Spezze did not disclose these highly exculpatory facts to prosecutors.

60.    More search and rescue personnel were brought in to assist that evening.  A massive search, involving numerous law enforcement entities and volunteer community members from nearby Salida and people who traveled to Salida from other cities and States started that evening and ensued for months following Suzanne's disappearance.

61.    Defendants Cahill and Graham directed that the search efforts be confined to an approximate 10-mile diameter area surrounding the Morphew home, based on these defendants' fixation on Barry as the perpetrator and the theory that he must have disposed of Suzanne's remains near the home.

62.    The search location directed by Defendants Graham, Cahill, Spezze,

Walker, and Rohrich was heavily wooded, mountainous, and rocky.

63.     Suzanne was never found in that area.

64.     A massive search, involving numerous law enforcement entities and volunteer community members from nearby Salida ensued for weeks following Suzanne's disappearance.

65.     On May 13, 2020, Defendant Scott Himschoot, a Chaffee County Sheriff's Deputy, found Suzanne' bike helmet approximately 0.84 miles northwest of the site the bicycle was found, approximately ten meters south of Highway 50 and about 1.52 miles from the Morphew residence.

66.     Barry is an avid hunter.  Prior to moving to Maysville, Colorado, Barry and Suzanne lived in Indiana where they owned a deer farm.

67.     Shortly after Suzanne's disappearance, Defendants Walker, Rohrich, Spezze and Himschoot learned through Suzanne's best friend that Suzanne had a secret pen that recorded conversations.

68.      Defendants Cahill, Walker, Rohrich, Spezze and Himschoot became aware that Suzanne wanted this secret pen recorder to record Barry in what Suzanne believed to be involved in an extra-marital affair.

69.     The secret pen recorder contained recordings of multiple conversations recorded between Suzanne and "Jeff" evidencing it was not Barry, but Suzanne that

was having an extra-marital affair.

70.    Suzanne's high school yearbooks revealed that the "Jeff" was Jeff Libler, a friend from high school.

71.    Suzanne used WhatsApp and Linkedin, phone apps she installed on her phone to communicate with Libler.

72.    For approximately two years prior to her disappearance, Suzanne had a secret, romantic affair with Jeff Libler, a man she knew from her high school in Indiana.

73.    Suzanne reconnected with Libler on Facebook.

74.    Libler lived in Michigan with his wife and children (who did not know about the affair).

75.    Over the period of a year and half preceding Suzanne's disappearance, Suzanne and Libler frequently talked to each other on the phone, on their secret What's App and LinkedIn accounts, and met each other in different cities all over the country without the knowledge of their spouses, relatives, children or closest friends.

76.    When the FBI agents contacted Libler, he admitted he did know Suzanne in November, 2020.

77.     FBI Agents from Colorado flew to Michigan the following day and

interviewed Libler. The interview was tape recorded.

78.    Libler inquired if he needed an attorney, but the FBI agents advised him they were focusing in on Barry, and they would "protect" Libler.

79.    Libler admitted that he had a romantic affair with Suzanne over the previous year and a half.

80.    Liber explained he had talked to her on May 9th, and on May 10, 2020 he learned Suzanne disappeared, but he did not contact law enforcement or try to reach out to Suzanne, because he did not want Suzanne's daughters to think badly of her.

81.    The FBI agents explained that they could not understand how he and Suzanne kept their love affair so elusive, even from the FBI.

82.    Libler confirmed that he and Suzanne communicated over secret profiles using encrypted communication tools WhatsApp and Linkedin.

83.    Law enforcement asked for Libler's phone, and Libler claimed his phone broke immediately after Suzanne disappeared and he deleted his secret WhatsApp and Linkedin Accounts. Libler expressed extreme concern that his wife and his employer would find out about his affair with Suzanne.

84.    Libler stated he did not believe Barry knew about the affair. This is exculpatory because it contradicts the theory that Barry knew about the affair and

that is why he allegedly killed Suzanne. Defendant Walker did not include this exculpatory information in the arrest affidavit.

85.    Libler did not report anything about Suzanne saying Barry was abusive.  This is exculpatory because it contradicts the theory that Barry was an abusive husband. Defendant Walker did not include this exculpatory information in the arrest affidavit.

86.    In early 2021, FBI Agents Grusing and Harris told Barry about Suzanne's affair. No one suspected Suzanne was having an affair. This is exculpatory because it contradicts the theory that Barry knew about the affair and that is why he allegedly killed Suzanne. Defendant Walker did not include this exculpatory information in the arrest affidavit.

87.    Barry, like all of Suzanne's friends and family, was shocked to learn about the affair.

88.    On at least sixty occasions between the time of Suzanne's disappearance and the day Barry was arrested, Barry voluntarily spoke with Defendants Walker, Cahill, Graham, Rohrich, and two FBI agents. Over one hundred hours of the interviews and conversations with Barry were recorded.

89.    Almost all of Barry's interactions with Defendants Walker, Cahill, Graham, Rohrich, the two FBI agents, and other law enforcement personnel officers

17

were secretly tape recorded, including occasions in July 2020, on which Barry hosted Defendants Cahill and Graham for dinner at the Morphew home where they prayed to find Suzanne and when Barry and Defendants Cahill, Rohrich and others handed out flyers in December 2020 at a local grocery store seeking the community's help in finding Suzanne.

90.    The intention of Defendants Spezze, Walker, Cahill, Rohrich and Graham was not to investigate or locate or potential suspects, but rather, to get Barry to confess. The Defendants never got the confession from Barry that they were hoping for.

91.    Barry was continuously searching for Suzanne and helping with the search, and made himself available to numerous investigators.

## B. THE ARREST AFFIDAVIT AND ITS AFTERMATH[1]

92.    Leading up and into early May 2021, Defendants Walker, Stanley, Lindsey, Cahill, Rohrich, Spezze, and Graham worked together to draft the affidavit for arrest. Each personally participated in the drafting and assisting others to draft the 129-page affidavit.[2]  Each personally participated in the investigation of the

---

[1] Mr. Morphew incorporates throughout this Complaint into each section, subsection and claims all information stated herein wherever it appears in the Complaint.

[2] In this Complaint, Mr. Morphew sets forth language from the Affidavit and provides page references for convenience. Mr. Morphew has attached the 129-page Affidavit to this Complaint. Mr. Morphew incorporates it by reference because blocking and copying all of its content into the Complaint would be impracticable. Wherever a fact is pertinent, Mr. Morphew has endeavored to quote the Affidavit herein.

case, both before and after filing of the Arrest Affidavit.

93.    On May 4, 2021, Defendant Alex Walker signed the Arrest Affidavit.
He stated he had been "duly sworn" and he "deposes and swears" to the Affidavit.

94.    Just above the signature line, Defendant Walker "affirm[ed] that this
affidavit and warrant has been reviewed by [Defendants Stanley and Lindsey].

95.    Defendant Walker further affirmed that Defendants Joseph Cahill and
Derek Graham edited and reviewed the affidavit.

96.    In fact, by at least April 2021 and thereafter, Defendant Walker had
circulated a draft of the affidavit to numerous individuals, including Defendants
Stanley, Lindsey, Cahill, Graham, Rohrich, and Spezze.

97.    Defendants Walker, Stanley, Lindsey, Cahill, Graham, Rohrich, and
Spezze all worked on the affidavit and caused it to contain false and misleading
information and to omit material exculpatory information.

98.    Defendants Walker, Stanley, Lindsey, Cahill, Graham, Rohrich, and
Spezze caused the affidavit to be issued despite a lack of probable cause.

99.    Judge Patrick Murphy signed the Affidavit, affirming that it was
"[s]ubscribed and sworn to before me this 4th day of May 2021."

100.    The theory set forth in the Arrest Affidavit was that Barry killed
Suzanne on the afternoon of May 9, 2020, by injecting her with animal tranquilizer

shot from a tranquilizer gun as she ran around the home trying to get away from him and then "staged" Suzanne's bicycle and helmet to divert attention from himself.

101.   Barry's motive, according to the affidavit, was jealousy and fear of Suzanne leaving him.

102.   The affidavit posited that Barry found out about Suzanne's affair with Libler long before May 9, 2020.

103.   The Arrest Affidavit contained false and misleading statements and omitted highly exculpatory information.

104.   Defendants Walker, Stanley, Lindsey, Cahill, Rohrich, Spezze, and Graham knowingly, recklessly, and maliciously omitted material, exculpatory information and included misleading and false information.

105.   There was no probable cause to arrest Barry Morphew.

106.   Barry was held in the Chaffee County jail without a bond until September 20, 2021.

107.   On April 8, 2022, the judge issued a written discovery order sanctioning the Prosecutors for violating its May and June 2021 discovery orders.

108.   The April 8, 2022, order ruled that the prosecutors concealed exculpatory information from the Arrest Affidavit.

109. Defendants Walker, Stanley, Lindsey, Cahill, Rohrich, Spezze, Rogers, Duge, and Graham caused the Arrest Warrant to be issued despite knowing there was no probable cause.

110. Defendants Walker, Stanley, Lindsey, Cahill, Rohrich, Spezze, Rogers, Duge, and Graham caused the murder and related charges to be brought despite knowing there was no probable cause.

111. No Defendant intervened to prevent the damage to Mr. Morphew, even though each had sufficient information and reasonably could have done so.

112. Had the Arrest Affidavit not contained false and misleading statements, and had it not omitted material exculpatory information, there would have been no probable cause on the face of the Affidavit.

## C. FALSE AND MISLEADING STATEMENTS IN THE AFFIDAVIT AND OMITTED EXCULPATORY DNA EVIDENCE

113. Defendants Spezze, Rohrich, and Walker caused DNA samples to be taken from the Morphew home and items there, as well as from the bike, bike helmet, and vehicles belonging to Barry, Suzanne, and Macy.

114. The results of the DNA testing were highly exculpatory. They excluded Barry, indicated a partial DNA Match from a sample in Suzanne's car to unsolved sex offense cases, and revealed unknown male DNA on the bike, bike helmet and in numerous locations in the house.

21

115.    The Arrest Affidavit failed to include the exculpatory DNA results described above, and other exculpatory results. This omission was highly material because the results strongly contradicted the statements in the Arrest Affidavit that there were no other potential suspects and strongly contradicted the theory that Barry killed Suzanne and staged her disappearance by placing her bike in a ravine.

116.    In the summer of 2020, Defendants Duge and Rogers determined foreign unknown male DNA was found on various items of the crime scene including: the exterior cushion of the bike helmet, Suzanne's bike seat, Suzanne's bike brakes and handlebars, Suzanne's bike grips, the carpet by the Morphew's bed, on a stair in the Morphew home, and on the back seat and the glovebox of Suzanne's Range Rover that was parked in the Morphew garage.

117.    Barry Morphew, along with nearly sixty other investigative personnel working the scene and lay people who could have possibly been the source of the unknown male DNA, were excluded as sources of the DNA samples.

118.    Defendant Cahill was the lead CBI investigator assigned to assist local authorities in the investigation of Suzanne's disappearance.

119.    In the fall of 2020, Defendant Cahill submitted a request that the CBI lab conduct forensic analysis of numerous items. He explained, "this unknown male profile was submitted … because [there is] additional information to suspect the

22

2015 Range Rover was used in commission of a criminal offense."

120.   Defendant Rogers determined the partial genetic profile warranted uploading the sample into CODIS, a national DNA database.

121.   CODIS is the acronym for the Combined DNA Index System. CODIS contains DNA samples of convicted offenders nationwide, along with unknown samples from unsolved crimes and active investigations.

122.   In October and November 2020, Defendants Rogers and Duge were made aware of two CODIS matches to two different unsolved sex offenses in Arizona.

123.   On December 4, 2020, Defendants Cahill, Walker, Rohrich, and Graham were made aware of one of the CODIS matches from an unsolved sex offense in Tempe, Arizona to the partial genetic DNA profile collected from Suzanne's car.

124.   In April 2021, Defendants Rogers and Duge were made aware of another CODIS match from Suzanne's Range Rover to another unsolved sex offense in Illinois.

125.   These results were highly exculpatory because the existence of this DNA shows potential other suspects and, by excluding Barry Morphew, tends to show he was not the perpetrator but rather, some other male(s).

126.   Defendants Walker, Stanley, Lindsey, Cahill, Rohrich, Spezze, and Graham omitted this highly exculpatory information from the Affidavit for Arrest Warrant.

127.   On May 19, 2021, Defendant Duge sent Defendant s Cahill a CODIS match letter via email indicating the unknown male DNA swabbed from the glovebox of Suzanne's Range Rover partially matched DNA found in three out-of-state unsolved sexual assault investigations in Tempe, Phoenix, and Chicago.

128.   Defendant Duge's May 19, 2021, letter stated that due to the "limited genetic profile" this was only a lead and further investigation was necessary.

129.   "Limited genetic profile" is not a scientific term mentioned or accepted in the FBI CODIS manual.

130.   Defendants Duge and Rogers made up the term "limited genetic profile."

131.   The made-up term "limited genetic profile" influenced the probable cause finding entered by Judge Murphy at the Preliminary Hearing.

132.   In the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill stated that there was no evidence of any potential alternate suspect.

133.   The Affidavit failed to accurately inform the judge of the existence of

unknown male DNA in various relevant places, CODIS matches between DNA

found in the investigation and DNA found in other sex assault investigations in

other states.

134.    During pendency of the nearly year-long criminal murder case against

Barry, and the following 11 months of litigation, the District Judge imposed

sanctions against the prosecution in a written order which included the following

finding:

> The Judge who found probable cause and set a no bond
> hold was not told that unknown foreign male DNA was
> found on various items at the crime scene or in the alleged
> victim's car at the time of signing the warrant for Mr.
> Morphew's arrest. See *Aff.*, at 44-45 (discussing CBI
> laboratory results related to DNA analysis of various
> items). If the Judge had known at the time of reviewing the
> arrest warrant about foreign unknown male DNA and
> CODIS matches to out-of-state cases, he may not have
> required Mr. Morphew to sit in jail for five months
> pending the PEPG and Hearings.[4]

135.    Unknown DNA and unknown male DNA was found on (i) Suzanne

Morphew's bedside, (ii) one of the stairs of the Morphew home, (iii), the sheets in

the dryer, (iv) the bicycle grips, (v) the bicycle seat, (vi) the bicycle brakes and

---

[4] People v. Morphew, Fremont County No. 22 CR 47, *Order Re: [D-17] Defendant's Renewed Motion for
Discovery and Contempt Sanctions and Forthwith Hearing; [D-17a] Supplement; [D-17b] Supplement; [D-17c]
Supplement; and [D-17d] Supplement* (filed April 8, 2022), p. 12

handlebars, (vii) Suzanne's bicycle helmet exterior, (viii) Suzanne's bicycle helmet interior cushions, (ix) the front driver door of Suzanne's car, (x) the front passenger door of Suzanne's car, (xi) the glove compartment of Suzanne's car, and (xii) the rear driver side seat cushion of Suzanne's car.

136.    In the affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill mentioned unknown DNA on only item (v) above, the bicycle seat.

137.    During pendency of the criminal case against Barry, the State District Court Judge expressly found that "the foreign male DNA being found on pieces of evidence at the crime scene that would exclude Mr. Morphew…would tend to negate guilt."[5]

138.    A swab taken from the glove compartment of Suzanne's car revealed that at least one unknown male contributed to the DNA profile.

139.    The DNA from the glove compartment was tested against at least 70 profiles, including but not limited to the Morphew family and friends, many of the Defendants, CCSD investigators, and other law enforcement personnel.

140.    The DNA from the glove compartment did not match any one of at least 70 profiles, of people known to have been at or near Suzanne's car, that it was

---

[5] People v. Morphew, Fremont County No. 22 CR 47, Transcript of February 10, 2022, p. 94.

tested against.

141.   On October 12, 2020, Defendant Cahill submitted to Defendants Duge and Rogers his determination that not only he but also the CBI, the CCSD, and the 11th Judicial District Attorney's office all believed that Suzanne's Range Rover was "used in the commission of a criminal offense connected to the disappearance of Suzanne Morphew."

142.   At the request of Defendant Cahill the swab from the glove compartment of Suzanne's car was submitted in October 2020 to CODIS.

143.   In October 2020, Defendants Duge and Rogers knew there was a DNA match from the CODIS search between the swab from the glove compartment of Suzanne's car and DNA recovered from an unsolved sex assault in Tempe, Arizona.

144.   In November 2020, Defendants Duge and Rogers learned that there was a DNA match from the CODIS search between the swab from the glove compartment of Suzanne's car to DNA recovered from an unsolved sex assault in Phoenix, Arizona.

145.   Defendant Duge notified the labs in Tempe and Phoenix and referred them to Defendant Cahill for follow up investigation regarding the DNA matches.

146.   On December 2, 2020, Defendant Burgess received an email from a Tempe, AZ detective notifying him of the DNA match between the swab from the

27

glove compartment of Suzanne's car and an unsolved sex assault in Tempe, Arizona.

147.  Defendant Burgess relayed this information to Defendants Walker, Spezze, Graham, Rohrich, and Cahill, and other co-conspirators whose identities are not yet known to Mr. Morphew.

148.  In April 2021, Defendants Duge and Rogers were notified that there was a DNA match between the swab from the glove compartment of Suzanne's car and an unsolved sexual assault in Chicago, Illinois.

149.  Defendants Duge and Rogers knew about these matches but claimed they intentionally withheld the Phoenix and Illinois matches from Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill.

150.  The Arrest Affidavit does not include any information about the three DNA matches described above from Tempe, Phoenix, and Chicago ("the three DNA matches").

151.  All the Defendants knew on or around May 4, 2021 that Barry was arrested on murder and related charges on May 4, 2021.

152.  Defendants Duge and Rogers issued a document titled "CODIS DNA Casework Match," dated May 19, 2021, addressed to Adams and Defendants Cahill and Burgess.

153.   Upon information and belief, Defendants Duge and Rogers made a conscious decision to delay release of the CODIS Match until after Barry's arrest.

154.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill did not amend the Arrest Affidavit to include the information about the three DNA matches.

155.   The Arrest Affidavit stated that there was no evidence of any alternate suspect.

156.   The statements that there was no evidence of an alternate suspect were false and misleading. The unknown male DNA discovered in the Morphew home, vehicles, bicycle and bicycle helmet, in addition to the three CODIS matches, constituted evidence of alternate suspects.

157.   At the time they authored the arrest affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that Suzanne's car was used in the commission of a criminal offense connected to the disappearance of Suzanne Morphew.

158.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Duge, Rogers, Graham, and Cahill knew unknown DNA had been found, DNA had been submitted to CODIS, and there had been three DNA matches; yet none of these defendants intervened to ensure that this exculpatory DNA information was included in the

Arrest Affidavit before it was presented to the Court.

159.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Duge, Rogers, Graham, and Cahill caused the Arrest Affidavit to include information about DNA that was misleading, incomplete, and false.

160.   The Arrest Affidavit states that Mallory Morphew was a "low level" contributor to a DNA sample found on a dart in a box found in the garage.

161.   While drafting the affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill failed to include anyone else as a DNA contributor to the dart in a box found in the garage. This was false and incomplete. (Arrest Affidavit, p. 45).

162.   There was another potential contributor – Deputy Scott Himschoot, who was an equally likely "low level" contributor according to the laboratory reports.

163.   While drafting the affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill failed to disclose in the affidavit that both Barry and Suzanne were excluded as possible contributors to the DNA sample from the dart in a box found in the garage.

164.   The Affidavit identified Suzanne and Macy as possible low level contributors to the DNA profile collected from the plastic hypodermic needle cover

("needle cover") recovered from the dryer. (Arrest Affidavit, p. 45).

165.   This statement was false. Suzanne was not a possible contributor to the swab from the needle cover.

166.   The Arrest Affidavit does not include the fact that the DNA report revealed that potential contributors to the swab from the needle cover include two of three people: (1) Defendant Alex Walker, (2) a male friend of both Suzanne and Barry, and (3) Macy Morphew.

167.   The fact that Defendant Walker may have handled the needle cover is exculpatory, as it demonstrates that Walker knew what the item was and he had examined it.

168.   As discussed in more detail below in this Amended Complaint, the Arrest Affidavit identifies the needle cover as a "dart cap."

169.   The needle cover was not a "dart cap."

170.   Defendant Walker knew the needle cover was not a "dart cap."

171.   The Arrest Affidavit stated that a partial DNA profile was developed from the interior cushions of Suzanne's bike helmet and that it was more likely to be a mixture of the DNA of Barry and Suzanne than of any other people.

172.   A DNA swab from the outside of the bike helmet revealed DNA from Suzanne and an unknown male.

173.   While drafting the affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill did not disclose in the affidavit the results of the swab of the exterior of the bike helmet. It did not disclose the existence of unknown male DNA on the exterior of the bike helmet.

174.   The Arrest Affidavit stated that DNA on the bicycle grips excluded Barry as a contributor.

175.   While drafting the affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill did not disclose all the results of the swab from the bicycle grips. They did not disclose the existence of 2 unknown profiles on the bicycle grips.

176.   The Arrest Affidavit stated that Barry was excluded as a contributor on the bicycle brakes and handlebars, and that Suzanne, Deputy Brown and Deputy Himschoot were primary contributors.

177.   While drafting the affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill  did not disclose all the results of the swab from the bicycle brakes and handlebars. They did not disclose the existence of at least one unknown male profile on the bicycle brakes and handlebars.

178.   The Affidavit states: "These items [Suzanne's bicycle and helmet] were not indicative of Suzanne being a runaway or the victim of a stranger

abduction." Arrest Affidavit, p. 2.

179.   That statement is false as there was unknown foreign DNA found on the bicycle and the helmet, which was indicative of a stranger handling her bicycle helmet and bicycle. The unknown foreign DNA tends to prove an abduction, contrary to the Arrest Affidavit's theory that the bike and helmet were "staged."

180.   While drafting the affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew the statement in paragraph 205 was not true.

181.   The Arrest Affidavit included a section labeled "Ongoing Investigation." Arrest Affidavit, p. 122.

182.   That section says nothing about the ongoing investigation into the unknown male DNA and CODIS matches.

183.   The state court judge presiding over the state criminal prosecution later entered a finding that "[i]n all the information included in the 129 page affidavit, the affidavit was devoid of any discussion of the fact that foreign male DNA, not belonging to Mr. Morphew, was found all over the crime scene: on the bike helmet, bike seat, bike breaks, glovebox of her car and rear seat of car. *See Aff. generally.*"

184.   The above false and misleading information about DNA and omitted exculpatory information about DNA were material to a finding of probable cause.

185. The omission of the exculpatory facts as described above and throughout this Complaint about DNA was material to a finding of probable cause.

186. Had the above false and misleading information about DNA been omitted and the exculpatory information about unknown male DNA, unknown DNA, the CODIS matches, and the DNA information described above been included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

### 1. *False, misleading, and omitted evidence from phones, computers, and vehicles*

187. Defendants Spezze, Walker, Cahill, Graham and Rohrich CCSD officers caused the seizure of Barry's truck, Barry's phone, Suzanne's car, the car belonging to Macy Morphew, the phones of his daughters and computers belonging to Barry and Suzanne.

188. Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill omitted from the Arrest Affidavit that Suzanne's computer and phone records indicate Suzanne was on a private, password-controlled website on her computer late in the evening on May 9, 2020, that her phone was also in use at that time, and that her phone was in use in the early morning hours of May 10, 2020. This information is exculpatory because it contradicts the theory that Barry killed Suzanne on the afternoon or evening of May 9, 2020.

34

189.   Defendants Walker, Lindsey, Stanley, Rohrich, Spezze, Graham, and Cahill omitted from the Arrest Affidavit the fact that Barry's phone download did not indicate any evidence of an extra-marital affair.  This information is exculpatory because it contradicts the theory that Barry was motivated to kill Suzanne because he was supposedly having an affair.

190.   Defendants Walker, Lindsey, Stanley, Rohrich, Spezze, Graham, and Cahill knew the contents of Barry's phone had been searched for location data.

191.   On June 2, 2020, Defendant Cahill was advised by FBI agents that certain GPS location data obtained from Barry's phone was unreliable because of a phenomenon known as "static drift."

192.   Defendants Walker, Stanley, Lindsey, Cahill, Rohrich, Spezze, and Graham utilized that unreliable data and did not disclose its unreliability in the Arrest Affidavit.

### *(a) GPS Phone Locations and pinpoint maps*

193.   The Arrest Warrant Affidavit states that Barry chased Suzanne Morphew around their home on May 9, 2020 at 2:44-2:45 p.m. Arrest Affidavit, p. 126.

194.   The Arrest Affidavit claims this is the time period when Barry allegedly caused the death of Suzanne.

35

195. Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that there was no cellular service, or cell tower reach, to the Maysville area, at and near the Morphew home and where Suzanne's bicycle was found.

196. The Arrest Affidavit includes "Attachment 6", which is described as "An estimate of the activity of Barry's phone as it appears to move from porch to porch, which he [Barry] explained by chasing and shooting a chipmunk." The following image was presented as if it was a scientific fact:



197. While drafting the affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew this was a false and misleading allegation.

198. Defendants Walker, Stanley, and Lindsey created the pinpoint Google map.

199.   Defendants Walker, Stanley, and Lindsey intended that the Court would be misled by the pinpoint Google map.

200.   While drafting the affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill did not disclose that this pinpoint Google map was fabricated, not based on any forensic data, but merely a creation of Defendants Walker, Stanley, and Lindsey.

201.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew this was false and misleading because an FBI Report ("the CAST Report") alerted them to this fact and an FBI Specialist had alerted Defendant Cahill of this in an email, as described below.

202.   However, knowing the data was not reliable, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill attached the pinpoint map to the Arrest Affidavit, to trick the judge into believing that their theory about Barry chasing Suzanne around the house at 2:45 p.m. on May 9, 2020, resulting in her death, was based in scientific fact.

203.   The above pinpoint Google map, if believed, would mean that Barry was moving 36.8 to 50 miles per hour from point to point, through the walls of his home.

204.   If Barry was moving around the walls of his home he would have had

to travel even faster than 50 miles an hour.

205.   On June 2, 2020, Defendant Cahill learned from FBI Special Agent Hoyland that "data" used to "pinpoint" Barry's movements was unreliable because "there is a phenomenon known as static draft wherein a stationary device can mistakenly be shown to be moving…"

206.   FBI Special Agent Kevin Hoyland was with the FBI's Cellular Analysis Survey Team (C.A.S.T.), which interpreted data from Barry's cell phone.

207.   Special Agent Hoyland wrote:

> "As an FYI, one of the challenges in determining movement with GPS readings in such a tight area is that there is a phenomenon known as static drift wherein **a stationary device can mistakenly be shown to be moving** because of the number of satellites taking measurements and their corresponding locations to the stationary device. Or it could be him walking around the property. Just hard to say but **I would be cautious in jumping right to the conclusion that he was bouncing around his property at these hours**."

208.   At page 27 of the CAST Report, the FBI illustrates the phenomenon of static drift and cautions that "[m]ore analysis is needed to determine the frequency of such anomalous data in and around the residence."

209.   This critical exculpatory information showed that the Arrest Affidavit statements about Barry supposedly having been moving rapidly around his property

were purposely misleading.

210.   While drafting the affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew this information was highly material and exculpatory and that without it, the statements in the affidavit were misleading or false.

211.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill  purposely omitted this exculpatory information from the Arrest Affidavit and concealed the email from the defense and the court.

212.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, Hurlbert, and Cahill concealed this June 2020 email until it was produced in late January 2022.

213.   In the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill  included false and misleading statements about GPS phone location data allegedly showing that in the early morning hours of May 10, 2020, Barry drove his truck nearby where Suzanne's bicycle helmet was later discovered.

214.   These false and misleading statements were included to bolster the theory that Barry intentionally discarded Suzanne's helmet in that location on the morning of May 10, 2020 in order to "stage" and abduction.

215.   While drafting the affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that the GPS phone locator detail was unreliable because of the "static drift" phenomenon.

216.   While drafting the affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill  also knew that there were no truck telematics[6] indicating the truck was in that area between May 9 and May 10, 2020.

217.   Defendant Cahill expressly warned Defendants and co-conspirators about the unreliability of such data, including Defendants Graham, Rohrich, Lindsey, and Walker.

218.   On July 8, 2020, Defendant Cahill received   from a technical engineering firm a "Location Estimate for Barry's Phone". The expert advised that there was low confidence in the estimate and "real considerations about its accuracy but that it could be used to "squeeze" Barry during an interrogation. Defendant Cahill forwarded this recommendation to Defendant Rohrich immediately.

219.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that FBI Agents Grusing and Harris lied to Barry about the alleged phone location data during the numerous interrogations with him. These defendants

---

[6] "Telematics"is a term describing technology whereby a computer within automobiles and trucks can capture events occurring in and around the vehicle, e.g., doors and windows opening and closing, the motor running and being shut off, etc. and essentially provide a digital blueprint of the vehicle's activity.

conducted and/or reviewed the interrogations.

220.   Upon information and belief, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill  knew that false and misleading information was being presented in the Affidavit and that material, exculpatory information was being omitted.

221.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill, and other Defendants and co-conspirators whose identities are not known to Mr. Morphew at this time included false information in the Arrest Affidavit garnered from lying to Barry about his movements on the day on May 10, 2020.

222.   In the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill stated that Barry was "blaming…. a chipmunk for why he was running around his house after arriving home at 2:44 PM, and the firing a gun of a .22 caliber to describe his violence towards Suzanne that afternoon and the caliber of the tranquilizer darts," Arrest Affidavit, p. 125, and that he said he was "running around the house, most likely chasing Suzanne while she is conscious." (Arrest Affidavit, p. 126).

223.   These statements were false and misleading: the pinpoint Google map did not show Barry was running around his home, Barry did not say he fired a .22 caliber gun that afternoon nor that he was "violen[t] towards Suzanne that

afternoon," and there was no such thing as "the caliber of the tranquilizer darts"[7] that was demonstrated or stated by Barry. Barry did not "blame" a chipmunk, he did not say "he is running around the house," and certainly did not say he was "most likely chasing Suzanne…"

224.   When confronted with the fabricated pinpoint Google map, Barry merely said that he was in the habit of shooting chipmunks. In making that statement, Barry was responding to fictitious and false information being provided to him by Defendants about his supposed movements on May 9, 2020.

225.   While drafting the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill did not disclose that the maps supposedly showing Barry's route and showing him running around the house, as well as the GPS phone data underlying it were fabricated and not based on any reliable science.

226.   The "pinpoint Google map" was not the only subject matter in the Arrest Affidavit that relayed false and misleading information about alleged locations of Barry's phone based on GPS location data.

227.   On page 34 and 35, the Arrest Affidavit states:

The location activities registered by Barry's phone were

---

[7] The issues regarding the "caliber of the tranquilizer darts" is a separate set of facts and falsehoods inserted into the Arrest Affidavit and are discussed elsewhere in this Complaint and incorporated here by reference.

abnormally high in frequency during the late nights and
early morning hours of May 8-9, 2020 and May 9-10, 2020
while at the Morphew residence. (Arrest Affidavit, p. 34)

That May 9-10, 2020 night, approximately 210 locations
for Barry's phone registered near the Morphew residence,
compared to zero-to-two locations on previous nights from
May 1st through May 8th. (Arrest Affidavit, p. 35).

228.  While drafting the affidavit, Defendants Walker, Rohrich, Stanley,

Lindsey, Spezze, Graham, and Cahill knew these statements were false and

misleading and knew the GPS location data from Barry's phone (or any phone) was

unreliable.

229.  The above false and misleading information about GPS phone

locations and omitted exculpatory information about GPS phone locations were

material to a finding of probable cause.

230.  Had the above false and misleading information about GPS phone

locations been omitted and the exculpatory information about GPS phone locations

been included, it would have vitiated and diluted probable cause, singularly and in

combination with the other misconduct described in this Complaint.

231.  For example, had Defendants Walker, Rohrich, Stanley, Lindsey,

Spezze, Graham, and Cahill disclosed the true facts, and had they also included the

highly exculpatory evidence showing that Suzanne was still alive late in the evening

on May 9, 2020,[8] no probable cause would have supported the affidavit's entire premise that Barry chased Suzanne around the house and killed her on the afternoon of May 9, 2020.

### (b) Status of *Barry's Phone on May 9, 2020 – "airplane mode"*

232.   In the Arrest Affidavit,    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill  stated that forensic evidence showed that Barry's phone was turned off or placed on "airplane mode" for 8 hours on May 9, 2020 starting at 2:47 p.m.

233.   In the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill alleged that Barry arrived home on Saturday afternoon around 2:30 p.m., at 2:44 p.m. he chased Suzanne around the house, and at 2:47 p.m. he placed his phone in airplane mode.

234.   They asserted that Barry purposefully placed his phone in airplane mode in order to conceal his location while he was hiding Suzanne's body and evidence of the alleged murder.

235.   The Arrest Affidavit alleges that Barry intentionally kept his phone in airplane mode throughout the evening until Saturday night at 10:30 pm. Arrest

---

[8] See discussion, elsewhere in this Amended Complaint and incorporated by reference here, that there was scientific proof that Suzanne was using her computer late on May 9, 2020 and that she had neatly put her swimsuit away in her closet.

Affidavit, pp. 77, 90, 99.

236.    The Arrest Affidavit states: "On May 9th, at 2:47 PM, Barry's phone appears to enter Airplane Mode" (Arrest Affidavit, p. 34).

237.    The Arrest Affidavit states: and "On May 9th, at 10:17 PM, an 'airplane mode off' event started on Barry's phone" (Arrest Affidavit, p. 35).

238.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill mentioned "airplane mode" 24 times in the Affidavit.

239.    It is false that the phone was in airplane mode for eight (8) hours as represented by Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill.

240.    On June 24 and 25, 2020, Defendants Walker, Cahill, and Rohrich received or were forwarded an email and a chart from a FBI expert that explained the airplane mode phenomenon.

241.    The June 24, 2020 email and chart explained that Barry's phone was not in airplane mode for even one hour, nor intentionally placed in airplane mode, and if it was in airplane mode it was for less than a minute and when the phone was powering down or powering up.

242.    In the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill did not disclose these highly exculpatory facts from the

June 24, 2020 FBI email and chart but instead inserted only the 24 false and misleading statements about the "airplane mode."

243.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, Hurlbert, and Cahill concealed this June 24, 2020 email and chart analyzing the airplane mode phenomenon from the defense until late January 2022.

244.    During the FBI Agents' interviews with Barry in March and April 2021, the Agents lied to Barry telling him that he intentionally placed his phone in airplane mode for hours on May 9th to prevent detection of his movements.

245.    In the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill had reviewed those interviews and knew it was false to represent that "Barry admitted to running around their property with a gun and placing his phone in Airplane Mode at 2:47 PM." Arrest Affidavit, p. 2.

246.    On page 75 of the Arrest Affidavit, it states that Barry "demonstrated how he placed his phone in Airplane Mode." This statement is misleading and included out of context.

247.    On March 5, 2021, during the (approximate) 30th interview of Mr. Morphew, FBI Agent Grusing told Barry that his phone was in airplane mode on May 9, 2020, to which Barry told him he did not recall putting his phone in airplane mode.

248.    Grusing lied to Barry, telling him that his phone was definitively in airplane mode from 2:47 p.m. to 10:18 p.m. on May 9, 2020, and added that if Barry accidentally put his phone on airplane mode, then he also must have accidentally turned it off, questioning Barry's veracity.

249.    In response to these statements, Barry told Grusing, "It's the first thing that comes up when you hit settings. If that happened, it was probably an accident. I do not recall that."

250.    While drafting the Affidavit,  Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew Grusing had lied to Barry, knew the statements were false, but inserted into the affidavit these false and misleading statements about Barry intentionally putting his phone in airplane mode for eight hours. This lie was critical to sell their false theory that Barry was attempting to cover up his location, after he supposedly murdered Suzanne right after supposedly chasing her around the house at 35-50 miles per hour to subdue her.

251.    Furthermore, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that the area in Colorado – specifically in and around the Morphew home and the Maysville area to Poncha Springs – had virtually no cell phone reception and cellular data is scant and imprecise.

252.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and

Cahill did not include the exculpatory facts that there is little to no cell reception and the cellular data collected from the area of Barry's home and Maysville is imprecise.

253. Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill omitted these exculpatory facts because it would have significantly weakened their theory that Barry murdered Suzanne; their theory was largely based on the "alleged" movements of Barry's phone.

254. The omission of the exculpatory facts as described above and throughout this Complaint about airplane mode was material to a finding of probable cause.

255. Had the above false and misleading information about airplane mode been omitted and the exculpatory information about airplane mode been included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

**(c) Alleged online searches on Barry's phone**

256. The Arrest Affidavit states that Barry's phone contained "deleted web searches" of pornographic and/or dating sites on January 7, 8, 24, and 25, 2020. Arrest Affidavit, pp. 32-33.

257. By referring to these as "deleted web searches on Barry's phone,"

Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill
implied that Barry was actively searching and/or visiting these sites.

258.   This statement was false. These were not manual searches or even
visits made to these sites, rather (similar to a pop-up advertisement), his phone was
redirected to these sites.

259.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and
Cahill either knew this inflammatory and irrelevant information was false or utterly
failed to conduct a reasonable forensic investigation that would have readily
disclosed the true facts.

260.   In a footnote, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze,
Graham, and Cahill quote Barry's response when asked if he had ever searched
online to meet other women (he replied, "No, never"). Arrest Affidavit, p. 33,
footnote 38. Because the true facts had been omitted, the Arrest Affidavit makes it
look like Barry was lying, when in fact he was telling the truth and a reasonable
forensic investigation would have readily revealed that.

### (d) An alleged second phone owned by Barry

261.   In the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey,
Spezze, Graham, and Cahill claim Barry had a second cell phone that was not
located. "Possible Second Device for Barry." Arrest Affidavit, p. 42.

262.   This statement was false.

263.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill  knew this statement was false as the 2020 Search Warrant Return from Apple provided information to show that was not correct.

264.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew from the 2020 Search Warrant Return from Apple that the "second device" identifier is not a second "device" or phone, but instead likely identifies that Barry and Suzanne's iPhones were connected to the same iCloud account for a while.

265.   This falsehood is significant and material because of the implication that Barry was lying, concealing material evidence, and otherwise behaving in a culpable manner.

266.   The numerous false and misleading statements in the Arrest Affidavit described above about Barry's second phone and alleged online searches, and the omissions of exculpatory facts, were material to a finding of probable cause.

267.   Had the above false and misleading information about Barry's phone been omitted and the exculpatory information about Barry's phone been included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

**2.    *False and Misleading Statements about Suzanne's Phone, Computer and Facebook Account***

### (a) Suzanne's Phone

268.   Defendants Cahill, Lindsey, Walker, Rohrich, Spezze, Graham, and Stanley purposely omitted material exculpatory facts from and made false statements in the Arrest Affidavit concerning Suzanne's phone activity on May 9th and 10th, 2020.

269.   In the summer of 2020, Defendants Walker, Cahill, Rohrich, Graham, Lindsey, Spezze, and Stanley, and FBI Agent Grusing (and other unknown co-conspirators whose identities are not yet known to the Mr. Morphew) received the FBI's CAST Report dated June 14, 2020.

270.   The CAST Report documents that Suzanne's phone and computer showed activity long after the time the Arrest Affidavit states Suzanne was killed.

271.   In the Arrest Affidavit Defendants Walker, Cahill, Burgess, Hysjulien, Rohrich, Graham, Lindsey, Spezze, and Stanley claim that Suzanne was killed on May 9, 2020 at approximately 2:45 p.m.

272.   The CAST Report documented that Suzanne's phone was making and/or receiving calls late in the evening on May 9, 2020, and in the early morning hours of May 10, 2020.

273.   Defendants Walker, Cahill, Rohrich, Graham, Lindsey, Spezze and Stanley were aware of this information.

274.   The Arrest Affidavit states that on May 9, 2020, "There is no phone activity for Suzanne after 2:30 p.m." (Arrest Affidavit, p. 126).

275.   That statement in the Arrest Affidavit is false.

276.   There was phone activity on Suzanne's phone later on May 9th and in the early morning hours of May 10th.

277.   In the Affidavit, Defendants Walker, Cahill, Rohrich, Graham, Lindsey, Spezze and Stanley stated: "There are no electronic records of Suzanne communicating by any means with anyone after 14:11 [2:11 p.m.] on May 9, 2020 when she sent her last message by Linkedin to Jeff Libler." Arrest Affidavit, p. 5.

278.   The statement by Defendants is false.

279.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that, in November 2020, Libler had been advised by FBI Agents Grusing and Harris they would "protect" him and knew that Libler had said he deleted his communications with Suzanne on both "Linkedin" and "Whatsapp" because he did not want Suzanne's daughters, his wife, Barry, or his employer to find out about their affair.

280.   In the Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey,

Spezze, Graham, and Cahill omitted the facts that they told Libler he was "protected", and that that Libler intentionally deleted his secret LinkedIn and WhatsApp accounts and communications with Suzanne because he did not want to be discovered by his family, work or Barry or Barry's family.

281.    When questioned by Defendants Grusing and Harris, Libler provided Suzanne's secret LinkedIn and WhatsApp profile names.

282.    In December 2021, Defendant Walker obtained a search warrant for both Libler and Suzanne's WhatsApp and LinkedIn records, but only communications on Suzanne's secret LinkedIn account for the 30 days prior to Suzanne's disappearance were recovered.

283.    The Arrest Affidavit citing only a portion of Suzanne's LinkedIn search warrant return states: "Suzanne did not respond to Libler's return messages at 2:44 p.m. and 2:46 p.m."

284.    The Arrest Affidavit also states that the lack of phone activity for Suzanne after 2:30 p.m. on May 9, 2020 "is out of the norm for her typical behavior and an *abrupt* end following her 59 communications with Jeff Libler that morning and afternoon." (Arrest Affidavit, p. 126; emphasis added).

285.    Those statements are false because Suzanne's phone did show activity late on May 9th and early on May 20, 2020.

286.   Those statements are purposely misleading as they imply that the communication was abruptly terminated by Suzanne.

287.   It was not "abrupt" and not terminated by Suzanne.

288.   Jeff Libler sent a text via LinkedIn to Suzanne at 2:39 p.m. on May 10th, 2020, ending their communications that day because his family arrived home and he was no longer alone.

289.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill omitted the LinkedIn message Libler sent Suzanne a message at 2:39 p.m. that stated, "My crew is back. Well half of them."

290.   The Arrest Affidavit statement is purposely misleading and false as it does not include this 2:39 p.m. message from Libler to Suzanne that members of his family had arrived home and he was no longer available to continue their secret chat.

291.   This message from Libler proves that it was Libler who ended their secret chat and not Suzanne being interrupted by Barry chasing her around the house at 35-50 miles an hour as the Defendants wanted the court to surmise.

292.   It was also misleading to claim Suzanne abruptly ended their communication.

293.   Libler deleted his WhatsApp account in May of 2020 immediately

after Suzanne disappeared, and in November 2020 when questioned he did not remember if he and Suzanne communicated via WhatsApp after 2:40 p.m.

## (b) Suzanne's Computer

294. Defendants Cahill, Lindsey, Walker, Stanley, Rohrich, Spezze, and Graham, purposely omitted material exculpatory facts from and made false statements in the Arrest Affidavit concerning Suzanne's computer activity.

295. In February 2021, Defendant Cahill received a forensic report documenting activity on Suzanne's computer.

296. The forensic report showed that Suzanne was on password protected sites to which only she would have had access.

297. The report showed that Suzanne was on her private Pinterest account late into the night of May 9, 2020, many hours after the Arrest Affidavit stated that she had been killed.

298. Defendants Cahill, Graham, Lindsey, Walker, Stanley, Rohrich and Spezze were aware of this report.

299. Defendants Cahill, Graham, Lindsey, Walker, Stanley, Rohrich and Spezze purposely omitted this material, exculpatory information from the Arrest Affidavit.

### (c) Suzanne's Facebook

300.    Defendants Cahill, Graham, Lindsey, Walker, Stanley, Rohrich and Spezze purposely omitted material exculpatory facts from and made false statements in the Arrest Affidavit concerning Suzanne's Facebook activity.

301.    The Arrest Affidavit states that, at 11:14 a.m. on May 9, 2020, Suzanne received a message from Facebook on her phone stating that her password had been reset. Arrest Affidavit, p. 34:

> On May 9, 2020 at 11:14 AM, Suzanne's phone received a second password reset message from Facebook. Shortly after 11:15 AM, Barry's phone traveled west on HWY 50, arriving at the Morphew residence at around 11:27 AM.

302.    Defendants Cahill, Graham, Lindsey, Walker, Stanley, Rohrich and Spezze also stated that Barry "pretended" to be Suzanne when he logged onto her Facebook Account and initiated "friend requests" with 23 people (20 males and 3 females). Arrest Affidavit, p. 31, 101.

303.    These statements are false, misleading, and omit material information.

304.    Defendant Walker obtained records of Suzanne's Facebook account and Barry's truck telematics and also downloaded Barry's phone to determine his whereabouts.

305.    The records from Suzanne's Facebook account reveal that Suzanne

changed her password on Friday night, May 8, 2020, and then initiated some Facebook friend requests.

306.   The records from Suzanne's Facebook account also reveal that, on May 9, 2020, Suzanne logged into Facebook at 11:11 a.m., changed her password again at 11:18, and logged off of Facebook at 11:23 a.m.

307.   Suzanne could not have changed her password on the morning of May 9th unless she knew the current password - which she had changed on the night of May 8th.

308.   Barry was in his truck driving at 11:11 a.m., the time the password was changed on May 9th and therefore he could not have reset the password.

309.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew Barry was driving throughout the times the password was changed.

310.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that Suzanne Morphew made the friend requests on Facebook, not Barry.

311.   Suzanne was intentionally on Facebook on May 9, 2020, at a time she knew Barry was not home.

312.   Some of these Facebook friend requests were initiated and accepted between 8:00 a.m. and 12:00 p.m. on Saturday, May 9, 2020, during a time when

Barry was at work.

313.   Suzanne was receiving alerts via SMS messages on her phone when people accepted her friend requests.

314.   Defendants knew Suzanne had her phone and was receiving these alerts.

315.   Defendants knew Barry arrived at work on May 9, 2020 at 7:30 a.m., and knew that he was continuously at work during the time that many of these Facebook friend requests were initiated by Suzanne.

316.   Approximately 70 more pages into the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill quote selective portions of an April 5, 2021 interrogation of Barry in which he vehemently denies ever logging onto her Facebook Account, ever changing her password, or ever initiating Facebook friend requests posing as her. Arrest Affidavit, pp. 101-102.

317.   The Arrest Affidavit suggests that Barry's statements were contrary to the forensic evidence and that he was being deceitful, when the Defendants knew the forensic evidence corroborated his statements and he was telling the truth.

318.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill omitted the fact that they knew Barry's was telling the truth when he said he did not change Suzanne's password or initiate Facebook friend requests on her

behalf.

319.    These Defendants knew that Suzanne was changing her own Facebook password and initiating her own Facebook friend requests. They knew that Suzanne was getting alerts on her phone indicating she was accepting the friend requests.

320.    In court on September 17, 2021, Defendant Lindsey admitted it was Suzanne, and not Barry, who was making the Facebook friend requests.

321.    The statements in the Arrest Affidavit regarding Suzanne's Facebook activity are false and misleading.

322.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew this when they wrote the affidavit.

### (d) Conclusion

323.    The numerous false and misleading statements described above related to Suzanne's phone, computer, and Facebook in the Arrest Affidavit, and the omissions of exculpatory facts, are incorporated by reference.

324.    The above false and misleading information and omitted exculpatory information about phone, computer, and Facebook were material to a finding of probable cause.

325.    The omission of the exculpatory facts as described above and throughout this Complaint about phone, computer, and Facebook was material to a

finding of probable cause.

326.   Had the above false and misleading information about tranquilizers been omitted and the exculpatory information about phone, computer, and Facebook been included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

### 3.    False and Misleading Statements about "Telematics" and Omitted Information about Suzanne's Phone Activity on May 9-10, 2020

327.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill purposely omitted material exculpatory facts from and made false statements in the Arrest Affidavit concerning the telematics [9] of Barry's truck and Suzanne's phone activity during the time period that Defendants claim that Barry had killed Suzanne and was supposedly disposing of her body.

328.   The Arrest Affidavit, on page 2, states:

> The computer activity (telematics) from Barry's Ford F350, the activity of his cell phone and statements he made to law enforcement in multiple interviews confirm that from 2:47 PM on May 9, 2020 until 5:37 AM on May 10, 2020, he took steps to dispose of evidence of Suzanne's disappearance and death, create a false alibi for

---

[9] Telematics is the software on a computer within automobiles and trucks that can capture (some, but not all) events occurring in and the vehicle, e.g., doors opening and closing, phone calls coming in via a car's bluetooth, the ignition turning on and off, GPS locations of a car, etc., etc.

himself and stage a crime scene. In recent months, following the presentation of evidence by FBI Agents to Barry, he has changed critical details about his activities in the 2:00 PM hour on May 9th in attempts to match the evidence.

329.    The Arrest Affidavit goes on to state: "On May 10, 2020, from 3:25 AM to 3:48 AM, the Ford F-350 registered 0 mph with GPS at Morphew residence as the doors opened and closed multiple times. SA Hoyland noted over eighty (80) events involving the F350 during this timeframe." Arrest Affidavit, p. 35.

330.    This statement was not true.

331.    There were at most eighteen (18) registered "events" – not 80.

332.    By the summer of 2020, Defendants had received a forensic report of the telematics download ("the BERLA Report") documenting the number of registered events.

333.    The BERLA report made it clear that the number "80" was simply something the Defendants made up out of thin air.

334.    Known to Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill, but not disclosed in the Arrest Affidavit, was the fact that the FBI's C.A.S.T. report (dated June 2020) documented activity on Suzanne's phone in the early morning hours on May 10, 2020, just before the "events" on Barry's truck.

335.   Suzanne's phone was both receiving and sending calls in the early morning hours of May 10, 2020.

336.   The Arrest Affidavit (pp. 33-39) shows a purported timeline that purposely omits exculpatory information and excludes exculpatory timeline events.

337.   For the overnight hours and early morning hours of May 10, 2020, the timeline omits any reference to the activity on Suzanne's phone during that period.

338.   The statements about "telematics" were false and misleading and the omitted material regarding Suzanne's phone activity during the time that Barry's truck was falsely engaged in "80" events is exculpatory information.

339.   In the Arrest Affidavit, Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich knowingly and purposely made false statements about the telematics and excluded Suzanne's relevant and exculpatory phone activity in an effort to mislead the court.

340.   The above false and misleading information and omitted exculpatory information about telematics and Suzanne's phone and computer activity were material to a finding of probable cause.

341.   The omission of the exculpatory facts as described above and throughout this Complaint about telematics and Suzanne's phone and computer activity was material to a finding of probable cause.

342.   Had the above false and misleading information about telematics and Suzanne's phone and computer activity been omitted and the exculpatory information included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

**4.    *Falsehoods and Omissions about Tranquilizer Chemicals, Gun and Needle Cap***

343.   Defendants Cahill, Lindsey, Walker, Rohrich, Spezze, Graham, and Stanley, purposely omitted material exculpatory facts from and made false statements in the Arrest Affidavit concerning the tranquilizer chemicals, a needle cap allegedly found in an empty clothes dryer, and a certain gun.

344.   The Affidavit alleges that Barry killed Suzanne by means of an animal tranquilizer shot from a tranquilizer gun. Arrest Affidavit, pp. 125-126.

345.   In the Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill referred to "tranquilizer dart evidence," Arrest Affidavit, p. 82, when there was no such evidence.

346.   Barry Morphew is an avid hunter.

347.   Barry and Suzanne lived in Indiana since birth, and owned a deer farm there.

348.   Barry, Suzanne and Mallory and Macy moved to Colorado around 2018.

349.    When Barry owned the deer farm, he obtained deer tranquilizers to manage the large herd on his property.[10]

350.    Barry denied harming Suzanne and certainly denied tranquilizing her.

351.    In the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill suggested that his denial was an indicator of a guilty conscience. In that respect they stated "Barry blamed…the deer for why his tranquilizer gun was used [and] to explain the needle sheath recovered in the dryer…and the firing a gun of a .22 caliber [sic] to describe his violence towards Suzanne that afternoon and the caliber of the tranquilizer darts." Arrest Affidavit, p. 125.

352.    All of these statements were false and misleading.

353.    Furthermore, the Arrest Affidavit states: "By around 2:30 p.m. on Saturday May 9th, it had become clear that Barry could not control Suzanne's insistence on leaving him and he resorted to something he has done his entire life - hunt and control Suzanne like he had hunted and controlled animals." (Arrest Affidavit, p. 126).

354.    This inflammatory, baseless statement had no grounding in fact and

---

[10] For example, one use for tranquilizing deer and elk is to move them, administer medicines, or to painlessly remove their antlers. It is not an unusual practice, nor is it uncommon for experienced hunters and deer farm owners to own tranquilizer dart guns.

was supported by no forensic evidence. It was misleading, false, and intentionally designed to provoke passion.

355.   Defendants Walker, Lindsey, Stanley, Rohrich, Spezze, Graham, and Cahill knew that investigators never found any evidence of any tranquilizers prescribed to Barry, electronically stored information regarding obtaining tranquilizers, or any tranquilizers in or around the home. This fact is exculpatory because it contradicts their theory that Barry killed Suzanne by shooting her with a dart containing animal tranquilizer. Yet, Defendants Walker, Lindsey, Stanley, Rohrich, Spezze, Graham, and Cahill omitted this highly exculpatory fact and instead wrote a misleading affidavit including allegations about the needle cover.

**(a) Lies About Tranquilizer Gun**

356.   The Affidavit failed to inform the judge that a true tranquilizer gun is the **only** method by which to shoot a tranquilizer dart.

357.   A tranquilizer dart can never be shot from a 0.22.

358.   In May 2020, Defendants Himschoot and Carricato, along with other defendants, found a tranquilizer gun in Barry's locked gun safe in the garage of the Morphew home.

359.   In May 2020, Defendants Himschoot and Carricato, along with other defendants, determined the tranquilizer gun was not operable and they determined

it had not been used in a long time.

360.    The facts that the tranquilizer gun was inoperable and had not been fired in a very long time were purposely omitted from the Arrest Affidavit.

361.    Instead the Arrest Affidavit stated: "Barry blamed….the deer for why his tranquilizer gun was used to explain the needle sheath recovered in the dryer…" (Arrest Affidavit, p. 125).

362.    That statement is purposely misleading and omits that the Defendants knew that the tranquilizer gun was not operable and had not been used in a long time.

363.    Furthermore, the Affidavit omitted the facts that (1) no trace of any animal tranquilizer serum was found in the Morphew home, (2) animal tranquilizer has a short shelf-life and must be properly stored in order to maintain its shelf life, and (3) no animal tranquilizer had been prescribed to Barry in recent years.

364.    These were highly material, exculpatory facts that thoroughly undermined the Defendants' speculation that Barry somehow killed Suzanne using tranquilizer serum.

### (b) Lies about Needle Cover

365.    After nine days investigating Suzanne's disappearance and causing multiple searches of the Morphew home and premises, Defendants Spezze,

Rohrich, Walker, Himschoot, Graham, and Stanley were frustrated because they had found no credible evidence establishing probable cause that Barry murdered Suzanne.

366.  Approximately nine days after the Morphew home was seized, Defendant Himschoot reported he found a plastic cap (a needle cover) that was believed to be a needle cover to a syringe. Defendant Himschoot reported that he found it, by itself at the bottom of the clothes dryer that had been emptied days before by crime scene investigators when they searched it.

367.  Defendant Himschoot placed the needle cover in the empty clothes dryer and lied about having discovered it there.

368.  Defendant Himschoot did not tell Defendants Lindsey or Stanley that he placed the needle cover in the empty clothes dryer.

369.  The fact that the needle cover was not discovered in the empty clothes dryer but was placed there was highly exculpatory, because it contradicted the theory that it was evidence of a crime and that it had been deposited in the clothes dryer at the time sheets from Mallory's bed were placed in the dryer.

370.  Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill omitted from the arrest affidavit the fact that the alleged "discovery" of the needle cover in the empty clothes dryer occurred nine days after the contents of the

dryer had been emptied and the dryer had been thoroughly searched. This fact was exculpatory because it undermined the theory that the needle cover was actually "discovered" by Defendant Himschoot.

371.    The needle cover had DNA on it, but tests revealed no DNA contributed by Barry. This is highly exculpatory because it contradicted the theory that the needle cover was evidence of a crime and that it had been removed from a dart that Barry Morphew allegedly used to kill Suzanne Morphew and that the needle cover had been deposited in the clothes dryer when Mallory's bed sheets were placed in the dryer. The fact that DNA was present also contradicts any hypothesis that inculpatory DNA had been removed from it.

372.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew or reasonably should have known that the needle cover had DNA on it but that it was not Barry's DNA but omitted this highly exculpatory information from the arrest affidavit.

373.    The item is a clear plastic hypodermic needle cover. That is how it was described by the CBI following their investigation.

374.    However, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill falsely called it "a tranquilizer dart cap," and "a dart or needle cap." Arrest Affidavit, p. 2 and p. 10.

68

375.    The reference to "a dart cap" was purposefully false and misleading.

376.    The below image is of the true animal tranquilizers that Defendant
Himschoot found in the locked gun safe in Barry's garage around May 13, 2020.



377.    The tranquilizers in their package collected by Defendant Himschoot
do **not** have caps or any type of cover whatsoever.

378.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and
Cahill knew this well before drafting the Arrest Affidavit and purposely excluded
that fact.

379.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham,
Himschoot, and Cahill purposely mislead the judge about this information to
support their bogus theory that Barry shot Suzanne with a dart gun by calling the
item they found in the dryer a "a tranquilizer dart cap."

380.    Below is a photograph of the item that was reportedly found by

Defendant Himschoot on or about May 19, 2020 in the dryer at the Morphew home:

 

381.   At the time of its "discovery," it was photographed in the emptied

out dryer drum not among or in any sheets:



382.   Furthermore, Defendant Himschoot's body worn camera on May 19,

2020 shows him entering the laundry room and opening an empty dryer before

claiming to find the item.

383.   The Arrest Affidavit states that the needle cover was found wrapped

in Mallory's sheets.

384.   That statement is false.

385.   Furthermore, the Arrest Affidavit states that "SA Grusing said [to Barry] the odd thing about the sheets and the house was that a tranquilizer dart had been fired 'in or around the house.'" Arrest Affidavit, pp. 85-86.

386.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, Himschoot and Cahill purposely caused those statements to beincluded in the Arrest Affidavit to mislead the judge.

387.   The Arrest Affidavit does not disclose that CBI and CCSD Officers had already emptied the contents of the dryer sometime between May 11 and 15, 2020. This was 4-8 days before the needle cover was "found" in the empty dryer drum.

388.   Defendant Walker knew that no "dart" or "dart cap" had been found in the dryer because he personally handled that item, as evidenced by his DNA found on the item.

389.   When they drafted the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill omitted the fact that Walker's DNA, and not Suzanne's, was on the item.

390.   Again, these statements were false.

391.   The Arrest Affidavit falsely states: "Barry admits on April 22, 2021 to the FBI that the tranquilizer was on the workbench and that it likely got thrown

away in Broomfield." Arrest Affidavit, p. 77, footnote 63.

392.   The Arrest Affidavit falsely states: "Barry admitted to disposing of the tranquilizers." Arrest Affidavit, pp. 111, 119.

393.   The Arrest Affidavit also contains a false statement that Defendant Grusing told Barry: "SA Grusing said [to Barry] the evidence of the tranq dart was found inside the house." Arrest Affidavit, p. 98.

394.   The Arrest Affidavit states: "Barry said he kept them [chemicals] on his work bench." Arrest Affidavit, p. 119.

395.   The statements in the Arrest Affidavit attributing statements about tranquilizers to Barry are false and misleading.

396.   Barry did not say there were any tranquilizers at his house or on the workbench in the garage on May 9, 2020.

397.   Barry did not "admit" to "disposing" of tranquilizers or tranquilizer darts.

398.   The statement that Barry's ownership of a .22 caliber gun somehow explained "the caliber of the tranquilizer darts" is nonsensical, false, and misleading. (Arrest Affidavit, p. 125).

399.   Barry's .22 caliber gun does not and cannot shoot darts; it can only shoot bullets.

400. Defendants knew these statements were false and misleading and included them anyway.

401. In the Arrest Affidavit, under a category called "ongoing investigation," the Defendants placed information gleaned from veterinarians about the possible effects if animal tranquilizers were to be injected into a human. See Arrest Affidavit, p. 123. The experts provided unscientific hunches and guesses into what would happen to a human if injected with animal tranquilizers, depending on the specific circumstances.

402. With no evidence whatsoever that Barry possessed any animal tranquilizers or that Suzanne was injected with animal tranquilizer, this information is misleading. The statements suggest that evidence of cause of death exists when, in fact, there was not even evidence about whether at the time, Suzanne was even deceased or simply missing.

403. Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill created a relationship between the manufactured, false pinpoint Google map and the veterinarian's speculation by hypothesizing that Suzanne must have been running around for 2-3 minutes after having been injected with animal tranquilizer; however, in presenting this information in the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill did not disclose that the

pinpoint Google map was manufactured and false or that the veterinarian's opinions depended upon the pinpoint Google map being true (i.e., reflecting reality).

404.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill included in the Arrest Affidavit a statement that the veterinarian was "surprised" that a civilian would have tranquilizers.

405.   However, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill did not reveal in the arrest affidavit (or, upon information and belief, to the veterinarian) that years prior, Barry used to be a deer farmer and had legal prescriptions for care and treatment of his deer, that animal tranquilizer sales are common in the local rural community, and that such tranquilizers are readily available and not uncommon for deer farmers and ranchers in the area to purchase and use.

406.   The above false and misleading information and omitted exculpatory information about tranquilizers were material to a finding of probable cause.

407.   The omission of the exculpatory facts as described above and throughout this Complaint about tranquilizers was material to a finding of probable cause.

408.   Had the above false and misleading information about tranquilizers been omitted and the exculpatory information about tranquilizers been included, it

would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

**5.    *False and Misleading Statements about the Timeline of Events on May 10, 2020***

409.    Defendants Rohrich, Graham, Cahill, Lindsey, Walker, Stanley, and Spezze purposely omitted material exculpatory facts from and included false allegations in the Arrest Affidavit in their purported timeline of May 10th, 2023.

410.    On pages 35-39 of the Arrest Affidavit, Defendants inserted a purported "timeline" of material events.

411.    That "timeline" omits highly exculpatory events and mislead the court in a way that was certain to influence a probable cause determination.

### (a) Suzanne's Bike Helmet in the Timeline

412.    The Arrest Affidavit states: "Suzanne's bicycle and helmet were discarded before Barry left town in the early morning hours of May 10, 2020." Arrest Affidavit, p. 2.

413.    The Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that this Statement in the Arrest Affidavit was not a fact, but a theory.

414.    There is absolutely no evidence when the bicycle and helmet were discarded.

415.    However, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill presented it as a fact.

### (b) Barry's Work Trip to Broomfield

416.    The Affidavit also states that on May 10, 2020, Barry "had to suddenly leave for a job in Broomfield." Arrest Affidavit, p. 125.

417.    The Affidavit further states that "he created an alibi for her disappearance," an "alibi to be out of town for an emergency job in Broomfield." Arrest Affidavit, pp. 125, 126.

418.    The inference from this false statement is that there was no job and/or that Barry created this job as a last minute cover up.

419.    Those statements are false as is the inference they are intended to make.

420.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew they were false.

421.    The Broomfield work job was planned long before May 10, 2020.

422.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew the contents of Barry's phone and of the numerous texts dating back to November 2019 with Reid Schwinn communicating about how the wall Barry was contracted to build in Broomfield had a dip in it and needed to be repaired.

423.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew from interviews with the company that subcontracted with Barry to fix the dip in the wall, and that was in the works since November 2019.

424.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew Barry had been trying for about a month to determine when the change order would come through.

425.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that on May 7, 2020, Barry was advised by an employee who worked with the General Contractor on the job, that the change order came through and the materials were supposed to arrive on Monday, May 10, 2020 to perform corrections on the Broomfield wall.

426.    Furthermore, Defendants Cahill and Walker knew from emails and receipts that the Holiday Inn in Broomfield where Barry stayed was reserved more than a week prior to May 10.

427.    Defendants Cahill and Walker also knew from Holiday Inn's and Barry's receipts collected during the search of his home, that Barry had stayed at the same Holiday Inn in November 2019 when the job was first underway.

428.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that Barry did not "leave suddenly" as stated in the Arrest Affidavit.

**(c) Barry's Calls to Suzanne on May 10, 2023**

429.   The Arrest Affidavit, when discussing Barry's phone, includes many of Barry's movements and calls made by his phone.

430.   However, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill purposely, knowingly or recklessly omitted the fact that Barry had telephoned Suzanne at 11:20 a.m. on Sunday, May 10, 2020, and placed a second text at 3:30 p.m.

431.   These exculpatory facts were omitted because they did not support the Defendants' theory of probable cause.

432.   The fact of that phone call is highly exculpatory because the Arrest Affidavit implies that Barry purposefully avoided trying to reach Suzanne because he allegedly killed her.

433.   The Arrest Affidavit states: "At 12:42 PM, Barry entered his hotel room. Barry does not leave his room, per the film, until 6:03 PM." (Arrest Affidavit, p. 37).

434.   This statement is false and misleading.

435.   There are phone calls at 1:45 p.m., 2:19 p.m., and 3:20 p.m. from Barry's phone completed through his truck's bluetooth that registered within that time frame, clearly demonstrating that Barry's truck had to be powered on, and he

had to have been within close range of his truck to be on the phone.

436.    Barry's truck was not parked inside his hotel room. It was parked in the hotel's parking lot.

437.    To the extent that the Defendants sought to obtain a finding of probable cause based on the allegation that Barry did not leave his room, the truck's bluetooth calls were highly exculpatory and omitted from the Arrest Affidavit.

### (d) 911 Call by Ritters

438.    The Arrest Affidavit states that, at approximately 5:58 p.m. on May 10, 2020, CCSD Dispatch informed CCSD Deputy Damon Brown that a neighbor, "Scott" Ritter (actually, "Martin" Ritter) had been told by Barry that he was driving back from Denver and "did not have cell service."

439.    The Arrest Affidavit stated that this information was not true and that at that time, "in fact, [Barry] was at his hotel in Broomfield with cell service." Arrest Affidavit, p. 3.

440.    The statement in the Arrest Affidavit that Barry was in the Broomfield hotel at 5:58 p.m. was false.

441.    The statement that Barry said he was at the job site during that call is not true.

442.    What the CCSD Dispatch told CCSD Deputy Brown was true – the

Berla report indicates that Barry was in his truck at the hotel when he received the call from Martin Ritter at 5:45 p.m., and that Martin Ritter called 911 at 5:58 p.m. when Barry started his drive back from Broomfield.

443.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, Himschoot, and Cahill knew the statement that Barry was in the hotel room at 5:58 p.m. on May 10, 2020 to be false.

### (e) Staging Tools in Hotel Lobby

444.   On page 118 of the Arrest Affidavit, there is a subheading using the phrase "Staging of tools in the hotel."

445.   The Arrest Affidavit states that, at approximately 5:00 p.m. on May 10, 2020, "He left his room, took tools out of his truck and put them in the lobby, to make it look like he was returning from the site." (Arrest Affidavit, p. 126).

446.   This phrase is false and misleading.

447.   There was evidence whatsoever of any "staging" of tools.

448.   Barry brought tools for his workers from his truck into the hotel before he left Broomfield.

449.   Barry did this so his workers who were to arrive later that evening could use the tools to complete the job because he was leaving the hotel to return to Salida to look for Suzanne.

450.   This was confirmed by hotel staff.

451.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, Himschoot, and Cahill include the false statement about Barry "staging" to purposely mislead the judge.

452.   The Arrest Affidavit states: "Barry made very little attempt to contact Suzanne on the way home, or look around his house or the bike scene, because he already knew what happened to her." (Arrest Affidavit, p. 126).

453.   The statements are false.

454.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, Himschoot, and Cahill knew this to be false.

455.   Barry had already texted Suzanne three times and called her twice on May 10, 2020.

456.   By the time he was driving home, Barry knew many family members and friends had been unable to reach Suzanne by phone and that she was not found at home.

457.   On the drive home, at 7:21 p.m. Barry did in fact attempt to reach her by phone, to no avail.

458.   Barry was in constant contact with law enforcement when he could be reached on the drive home, despite intermittent low cell phone reception and

coverage.

459.   Barry made it from Broomfield to Salida nearly thirty (30) minutes faster than the average drive.

460.   Barry was taken into the Morphew home by Defendant Rohrich to obtain a piece of Suzanne's clothing for the K-9 search.

461.   When they entered the home, Defendant Rohrich instructed Barry to not look around.

462.   When Barry arrived from Salida to the location on the road nearby where Suzanne's bike had been found, he consistently asked if he could search for Suzanne, he was looking at the bike, and he was asking how he could assist the responding officers to find Suzanne.

463.   The Arrest Affidavit stated that, by the time he was on his way back to Salida, Barry "already knew what happened" to Suzanne.

464.   That is false.

465.   Barry still does not know what happened to Suzanne.

### (f) Conclusion

466.   The numerous false and misleading statements described above related to the timeline in the Arrest Affidavit, and the omissions of exculpatory facts, are incorporated by reference.

467.   The above false and misleading information and omitted exculpatory information were material to a finding of probable cause.

468.   The omission of the exculpatory facts as described above and throughout this Complaint was material to a finding of probable cause.

469.   Had the above false and misleading information been omitted and the exculpatory information been included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

**6.    *Omission of Evidence that Suzanne's Scent was Detected in the Vicinity of her Bike***

470.   As described, supra, in this Amended Complaint, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that the K-9 ("Rosco") had picked up a scent and followed it down to the river where it stopped, which indicated that Suzanne could have been in the area around the bike and down along the creek.

471.   This discovery was extremely exculpatory, because it undermines the Defendants' theory that the bicycle was "staged" or placed in that location by Barry.

472.   This information was purposely omitted from the Affidavit.

473.   The omission of the exculpatory facts described above about the K-9 scent search at the bicycle location was material to a finding of probable cause.

474.    Had the above false and misleading information been omitted and the exculpatory information been included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

**7.      False Statements and Material Omission of Exculpatory Evidence about the Mileage Reading on Barry's Truck on May 10, 2020**

475.    The Arrest Affidavit states that there was a discrepancy in the mileage on Barry's truck on May 10, 2020, with the mileage to Broomfield being 183 miles and a return trip of only 167 miles – a discrepancy of 14 miles. Arrest Affidavit, p. 73.

476.    Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich stated an inference that on May 10, 2020 around 5:00 a.m, Barry drove his truck a total of 14 miles round trip to hide Suzanne's body or evidence of a crime before leaving for Broomfield, Colorado.

477.    The Arrest Affidavit is false: the FBI's CAST report (which references telematics report ("Berla report") reflects that the "missing" mileage was 18 miles, not 14 miles.

478.    The fact that the "missing" miles was 18 miles is significant because those miles are not "missing" at all.

479.   The Arrest Affidavit failed to include the fact that, on May 9, 2020, in the afternoon, Barry had driven to and from Salida Stove and Spa, a local business.

480.   On three dates – May 19, May 22, and September 25, 2020 – Defendants confirmed with impartial witnesses that Barry had traveled to Salida Stove and Spa on May 9, 2020 in the afternoon.

481.   The round trip drive distance to Salida Stove & Spa is approximately 18 miles.

482.   Defendants Graham, Walker, and Cahill knew these facts about Salida Stove and Spa but did not include them in the Arrest Affidavit.

483.   In the Arrest Affidavit, Defendants Walker, Stanley, Lindsey, Spezze, Graham, Rohrich, and Cahill left the misleading impression that there were unaccounted for miles on Barry's truck with the inference that he must have been engaged in criminal activity.

484.   The above false and misleading information and omitted exculpatory information were material to a finding of probable cause.

485.   The omitted information from the impartial witnesses that Barry had traveled to Salida Stove and Spa on May 9, 2020, thereby accounting for the supposed "inculpatory" extra 18 miles, would have vitiated and diluted any probable cause.

486.    Had the Arrest Affidavit omitted the untrue fact that the "unaccounted-for" miles were 14 miles and included the exculpatory true fact that it was 18 miles, probable cause would have been vitiated and diluted singularly and in combination with the other misconduct described in this Complaint.

**8.      *False and Misleading Statements about the Broomfield Hotel***

487.    The Arrest Affidavit infers suspicion from the fact that one of Barry's co-workers on the Broomfield job stated Barry's hotel room smelled of chlorine.

488.    The Arrest Affidavit does not disclose material, highly exculpatory information about the hotel room.

489.    The Arrest Affidavit does not include that law enforcement never went to Barry's hotel room or conducted an investigation there.

490.    The Arrest Affidavit does not include that in September 2020, CBI Agent Jason Hebrard and the Hotel General Manager, Ms. Almeida, emailed each other about the location of the room.

491.    The Arrest Affidavit does not include that Ms. Almeida emailed that Room 225 is right above the indoor pool at the hotel and four months later, still had a strong pool smell.

492.    The Arrest Affidavit does not include that Ms. Almeida invited Hebrard to the hotel to smell the chlorine for himself, but he did not follow up.

493.  Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew these facts and omitted them from the Arrest Affidavit.

494.  Prior to inserting the misleading information in the Arrest Affidavit and omitting the exculpatory information, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill did not ensure that the hotel room was inspected.

495.  Prior to inserting the misleading information in the Arrest Affidavit and omitting the exculpatory information, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill did not conduct any forensic testing of the hotel room.

496.  Prior to inserting the misleading information in the Arrest Affidavit and omitting the exculpatory information, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill did not investigate this specious claim.

497.  The above false and misleading information and omitted exculpatory information about the chlorine smell and the location of the hotel room in the hotel were material to a finding of probable cause.

498.  Had the above information about the chlorine smell and the location of the hotel pool been included, and had the Defendants inspected the hotel room and reported the true facts, it would have vitiated and diluted probable cause.

499. The omission of the exculpatory facts about the chlorine smell and the location of the hotel pool was material to a finding of probable cause.

500. Had the above false and misleading information been omitted and the exculpatory information been included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

## 9. *False and Misleading Statements Attributed to Suzanne*

### (a) Claim that Suzanne Wanted Out of the Marriage

501. The Arrest Affidavit states: "Suzanne told **numerous** close friends, **her daughters** and Barry that she wanted out of her marriage." Arrest Affidavit, p. 10 (emphasis added).

502. These statements were used to infer motive, i.e., that Barry killed Suzanne because she wanted "out of her marriage."

503. These types of statements were critical to probable cause.

504. These statements are false.

505. Mallory and Macy did not report that Suzanne told them she wanted out of her marriage.

506. While one of Suzanne's friends, Sheila Oliver, said that Suzanne made a statement to that effect, that is not "numerous close friends" as stated in the Arrest

Affidavit.

507.    Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich knew these statements were false.

508.    The records of the interviews with Macy and Mallory Morphew revealed they did not make those statements.

### (b) Claim Suzanne Assisting with Sheila's Daughter's Wedding

509.    Suzenne had a friend, Sheila Oliver, in Indiana who she communicated with by phone and text messaging.

510.    The Arrest Affidavit states: "Suzanne had been excited about the wedding of [her friend] Sheila's daughter on May 10th - Suzanne was helping Sheila prepare and eager to watch it online." Arrest Affidavit, p. 10.

511.    These statements were used to infer that Suzanne did not simply leave voluntarily but rather, she was killed.

512.    This statement is false.

513.    Suzanne did not help Sheila prepare for the wedding.

514.    Suzanne learned about the wedding just before May 10, 2020.

### (c) Claims Regarding the Spy Pen

515.    Sheila told Burgess that she bought a "spy pen" for Suzanne to assist Suzanne in possibly catching Barry in an extramarital affair.

516.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill wrote that Shelia purchased the spy pen because she was concerned about Suzanne's safety. Arrest Affidavit p. 11.

517.    This was false.

518.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew what Shelia told Burgess about why she purchased the pen in an attempt to catch Barry in an affair.

519.    Sheila purchased the spy pen because Suzanne wrongly believed Barry was having an extra-marital affair.

520.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill had those records as they found the spy pen in the Morphew home.

521.    The recordings on the spy pen were what led the investigators to discover Suzanne's extra-marital affair with Libler.

522.    This and similar statements and false inferences were material to probable cause because they suggested that Barry might have a propensity to commit violence upon Suzanne.

### (d) Conclusion

523.    The above false and misleading information and omitted exculpatory information about statements attributed to Suzanne were material to a finding of

probable cause.

524.   The omission of the exculpatory facts that contradicted the statements attributed to Suzanne in the Arrest Affidavit was having an affair was material to a finding of probable cause.

525.   The false and misleading statements attributed to Suzanne were material to probable cause, without which probable cause would have been vitiated and diluted.

526.   Had the above false and misleading information been omitted and the exculpatory information been included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

**10.     *False Statement Attributed to Jeff Libler***

527.   Suzanne Morphew was having a secret extramarital affair with a man who lived in Michigan – Jeff Libler.

528.   Defendants discovered this extramarital affair during the investigation of this case.

529.   Evidence of the affair was discovered because Suzanne had recorded conversations with herself and Libler on the spy pen Sheila Oliver had given her.

530.   Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and

Rohrich wanted the court to believe that Libler was not responsible for Suzanne's disappearance, i.e., that he did not have her abducted or killed and he did not help arrange for her to leave voluntarily.

531.   This was critical to the targeting of Barry Morphew in the Arrest Affidavit.

532.   The Arrest Affidavit states: "Libler has not traveled to Colorado to see Suzanne, partly because Suzanne said Barry has surveillance cameras all around the house." Arrest Affidavit, p. 14.

533.   That statement is false.

534.   Libler never stated that he did not travel to Colorado because Suzanne said they had surveillance cameras around the house.

535.   The above false and misleading information about Libler supposedly explaining why he did not travel to Colorado and the lack of investigation into Libler were material to a finding of probable cause.

536.   Had the above false and misleading information been omitted, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

## 11.   *False and Misleading Information about Statements Attributed to Barry Morphew*

537.   The Arrest Affidavit states: "The computer activity (telematics) from

Barry's Ford F350, the activity of his cell phone and statements he made to law

enforcement in multiple interviews confirm that from 2:47 p.m. on May 9, 2020

until 5:37 AM on May 10, 2020 he took steps to dispose of evidence of Suzanne's

disappearance and death, create a false alibi for himself and stage a crime scene."

Arrest Affidavit, p. 2.

538.    The Arrest Affidavit states:

> In recent months, following the presentation of evidence
> by FBI Agents to Barry, he has changed critical details
> about his activities in the 2:00 PM hour on May 9th in
> attempts to match the evidence. Since January 2021, Barry
> has admitted to: chasing a chipmunk with a gun around the
> house while Suzanne was outside sunbathing, shooting a
> deer with a tranquilizer dart to explain a dart or needle cap
> in the dryer, disposing of the tranquilizer solution during
> his trip to Broomfield, following a bull elk down Highway
> 50 in the 4:00 AM hour on May l0th to explain why his
> truck would be headed west (where the helmet was
> discarded). Arrest Affidavit, p. 2.

539.    The alleged "admissions" by Barry are referenced completely out of

context in the Arrest Affidavit.

540.    Barry did not make the "admissions" attributed to him in the Arrest

Affidavit or, in some cases, the "admissions" are taken very much out of context

following leading questions and false statements by the questioners.

541.    The above false and misleading information and omitted exculpatory

information about Barry's supposed "admissions" were material to a finding of

probable cause.

542.    The omission of the exculpatory facts that Barry did not make these "admissions" was material to a finding of probable cause.

543.    While drafting the affidavit, Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich knew that Barry had spoken to law enforcement officers over 50 times, for more than 100 hours, never with a lawyer, over the period of eleven months, covering and repeating numerous topics, and that in a deliberate attempt to trip him up, law enforcement consistently lied to him, tricked him, twisted his words, and asked to adopt lies to fit law enforcement theories. They knew that many times law enforcement did not like Barry's answers because they did not fit their theory.

544.    For example, sometimes Barry said "I don't recall that" when the officers were lying to him, telling him that things happened when they did not. An example was telling Barry that he had been putting his phone in and out of airplane mode, when he had not. He repeatedly told them he did not recall doing that.

545.    Barry said he thought James Comey and Hilary Clinton said they didn't recall when in fact, these two just did not want to tell the truth.  Barry never said he did that and in fact, repeatedly told his interrogators that when he told them he did not recall something, it means he actually did not recall it.

546.   Nevertheless, Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich wrote a misleading narrative in the arrest affidavit, leaving out all of the thousands of answers Barry had given them that were accurate and consistent with the known evidence, and instead implying that Barry himself had a "code" that when he says "I don't recall," he means he doesn't want to answer the question.

547.   Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrichdid not include the substantial consistent and corroborated information Barry provided over the span of 11 months to various law enforcement officers regarding his memory of events leading up to Suzanne's disappearance, leaving the impression that he claimed to remember almost nothing.

548.   Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich knew that Barry never said or meant that, but they chose to omit key facts about the interrogations and instead knowingly and intentionally left a false impression.

549.   Had the above false and misleading information been omitted and the exculpatory information been included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

***12.    "Suspected Blood" near the Morphew Garage that Defendants Knew was NOT Blood***

550.    "On May 11, 2020, pursuant to an authorized search warrant obtained by your affiant, while assisting with the search of the exterior of the residence your affiant located what appeared to be suspect blood on the apron of the garage near the east side of the three-car garage." Arrest Affidavit, p. 8.

551.    That statement is misleading and omits material exculpatory information.

552.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew by the end of the summer of 2020 that the "suspect blood" was not blood at all.

553.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill intentionally omitted that the "suspected blood" had been tested and proved not to be blood.

554.    The above false and misleading information and omitted exculpatory information about "suspect blood" were material to a finding of probable cause.

555.    The omission of the exculpatory fact that blood was ruled out was material to a finding of probable cause.

556.    Had the above false and misleading information been omitted and the

exculpatory information been included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

### 13.    False and Misleading Statements that Barry Knew About Suzanne's Affair and so had a Motive

557.    Suzanne Morphew had a long sexual affair with Jeff Libler.

558.    The affair with Libler was hidden extremely well.

559.    Libler's wife did not know of the affair.

560.    Suzanne's best friend, Sheila Oliver, did not know of the affair.

561.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill did not discover the affair, who it was with, or the intensity of it until at least six months after Suzanne disappeared.

562.    On January 27, 2021, FBI Agents Grusing and Harris interviewed Barry and, for the first time, told him about Suzanne's affair with Libler.

563.    Barry was shocked.

564.    Barry stated he had not known about any affair.

565.    Barry asked Grusing and Harris questions about what they knew and who it was.

566.    Grusing and Harris did not reveal much detail to Barry on January 27, 2021.

567.    On January 28, 2021, Barry told Grusing and Harris upon reflection that Suzanne had taken trips by herself.

568.    Barry asked about one in particular – a trip to New Orleans – and wondered whether she had met the man on that trip.

569.    Barry told Grusing and Harris that Suzanne told him she just wanted to go to New Orleans and that she was going by herself.

570.    Barry told Grusing and Harris that he had asked Suzanne why she wanted to go to New Orleans by herself.

571.    Barry told Grusing and Harris that Suzanne's explanation "didn't make sense" to him when he asked her about it.

572.    In the arrest affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill wrote, "Barry admitted to questioning Suzanne about the New Orleans trip (to meet Libler), further evidence he suspected the affair." (Arrest Affidavit, p. 65).

573.    This footnote was false and misleading because Barry had not questioned Suzanne about her trip *to meet Libler* – he said he questioned her about why she would want to go *by herself*.

574.    The footnote was also false and misleading because it called Barry's questioning Suzanne about why she wanted to go to New Orleans by herself

"evidence he suspected the affair".

575.   There was no evidence at all that Barry's questions to Suzanne about the New Orleans trip suggested he knew about the affair with Libler or suspected anything.

576.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that Barry did not know about the affair until Defendant Grusing told him about it.

577.   The Affidavit states: "In January 2019, Barry took Suzanne's phone from her when they were in a resort in Mexico while she was talking to Libler, but he was unable to determine Libler's identity." Arrest Affidavit, p. 2.

578.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill inserted this into the Arrest Affidavit to leave the inference that Barry had a motive to kill Suzanne.

579.   These Defendants wanted to leave the impression that Barry knew she was having an affair with Jeff Libler.

580.   The statement that Barry took Suzanne's phone away from her while she was talking to Libler, is not true and these defendants knew it was not true.

581.   Libler told Grusing and Harristhat it was not true.

582.   The Arrest Affidavit states: "By September 2019, Barry took clear

99

steps to determine if Suzanne was having an affair by stalking her at their own residence in Salida, Colorado." Arrest Affidavit, p. 2.

583.    This was both false and misleading.

584.    The event to which defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill refer occurred not in September 2019, but in September 2018 and is blatantly mischaracterized.

585.    In September of 2018, Suzanne called 911 because she heard someone outside the Morphew home.

586.    At the time, their daughter Macy and Suzanne's friend Sheila were there.

587.    It was Barry, outside the home.

588.    During the 911 call, Barry entered the home, Suzanne and everyone else laughed at the surprise, and she terminated the 911 call without incident.

589.    All of this is clearly audible on the 911 call, but was not disclosed in the Arrest Affidavit.

590.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew this and purposely inserted that gross mischaracterization.

591.    Instead, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill inserted into the Arrest Affidavit the theory that, because he did

100

not immediately enter the residence, Barry might have been attempting to determine if Suzanne was actually with a male visitor by "stalking" her.

592.   In a highly misleading fashion, Defendants Rohrich, Spezze, Graham, Cahill, Walker, Lindsey, and Stanley characterized these innocuous events as "clear steps" and "stalking."

593.   The above false and misleading information and omitted exculpatory information was material to a finding of probable cause.

594.   The omission of the exculpatory facts described above was material to a finding of probable cause.

595.   Had the above misleading information about whether Barry knew about the affair, and all the underlying statements inferring that accusation been omitted and the exculpatory information been included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

## 14.   *Misleading Statements that Falsely Implied that Barry was having an Affair*

596.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill extensively investigated whether Barry was having an extramarital affair.

597.   The Arrest Affidavit states: "Morgan Interview May 14, 2020, Morgan

101

adamantly denied there was ever any type of sexual relationship between her and Barry." p. 47.

598.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew Barry never had an affair. Yet, they inserted this statement in the Affidavit to imply Barry Morphew had a motive to murder his wife.

599.   The Arrest Affidavit omits the exculpatory fact that there was never any reliable evidence that Barry was having an extramarital affair.

600.   Instead, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill relayed statements that Sheila Oliver suspected him of having an affair in the past.

601.   The Arrest Affidavit falsely states: "Relationship with [Shoshana] Darke reported to date back to July 2020, though investigators have not confirmed that." Arrest Affidavit, p. 124.

602.   This statement was also false.

603.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew it was false.

604.   Investigators had, in fact, confirmed that Barry and Ms. Darke did not meet until October 2020.

605.   The Defendants used this false fact to encourage the Court to speculate

that Barry had a motive to kill his wife because he was having an affair or relationship with Ms. Darke.

606.   In the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill devote almost an entire page to the subject of Ms. Darke.

607.   As indicated elsewhere in this Complaint, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill also included in the Arrest Affidavit the untrue, misleading, and irrelevant allegation that on a trip Barry and Ms. Darke took in February 2021, he intentionally disabled his phone and/or manually turned it on "airplane mode."

608.   The above false and misleading information and omitted exculpatory information were material to a finding of probable cause.

609.   If the Arrest Affidavit had omitted the false and misleading statements described above, including about Barry supposedly having an affair or affairs and using "airplane mode" or disabling his phone in February 2021 to hide an affair, probable cause would have been vitiated and diluted.

610.   Had the above false and misleading information been omitted and the exculpatory information been included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this

Complaint.

### 15.    *False Statements About the Backhoe ("Skid Steer")*

611.    For Barry's landscaping business, he owned a skid steer (otherwise known as a "Bobcat").

612.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that the skid steer that Barry owned was not used after 12:34 p.m. May 9th or on May 10th, 2020.

613.    They knew it was in no way used or related to any criminal activity.

614.    Despite this knowledge, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill inserted multiple references to Barry's skid steer into the Affidavit.

615.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill included wild speculation from neighbors and friends that perhaps Barry used his Bobcat to cover up his wrongdoing, by burying Suzanne or taking other steps.

616.    Such statements in the Arrest Affidavit include:

•    Brad Osswald's statement that Barry is an excellent skid loader operator and can do incredible things with a skid loader. (Arrest Affidavit, p. 51).

•    Andrew Moorman's speculation that Barry could have placed

Suzanne's body in a tarp in the skid loader and put her anywhere on his way to Denver. (Arrest Affidavit, p. 53)

•       Beginning in the fall of 2019, Barry had discussions with a man named Tim Klco about possibly buying a backhoe attachment from him. Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill inserted part of Defendant Grusing's July 2020 interview with Klco and hypothesized that perhaps Barry wanted to buy the backhoe so he could "dig a deep hole or trench in a very short amount of time." Arrest Affidavit, p. 53.

•       Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill then inserted a footnote: "In March and April 2021, FBI Agents asked Barry about why he needed a backhoe that particular time and day. FBI Agents learned that before Barry left Indiana in 2018, he used a backhoe to dig a large hole in his front yard, fill it with items to include furniture, and cover it over, planting alfalfa on top. Barry also dug holes to hide large sums of money in Indiana, per his associates and own admissions." Arrest Affidavit, p. 53, footnote 55.

•       There were barefoot footprints on the Bobcat and the blade and nuts and bolts appeared to be new. Arrest Affidavit, p. 5.

617.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill included many statements about the Bobcat.

618.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew there was no evidence that Barry used the skid steer to do anything related to Suzanne's disappearance.

619.   These Defendants' knowledge was based on forensic evidence, telematics on the skid steer, and further investigation including multiple digs by law enforcement to excavate areas where they surmised Barry could have buried

Suzanne's body to no avail.

620.   The statements above about the skid steer were part of a fabricated story used to raise suspicions that because Barry had a backhoe, perhaps he killed his wife and used it to get rid of her body.

621.   The above false and misleading information and omitted exculpatory information were material to a finding of probable cause.

622.   The omission of the facts described above about the Bobcat Skid Steer telematics ruling out its use was material to a finding of probable cause.

623.   If the false and misleading statements about the Bobcat skid steer described above and the unfounded wild speculation had been omitted, probable cause would have been vitiated and diluted.

624.   Had the above false and misleading information about the Bobcat been omitted and the exculpatory information been included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

**16.    False Statements about the Canine ("K-9") Searches**

625. For weeks following Suzanne's disappearance, the Morphew residence, including vehicles parked in the garage were thoroughly searched with the use of K-9's trained to identify scents of humans, and multiple crime scene

investigators. This exculpatory evidence was not in the arrest affidavit.

626.    While drafting the affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that these K-9 searches for Suzanne had yielded exculpatory results.

627.    On May 12, 2020 two K-9's with different dog handlers from El Paso County were brought to the Morphew residence to search for the scent of a decomposed body or remains.

628.    On May 12, 2020, the cadaver K-9's did not alert in the garage, in Suzanne's car, or in Macy's car.

629.    On May 12, 2020 one cadaver K-9 searched the inside of the Morphew home but made no alert.

630.    The lack of cadaver dog alerts at the Morphew residence on May 12, 2020, is exculpatory information.

631.    The lack of cadaver dog alerts at the Morphew residence on May 12, 2020 was not included in the Affidavit.

632.    On May 12, 2020, Defendant Officers conducted a K-9 search at the impound lot where Barry's truck was held.

633.    The K-9 search of Barry's truck at the impound lot included the cab of the truck, the outside of the truck and the truck bed.

634.   The K-9 searching Barry's truck at the impound lot did not alert that there was a scent of Suzanne's body or remains.

635.   The result of the K-9 search of Barry's truck at the impound lot was exculpatory information.

636.   The result of the K-9 search of Barry's truck at the impound lot corroborates the lack of Suzanne's DNA found in Barry's truck.

637.   The result of the K-9 search of Barry's truck at the impound lot contradicts the theory that Barry used his truck to bury Suzanne, her clothing, or objects used to kill her.

638.   The result of the K-9 search of Barry's truck at the impound lot was not included in the Affidavit.

639.   On May 16, 2020, the FBI's Evidence Response Team brought in two K-9's and two handlers to the Morphew residence.

640.   The K-9's searching the Morphew residence on May 16, 2020 did not give a "trained final response" inside the residence.

641.   The K-9's searching the Morphew residence on May 16, 2020 did not give a "trained final response" on the Skid Steer.

642.   The results of the K-9's searching the Morphew residence on May 16, 2020, were exculpatory.

643.   The results of the K-9's searching the Morphew residence on May 16, 2020, were not included in the Arrest Affidavit.

644.   On May 16, 2020, the FBI's Evidence Response Team and its two K-9's were brought to a vehicle line-up that included the two Range Rovers that had previously been sniffed on May 12, 2020, in the Morphew garage.

645.   At the vehicle line-up on May 16, 2020, there was "no trained final response" by either of the dogs in either of the Range Rovers.

646.   The results of the K-9 search at the vehicle line-up on May 16, 2020, were exculpatory.

647.   The results of the K-9 search at the vehicle line-up on May 16, 2020, were not included in the Affidavit.

648.   On May 17, 2020, another K-9 trained to search for a decomposing body/cadaver conducted a scent search at a vehicle line-up that included Barry's truck.

649.   At the K-9 search on May 17, 2020, the dog was led around all of the trucks and inside all of the trucks.

650.   At the K-9 search on May 17, 2020, the dog did not signal on Barry's truck.

651.   The results of the K-9 search at the vehicle line-up on May 17, 2020,

were exculpatory.

652.   The results of the K-9 search at the vehicle line-up on May 17, 2020 not included in the Affidavit.

653.   While drafting the arrest affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill included the results from only one K-9 search of the Morphew property – a **fourth** K-9 search on May 23, 2020.

654.   The Arrest Affidavit states that, at the K-9 search on May 23, 2020, all three K-9's alerted to the flatbed trailer and Bobcat Skid Steer." Arrest Affidavit, p. 41.

655.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew the SIM Card and GPS in the Bobcat proved the Bobcat did not move after 12:34 p.m. on May 9, 2020.

656.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew that the Bobcat Skid Steer was not involved in Suzanne's disappearance.

657.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill purposely omitted the three K-9 searches where there were no alerts to many different items.

658.   The Arrest Affidavit failed to state that the K-9's did not alert to any

evidence indicative of that Suzanne was murdered in or around the curtilage of the home, or her deceased body or body parts were put in any of the Morphew vehicles.

659.   The above false and misleading information and omitted information about the exculpatory K-9 searches was material to a finding of probable cause.

660.   Had the above misleading information about the May 23, 2020 Bobcat K-9 search been omitted and the exculpatory information about all the other K-9 searches been included, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

## 17.   Misleading Statements about the "Steak Dinner" Barry and Suzanne had on May 9, 2020

661.   The Arrest Affidavit states: "Barry claimed to the CBI that he and Suzanne ate steaks, though he cannot describe them." (referring to May 9, 2020). (Arrest Affidavit p. 125).

662.   Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill included this statement about Barry being unable to "describe" steaks to raise doubt about his statements that on the evening of May 9, 2020, he and Suzanne had a steak dinner.

663.   Defendants Cahill, Graham, Walker, Rohrich, Stanley, Lindsey, and Spezze, knew that on numerous occasions when Barry and Suzanne ate steak for

dinner, they shared one big steak.

664.   The search of the freezer in the Morphew home revealed an open package of steaks in a ziplock freezer bag that appeared to have one large steak missing.

665.   The corroborating evidence that Barry and Suzanne shared a steak on May 9, 2020 was exculpatory because it countered the suspicion raised by the Affidavit's statement that Barry could not "describe" the steak they had for dinner.

666.   The exculpatory information about Barry's statement that, when he and Suzanne ate steak, they often shared one steak was not included in the Arrest Affidavit.

667.   The exculpatory information about the open package of steaks in the freezer with one steak missing was not included in the Arrest Affidavit.

668.   The above misleading information and omitted exculpatory information about the steak were material to a finding of probable cause.

669.   Had the above information about the steak in the freezer been included and the misleading information been omitted, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

**18.    *Misleading Statement that Barry "Blamed" a Mountain Lion***

670.    The Arrest Affidavit states: "Barry initially blamed a mountain lion for Suzanne's death upon being notified of her bicycle discovery." (Arrest Affidavit, p. 125).

671.    The statement that Barry "blamed" a mountain lion is false.

672.    On May 10, 2020, upon being notified of the discovery of the bicycle, Barry *asked* if it was a mountain lion. Barry stated, "I thought - I asked some of the guys about it and we do have a big mountain lion in the subdivision but you would think there would be some evidence of that…"

673.    Barry's statements about the mountain lion described in the preceding paragraph are not included in the Arrest Affidavit.

674.    Mountain lion attacks on humans are not uncommon in that area of Colorado.

675.    Defendants Spezze and Rohrich later discovered that there was a big mountain lion seen near Barry's home the next day.

676.    In the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill did not disclose the information in the preceding two paragraphs.

677.    In the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill  intentionally sought to infer that Barry Morphew was

113

making up wild excuses for Suzanne's disappearance.

678.   Barry also discussed with first responders a variety of possibilities about what might have happened, this was video recorded on body cameras, all of which was also omitted.

679.   The above false and misleading information and omitted exculpatory information were material to a finding of probable cause.

680.   The omission of the facts that Barry was asking about a mountain lion, that his questions were not unreasonable, and that he asked about many possibilities (not just about a mountain lion), was material to a finding of probable cause.

681.   Had the above information that Barry had reason to ask about a mountain lion and asked (not told) Defendants about the lion been included and the false and misleading information about Barry supposedly "blaming a mountain lion …" been omitted, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

**19.**   ***Misleading Statements About Barry Blaming a Turkey***

682.   The Arrest Affidavit states: "In 2021, Barry blamed the turkeys for why he did not have veggie soup with Suzanne during lunch on Saturday, May 9th…." Arrest Affidavit, p. 125.

683.   This statement is false.

684.    Barry did not "blame" a turkey for anything.

685.    This was another attempt by Defendants Walker, Rohrich, Stanley,
Lindsey, Spezze, Graham, and Cahill  to create an inference that Barry was making
bad excuses.

686.    In April, 2021, Grusing and Harris showed Barry the pinpoint map
("pushpin map") and told him that he was down by the creek at a time that Suzanne
was on the telephone with her lover Libler.

687.    Grusing and Harris asked Barry why he was down at the creek.

688.    Barry's response was: "*if I was out there,*" the "only things I'd be
doin'" might be looking for antlers or turkeys.

689.    In the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey,
Spezze, Graham, and Cahill did not accurately recite what Barry told them and did
not explain it was in response to the lies they told him using the manufactured
pinpoint map.

690.    The above false and misleading information and omitted exculpatory
information were material to a finding of probable cause.

691.    Had the above information that Barry's statements were made in
response to lies he was being told by Grusing and Harris been included and the false
and misleading information about Barry supposedly "blaming a Turkey…" been

omitted, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

**20.    *False and Misleading Statements about What Barry was to Have Said to Defendants***

692.    The Arrest Affidavit states: "Barry blamed…the firing a gun of a .22 caliber to describe his violence towards Suzanne that afternoon…" (Arrest Affidavit, p. 125).

693.    This statement is false.

694.    Barry did not "describe" any violence towards Suzanne on May 9, 2020.

695.    Barry's statements were in response to the lies he was being told by Grusing and Harris as they confronted him with the fabricated "pushpin map" and told him there was proof that he was running around his house on the afternoon of May 9, 2020.

696.    The above false and misleading information was material to a finding of probable cause.

697.    The omission of the fact that Barry was responding to lies he was being told was material to a finding of probable cause.

698.    Had the false and misleading information been omitted, it would have

vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

**21.    False Statements about Suzanne's Breathing in the Morning of May 10, 2020**

699.    The Arrest Affidavit states: "Barry cannot provide a last sighting of Suzanne…" (Arrest Affidavit, p. 126.)

700.    That is false.

701.    Barry said that, when he woke on the morning of May 10, 2020, to leave for Broomfield, Suzanne was laying in bed sleeping.

702.    Grusing asked Barry if he saw Suzanne under a "lump" of covers and he agreed he did.

703.    The Arrest Affidavit also states that Barry said that, when he heard Suzanne in the bed in the morning, she was experiencing "labored breathing similar to a snore." (Arrest Affidavit, p. 126).

704.    That is false.

705.    Barry did not say her breathing was "labored."

706.    Barry described Suzanne's snoring as a light snore. He said Suzanne had always lightly snored and was doing so on the morning of May 10, 2020.

707.    Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill knew these facts because they had conducted interviews and reviewed

117

Barry's interviews.

708.   In the Arrest Affidavit, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill used their own description, " labored breathing similar to a snore," to assert that Suzanne was making sounds "consistent with her being tranquilized." (Arrest Affidavit, p. 126).

709.   This statement is misleading because Barry did not say that Suzanne sounded like she was experiencing "labored breathing."

710.   The above false and misleading information and omitted exculpatory information were material to a finding of probable cause.

711.   Had the above information about Barry having a last sighting of Suzanne been included and the false and misleading information about Suzanne's "labored breathing" been omitted, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

**22.    *False and Misleading Statement about Barry taking Suzanne's Phone***

712.   The Arrest Affidavit states: "Barry has admitted that he had taken Suzanne's phone from her at least twice in the past to try to monitor or control what she was doing."

713.   That statement is false.

118

714.   The above false statement is material to a finding of probable cause.

715.   Had the above information about Barry "admit[ting] that he had taken Suzanne's phone from her at least twice in the past to try to monitor or control what she was doing" been omitted, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

### 23.    Omitted material information about Suzanne's swimsuit in her closet

716.   Suzanne's closet was searched. Defendant Himschoot photographed the contents of the closet, including the swimsuit Suzanne was wearing in a "selfie" she sent on May 9, 2020 to Libler. This finding was highly exculpatory because it is evidence that Suzanne carefully put away her swimsuit, which contradicts the theory that Barry killed Suzanne after discovering her in her swimsuit and chasing her around the home while she was wearing it, and killing her while she was wearing it.

717.   Defendants Walker, Rohrich, Lindsey, Stanley, Spezze, Graham, and Cahill omitted from the Arrest Affidavit the exculpatory information about the discovery of the swimsuit.

### 24.    Overwhelming evidence negating the suspicion that because Barry had the "opportunity" to commit the crime, there must be probable cause

718.    Defendants Walker, Rohrich, Lindsey, Stanley, Spezze, Graham, and Cahill inserted their suspicions that perhaps Barry committed the crime because he had the opportunity to do so, even though they knew that the overwhelming body of evidence negated the notion that he did, in fact, commit the crime.

719.    Because of the exculpatory evidence, there was no credible theory of probable cause supported by evidence that Barry could have carried, transported, buried or otherwise concealed Suzanne's body without detection. Barry would have had to kill her leaving no trace, transport her on foot, and bury her somewhere in rocky mountain terrain with no machinery, leaving no scent anywhere, in such a way as to leave the body undetected by thousands of human and canine searchers.

720.    This notion is not probable cause – it is a mere theory of suspicion with no grounding in the facts the investigation revealed.

721.    To bolster the false theory that Barry had the "opportunity" to commit the crime, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill omitted the results from the K9 search around the house and the vehicles indicating that Suzanne, nor any part of her, touched or were in the skid steer, the Range Rover, or Barry's truck, omitted an enormous body of evidence as described in this Amended Complaint, and inserted false and misleading information into the affidavit.

***25.    False and Misleading statements about Barry supposedly "liquidating assets" and omission of exculpatory information.***

722.    Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich claimed that shortly after Suzanne disappeared, Barry "liquidated" assets, i.e., he closed on the sale of their Indiana home, sold her Range Rover, went through with purchase of a lot they had already been planning to purchase, and then later sold the property they owned in Salida.  (Arrest Affidavit, pp. 45-46).

723.    Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich knew, but did not disclose, that, while the closing on the sale of the Indiana home occurred on June 6, 2020 (after Suzanne disappeared), the offer/acceptance/and title work for the sale had been in process for quite some time; the sale was pending and under contract with Suzanne's authorization and participation before she disappeared.

724.    Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich knew, but did not disclose, that Barry was under contract and legally obligated to close on the Indiana real estate transaction to which they had both committed.

725.    Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich stated that Barry obtained a court-ordered guardianship over Suzanne in her absence that "allowed" him to sell their real estate, but they did not disclose that

the guardianship was legally required in order for Barry to satisfy the legally-binding contract he and Suzanne had entered-into to sell the Indiana home.

726.   Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich knew the reason for Barry's emergency guardianship was because Barry would not be able to follow through with the contract and sell their Indiana home without it.

727.   Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich knew that the purchase of a lot Salida ("Lot 8 of the Longhorn ranch") had been in the works well before Suzanne's disappearance. Yet, these defendants disclosed only that Barry purchased the property on June 25, 2020.

728.   Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich knew that before Suzanne disappeared, Suzanne's friend in Indiana expressed wanting her Range Rover, and that Barry and Suzanne had planned to buy Suzanne a car where a hitch could be attached (which was not possible on the Range Rover) for Suzanne's bike.

729.   Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich knew that law enforcement seized the Range Rover, forensically searched it, and damaged it in such a way as to reduce its value; they knew that when the Range Rover was returned it in June 2020, the entertainment system had been

removed and was simply put on the seat of the Range Rover.

730.   The Defendants who authored the arrest warrant knew that Barry sold the Range Rover in that condition, for a substantially reduced cost, to Suzanne's friend, following through on the plans he and Suzanne had made to sell the Range Rover anyway.

731.   It is true, as Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich wrote in the Arrest Affidavit, that in 2021, Barry sold the Morphew home in Maysville and sold the Salida lot back to the person from whom he had purchased it.

732.   Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich included this information as if it was inculpatory, when they knew there was an innocent if tragic explanation. Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich knew, but did not disclose in the affidavit, the reason Barry sold the Maysville home was because Barry and his daughter had a very difficult time, emotionally, living in the family home after Suzanne disappeared.  These defendants also knew, but did not disclose in the affidavit, that it did not appear there was any point to retaining the Lot in Salida under the circumstances.

733.   Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and

Rohrich inserted into the Arrest Affidavit the facts that Barry and Mallory received a $ 40,000 deposit from Monex on February 24, 2020 (months before Suzanne's disappearance) and that, after Suzanne's disappearance on June 19, 2020, Mallory Morphew had written a $30,000 check to her father.  Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich knew these transactions had nothing to do with Suzanne's disappearance and certainly knew they had nothing to do with her death. These sums do not appear to have anything to do with a motive for murder.

734.   In the Arrest Affidavit, Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich bent the truth, omitted material exculpatory facts, and intentionally mislead the Court into believing that these not-unexpected financial transactions constituted "liquidation of assets" and were somehow probable cause to believe Barry committed murder.

735.  Had the above information about the Morphew family's financial transactions not been presented false and misleading manner in the Arrest Affidavit, and had highly exculpatory information not been omitted, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

**26.    *False and misleading statements about scratches on Barry's arms***

736. The Arrest Affidavit claims that on May 13, 2020 Barry is photographed with scratches on his arm, they are several days old, and that when asked "later" by the FBI he did not recall how get those, possibly from a tree. Arrest Affidavit pgs. 21, 48, and 64.

737. **Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich** knew and falsified the affidavit by inferring the scratches came from a struggle with Suzanne on May 9, 2020.

738. Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich knew that on May 13, 2020, Barry said the scratches on his arm came from walking in the woods, and that when FBI agents asked Barry 9 months later, on March 5, 2021, where the scratches came from, he said "I don't remember, but I know I've been in the woods several times."

739. When Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich stated that nine months after Suzanne's disappearance, Barry did not remember, they knew this was false and misleading.

740. Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich also knew that Barry was captured on video on May 10, 2020 at the hotel surveillance camera and other surveillance cameras and that on none of them did he have visible scratches on his arm or arms.

741. Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich failed to disclose that the scratches were obtained when Barry went searching (with scores of other people) for Suzanne through the thick brush and woods after she disappeared.

742. Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich also knew that there were no other scratch marks, or notable injuries on Barry's entire body reflecting a struggle, and they knew from photos before Suzanne's disappearance, that she had very short fingernails and so could not likely have left any scratches like those seen.

743. Had Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich included Barry's actual consistent statements and the facts about the surveillance camera videos, and had they not intentionally mislead the Court in the Affidavit, it would have vitiated and diluted probable cause, singularly and in combination with the other misconduct described in this Complaint.

### D. FAILURE TO TRAIN AND SUPERVISE; PATTERN OF MISCONDUCT, CUSTOM AND POLICY

744. Defendant Spezze, acting in his capacity, and the CCSD failed to train and supervise Defendants Walker, Himschoot and Rohrich and other personnel concerning the constitutional rights of citizens like Barry Morphew.

745. Defendant Spezze, acting in his official capacity, and the CCSD tacitly

approved of the misconduct of Defendants Walker, Himschoot and Rohrich by retaining their employment, failing to train and discipline them, and participating in the misconduct as supervisors.

746.    Defendant Spezze, acting in his official capacity, and the CCSD exhibited deliberate indifference to or tacit approval of the misconduct of their personnel.

747.    The misconduct that Defendants Spezze, Rohrich, Himschoot and Walker committed against Barry Morphew was part of an official custom, policy, or practice of the CCSD and the EJDAO and undertaken with the authorization, approval, and ratification by Defendant Spezze and the CCSD and included direct action by Defendant Spezze acting as a final policymaker for the CCSD, and Chaffee County.

748.    The Colorado Supreme Court has recently recognized the pattern of misconduct of the CCSD and the EJDAO in the Eleventh Judicial District. In *People v. Tippet*, 2023 CO 61, 539 P.3d 547, the Colorado Supreme Court affirmed an order for discovery sanctions against the Eleventh Judicial District Attorney's Office based on a pattern of neglect in numerous cases: "beginning in July 2021, five different judicial officers sitting in the Eleventh Judicial District entered orders finding that the District Attorney's Office had engaged in a pattern of discovery

violations, and imposed deterrent sanctions…."

749.  The District Judge in the *Tippet* case found discovery violations rampant in some twenty (20) cases, a "small sample" of which are noted in the Supreme Court's opinion. *Tippet, supra*, at ¶44.

750.  Upon information and belief, the misconduct that was rampant throughout the Eleventh Judicial District included a pattern of misconduct in cases handled and investigated by the CCSD and Sheriff Spezze.

751.  In the *Tippet* and other cases, the EJDAO attributed its failure to disclose evidence to the failings of the law enforcement agencies with which it worked.

752.  For example, in *People v. Linda Stanley*, No. 23PDJ041, 2024 WL 4481257 (Colo. O.P.D.J. Sept. 27, 2024), Defendant Stanley faulted the CCSD for her failure to disclose evidence to the defense in Plaintiff's criminal case and observed that this was part of a pattern throughout the Eleventh Judicial District.

753.  If Defendant Stanley's allegations about the CCSD and Defendant Spezze are accurate, it is highly unlikely that the faults were merely in Mr. Morphew's case. Upon information and belief, CCSD and Defendants Spezze, Walker, Rohrich, Himschoot and Stanley caused material exculpatory information to be withheld not only after charges were filed in criminal cases, but beforehand

through such misconduct as omissions or misleading statements in arrest affidavits.

## E. RECKLESS INVESTIGATION

754. Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich received numerous investigative leads they did not pursue.

755. As described elsewhere in this Complaint, Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich did not follow up on the CODIS DNA matches.

756. Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich did not cause there to be interviews of Libler's friends or family, or cause his computers to be collected or searched, or cause his home or car to be searched.

757. Defendants caused some of Libler's phone records from Verizon to be obtained, but only those from 2019 to December 2020.

758. In the Affidavit, Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, and Rohrich stated they received from Libler screenshots showing Costco receipts in Michigan on May 7, 9, and 11, 2020, but failed to report that those receipts were on his wife's account, not Libler's.

759. The timetable prepared by Defendants Stanley, Lindsey, Hurlbert, Walker, and/or other defendants and persons unknown to Plaintiff at this time, was based on political concerns and motivations, and public pressure, not an adequate

investigation.

760.   Further acts and omissions demonstrating a reckless investigation are described throughout this Complaint and incorporated here by reference.

## F. CONSPIRACY BY ALL CODEFENDANTS

761.   From May 2020 to present Defendants Walker, Rohrich, Stanley, Lindsey, Hurlbert, Spezze, Graham, Duge, Rogers, Himschoot and Cahill met with each other and/or communicated by telephone, email, in-person conversations and meetings, and numerous other forms of communication.

762.   Defendants Walker, Rohrich, Stanley, Lindsey, Hurlbert, Spezze, Graham, Duge, Rogers, Himschoot and Cahill kept communication logs and shared a computer database containing case information, reports, and information.

763.   At all times relevant to this Complaint.

764.   Defendants Walker, Rohrich, Stanley, Lindsey, Hurlbert, Spezze, Graham, Duge, Rogers, Himschoot and Cahill, in a single-minded effort to obtain the arrest and prosecution of Barry and seizure of his property, no matter what the methods or contrary evidence, conspired with the each other to manufacture probable cause that Barry had committed murder and they all conspired to fabricate evidence, conspired to withhold exculpatory evidence leading to Barry's unconstitutional arrest and prolonged prosecution.

765.   Defendants Walker, Rohrich, Stanley, Lindsey, Hurlbert, Spezze, Graham, Duge, Rogers, Himschoot and Cahill worked closely together, sharing information, strategizing, with the objective to present false information and omitting exculpatory information in the Arrest Affidavit in order to procure a wrongful arrest and prosecution of Mr. Morphew.

766.   Defendants Walker, Rohrich, Stanley, Lindsey, Hurlbert, Spezze, Graham, Duge, Rogers, Himschoot and Cahill, individually and in a conspiracy with each other and others unknown to Plaintiff at this time, maliciously and purposely withheld exculpatory information from the judge and the defense.

## G. ABSENT THE FALSE AND MISLEADING STATEMENTS, AND WITH THE OMITTED EXCULPATORY INFORMATION INCLUDED, THERE WOULD HAVE BEEN NO PROBABLE CAUSE

767.   The above false and misleading information and omitted exculpatory information described in this Complaint were material to a finding of probable cause.

768.   The omitted information described in this Complaint, had it been included, would have vitiated and diluted any probable cause.

769.   Had the false and misleading information described in this Complaint been excluded, probable cause would have been vitiated and diluted.

770.   Some of the specific false and misleading information and/or the

omitted information detailed above was so material that, standing alone, probable cause would have been vitiated and diluted had the false and misleading information been omitted and/or the exculpatory information included.

771.    Barry's allegations are intended to be viewed collectively.

772.    The cumulative impact of the false and misleading information and/or the omitted information was so material to the probable cause determination that, viewed cumulatively, individually, or in any combination, probable cause would not have existed in the Arrest Affidavit had the Defendants' misconduct not occurred.

## H. THE ARREST AND PROSECUTION OF BARRY

773.    Upon review of the Arrest Warrant Affidavit, Chaffee County, Colorado Chief Judge Murphy found probable cause and set a no bond hold as requested by Defendant Prosecutors.

774.    CCSD, including Defendants Spezze and Rohrich, arrested Barry on May 5, 2021. Defendant Stanley witnessed the arrest.

775.    Barry remained incarcerated until he posted a $500,000.00 cash bond on September 20, 2021. Thereafter, he was subject to restrictive conditions of release, including an ankle GPS monitor, required weekly meetings with a pretrial services officer, an order that he not leave Chaffee County borders, and numerous

other restrictions. He was subjected to intrusive and continuous monitoring by Defendants, including being monitored by a game camera posted by Defendant Walker near his home.

776.    Formal charges were filed on May 18, 2021.

777.    On May 5, 2021, the day of Barry's arrest, Defendant Spezze and Defendant Stanley convened a press conference where Defendant Stanley falsely stated "Alex Walker Investigator and Sheriff Spezze's Office ....followed every lead tip and every unanswered question no matter what direction it led them in and they never compromised the integrity of the investigation."

778.    In the press conference, neither Defendant Spezze nor Defendant Stanley mentioned they had not followed up on substantial leads, including the partial DNA match from Suzanne's Range Rover to unsolved sex offense cases, or any investigation into Jeff Libler.

779.    Defendant Stanley, in violation of her professional ethics and Barry's constitutional rights stated Barry "was taken into custody and when asked questions he said he wanted a lawyer and all questioning ended." This comment implied Barry's silence was evidence of his guilt.

780.    Defendant Stanley's statement misrepresented the true fact that Barry had spoken openly with law enforcement, answering thousands of questions over

many hours in the months since Suzanne's disappearance.

## I. CONTINUED MALICIOUS PATTERN OF DECEPTION

781.   After filing of charges, Defendants Walker, Rohrich, Stanley, Lindsey, Hurlbert, Graham, Duge, Rogers, and Cahill continued to withhold exculpatory information and make false statements.

782.   Defendants Walker, Stanley, Lindsey, Spezze, Graham, Cahill, Hurlbert and Rohrich caused the prosecution to continue despite knowing there was not probable cause.

783.   As explained above, on May 19, 2021, Defendant Duge sent Defendant Cahill a CODIS match letter via email indicating the unknown male DNA swabbed from the glovebox of Suzanne's Range Rover partially matched DNA found in three out-of-state unsolved sexual assault investigations in Tempe, Phoenix, and Chicago. ("The match letter").

784.   The match letter was provided to the defense.

785.   However, almost none of the underlying information was provided to the defense at that time.

786.   The Preliminary Hearing was ultimately scheduled for and held on August 8, 9, 23, and 24, 2021.

787.   In the months leading up to and during the Preliminary Hearing,

Defendants Walker, Rohrich, Stanley, Lindsey, Hurlbert, Spezze, Graham, Duge, Rogers, and Cahill had three meetings including law enforcement and other CBI analysts to discuss the meaning of the CODIS match, its significance, and follow up investigation to rule out potential sources of the DNA.

788. These meetings included Defendants Walker, Rohrich, Stanley, Lindsey, Hurlbert, Spezze, Graham, Duge, Rogers, and Cahill.

789. Information tending to negate Barry's guilt and contradict probable cause was discussed.

790. However, nothing was reduced to writing.

791. Nothing was disclosed to the defense about any of the three meetings at that time.

792. On May 27, 2021, Mr. Morphew appeared on the filing of charges.

793. On May 27, 2021, the Court also addressed several motions filed by the defense related to discovery.

794. The Court ordered the People to ensure that all discovery mandated by the Colorado Rules of Criminal Procedure be produced by June 2, 2021.

795. On June 3, 2021, the judge issued a written discovery order commensurate with the verbal rulings made on May 27, 2021.

796. The judge also issued a written order that "any electronic

communications created or received by law enforcement officers related to this case must be disclosed to the defense if they are material to the prosecution of the case or if they contain any evidence that would be in any way favorable to the defense."

797.   Defendants Stanley, Lindsey, Walker and (after he got on the case) Hurlbert did not comply with that Order. Defendants Stanley, Lindsey, Walker, and Hurlbert concealed emails, texts, and other documentation that contradicted the alleged circumstantial evidence and insinuations set forth in the Arrest Affidavit.

798.   On June 24, 2021, Barry's attorneys filed a motion for discovery sanctions, arguing that the court rules and the court's orders had not been complied with.

799.   On July 6, 2021, Barry's attorneys filed a Motion for a Contempt Citation, alleging discovery violations.

800.   On July 22, 2021, the Court and parties held a discovery sanction hearing.

801.   On July 22, 2021, the Court entered findings and conclusions, including that "there are violations here," Transcript of 7/22/2021, p. 56, and (on the same page) stated:

- [A]t this time I can't really find that it's a pattern. I'm hoping that this is just the result of the enormous amount of information that had to be disclosed within those few

weeks, and **not a situation where as new evidence is
being generated, new reports being generated, that
there's a delay in providing those to the defense.**

- I'm glad that these discovery issues have been brought to my attention
because if this does appear to be a pattern my response might be
different going forward."

802.   That is exactly what was happening. Defendants Walker, Rohrich,
Stanley, Lindsey, Hurlbert, Spezze, Graham, Duge, Rogers, and Cahill were
continuing to meet, communicate, and plan what to do about the emerging DNA
evidence, all the while, not disclosing these efforts to Barry Morphew or his defense
team.

803.   By this time, Defendant Mark Hurlbert had joined the prosecution
team.

804.   Defendant Hurlbert was involved in the numerous meetings and
conversations about the CODIS matches.

805.   Defendant Hurlbert participated in the decisions to not disclose
exculpatory information, to provide false and misleading information, and to delay
Barry Morphew's discovery of the DNA investigation.

806.   During the summer of 2021, Defendant Walker transferred from his
position with the EJDAO and joined the CCSD.

## J. THE PRELIMINARY HEARING/PROOF EVIDENT AND PRESUMPTION GREAT HEARING

807.   On August 9, 2021, the court commenced the preliminary hearing, combined with the "proof evident presumption great hearing." ("preliminary/PEPG").[14]

808.   The People (Defendants Stanley, Lindsey and Hurlbert) called the following witnesses at the Preliminary/PEPG Hearing: Alex Walker, Kenneth Harris, Jonathan Grusing, Derek Graham, Kevin Koback, and Andy Rohrich.

809.   The People (Defendants Stanley, Lindsey and Hurlbert) did not elicit any testimony concerning the foreign male DNA from any of these witnesses.

810.   The defense ultimately called Defendant Cahill to present the information to the Court.

811.   On September 17, 2021, the Court issued its ruling finding probable cause, but also finding that proof was not evident and the presumption not great.

812.   Judge Murphy, who presided over the hearing, specifically found that the unknown male DNA profile was "particularly significant because while it doesn't prove a stranger abduction theory, it does at least support it." Transcript of

---

[14] Article II, Section 19 of the Colorado Constitution provides: "All persons shall be bailable by sufficient sureties except for capital offenses, when the proof is evident or the presumption great." Section 16-4-101(1)(a), C.R.S., provides that all persons shall be bailable except "For capital offenses when proof is evident or presumption is great…" In Colorado, the hearing to determine whether the proof is evident or presumption is great are generally combined with the Preliminary Hearing.

9/17/2021, pp. 65-66.

813.   In April, 2022, Judge Ramsey Lama, who was by then presiding over the criminal prosecution, found:

> It is important to note that Chief Judge Murphy did not learn about the unknown foreign male DNA and CODIS matches in the Arrest Affidavit or through the People's elicited testimony at the PEPG and Preliminary Hearing. Over four days of testimony, the People did not discuss the CODIS matches throughout their case-in-chief. Chief Judge Murphy learned about the evidence because the defense presented it by calling and examining Agent Cahill.

814.   Judge Lama found that "had the defense had all of the information surrounding the CODIS matches and related investigation, they may have decided to call witnesses or experts to negate any probable cause findings [at the preliminary/PEPG hearing]."

815.   Shortly after Defendant Cahill testified at the Preliminary/PEPG Hearing, Defendant Stanley contacted CBI to express her displeasure with Defendant Cahill's testimony at the Preliminary Hearing.

816.   At the Preliminary/PEPG Hearing, Defendant Cahill, one of the lead detectives on the case, testified that he only reviewed 19 pages of the arrest affidavit. Transcript of 8/24/2021, p. 57:8-11 ("I believe it was around 126 [pages]

of which I got to page 19").

817.   That testimony was false.

818.   As the state court judge later found, "disclosures indicated [Cahill] had reviewed it in its 'entirety' and even offered specific critiques to the affiant."

## K. CONTINUING MISCONDUCT

**1.**   ***The alleged murder weapon***

819.   Barry was charged both with charges related to Suzanne's disappearance and a charge alleging that he possessed a dangerous firearm.

820.   The defense moved to sever the trial of the firearm charge from the trial of the remaining charges.

821.   On January 8, 2022, Defendant Stanley and Daniel Edwards filed in court a response that stated that "the possession of the short rifle is one method that the Defendant may have used in the murder" and that the darts found at the crime scene "can be shot from the dangerous weapon."

822.   That statement was false.

823.   On February 24, 2022, Robert Weiner handled oral argument on behalf of Defendant Stanley.

824.   At the hearing on February 24, 2022, Mr. Weiner stated that the weapon at issue could not have been used to fire a tranquilizer as it was incapable

of firing such a dart. Transcript of 2/24/2022, p. 109-110.

## 2.    *K-9 Pretrial Testimony*

825.    On March 1, 2022, Defendants Stanley and Hurlbert filed a false statement with the Court in which they wrote that, at trial, K-9 handler Doug Spence would testify that "the dog kept trying to go in the direction of the Morphew residence but had to stop because he couldn't cross a creek."

826.    On March 30, 2022, minutes prior to Mr. Spence's slated testimony at a *Daubert* hearing in the state criminal prosecution, Special Prosecutor Grosgebauer told the court that, actually, Mr. Spence would testify that the statement the defendant prosecutors had submitted to the court was false and that, in fact, Rosco did not pick up Suzanne's scent.

827.    Grosgebauer said the prosecution would be withdrawing Mr. Spence as an expert.

828.    Body Worn Camera footage capturing Mr. Spence's verbatim and nearly contemporaneous account of his dog alerting to Suzanne's scent where her bike was located.

829.    Spence testified that it was not true that the scent continued on the other side of the creek and that, had the scent continued on the other side of the creek, Rosco would have gone into the creek, crossed it, and followed the scent.

*3.*     ***Withholding exculpatory evidence***

830.   In late January 2022, following numerous court orders and motions, Defendants Stanley and Hurlbert disclosed thousands of pages of exculpatory material to the defense.

831.   The material disclosed exceeded 25,000 pages.

832.   The vast majority of the pages consisted of emails, reports, and communications that occurred and/or were created before Barry's arrest.

833.   Defendants Stanley and Hurlbert did not disclose this material voluntarily, but were forced to do so by the Court.

834.   Among the material that had not been disclosed were the facts about how the fabricated pinpoint Google map had been created.

835.   Among material that had not been disclosed were the emails and reports documenting the unreliability of the "airplane mode" reports.

836.   Among the material that had not been disclosed were emails that highlighted the static drift phenomenon described above in this Complaint.

837.   Among the material that had not been disclosed were emails revealing the numerous meetings, conversations, and discussions among the Defendants.

838.   Among the material that had not been disclosed was a December 2, 2020 email that disclosed that Defendants Walker, Rohrich, Cahill and Graham

were informed about the CODIS match in Tempe, Arizona.

839.    Among the material that had not been disclosed were the identities of the Defendants who had authored and revised the Arrest Affidavit.

840.    Among the material that had not been disclosed were communications from Defendants Cahill and Graham to CBI officials that any imminent arrest of Barry Morphew was premature and the worst decision that could be made.

841.    Among the material that had not been disclosed was proof that Defendant Duge had undergone a Quality Assurance Review involving her work on the Morphew case.

842.    Among the material that had not been disclosed was the content of the Quality Assurance Review, including the fact that Defendant Duge had created the term "limited genetic profile" and that it was not a scientific term used in the field.

843.    Among the material that had not been disclosed included the fact that Defendant Duge's supervisors agreed that the Tempe, Phoenix, and Illinois matches were well-founded.

844.    Among the material that had not been disclosed was proof that, during the Preliminary/PEPG hearing, Defendant Lindsey had emailed Defendant Duge, requesting that she confer with officers who were concerned about the three CODIS matches.

845. Among the material that had not been disclosed were emails that documented that evidence and emails were being altered before being disclosed to the defense.

846. The reason that evidence and emails were being altered was to purposely conceal their concern about the items with unknown male DNA that still remain in the case.

847. An example of the evidence and emails that had been altered appears in the following comparison between two emails that were produced – one altered to remove the exculpatory information and one complete:

> • Defendant Rogers had emailed Burgess and Defendants Cahill and Graham, asking if [CCSD] Zach Tucker's DNA needed to be tested against all the DNA from the case. This part of the communication was disclosed on both emails provided.

> • Defendant Cahill responded, "Good morning. I am not aware of any other physical evidence which [Deputy Tucker] may have been associated with the collection. Regards, Joe [Cahill]." This part of the communication was disclosed on both emails provided.

> • However, a Defendant and/or co-conspirator whose identity is presently unknown to Plaintiff had purposely redacted Burgess's response. Burgess agreed that it would be "great" if Tucker's DNA could be compared with all the DNA in the case, because Burgess "feel[s] like we still had a few unknowns…" This exculpatory part of the communication was purposely withheld.

144

• Apparently by accident, a copy of the un-altered email was produced with approximately 22,000 pages of and the defense had found the un-altered email to compare with the altered one received earlier.

848. Among the material that had not been disclosed was the November 2021 discovery of an "unresolved match" between the DNA swabbed from the glovebox of Suzanne's car and DNA from Maryland.

849. Among the material that had not been disclosed was a CODIS Briefing/Morphew Meeting for November 18, 2021 that had been convened by Colorado Bureau of Investigations Deputy Director of Investigations Chris Schaefer.

850. The meeting of November 18, 2021 was a briefing regarding the testimony of Defendants Duge and Rogers at a pretrial hearing on November 9, 2021.

851. Multiple members of CBI Investigative and Laboratory personnel were present at the meeting of November 18, 2021, including Defendants Hurlbert and Walker.

852. Of the 10 agents invited to the Morphew meeting, the defense received notes from only two different attendees.

853. Those two attendees' notes were not produced to the defense until

March 3, 2022.

854.    At the November 18, 2021 meeting, Defendants attending the meeting agreed that the defense had received too much information from the CBI Communications Log and the Defendants agreed to cease or minimize note-taking so that the defense would not receive information.

855.    Among the material provided was a July 16, 2021 email from an FBI expert who examined the computer data on Suzanne's Range Rover.

856.    The July 16, 2021 email was not disclosed until January 26, 2022, despite the state court's orders beginning on June 3, 2021.

857.    The email identifies the name and contact information of the FBI expert who had looked at the data from Suzanne's Range Rover and stated it was quite "promising."

858.    In a follow-up communication, the expert states that the data could be very helpful.

859.    The Range Rover download expert sent the downloaded data to Defendants Stanley, Lindsey, and Cahill, among others.

860.    The Defendants Stanley, Lindsey, and Hurlbert had the data and did not produce the data.

861.    Upon receiving the email, in late January 2022, the defense learned of

this Range Rover download expert and demanded that Defendants Stanley and Hurlbert produce the data.

862.    Defendants Stanley and Hurlbert produced the data after another court order in March 2022.

863.    There was no event data produced similar to what was produced with Barry's truck (i.e. door openings/closings, ignition on/off, lights on and off).

864.    The FBI Range Rover download expert explained he was never asked to examine the Range Rover for event data.

865.    If the Range Rover had any registered events on May 10, 2020, after 5:00 a.m., it would indicate that Suzanne was alive (and not killed on May 9, 2020 as the Defendants alleged) and accessing her own car, that the car had been driven, or there was an intruder who was in her Range Rover.

866.    In March 2022, the Range Rover download expert explained he could not conduct such an examination without a formal request from one of his superiors and stated the examination was complicated and time-consuming and would take as long as the summer of 2022 to get started on such an examination.

867.    As the above section shows, Defendants Stanley, Lindsey, and Hurlbert continued a pattern and practice of hiding exculpatory evidence, failing to investigate and/or recklessly investigating the case without any care for Mr.

Morphew's Constitutional rights.

## L. DISMISSAL OF CHARGES

868.   All charges against Barry were dismissed on April 19, 2022.

## V. DAMAGES

869.   As result of the Defendants' conduct Barry was charged, arrested, and prosecuted, and his property seized, for a crime he did not commit.

870.   As result of the Defendants' conduct Barry spent five months in jail, approximately 6 more months wearing a GPS ankle monitor with severe restrictions on his movement, and almost a year defending against the criminal charges. To this date, Barry's property remains in the CCSD's possession.

871.   Barry's name and reputation has been irreparably tarnished in Colorado and all around the country.

872.   Barry suffered great anguish and emotional distress, including but not limited to depression, severe anxiety, chest pain and insomnia.

873.   Barry suffered loss of familial association with his two daughters, one of which was 17-years-old when he was arrested and jailed.

874.   Barry suffered great economic losses as a result of Defendants' actions, including the loss of his home, business, savings and much more.

## VI. STATEMENT OF CLAIMS FOR RELIEF

**CLAIM ONE**: 42 U.S.C. § 1983
**Malicious Prosecution and unlawful detention**

**Defendants Stanley, Lindsey, Hurlbert, Spezze, Rohrich, Walker, Cahill, Duge, Rogers, Graham, and Himschoot**

875.  Mr. Morphew hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and relies upon them in setting forth this claim.

876.  In the manner described more fully above, Defendants Stanley, Lindsey, Hurlbert, Cahill, Duge, Rogers, Graham, Spezze, Rohrich, Walker, and Himschoot individually, jointly, and in conspiracy with one another and/or with others unknown, acting under color of law and within the scope of their employment, deprived Barry Morphew of his constitutional rights, including his right to be free from malicious prosecution when they: (1) fabricated evidence and manufactured inculpatory evidence; (2) manipulated witness testimony; (3) suppressed exculpatory evidence; (4) omitted exculpatory evidence and lied in the Arrest Affidavit and (5) falsified charges in order to arrest and prosecute Barry Morphew without probable cause, resulting in his unlawful detention and the damages set forth herein.

877.  Defendants Stanley, Lindsey, Hurlbert, Cahill, Duge, Rogers, Graham, Spezze, Rohrich, Walker, and Himschoot accused Barry Morphew of criminal

activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against him without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

878.   In so doing, these Defendants knowingly, maliciously, and/or recklessly caused Mr. Morphew to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause.

879.   The proceedings were ultimately terminated in Barry Morphew's favor when all charges against him were dismissed on April 19, 2022.

880.   Defendants subjected Barry Morphew to unauthorized, arbitrary, and malicious governmental action that shocks the conscience in that he was deliberately and intentionally framed for a crime of which he was innocent, through the Defendants' fabrication, suppression, and withholding of evidence.

881.   The acts and omissions of Defendants were objectively unreasonable and undertaken intentionally, maliciously, and with reckless indifference to the rights of others, and in reckless disregard of the truth and Mr. Morphew's innocence.

882.   Even though each Defendant had an affirmative duty to intervene to protect Barry Morphew and and prevent his constitutional rights from infringement

by the others, and even though each had the opportunity to intervene and prevent the harm, each Defendant failed to take reasonable steps to intervene in other Defendants' unconstitutional conduct.

883. The misconduct described in this Count was committed not only by Defendants Stanley, Lindsey, Hurlbert, Cahill, Duge, Rogers, Graham, Spezze, Rohrich, Walker, and Himschoot acting in their individual capacities, but also by Defendant Spezze acting as a final policymaker and pursuant to the policy and practice of the CCSD and Chaffee County, Colorado as set forth in more detail in Claim Seven below (*Monell* Claim).

884. As a proximate result of each Defendant's unlawful conduct, Barry Morphew was arrested, held in custody until he was able to bond out, and lived under bond conditions for over eleven months and suffered severe actual physical and emotional injuries and other damages and losses as described herein, entitling him to compensatory and special damages, including loss of past and future income and loss of earning capacity, loss of property, attorney's fees, and punitive damages, and causing him to continue to incur further economic or other special damages, in amounts to be established at trial.

885. Barry Morphew is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

**CLAIM TWO** : 42 U.S.C. § 1983 Due Process
– Fabrication of Evidence –
**Defendants Walker, Cahill, Graham, Duge, Rogers, Rohrich, Himschoot, Stanley, Lindsey, Hurlbert and Spezze**

886.   Mr. Morphew hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and relies upon them in setting forth this claim.

887.   In the manner described more fully above, Defendants Walker, Rohrich, Stanley, Lindsey, Spezze, Graham, and Cahill, individually, jointly, and in conspiracy with one another and/or with others unknown, acting under color of law and within the scope of their employment, knowingly or recklessly deprived Barry Morphew of his constitutional right to liberty and due process by fabricating (1) what became known as the "pushpin map" (or "pinpoint Google map") that fictitiously "documented" Barry Morphew's movements around his property on the afternoon of May 9, 2020, (2) the false report that Defendant Himschoot discovered a needle cover in the empty clothes dryer, (3) the false map supposedly revealing that Barry's car traveled near where Suzanne's bicycle helmet was found, and (4) the numerous falsities described in this Amended Complaint.

888.   In the manner described more fully above, Defendants Walker, Cahill, Graham, Rohrich, Himschoot, Hurlbert, Stanley, Lindsey and Spezze fabricated evidence and solicited false testimony implicating Mr. Morphew in the crime that

they knew was false; obtained Mr. Morphew's prosecution and incarceration using that false evidence; knowingly withheld exculpatory evidence and fabricated evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Mr. Morphew to effectuate his arrest, detention, and prosecution.

889.    Even though Defendants Walker, Cahill, Graham, Rohrich, Himschoot, Hurlbert, Stanley, Lindsey, Spezze, Duge and Rogers each had an affirmative duty to intervene to protect Barry Morphew and and prevent his constitutional rights from infringement by the others, and even though each had the opportunity to intervene and prevent the harm, each Defendant failed to take reasonable steps to intervene in other Defendants' unconstitutional conduct.

890.    Defendants' misconduct resulted directly in the unjust criminal detention and prosecution of Barry Morphew, thereby denying his constitutional right to be free of an unreasonable seizure as guaranteed by the Fourth Amendment and his right to substantive and procedural due process as guaranteed by the Fourteenth Amendment.

891.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in reckless disregard of the truth and Mr. Morphew's clear innocence.

892.    The misconduct described in this Count was committed not only by Defendants Stanley, Lindsey, Hurlbert, Cahill, Duge, Rogers, Graham, Spezze, Rohrich, Walker, and Himschoot acting in their individual capacities, but also by Defendant Spezze acting as a final policymaker and pursuant to the policy and practice of the CCSD and Chaffee County, Colorado as set forth in more detail in Claim Seven below (*Monell* Claim).

893.    As a proximate result of each Defendant's unlawful conduct, Barry Morphew was arrested, held in custody until he was able to bond out, and lived under bond conditions for over eleven months and suffered severe actual physical and emotional injuries and other damages and losses as described herein, entitling him to compensatory and special damages, including loss of past and future income and loss of earning capacity, loss of property, attorney's fees, and punitive damages, and causing him to continue to incur further economic or other special damages, in amounts to be established at trial.

894.    Barry Morphew is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## CLAIM THREE: 42 U.S.C. § 1983 Due Process
### – *Franks* Claim -
### Defendants Walker, Stanley, Lindsey, Cahill, Rohrich, Spezze, Himschoot, and Graham

895.   Barry Morphew hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and relies upon them in setting forth this claim.

896.   Defendants Stanley, Lindsey, Walker, Spezze, Himschoot, Graham, Cahill, and Rohrich individually, jointly, and in conspiracy with one another and/or with others unknown, acting under color of law and within the scope of their employment, deprived Barry Morphew of his constitutional rights under *Franks v. Delaware*, 438 U.S. 154 (1978) and the Fourth and Fourteenth Amendments by knowingly and intentionally, or with reckless disregard for the truth, causing false statements to be included in the Arrest Affidavit and causing exculpatory facts to be omitted; and, had they not done so, probable cause would have been vitiated or diluted.

897.   The misconduct described in this Count was committed not only by Defendants acting in their individual capacities, but also by Defendant Spezze acting as a final policymaker and pursuant to the policy and practice of the CCSD and Chaffee County, Colorado as set forth in more detail in Claim Seven below (*Monell* Claim).

898.   Even though Defendants Stanley, Lindsey, Walker, Spezze, Graham, Cahill, Himschoot and Rohrich each had an affirmative duty to intervene to protect Barry Morphew and prevent his constitutional rights from infringement by the

155

others, and even though each had the opportunity to intervene and prevent the harm, each Defendant failed to take reasonable steps to intervene in other Defendants' unconstitutional conduct.

899.   As a proximate result of each Defendant's unlawful conduct, Barry Morphew was arrested, held in custody until he was able to bond out, and lived under bond conditions for over eleven months and suffered severe actual physical and emotional injuries and other damages and losses as described herein, entitling him to compensatory and special damages, including loss of past and future income and loss of earning capacity, loss of property, attorney's fees, and punitive damages, and causing him to continue to incur further economic or other special damages, in amounts to be established at trial.

900.   Barry Morphew is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## CLAIM FOUR: 42 U.S.C. § 1983
### – Conspiracy –
### Defendants Stanley, Lindsey, Hurlbert, Cahill, Duge, Rogers, Graham, Spezze, Rohrich, Walker, and Himschoot

901.   Barry Morphew hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and relies upon them in setting forth this claim.

902.   Defendants Stanley, Lindsey, Hurlbert, Cahill, Duge, Rogers, Graham,

Spezze, Rohrich, Walker, and Himschoot, individually, jointly, and in conspiracy with one another and/or with others unknown, acting under color of law and within the scope of their employment, conspired among and between themselves and took overt acts in furtherance of a conspiracy to deprive Barry Morphew of his due process rights and his right to be free from seizure, incarceration, deprivation of property and restrictions on liberty, to fabricate evidence against him, to manipulate witness testimony, to suppress, conceal and omit exculpatory evidence, to falsify charges, to commit the misconduct described in this Complaint, and to conceal the knowing and reckless misconduct and to protect one another from liability for depriving Barry Morphew of his constitutional rights.

903.   In so doing, these Defendants conspired to accomplish an unlawful purpose by unlawful means.

904.   In furtherance of their conspiracy, Defendants Stanley, Lindsey, Hurlbert, Cahill, Duge, Rogers, Graham, Spezze, Rohrich, Walker, and Himschoot each committed overt acts and were otherwise willful participants in joint activity towards the common objective of causing Barry Morphew to be arrested and prosecuted for murder without probable cause

905.   The misconduct of Defendants Stanley, Lindsey, Hurlbert, Cahill, Duge, Rogers, Graham, Spezze, Rohrich, Walker, and Himschoot was objectively

unreasonable and was undertaken maliciously and willfully, with reckless indifference to the rights of others and in total disregard of the truth and Mr. Morphew's innocence.

906.    This conspiracy spanned from approximately May 2020 and continues today.

907.    Even though Defendants Stanley, Lindsey, Hurlbert, Cahill, Duge, Rogers, Graham, Spezze, Rohrich, Walker, and Himschoot each had an affirmative duty to intervene to protect Barry Morphew and and prevent his constitutional rights from infringement by the others, and even though each had the opportunity to intervene and prevent the harm, each Defendant failed to take reasonable steps to intervene in other Defendants' unconstitutional conduct or to prevent the conspiracy and/or its overt acts.

908.    The misconduct described in this Count was committed not only by Defendants Stanley, Lindsey, Hurlbert, Cahill, Duge, Rogers, Graham, Spezze, Rohrich, Walker, and Himschoot acting in their individual capacities, but also by Defendant Spezze acting as a final policymaker and pursuant to the policy and practice of the CCSD and Chaffee County, Colorado as set forth in more detail in Claim Seven below (*Monell* Claim).

909.    As a proximate result of each Defendant's unlawful conduct, Barry

Morphew was arrested, held in custody until he was able to bond out, and lived under bond conditions for over eleven months and suffered severe actual physical and emotional injuries and other damages and losses as described herein, entitling him to compensatory and special damages, including loss of past and future income and loss of earning capacity, loss of property, attorney's fees, and punitive damages, and causing him to continue to incur further economic or other special damages, in amounts to be established at trial.

910.   Barry Morphew is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

### CLAIM FIVE: 42 U.S.C. § 1983
**– Failure to Intervene –**
**Defendants Stanley, Lindsey, Hurlbert, Cahill, Duge, Rogers, Graham, Spezze, Rohrich, Walker, and Himschoot**

911.   Barry Morphew hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and relies upon them in setting forth this claim.

912.   Defendants Stanley, Lindsey, Hurlbert, Cahill, Duge, Rogers, Graham, Spezze, Rohrich, Walker, and Himschoot, together with other persons presently unknown, had an affirmative duty to intervene to protect Mr. Morphew and and prevent his constitutional rights from infringement by the others.

913.   Each Defendant violated the affirmative duty to intervene to protect

the constitutional rights of citizens from infringement by other persons acting under color of state law. During the constitutional violations described herein, all Defendants stood by without intervening to prevent the violation of Mr. Morphew's constitutional rights, even though each had the knowledge and an opportunity to do so.

914.   Each Defendant's failure to intervene was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the violation of Mr. Morphew's constitutional rights.

915.   The misconduct described in this Count was committed not only by Defendants acting in their individual capacities, but also by Defendant Spezze as a final policymaker and pursuant to the policy and practice of the CCSD,, and Chaffee County, Colorado as set forth in more detail in Claim Seven below (*Monell* Claim).

916.   As a proximate result of Defendants' unlawful conduct, Mr. Morphew was arrested, held in custody until he was able to bond out, and lived under bond conditions for over eleven months and suffered severe actual physical and emotional injuries and other damages and losses as described herein, entitling him to compensatory and special damages, including loss of past and future income and loss of earning capacity, loss of property, attorney's fees, and punitive damages, and causing him to continue to incur further economic or other special damages, in

amounts to be established at trial.

917.   Barry Morphew is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## CLAIM SIX: 42 U.S.C. § 1983
### – Reckless Investigation –
### Defendants Cahill, Duge, Rogers, Graham, Rohrich, Walker, Himschoot, Stanley, Lindsey, and Hurlbert

918.   Barry Morphew hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and relies upon them in setting forth this claim.

919.   Although Defendants knew or should have known that Mr. Morphew was not involved in the disappearance of Suzanne, they conducted a reckless investigation, coerced false and misleading statements, fabricated evidence, concealed exculpatory information from judges and prosecutors, placed false statements in reports and Affidavits, made false statements in conversations with prosecutors, and in pretrial testimony, suppressed the exculpatory evidence that they had engaged in such wrongdoing, disregarded, concealed, and withheld evidence indicating that Mr. Morphew was innocent and evidence pointing to other leads or suspects, and knowingly, recklessly and with reckless disregard for Mr. Morphew's innocence and constitutional rights committed the acts described in this Complaint.

920.   These fraudulent, outrageous, and egregious acts robbed Barry Morphew of fundamental fairness in the investigation, prosecution, and pretrial proceedings to a degree that shocks the conscience, violating Mr. Morphew's clearly-established constitutional right to substantive due process of law as guaranteed by the Fourteenth Amendment and causing him the injuries and damages set forth in this Complaint, to the magnitude of potential and actual harm that is truly conscience shocking.

921.   Even though each Defendant had an affirmative duty to intervene to protect Mr. Morphew and and prevent his constitutional rights from infringement by the others, and even though each had the opportunity to intervene and prevent the harm, each Defendant failed to take reasonable steps to intervene in other Defendants' unconstitutional conduct.

922.   The misconduct described in this Count was committed not only by Defendants acting in their individual capacities, but also by Defendant Spezze acting as a final policymaker and pursuant to the policy and practice of the CCSD, and Chaffee County, Colorado as set forth in more detail in Claim Seven below (*Monell* Claim).

923.   As a proximate result of Defendants' unlawful conduct, Mr. Morphew was arrested, held in custody until he was able to bond out, and lived under bond

conditions for over eleven months and suffered severe actual physical and emotional injuries and other damages and losses as described herein, entitling him to compensatory and special damages, including loss of past and future income and loss of earning capacity, loss of property, attorney's fees, and punitive damages, and causing him to continue to incur further economic or other special damages, in amounts to be established at trial.

924.   Barry Morphew is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

**CLAIM SEVEN: 42 U.S.C. § 1983 –** *Monell*
***Final Policymaker, Ratification, Unconstitutional Official Policy and Failure to Supervise and Train***
**Against Chaffee County, Board of County Commissioners of Chaffee County, CCSD, and Defendant Spezze acting in his official capacity**

925.   Barry Morphew hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and relies upon them in setting forth this claim.

### A.    Failure to Train and Supervise

926.   Defendants Chaffee County, Board of County Commissioners of Chaffee County, CCSD, and Defendant Spezze acting in his official capacity ("the Monell defendants") each have duties to train and supervise officers, investigators, and other personnel.

927.   The Monell defendants all intentionally and/or recklessly and with

deliberate indifference to the constitutional rights of citizens, failed to ensure through custom, policy, practice, training, and supervision that officers and personnel would conduct constitutionally adequate investigations; not fabricate inculpatory evidence; ensure that suspects would not be maliciously prosecuted; ensure that applications for arrest warrants would not contain false and misleading information and/or omit exculpatory information; disclose to prosecutors and courts material information favorable to criminal defendants; follow the duties imposed by *Franks v. Delaware*; conduct appropriate testing and properly handle, process, analyze, and report forensic evidence; not utilize forensic evidence in a false and reckless manner in criminal investigations and prosecutions, intervene to prevent constitutional violations and ensure that their personnel would not conspire to do any of the above.

928.    Defendants Chaffee County, Board of County Commissioners of Chaffee County, and Defendant Spezze acting in his official capacity, and the CCSD and/or other final policymakers had actual or constructive notice of such failures to train, supervise, and provide policy to their employees, and failed to provide training or supervision despite an obvious need that such training and supervision was required, where Defendants knew that it was foreseeable that officers and personnel would predictably confront these situations and as a result of

164

the failure to train and supervise, constitutional violations would result.

### B.    Policy or Custom

929.    The *Monell* defendants through their final policymakers developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of Barry Morphew, which caused the violation of his rights as described in this Complaint.

930.    Mr. Morphew's injuries were caused by the policies, practices, and customs of the Monell defendants in that final policymakers, officers, agents and other personnel of the CCSD, Board of County Commissioners of Chaffee County and Chaffee County regularly failed to disclose exculpatory evidence to prosecutors and defendants, fabricated false evidence implicating criminal defendants in criminal conduct, pursued wrongful prosecutions through profoundly flawed investigations, and otherwise violated due process and the Fourth Amendment in a similar manner to that alleged herein.

931.    The above-described widespread practices, which were so well-settled as to constitute the de facto policy of the CCSD, Board of County Commissioners of Chaffee County, and Defendant Spezze acting in his official capacity and Chaffee County, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the risk that these policies, practices,

and customs would lead to the violation of citizens' constitutional rights, effectively ratified the conduct, and declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers, agents, and personnel who withheld material evidence, fabricated false evidence and witness testimony, conducted reckless investigations, inserted into Affidavits for Arrest and Search Warrants false and misleading information while omitting exculpatory information, and pursued wrongful prosecutions.

932.    The *Monell* defendants had been warned on numerous occasions by witnessing sanctions entered in many cases throughout the Eleventh Judicial District Court that their practices were unconstitutional and in need of correction.

### C.    Ratification

933.    Defendant Spezze ratified and authorized the misconduct and reckless investigation that caused violation of Barry Morphew's constitutional rights described in this Complaint. Defendant Spezze did this by explicitly and directly engaging in the misconduct and observing the misconduct of his subordinates, including Defendants Rohrich, Himschoot, and Walker, yet made the conscious decision to not sanction or correct the behavior but instead to ratify, endorse, and approve it. He drafted and approved the false and misleading arrest affidavit and even held a press conference to approve of the investigation.

934.   Defendant Spezze's ratification constituted the official policy of Chaffee County, Board of County Commissioners of Chaffee County and CCSD.

**D.     Misconduct by Sheriff Spezze as a Final Policymaker**

935.   Barry Morphew was deprived of his constitutional rights as described in this Complaint by the acts and omissions of Defendant Spezze acting in his official capacity as a final policymaker, when Spezze conducted the investigation and conspired with others to prosecute Barry Morphew knowing that there was not probable cause, to insert false and misleading statements in the Arrest Affidavit, and to omit exculpatory evidence and information as described throughout this Complaint. These actions were all within his sphere of authority.

**E.     Proximate Cause of Damages**

936.   As a proximate result of Defendants' unlawful conduct, Barry Morphew was arrested, held in custody until he was able to bond out, and lived under bond conditions for over eleven months and suffered severe actual physical and emotional injuries and other damages and losses as described herein, entitling him to compensatory and special damages, including loss of past and future income and loss of earning capacity, loss of property, attorney's fees, and punitive damages, and causing him to continue to incur further economic or other special damages, in amounts to be established at trial.

937.   Barry Morphew is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## STATE LAW CLAIM

### CLAIM EIGHT: Malicious Prosecution (state law)
### Colo. Rev. Stat. § 13-21-131 – Violation of Colo. Const. Art. II, Section 7 (Unlawful Seizure), Section 25 (due process), Section 3 (inalienable rights) Defendants Spezze, Rohrich, Walker, and Himschoot

938.   Mr. Morphew hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and relies upon them in setting forth this claim.

939.   At all times relevant to the allegations in this Complaint, Barry Morphew had the clearly established constitutional right to be free from malicious prosecution. Any reasonable law enforcement officer, including Defendants in this case, knew or should have known of these rights.

940.   Defendants violated Barry Morphew's rights under the Colorado Constitution (Article II, sections 3, 7, and 25) to be free from malicious prosecution without probable cause when they, among other things: (1) fabricated evidence; (2) manipulated witness testimony; (3) suppressed exculpatory evidence; (4) omitted exculpatory evidence, (5) lied in the Arrest Affidavit, (6) falsified charges in order to arrest and prosecute Barry Morphew without probable cause, resulting in his unlawful confinement and continued prosecution, and (7) concealed their misconduct and that of others.

941.   All charges against Barry Morphew were dismissed on April 19,
2022.

942.   The conduct of Defendants was malicious, shocking, and objectively
unreasonable considering the circumstances.

943.   The actions of each of Defendants Spezze, Rohrich, Walker, and
Himschoot were instrumental in Mr. Morphew's confinement and prosecution.

944.   Defendants Spezze, Rohrich, Walker, and Himschoot engaged in a
collective plan or effort to seize and prosecute Barry Morphew, and continue a
prosecution against him without probable cause, or alternatively, each Defendant
failed to take reasonable steps to intervene in the other Defendants' unlawful seizure
and prosecution, and continued prosecution  of Mr. Morphew, despite being in a
position and having the opportunity to do so. Each is therefore liable for the
damages resulting from the objectively unlawful and unreasonable arrest and
seizure and continued prosecution of Barry Morphew.

945.   Defendants Spezze, Rohrich, Walker, and Himschoot reached an
explicit or implicit understanding, engaged in a course of conduct, acted in concert,
and/or otherwise conspired among themselves to deprive Barry Morphew of his
constitutional rights, including the right to be free from seizure based on false
statements or omissions of material statements of fact. Each acted to advance a clear

common goal and/or implicitly agreed to conceal material information from important decision-makers regarding Barry Morphew's confinement and prosecution.

946.    Defendants Spezze, Rohrich, Walker, and Himschoot intentionally subjected or caused Barry Morphew to be subjected to the deprivation of individual rights secured by the bill of rights of the Colorado Constitution. In the alternative, they did so recklessly.

947.    The acts or omissions of the Defendants Spezze, Rohrich, Walker, and Himschoot were the proximate cause of injuries sustained by Barry Morphew.

948.    A reasonable person in each of these Defendants' positions would know that Barry Morphew's state constitutional rights were being violated and that he was being subjected to the violations and damages outlined in this Complaint.

949.    Each of these Defendants had an affirmative duty to intervene to protect Barry Morphew and and prevent his constitutional rights from infringement by the others. Defendants Spezze, Rohrich, Walker, and Himschoot each had the opportunity to intervene and prevent the harm but failed to take reasonable steps to intervene in other Defendants' unconstitutional conduct.

950.    The acts or omissions of Defendants Spezze, Rohrich, Walker, and Himschoot deprived Barry Morphew of his constitutional and statutory rights and

caused him severe damages.

951.   Defendant Sheriff Spezze is liable for the acts and omissions of Defendants Rohrich, Himschoot, and (while he was employed at CCSD) Defendant Walker, who were acting within the scope and course of their employment.

952.   Defendant Linda Stanley is liable for the acts and omissions of Defendant Walker while he was employed by the EJDAO, who was acting within the scope and course of his employment.

953.   The conduct described herein of Defendants Spezze, Rohrich, Walker, and Himschoot was attended by circumstances of malice, or willful and wanton conduct, which each of these Defendants must have realized was done heedlessly and recklessly, without regard to the consequences, or of the rights of others, particularly Mr. Morphew.

954.   As a proximate result of the unlawful conduct of Defendants Spezze, Rohrich, Walker, and Himschoot, Barry Morphew was arrested, held in custody until he was able to bond out, and lived under bond conditions for over eleven months and suffered severe actual physical and emotional injuries and other damages and losses as described herein, entitling him to compensatory and special damages, including loss of past and future income and loss of earning capacity, loss of property, attorney's fees, and punitive damages, and causing him to continue to

incur further economic or other special damages, in amounts to be established at trial.[15]

955.   Barry Morphew is further entitled to attorney's fees and costs pursuant to § 13-21-131(3), C.R.S., as well as prejudgment interest and postjudgment interest as provided by law.

## NOTICE OF CLAIM

956.   The "Colorado Governmental Immunity Act", article 10 of title 24, does not apply to claims brought pursuant to § 13-21-131, C.R.S. *See id.*, subsection (2)(a).

957.   Nonetheless, Mr. Morphew filed a Notice of Claim on all Defendants on or about October 18, 2021, within 182 days of the events complained of herein. More than 90 days have elapsed since the filing of the Notice of Claim, and adjustment or payment thereof has been neglected or refused.

## VII.   REQUEST FOR RELIEF

958.   Barry Morphew requests that this Court enter judgment for him and against Defendants and that said judgment grants:

A.      Compensatory and punitive damages, including damages for

---

[15] Mr. Morphew seeks declaratory and injunctive relief against Defendant Chaffee County Sheriff's Office.

emotional distress, humiliation, loss of enjoyment of life, loss of future business earnings, and other pain and suffering on all claims allowed by law in the amounts detailed below or such greater amount as may be set by a jury;

B.      Economic losses on all claims allowed by law in the amounts detailed below or such greater amount as may be set by a jury;

C.      Special damages and/or injunctive relief, including but not limited to, requiring that the Chaffee County Sheriff's Department have required training and oversight of the Sheriff and the Deputies and other personnel so as to prevent similar decisions being made in the future that results in the violations of individuals' constitutional rights and conspiracies to do so;

D.      Special damages and/or injunctive relief, including but not limited to, requiring that the Chaffee County Sheriff's Department have required training and oversight of the Sheriff and the Deputies and other personnel so as to prevent similar decisions being made in the future that results in the violations of individuals' constitutional rights and conspiracies to do so;

E.      Pre- and post-judgment interest at the lawful rate; and

F.     Damages to date are estimated to be Fifteen Million ($15,000,000) to include all categories listed above.

G.     Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

H.     Any further relief that this court deems just and proper, and any other appropriate relief at law and equity.

## VIII.  <u>DEMAND FOR A TRIAL BY JURY</u>

959.   Barry Morphew demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues and every claim herein.

DATED this 4th day of December, 2024.
Denver, Colorado

<u>/s/ Jane Fisher Byrialsen</u>
Jane Fisher-Byrialsen, #49133
David Fisher, # 48253
Fisher & Byrialsen, PLLC
4600 South Syracuse St., 9th Floor,
Denver, Colorado 80237
(303) 256-6345
Jane@FBlaw.org

<u>/s/ Hollis Whitson</u>
Hollis Whitson, #32911
Eric Samler, #32349
Samler and Whitson, PC
1600 Stout Street, Suite 1400
Denver, CO 80202
(303)670-0575
Hollis@samlerandwhitson.com

174

_/s/ Iris Eytan_

Iris Eytan
Eytan Law
2701 Lawrence St, Ste 108
Denver, CO 80205
(720) 440-8155
iris@eytanlawfirm.com

_ATTORNEYS FOR PLAINTIFF BARRY LEE MORPHEW_